**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

_____

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.  19-cv-809 |
| BLUEPOINT INVESTMENT COUNSEL, LLC, MICHAEL G. HULL, CHRISTOPHER J. NOHL, CHRYSALIS FINANCIAL LLC, and GREENPOINT ASSET MANAGEMENT II LLC, | ) ) ) ) ) ) ) | JURY DEMANDED |
| Defendants. | ) ) | |

_____

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission (the "SEC"), alleges as follows:

### Introduction

1.      Michael G. Hull ("Hull") and his entity, Greenpoint Asset Management II LLC, and Christopher J. Nohl ("Nohl") and his entity, Chrysalis Financial LLC, perpetrated an offering fraud.  Hull and Nohl through their entities manage Greenpoint Tactical Income Fund LLC ("Greenpoint Tactical Income Fund" or the "Fund").  From April 25, 2014 to June 2019, Hull, Nohl, and their entities raised approximately $52.783 million from approximately 129 investors in 10 states.

2.      Hull is also the co-owner of Bluepoint Investment Counsel, LLC ("Bluepoint"), a now de-registered investment adviser that claimed to have as much as $145 million in assets under management.  Bluepoint through Hull recommended that all of Bluepoint's individual clients

1

invest in the Greenpoint Tactical Income Fund and other affiliated Greenpoint Funds. Hull made these recommendations without regard for each individual investor's needs and circumstances.

3.      Hull, Nohl, and their entities are investment advisers to Greenpoint Tactical Income Fund and owe fiduciary duties to the Fund including a duty of loyalty.

4.      In the offering materials for Greenpoint Tactical Income Fund, Hull, Nohl, and their entities made false and misleading statements to the investors. Hull, Nohl, and their entities have represented to investors that Greenpoint Tactical Income Fund is an "income" fund. However, the Fund's holdings are almost entirely non-income-generating and illiquid assets. As of June 30, 2018—the last date for which the Fund has financial statements—52% of the Fund's purported value is its gem and mineral collection and 46% of the Fund's purported value is a portfolio of debt and equity securities of private companies, primarily consisting of a now defunct and worthless environmental remediation company ("Private Company 1").

5.      According to the Fund, as of June 30, 2018, it had a net asset value of $135 million based almost entirely on unrealized gains. Indeed, 95% of the purported gains are unrealized. These gains are largely fictitious.

6.      Hull, Nohl, and their entities have misled the investors as to how they have been operating the Fund and valuing its assets.

7.      For 2014, Hull, Nohl, and their entities claim that Greenpoint Tactical Income Fund had a return on investment of 65.68%. For 2015, they claim that the Fund had a return on investment of "just in excess of 50%." For 2016, they claim that the Fund had a return on investment of 25.48%. For the first two quarters of 2018, they claim that the Fund had a return on investment of 16.11%. The purported returns come from Hull and Nohl improperly inflating the value of Private Company 1 and from the valuations of the gems and minerals that, amongst other

things, failed to comply with the minimal valuation procedures contained in the Fund's operating agreements.

8.      Hull, Nohl, and their entities initially valued the Fund's interest in Private Company 1 at over $4.2 million as of December 31, 2015 and increased the value of the Fund's interest to over $46 million as of June 30, 2018.  Hull, Nohl, and their entities more than doubled the value from the fourth quarter of 2017 to the first quarter of 2018 while knowing that the primary subsidiary of Private Company 1 was in default on a line of credit secured by all of the subsidiary's assets and guaranteed by Private Company 1.  Private Company 1 is now defunct and worthless.

9.      Hull, Nohl, and their entities used their misleading and improperly determined valuations to charge the Fund excessive management and other fees and payments.  From April 25, 2014 through approximately the first quarter of 2019, they charged the Fund approximately $13.71 million in fees and payments.  Since 2017, Hull, Nohl, and their entities have charged the Fund more than $5.9 million.  At the same time, many investors have been told the Fund has no liquidity to meet investor redemption requests.  Hull, Nohl, and their entities continue to sell interests in the Fund, the proceeds of which are largely used to pay their management fees, repay debt, and to pay some investor redemptions.

10.     Additionally, Hull, Nohl, and their entities have unlawfully enriched themselves at the expense of investors by engaging in undisclosed self-dealing and related party transactions. After paying management fees, Greenpoint Tactical Income Fund has frequently lacked cash to pay its obligations and make investments including paying its funding commitments to Private Company 1 and making installment payments on minerals the Fund purchased.  Hull and Nohl made numerous short-term loans to the Fund.  For a number of the loans, Hull and Nohl charged the Fund interest exceeding 100% annual percentage rate.  Hull and Nohl also caused the Fund to

borrow money from investors in the Fund.  Hull, Nohl, and their entities did not disclose these loans, which were related party transactions, to the Fund's investors or auditor.

11.     Moreover, Hull, Nohl, and their entities represented to the Fund's investors and auditor that the gem and mineral valuations were determined in an objective manner; that the appraisers were independent; and that the gems and minerals were valued at the purchase price during the year they were acquired.  To the contrary, Nohl repeatedly interfered in the appraisals of the gems and minerals owned by the Fund in order to obtain and report higher values and thereby obtain higher management fees.  Nohl's interference includes purchasing minerals from an appraiser contemporaneously with the appraiser appraising the Fund's gems and minerals; leaning on appraisers to assign higher appraised values; rejecting appraisals he deemed too low and instead using older, higher appraised values; and cherry-picking higher appraised values.  Also, Hull and Nohl acted in violation of the Fund's operating agreement by not using the purchase prices as the value of the gems and minerals during the year the Fund acquired them.

## Jurisdiction And Venue

12.     The SEC brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)], Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)], and Section 209(d) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-9(d)].  This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa], and Section 214(a) of the Advisers Act [15 U.S.C. § 80b-14(a)].

13.     Venue is proper in the Western District of Wisconsin pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa], and Section 214(a) of the Advisers Act [15 U.S.C. § 80b-14(a)] because Defendant Bluepoint

Investment Counsel's office and Defendant Greenpoint Asset Management II's office are in this District and the acts, practices, and courses of business constituting the violations alleged in this Complaint have occurred within this District and elsewhere.

## **Defendants**

14.     **Michael G. Hull ("Hull")** is a resident of Oconomowoc, Wisconsin.  He was a Principal and investment adviser representative of Bluepoint Investment Counsel, LLC from June 2012 through March 2019.  Hull, through various entities, is co-manager of Greenpoint Tactical Income Fund, Greenpoint Global Mittelstand Fund I, and Greenpoint Fine Art Fund. He previously held Series 3, 6, 7, 63, and 65 licenses and was a registered representative and investment advisory representative of several firms.  He is 51 years old.

15.     **Christopher J. Nohl ("Nohl")** is a resident of Milwaukee, Wisconsin.  Nohl, through Chrysalis Financial LLC, is co-manager of the Greenpoint Tactical Income Fund.  He is 44 years old.

16.     **Bluepoint Investment Counsel, LLC ("Bluepoint")** is a Wisconsin limited liability company.  Bluepoint's principal place of business is in Madison, Wisconsin.  Bluepoint is owned by Michael Hull and his brother.  Bluepoint is controlled by Hull.  Bluepoint was registered with the SEC as an investment adviser from June 2012 through March 2019. Bluepoint is no longer registered with the Commission or any state as an investment adviser.  In its most recent Form ADV, dated March 30, 2018, Bluepoint reported 162 accounts and $124.5 million in assets under management.

17.     **Chrysalis Financial LLC ("Chrysalis")** is a Wisconsin limited liability company located in Milwaukee, Wisconsin.  Chrysalis is owned and controlled by Nohl. Chrysalis is one of two Managing Members of Greenpoint Tactical Income Fund.

18.     **Greenpoint Asset Management II LLC ("Greenpoint Management II")** is a Wisconsin limited liability company.  Greenpoint Management II's principal place of business located in Madison, Wisconsin.  Greenpoint Management II is owned by Greenpoint Asset Management LLC, which is owned by Hull and his brother.  Greenpoint Management II is controlled by Hull.  Greenpoint Management II is one of two Managing Members of Greenpoint Tactical Income Fund.

19.     Hull, Nohl, Bluepoint, Chrysalis, and Greenpoint Management II are collectively referred to as the "Defendants."

20.     The Defendants, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a national securities exchange in connection with the acts, practices, and courses of business alleged in this Complaint.

21.     There is a reasonable likelihood that the Defendants will, unless enjoined, continue to engage in the transactions, acts, practices, and courses of business set forth in this Complaint, and transactions, acts, practices and courses of business of similar purport and object.

22.     By engaging in the conduct alleged in this Complaint, Hull violated Sections 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2), and (3)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b), and (c) thereunder [17 C.F.R. 240.10b-5(a), (b), and (c)]; and Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C §§ 80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]. Pursuant to Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)], Hull also aided and abetted Bluepoint's and Greenpoint Management II's violations of Sections 206(1) and 206(2) of the

Advisers Act and Greenpoint Management II's violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

23.     By engaging in the conduct alleged in this Complaint, Nohl violated Sections 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2), and (3)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b), and (c) thereunder [17 C.F.R. 240.10b-5(a), (b), and (c)]; and Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C §§ 80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]. Pursuant to Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)], Nohl also aided and abetted Chrysalis' violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

24.     By engaging in the conduct alleged in this Complaint, Bluepoint violated Sections 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2), and (3)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b), and (c) thereunder [17 C.F.R. 240.10b-5(a), (b), and (c)], and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C §§ 80b-6(1), 80b-6(2)].

25.     By engaging in the conduct alleged in this Complaint, Chrysalis violated Sections 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2), and (3)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b), and (c) thereunder [17 C.F.R. 240.10b-5(a), (b), and (c)]; and Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

26.     By engaging in the conduct alleged in this Complaint, Greenpoint Management II violated Sections 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2), and (3)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b), and (c) thereunder

[17 C.F.R. 240.10b-5(a), (b), and (c)]; and Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## Other Relevant Entities

27.     **Greenpoint Tactical Income Fund LLC ("Greenpoint Tactical Income Fund" or the "Fund")** is a Wisconsin limited liability company with its principal place of business in Madison, Wisconsin.  Greenpoint Tactical Income Fund is a private investment fund managed by Greenpoint Management II, Chrysalis, Hull, and Nohl.  The Fund has a stated investment strategy of "generating a strong, stable balance of current cash flow and capital gains."

28.     **Greenpoint Global Mittelstand Fund I LLC ("Greenpoint Global Mittelstand Fund")** is a Wisconsin limited liability company with its principal place of business in Madison, Wisconsin.  Greenpoint Global Mittelstand Fund is managed by Hull and two other individuals.  It has a stated investment strategy of investing in Korean companies.  As of December 31, 2016, Greenpoint Global Mittelstand Fund claimed it had net assets of approximately $4.1 million.

29.     **Greenpoint Fine Art Fund LLC ("Greenpoint Fine Art Fund")** is a Wisconsin limited liability company with its principal place of business in Madison, Wisconsin.  Greenpoint Fine Art Fund is managed by Hull and two other individuals.  It has a stated strategy of investing in artwork.  As of December 31, 2016, Greenpoint Fine Art Fund claimed it had net assets of approximately $4.3 million.

30.     **GP Chemical LLC ("GP Chemical")** is a wholly owned subsidiary of Greenpoint Tactical Income Fund.  It is a Wisconsin limited liability company.  GP Chemical is the entity that holds securities issued by Private Company 1 and purchased by the Fund.

31.     **GP Rare Earth Trading Account LLC ("GP Rare Earth")** is a wholly owned

subsidiary of Greenpoint Tactical Income Fund.  It is a Wisconsin limited liability company.  GP Rare Earth is the entity that holds the gems and minerals.

32.     **H Informatics LLC ("H Informatics")** is owned by Hull and an investor in Greenpoint Tactical Income Fund.  On or about January 1, 2018, the managers of the Fund retained H Informatics to provide information to the Fund's investors.  The Fund has paid and continues to pay H Informatics a fee of 0.85% of the Fund's net assets.

33.     **Alt Asset Portfolio Services LLC ("Alt Asset Portfolio Services")** is owned by Hull and Nohl.  The accountant for Greenpoint Tactical Income Fund was employed by Alt Asset Portfolio Services.

I.     **FACTS**

A.     **Hull Created The Greenpoint Funds After He Was Terminated By Another Firm**

34.     In June 2012, Hull co-founded Bluepoint following his termination by another investment advisory firm.  At all relevant times, Hull has controlled and continues to control Bluepoint.  In 2013, Hull created a series of private investment funds, including Greenpoint Tactical Income Fund, Greenpoint Global Mittelstand Fund, and Greenpoint Fine Art Fund (collectively, the "Greenpoint Funds").

35.     Greenpoint Tactical Income Fund is the largest of the Greenpoint Funds. Greenpoint Tactical Income Fund's most recent financial statements are for the quarter ended June 30, 2018.  Those financial statements have not been audited.  From its inception date of February 2, 2013 through June 30, 2018, the Fund reported gains of approximately $93 million.  Over 95% of these reported gains were unrealized gains based on the Defendants' improper valuations described throughout the Complaint.

36.     As of June 30, 2018, Greenpoint Tactical Income Fund reported assets with a cost

basis of $40.1 million and a fair market value of $135.3 million.  These purported remarkable

returns were derived primarily from two sources.  The Fund reported that as of June 30, 2018, its

collection of gems and minerals was worth $68.3 million, composed of $21.9 million in original

cost and $46.4 million in unrealized gains.  The Fund also reported that its shares in Private

Company 1 were worth $46.2 million, similarly composed of $9 million in original cost and $37.2

million in unrealized gains.

  37. Hull, Nohl, Chrysalis, and Greenpoint Management II have portrayed Greenpoint

Tactical Income Fund as an "income" fund.  A fact sheet distributed to the investors entitled

"Income Strategy Q4 2015" states that the Fund:

> Seeks to Provide total return through a combination of current income, capital
> gains, and capital appreciation.

> Invests primarily in assets that produce investment return through interest
> payments, trading profits, or operational cash flow.

> Takes positions in operating businesses for cash flow, but also to secure the lending
> opportunities related to the company.

  38. Contrary to these representations, the Fund's holdings are almost entirely non-

income-generating and illiquid assets.

  39. At all relevant times, Bluepoint has been an investment adviser, and Hull has been

an investment adviser representative of Bluepoint.  As an investment adviser, Bluepoint advises

others on investing in securities in exchange for compensation.  Bluepoint through Hull

recommended to all of Bluepoint's individual clients that they invest in the Greenpoint Funds.

Hull made these recommendations without regard for the individual investor's needs and

circumstances.  Hull recommended to the majority of Bluepoint's individual clients that they invest

all assets managed by Bluepoint in the Greenpoint Funds.

  40. Hull and, through him, Bluepoint made verbal false and misleading representations

to Bluepoint's individual clients.  Hull falsely stated that investments in Greenpoint Tactical

Income Fund (1) were safe, (2) would generate high returns, and (3) could be withdrawn as

needed.  These were material misrepresentations and omissions by Hull and Bluepoint because the

investments were not safe and the reported returns were inflated.  Furthermore, the investors' funds

could not be withdrawn as needed.  Redemption requests by investors have been delayed or

unfulfilled, and when they are fulfilled, it is when funds are received from new investors.

41.     Hull also falsely represented to Bluepoint's clients that Greenpoint Tactical Income

Fund was actively selling minerals and often had arranged a sale of the mineral before the Fund

even committed to purchase the mineral.  Greenpoint Tactical Income Fund did not often have

sales arranged before even committing to a purchase.

42.     Bluepoint and Hull had ultimate authority over the referenced representations

because Bluepoint is the investment advisory firm and Hull was the investment adviser for the

investors and signed the investment management agreements as Bluepoint's director.

43.     Hull convinced some investors to invest their entire life savings in the Greenpoint

Funds.  These investors include people on fixed incomes, older individuals, and others for whom

risky illiquid investments were not appropriate.  Hull also convinced the board of directors of a

small public library to invest in the Greenpoint Funds.

44.     Hull and Bluepoint obtained money by means of the false statements and omissions

because the investors paid 1% of assets under management to Bluepoint.  Hull received a portion

of the management fees because he controls Bluepoint and co-owns it.

**B.      Chrysalis, Greenpoint Management II, Hull, and Nohl Are Investment
         Advisers To Greenpoint Tactical Income Fund**

45.     Greenpoint Tactical Income Fund is managed by two managing members, namely

Chrysalis and Greenpoint Management II.  Chrysalis and Greenpoint Management II have received

and continue to receive management fees from Greenpoint Tactical Income Fund.

46.     Chrysalis is controlled and owned by Nohl.

47.     Greenpoint Management II is controlled by Hull and co-owned by Hull.

48.     Hull and Nohl jointly make investment decisions for Greenpoint Tactical Income Fund.  The investment decisions include, but are not limited to, determining whether Greenpoint Tactical Income Fund would purchase, hold, and sell securities in the form of distressed commercial notes and stocks and notes issued by private companies.  The Fund invested in such securities.

49.     Nohl is primarily responsible for operations of the Fund.  Hull is primarily responsible for dealing with investors in the Fund and locating new investors for the Fund.

50.     Because of their ownership of Chrysalis and Greenpoint Management II respectively, Nohl and Hull have received and continue to receive a portion of the management fees and incentive fees the Fund pays to Chrysalis and Greenpoint Management II as well as of other payments to other entities owned and controlled by Hull and Nohl.

51.     As Greenpoint Tactical Income Fund's managing members, Chrysalis and Greenpoint Management II are investment advisers to Greenpoint Tactical Income Fund.  As owners of the managing member entities, Hull and Nohl are investment advisers to Greenpoint Tactical Income Fund.

52.     Hull is also an investment adviser to Greenpoint Tactical Income Fund because he effectively controls Greenpoint Management II.

53.     Nohl is also an investment adviser to Greenpoint Tactical Income Fund because he controls Chrysalis.

54.     Hull also received compensation from Greenpoint Tactical Income Fund in the

form of a $265,000 loan from the Fund on August 22, 2013 at a favorable interest rate. Nohl also received compensation from Greenpoint Tactical Income Fund in the form of a purported $7,424 origination and underwriting fee on the loan from the Fund to Hull.

55.     As an investment adviser to Greenpoint Tactical Income Fund, Hull owes fiduciary duties including the duty of loyalty to the Fund.

56.     As an investment adviser to Greenpoint Tactical Income Fund, Nohl owes fiduciary duties including the duty of loyalty to the Fund.

57.     Hull through Greenpoint Asset Management V, LLC is an investment adviser to Geenpoint Global Mittelstand Fund. Hull through Greenpoint Asset Management IV, LLC is also an investment adviser to Greenpoint Fine Art Fund. As an investment adviser to these funds, Hull owes fiduciary duties including the duty of loyalty to the funds.

**C.     Greenpoint Tactical Income Fund Purchased Gems And Fine Minerals**

58.     Between mid-2013 and early 2015, Nohl committed $21.9 million from the Greenpoint Tactical Income Fund to purchase gems and fine mineral specimens. Thirty-eight of the specimens were purchased for at least $100,000 each.

59.     There are approximately 3,000 gems and minerals in the Fund's collection. Most of the reported value of the collection comes from approximately 30 specimens.

60.    An example of a mineral in the collection is pictured below:



61.    The three most expensive specimens were purchased from a dealer ("Dealer Number 1") for a combined price of $6.8 million.  The written contract with Dealer Number 1 dated February 18, 2015 required the following installments to be paid:

- $1,000,000 due now [February 18, 2015]

- $1,450,000 due April 15, 2015

- $1,450,000 due June 15, 2015

- $1,450,000 due August 15, 2015

- $1,450,000 due October 15, 2015.

62.    Greenpoint Tactical Income Fund through GP Rare Earth failed to make the required payments to Dealer Number 1.  After the Fund through GP Rare Earth made partial

14

payments, Dealer Number 1 delivered two of the three specimens to the Fund.  After the Fund through GP Rare Earth still had not fully paid Dealer Number 1, Dealer Number 1 threatened to sue.  The Fund then paid most of what it owed Dealer Number 1 plus a $500,000 late fee between December 2018 and February 2019.  The Fund did not take possession of the third piece, which is an emerald named the "Emperor," until February 2019 after it paid most of what it owed.  The Fund still owes $100,000 to Dealer Number 1.

63.    Nohl created a false contract with Dealer Number 1.  The false contract is the same as the actual contract with Dealer Number 1, but has handwritten on it "time is not of the essence and all payments are best efforts."  The false contract also has a signature on it.  Dealer Number 1 did not sign the false contract.

64.    Nohl recorded large, unrealized gains on the three specimens even though the Fund through GP Rare Earth did not make the payments according to schedule; still has not completely paid for them; did not have possession of two of the pieces until months after the contract date; and did not have possession of the third specimen until February 2019.

**D.    The Offerings For Greenpoint Tactical Income Fund**

**1.    The First Offering**

65.    The Greenpoint Tactical Income Fund had its first offering from May 17, 2013 through September 26, 2013.  The Fund reported that it raised approximately $9,250,000 through the sale of securities to investors during that period.

**2.    The Second Offering And Second Confidential Investment Letter**

66.    Hull, Nohl, Chrysalis, and Greenpoint Management II conducted the Second Offering for Greenpoint Tactical Income Fund from September 2013 through April 29, 2016 ("Second Offering").  The Fund represented to prospective investors and investors that it raised

$32,495,504.57 during the Second Offering.

67.     The primary offering document for the Second Offering was entitled "Confidential Investment Letter."  The Confidential Investment Letter for the Second Offering ("Second Confidential Investment Letter") was distributed to prospective investors and investors from September 2013 through at least April 29, 2016.

68.     For the Second Offering, the Fund sold securities to investors.  The Second Confidential Investment Letter states that the type of offering is "Class A Units at $25,000 per Unit."   The Second Confidential Investment Letter states the units are securities and that "the offering is being made in reliance upon an exemption from registration under the Securities Act of 1933 . . ."  An attachment to the Second Confidential Investment Letter entitled Exhibit K-Subscription Agreement and Signature Page states, "THE SECURITIES REPRESENTED BY THIS INSTRUMENT . . ."

69.     The Second Confidential Investment Letter for Greenpoint Tactical Income Fund was drafted jointly by Hull and Nohl.  The Second Confidential Investment Letter was authored by Nohl as President of Chrysalis and Hull as Managing Director of Greenpoint Management II.

70.     Hull, Nohl, Chrysalis, and Greenpoint Management II manage Greenpoint Tactical Income Fund.  Hull, Nohl, Chrysalis, and Greenpoint Management II made the statements in the Second Confidential Investment Letter because they all had ultimate authority over the statements including the content and made the decision to make the statements.

71.     The Second Confidential Investment Letter states, "Chrysalis will be responsible for implementation of the Company's strategy, identifying properties and assets for purchase, negotiating transactions, ensuring accurate reporting, cash flow management, and leverage management."

72.     The Second Confidential Investment Letter states that Greenpoint Management II "will be responsible for raising capital for the Company, handling investor relations, performance reporting, evaluating acquisitions and divestitures, managing risk and regulatory oversight."

73.     The Second Confidential Investment Letter falsely and misleadingly represents to investors that "[f]unds will be used primarily [sic] acquisition of investments in three arenas: (1) distressed real estate assets, specifically in the petroleum, oil markets, but may also include multifamily and commercial markets; and (2) mining, minerals and precious stones; and (3) intellectual property."  As of June 30, 2018, the gem and mineral collection represented approximately 52% of the Fund's purported value, and a portfolio of debt and equity securities of private companies represented approximately 46% of the Fund's purported value.

74.     The Second Confidential Investment Letter also falsely and misleadingly represents to investors that "[t]he Company's goal is to achieve a high level of current income through purchases of distressed real estate notes and other assets of a distressed nature."   To the contrary, the Fund's holdings have been largely composed of non-income-generating assets and illiquid assets.

75.     The Second Confidential Investment Letter falsely and misleadingly represents to investors that "[f]urther the fund has made investments in the gem and mineral markets.  Many of these transactions are short term in nature and provide strong cash flow as well."  The vast majority of the gem and mineral transactions were not short term in nature and did not provide strong cash flow.

76.     With respect to gems and minerals, the Second Confidential Investment Letter falsely and misleadingly represents to investors that "[t]he Company is working on a number of large acquisitions, in some cases entire collections from some of the most respected collectors in

17

the world.  The company will acquire these collections at a fraction of their current value . . . The global demand for world class specimens cannot be overstated."  The Fund had no reasonable expectation of acquiring, and did not acquire, large acquisitions and entire collections at a fraction of their current value.

77.     The "Greenpoint Tactical Income Fund, LLC Business Plan" ("Business Plan") was attached to the Second Confidential Investment Letter and distributed to potential investors and investors.

78.     The Business Plan falsely and misleadingly represents to investors "[d]emand for the finest mineral specimens is spreading like a wild-fire throughout the world and it is imperative to acquire these assets now before truly unique, utterly rare and beautiful things are locked up in private collections completely where they are nearly impossible to acquire. . . . The upper or tip-top of mineral specimens, those being represented by less than 0.0005% of total salable specimens by quality and size, are the most sound investment as possessors get whatever price they demand for the very best in existence and get the same without delay or negotiation.  It is truly a seller's market."  The Fund had no reasonable expectation of getting, and has not gotten, "whatever price they demand[ed]" "without delay or negotiation" in the sale of mineral specimens.

79.     The Business Plan also falsely and misleadingly represents to investors that "[t]he second stance includes an allocation of fund assets to serve as a revolving line upon which the fund will arbitrage mid-range minerals in rapid succession.  Typical returns of 'fast-moving' material (transactions within hours or days) realize returns of 10 – 30% but may, when purchased most advantageously, yield 100 – 300% IRR within 30 days of inception for each respective instance."  The Fund rarely, if ever, sold gems and minerals in "rapid succession," in "fast-moving transactions" "within hours or days," or for profits of 100-300% within 30 days of acquiring them.

80.     The Business Plan additionally falsely and misleadingly represents to investors that "[b]y far the greatest returns on midlevel specimens can be realized through sales to collectors and dealers in China and other southeast Asian countries which currently exist in a non-contiguous bubble from American dealers (even at the very top). The fund will seek to rapidly build a database of Chinese collectors and dealers to make pieces available where no other American dealer is doing business although it is the place of highest and most rapidly increasing demand." The Fund never did any work to build a database of Chinese collectors and dealers.

81.     The Business Plan further falsely and misleadingly represents to investors that [t]o facilitate the trading and acquisition goals of this stance the Fund will, once cash flow supports it, open a small sorting and clearing house operation in the Milwaukee, Wisconsin area. Contained within that space will be vaults for security, as well as a phone bank for deal coordination." The Fund never opened a sorting and clearing house. The Fund never opened a phone bank for deal coordination.

82.     Exhibit E – Risk Factors, which was attached to the Second Confidential Investment Letter and distributed to potential investors, represents to potential investors that "[t]he Company's financial statements have been internally prepared and audited by an external auditor subject to oversight by the Public Company Audit Oversight Board (PCAOB)."

**3.      The Third Offering And Third Confidential Investment Letter**

83.     Hull, Nohl, Chrysalis, and Greenpoint Management II conducted the Third Offering for Greenpoint Tactical Income Fund from May 1, 2016 through the present ("Third Offering"). During this period, the Fund has raised approximately $21,723,038.87. Of that amount, $4.1 million was raised from new and existing investors from July 1, 2018 to May 29, 2019. Hull, Nohl, Chrysalis, and Greenpoint Management II continue to raise money for Greenpoint Tactical

Income Fund.

84.     The Confidential Investment Letter for the Third Offering has been distributed to prospective investors and investors from at least May 1, 2016 through the present ("Third Confidential Investment Letter").

85.     For the Third Offering, Greenpoint Tactical Income Fund sold securities to investors.  The cover page to the Third Confidential Investment Letter states, "THE SECURITIES OFFERED HEREBY . . ."

86.     The Third Confidential Investment Letter is dated May 1, 2016.

87.     The Third Confidential Investment Letter for Greenpoint Tactical Income Fund was drafted jointly by Hull and Nohl.  The Third Confidential Investment Letter was authored by Nohl as President of Chrysalis and Hull as Managing Director of Greenpoint Management II.

88.     The cover page to The Third Confidential Investment Letter lists Nohl, President of Chrysalis, as a Manager.  The cover page also lists Hull, Managing Director of Greenpoint Management II, as a Manager.

89.     Hull, Nohl, Chrysalis, and Greenpoint Management II manage Greenpoint Tactical Income Fund.  Hull, Nohl, Chrysalis, and Greenpoint Management II made the statements in the Third Confidential Investment Letter because they all had ultimate authority over the statements including the content and made the decision to make the statements.

90.     The Third Confidential Investment Letter falsely and misleadingly represents to prospective investors and investors:

> Proceeds of the Offering will be used primarily for the acquisition of investments in the Company's four asset categories: 1) purchasing real assets, possibly of a distressed nature, improving and then subsequently leasing or reselling them, 2) investing in private businesses that have either high net income or the potential for high net income, 3) advancing and/or lending money secured by purchase orders (known as production factoring) and/or participating in commercial lending of other

types of lending or debt transactions that are likely to produce net interest income, (4) acquiring rare minerals and precious gemstones.

As of June 30, 2018, the gem and mineral collection was approximately 52% of the

Fund's purported value, and a portfolio of debt and equity securities of private

companies, including a now-worthless position in Private Company 1, was approximately

46% of the Fund's purported value.

91.     The Third Confidential Investment Letter represents to investors that Chrysalis

is specifically tasked with locating suitable investment opportunities that will lead to a return on investment for all Members.  Chrysalis is responsible for managing operational risks associated with the Company's investment activities.  Chrysalis is also responsible for monitoring cash flow and identifying buyers for certain assets of the Company.

92.     The Third Confidential Investment Letter also represents to investors that

Greenpoint Management II "is responsible for evaluating acquisitions and divestitures, managing

risk for the Company, providing regulatory oversight and conducting performance reporting."

93.     The Third Confidential Investment Letter falsely and misleadingly represents to

prospective investors and investors "[t]he current $40MM evaluation on [Private Company 1] was

set by [Private Company 1] prior to engagement with the [Fund] and by all calculations is well

below the current value given contracts, approvals and opportunities realized by [Private Company

1] in the last 6 months."  "Contracts, approvals and opportunities realized by [Private Company 1]

in the last 6 months" did not by all calculations show that a $40 million valuation of Private

Company 1 was well below its current value.

94.     The Third Confidential Investment Letter falsely and misleadingly represents to

prospective investors and investors "the [Fund] has made investments in the precious stone and

very fine mineral markets and has amassed one of the top 5 collections of fine minerals in the

world public or private according to numerous experts.  Many of these transactions are short term

21

in nature and provide cash flow as well."  Few of the transactions were short term in nature and few, if any, provided significant cash flow.

95.     The Third Confidential Investment Letter falsely and misleadingly represents to prospective investors and investors that "[d]iscussions are underway to sell somewhere between $10MM and $30MM of the collection on a 3-7 year amortized terms to the most prominent dealer in the world who is New York City based." The Third Confidential Investment Letter is dated May 1, 2016.  As of May 1, 2016, Greenpoint Tactical Income Fund had no reasonable expectation of selling between $10 million to $30 million of minerals from its collection to one person.

96.     The Third Confidential Investment Letter falsely and misleadingly represents to prospective investors and investors that "[r]elationships have been developed to capitalize upon the Company's well-developed catalogue for conversion to an internet sales format within the near future."  The Fund's collection was not converted to an internet sales format "within the near future."  Significant pieces were never offered for sale in an internet sales format.

97.     The Third Confidential Investment Letter falsely and misleadingly represents to prospective investors and investors that "[a]ll of the [Fund's] portfolio companies are exhibiting strong growth."  As of the date of the Third Confidential Investment Letter, Private Company 1 was not exhibiting strong growth.  Private Company 1's actual 2015 revenues were approximately $3.98 million, and its net income was $100,000.  For the first quarter of 2016, Private Company 1's revenue was $84,990 and losses were $995,438.  Through the second quarter of 2016, Private Company 1's revenue was $430,049 and losses were $1,361,719.

98.     The Third Confidential Investment Letter represents to prospective investors and investors that "[t]he Company's financial statements have been internally prepared and audited by an external auditor subject to oversight by the Public Company Audit Oversight Board (PCAOB)."

The Third Confidential Investment Letter further represents to investors "[t]he financial statements attached hereto as Exhibit G . . . were prepared by the Managing Members."

99.     "Exhibit C – Valuation of Assets" to the Third Confidential Investment Letter has been distributed to prospective investors and investors.  With respect to fine minerals, Exhibit C – Valuation of Assets represents to investors "[n]o other business other than the business of appraising may be entered with the respective appraisers."

**E.     The Managers Have Charged The Fund $13.71 Million in Fees Based On Fictitious Gains**

100.     Greenpoint Tactical Income Fund has paid and continues to pay Chrysalis and Greenpoint Management II each a management fee equal to 1% of assets under management, for a total of 2% of assets under management.  The management fees are paid quarterly based on the net asset value determined for each respective quarter.  The net asset value includes unrealized gains.

101.     As owners of Chrysalis and Greenpoint Management II, Nohl and Hull respectively received and continue to receive a portion of these fees.

102.     Greenpoint Tactical Income Fund has reimbursed and continues to reimburse Chrysalis and Greenpoint Management II for out-of-pocket expenses.

103.     The Fund also pays Chrysalis and Greenpoint Management II incentive fees of 30% of the Fund's profits, which are calculated on both realized and unrealized gains.

104.     In addition, Bluepoint charged its individual clients a fee which was typically 1% of assets under management.  This fee arrangement concluded at the end of 2017.  On January 1, 2018, the managers of Greenpoint Tactical Income Fund retained a new entity, H Informatics LLC, which also uses the name H Family Office, to purportedly provide information to the Fund's investors.  The Fund has paid and continues to pay H Informatics a fee of 0.85% of net assets.  H Informatics is owned by Hull and an investor in the Fund ("Investor Number 1").  This fee and

ownership of H Informatics by Hull and an investor have not been disclosed to the investors.

105.    The H Informatics contract was approved by Nohl and another investor in the Fund ("Investor Number 2").  Investor Number 2 was designated as Greenpoint Tactical Income Fund's "Conflicts Committee Chair."  Investor Number 2 is also the father of Investor Number 1.

106.    Hull and Nohl own Alt Asset Portfolio Services.  Until approximately the beginning of March 2019 the accountant for Greenpoint Tactical Income Fund was employed by Alt Asset Portfolio Services.  Hull and Nohl through Alt Asset Portfolio Services charged the Fund approximately $100,000 more than the accountant received in compensation.  In 2016, 2017, and 2018, Hull and Nohl together through Alt Asset Portfolio Services pocketed the approximately $100,000 over the accountant's compensation that Alt Asset Portfolio Services charged the Fund. Chrysalis, Greenpoint Management II, Hull, and Nohl did not disclose to investors that the Fund was paying $100,000 in excess of the accountant's salary or that Hull and Nohl pocketed the $100,000.

107.    Since the inception of the Fund, Greenpoint Tactical Income Fund has paid approximately $14.5 million in fees and redemptions to entities controlled or owned by Hull or Nohl, including Chrysalis, Greenpoint Management II, H Informatics, and Alt Asset Portfolio Services.

108.     From April 29, 2014 to approximately March 12, 2019, over $13.7 million has been paid to entities controlled or owned by Hull or Nohl, including Chrysalis, Greenpoint Management II, Bluepoint, H Informatics, and Alt Asset Portfolio Services.  A table of the fees is below:

| ENTITY | FEES AND PAYMENTS |
|---|---|
| Chrysalis Financial | $5,455,027 |
| Greenpoint Asset Management II | $5,898,747 |
| Bluepoint Investment Counsel | $1,772,155 |
| Alt Asset Portfolio Services | $384,977 |
| H Family Office & H Informatics | $199,171 |

109.     Almost all of the money Greenpoint Tactical Income Fund paid to Hull, Nohl, Chrysalis, Greenpoint Management II, and H Informatics came from funds invested by investors because less than 5% of the Fund's returns were realized gains providing cash income for the Fund.

110.     Greenpoint Tactical Income Fund has two classes of shares.  All investors are issued Unit A shares.  Chrysalis and Greenpoint Management II have contributed almost no capital to the Fund.  Despite this, Chrysalis and Greenpoint Management II own 30% of the Fund in the form of Unit B shares.  When new Unit A shares are issued upon the receipt of investor funds, Chrysalis and Greenpoint Management II are simultaneously issued Unit B shares.  The ratio of Unit A shares to Unit B shares is maintained at 70 to 30 regardless of investments and redemptions.

111.     By virtue of the ownership of Unit B shares, Chrysalis and Greenpoint Management II share in 30% of the profits.  The managers have monetized those gains by

redeeming funds from the capital accounts associated with those Unit B shares.  Chrysalis and

Greenpoint Management II have taken redemptions from the Unit B capital accounts.  They have

not taken redemptions since 2016 because Greenpoint Tactical Income Fund has not had adequate

liquidity.

112.    As of June 30, 2018, the combined reported value of the capital accounts associated

with the outstanding Unit B shares held by Chrysalis, which is controlled by Nohl, and Greenpoint

Management II, which is controlled by Hull, was $30.0 million.

**F.      Greenpoint Tactical Income Fund's Financial Statements**

**1.      Greenpoint Tactical Income Fund's Financial Statements for the Year
Ended December 31, 2015**

113.    On July 29, 2016, the Independent Auditor's Report was issued.  The Fund's

auditor audited the financial statements of Greenpoint Tactical Income Fund which consists of "the

statement of assets and liabilities, including the schedule of investment as of December 31, 2015,

and the related statements of operations, changes in members' capital, and cash flows for the

period February 6, 2013 through December 31, 2015, and the related notes to the financial

statements."

114.    The July 29, 2016 Audit Report was distributed to investors in the Greenpoint

Tactical Income Fund.

115.    The July 29, 2016 Audit Report states, "[m]anagement is responsible for the

preparation and fair presentation of these financial statements in accordance with accounting

principles generally accepted in the United States of America; this includes the design,

implementation, and maintenance of internal control relevant to the preparation and fair

presentation of financial statements that are free from material misstatement, whether due to fraud

or error."

116.   The Schedule of Operations for the period February 6, 2013 through December 31, 2015 reported realized gain on investments of $310,035.  It reported net unrealized appreciation on investments of $43,179,994.  It reported management fees of $1,821,381; professional fees of $271,180; and other expenses of $292,605.

117.   Note 3 to the Financial Statements for the period ended December 31, 2015 falsely states:

> Fine minerals and gems are valued using third party appraisals based on underlying market driven events. . . . Observable data is generally available at market driven sales shows and special events typically in the first quarter of each year.  These events provide public and semi-public transactions that utilized in development estimates of fair value for the portfolio of the Fund.  The valuations of these investments are further evaluated throughout the year and as of the reporting date based on other market data available, generally the Fund's own transactions or semi-public information used by appraisal experts of large scale market participants.

118.   "Note 5 – Management Fee and Related Parties" to the Financial Statements for the period ended December 31, 2015 states in its entirety:

> The Fund pays an annual management fee, payable in quarterly installments, one percent (1%) of assets under management ("AUM") to each of the General Members.  All reasonable and customary out-of-pocket expenses incurred by the General Members in connection with the Fund's business will be paid by the Fund or reimbursed to the General Members by the Fund.

119.   No mention is made in Note 5 of the loans between the Fund and related parties or the material terms of such loans.

### 2.   Greenpoint Tactical Income Fund's Financial Statements for the Year Ended December 31, 2016

120.   On July 14, 2017, the Independent Auditor's Report for the period ended December 31, 2016 was issued.  The auditor audited the financial statements of Greenpoint Tactical Income Fund which consist of "the statement of assets and liabilities, including the schedule of investment as of December 31, 2016, and the related statements of operations, changes in members' capital,

27

and cash flows for the year then ended, and the related notes to the financial statements."

121.    The July 14, 2017 Audit Report was distributed to investors in the Greenpoint Tactical Income Fund.

122.    The July 14, 2017 Audit Report states "[m]anagement is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error."

123.    The Schedule of Operations as of and for the year ended December 31, 2016 reported realized gain on investments of $0.  It reported net unrealized appreciation on investments of $24,132,862.  It reported management fees of $1,627,957; professional fees of $789,860; interest expense of $329,965; and other expenses of $92,306.

124.    Note 3 to the Financial Statements for the period ended December 31, 2016 falsely states:

> Fine minerals and gems are valued using third party appraisals based on underlying market driven events. . . . Observable data is generally available at market driven sales shows and special events.  These events provide public and semi-public transactions that utilized in development estimates of fair value for the portfolio of the Fund.  The valuations of these investments are further evaluated throughout the year and as of the reporting date based on other market data available, generally the Fund's own transactions or semi-public information used by appraisal experts of large scale market participants.

125.    "Note 5 – Management Fee and Related Parties" to the Financial Statements for the period ended December 31, 2016 states in its entirety:

> The Fund pays an annual management fee, payable in quarterly installments, one percent (1%) of assets under management ("AUM") to each of the General Members.  All reasonable and customary out-of-pocket expenses incurred by the

General Members in connection with the Fund's business will be paid by the Fund or reimbursed to the General Members by the Fund.

The Fund has $1,025,000 in outstanding notes payable to Greenpoint Global Mittelstand Fund I LLC, a separate investment fund managed by one of the General Members.

126.   No mention is made in Note 5 of the material terms of the loans from Greenpoint Global Mittelstand Fund or of the loans between the Fund and other related parties or the material terms of such loans.

### 3.   Greenpoint Tactical Income Fund's Unaudited Financial Statements for the First Quarter of 2017

127.   Greenpoint Tactical Income Fund's financial statements for the year ended December 31, 2017 have not been audited.

128.   The Accountant's Compilation Report for the quarter ended March 31, 2017 is dated August 10, 2017 ("First Quarter 2017 Unaudited Financials").  The First Quarter 2017 Unaudited Financials state that "[m]anagement is responsible for the accompanying financial statements of Greenpoint Tactical Income Fund LLC  . . . which is comprised of the balance sheet as of March 31, 2017, and the related statement of operations for the quarter then ended and calendar year to date, and the statement of changes in members' equity (net asset value) for the quarter then ended in accordance with accounting principles generally accepted in the United States of America."

129.   The First Quarter 2017 Unaudited Financials also state that "[m]anagement has elected to omit substantially all of the disclosures and the statement of cash flows required by accounting principles generally accepted in the United States of America."

130.   The Statement of Operations for the quarter ended March 31, 2017 reports net realized gain from investments of $0.  It reports management fees to managing members of

$434,904.50; professional fees of $166,104.43; operating expenses of $52,870.49; and net loss on investments of $500,143.91.

### 4. Greenpoint Tactical Income Fund's Unaudited Financial Statements for the Second Quarter of 2017

131.    The Accountant's Compilation Report for the quarter ended June 30, 2017 is dated October 24, 2017 ("Second Quarter 2017 Unaudited Financials").  The Second Quarter 2017 Unaudited Financials state that "[m]anagement is responsible for the accompanying financial statements of Greenpoint Tactical Income Fund LLC . . . which is comprised of the balance sheet as of June 30, 2017, and the related statement of operations for the quarter then ended and calendar year to date, and the statement of changes in members' equity (net asset value) for the quarter then ended in accordance with accounting principles generally accepted in the United States of America."

132.    The Second Quarter 2017 Unaudited Financials also state that "[m]anagement has elected to omit substantially all of the disclosures and the statement of cash flows required by accounting principles generally accepted in the United States of America."

133.    The Statement of Operations for the quarter ended June 30, 2017 reports net realized gain from investments of $0.  It reports management fees to managing members of $433,755.73; professional fees of $570,762.23; and operating expenses of $19,341.89.

### 5. Greenpoint Tactical Income Fund's Unaudited Financial Statements for the Third Quarter of 2017

134.    The Accountant's Compilation Report for the quarter ended September 30, 2017 is dated March 2, 2018 ("Third Quarter 2017 Unaudited Financials").  The Third Quarter 2017 Unaudited Financials state that "[m]anagement is responsible for the accompanying financial statements of Greenpoint Tactical Income Fund LLC . . . which is comprised of the balance sheet

as of September 30, 2017, and the related statement of operations for the quarter then ended and calendar year to date, and the statement of changes in members' equity (net asset value) for the quarter then ended in accordance with accounting principles generally accepted in the United States of America."

135.    The Third Quarter 2017 Unaudited Financials also state that "[m]anagement has elected to omit substantially all of the disclosures and the statement of cash flows required by accounting principles generally accepted in the United States of America."

136.    The Statement of Operations for the quarter ended September 30, 2017 reports net realized gain from investments of $0.  It reports management fees to managing members of $417,584.43; professional fees of $79,800.19; and operating expenses of $8,797.57.

**6.      Greenpoint Tactical Income Fund's Unaudited Financial Statements for the Fourth Quarter of 2017**

137.    The Accountant's Compilation Report for the quarter ended December 31, 2017 is dated March 13, 2018 ("Fourth Quarter 2017 Unaudited Financials").  The Fourth Quarter 2017 Unaudited Financials state that "[m]anagement is responsible for the accompanying financial statements of Greenpoint Tactical Income Fund LLC . . . which is comprised of the balance sheet as of December 31, 2017, and the related statement of operations for the quarter then ended and calendar year to date, and the statement of changes in members' equity (net asset value) for the quarter then ended in accordance with accounting principles generally accepted in the United States of America."

138.    The Fourth Quarter 2017 Unaudited Financials also state that "[m]anagement has elected to omit substantially all of the disclosures and the statement of cash flows required by accounting principles generally accepted in the United States of America."

139.    The Statement of Operations for the quarter ended December 31, 2017 reports net

realized gain from investments of $0.  It reports management fees to managing members of $425,493.64; professional fees of $188,880.30; and operating expenses of $10,987.59.

### 7. Greenpoint Tactical Income Fund's Unaudited Financial Statements for the First Quarter of 2018

140.    Greenpoint Tactical Income Fund's financial statements for the year ended December 31, 2018 have not been audited.

141.    The Fund's most recent unaudited financial statements are for the quarter ending June 30, 2018.

142.    The Accountant's Compilation Report for the quarter ended March 31, 2018 is dated August 21, 2018 ("First Quarter 2018 Unaudited Financials").  The First Quarter 2018 Unaudited Financials state that "[m]anagement is responsible for the accompanying financial statements of Greenpoint Tactical Income Fund LLC  . . . which is comprised of the balance sheet as of March 31, 2018, and the related statement of operations for the quarter then ended and calendar year to date, and the statement of changes in members' equity (net asset value) for the quarter then ended in accordance with accounting principles generally accepted in the United States of America."

143.    The First Quarter 2018 Unaudited Financials also state that "[m]anagement has elected to omit substantially all of the disclosures and the statement of cash flows required by accounting principles generally accepted in the United States of America."

144.    The Statement of Operations for the quarter ended March 31, 2018 reports net realized gain from investments of $0.  The Statement of Operations reports management fees to managing members of $483,347.32; professional fees of $250,647.02; H Informatics fee of $203,931.31; and operating expenses of $35,907.35.  It also reports unrealized gains from investments of $18,525,689.44.

### 8.   Greenpoint Tactical Income Fund's Unaudited Financial Statements for the Second Quarter of 2018

145.    The Accountant's Compilation Report for the quarter ended June 30, 2018 is dated August 22, 2018 ("Second Quarter 2018 Unaudited Financials").  The Second Quarter 2018 Unaudited Financials state that "[m]anagement is responsible for the accompanying financial statements of Greenpoint Tactical Income Fund LLC . . . which is comprised of the balance sheet as of June 30, 2018, and the related statement of operations for the quarter then ended and calendar year to date, and the statement of changes in members' equity (net asset value) for the quarter then ended in accordance with accounting principles generally accepted in the United States of America."

146.    The Second Quarter 2018 Unaudited Financials also state that "[m]anagement has elected to omit substantially all of the disclosures and the statement of cash flows required by accounting principles generally accepted in the United States of America."

147.    The Statement of Operations for the quarter ended June 30, 2018 reports net realized gain from investments of $0.  It also reports change in unrealized gains of $8,338,707.23. The Statement of Operations reports management fees to managing members of $512,771.23; professional fees of $189,839.36; H Informatics fee of $216,354.62; and operating expenses of $3,655.19.

148.    The Defendants have not provided the investors with any financial statements after the second quarter of 2018.

### G.   Hull and Nohl Engaged In Self-Dealing And Did Not Disclose Related Party Transactions And Conflicts Of Interest To The Fund's Investors Or To The Fund's Auditor

149.    Hull and Nohl engaged in extensive undisclosed self-dealing that enriched them and their entities.  Hull and Nohl received millions of dollars of investor funds but did not disclose

to the investors in the Fund their conflicts of interest and related party transactions in either the Confidential Investment Letters, financial statements, or other offering materials.

150.    By engaging in the below described related party transactions and conflicts of interest Hull, Nohl, Chrysalis, and Greenpoint Management II breached their fiduciary duties to Greenpoint Tactical Income Fund.  Hull also breached his fiduciary duties to Greenpoint Mittelstand Fund and Greenpoint Fine Art Fund.

**1.    Nohl Approved a Loan of Investor Funds to Hull and Hull Approved a Commission Fee Arrangement For Nohl**

151.    On or about July 30, 2013, Greenpoint Fine Art Fund purchased a painting with investor funds.  Nohl had a commission agreement with the sellers.  Nohl was paid a $580,000 commission, which was 20% of the amount Greenpoint Fine Art Fund paid for the painting.  Nohl then gave $200,000 of the commission to Bluepoint, which is controlled and co-owned by Hull.  Hull, Nohl, Chrysalis, and Greenpoint Management II did not disclose this commission agreement to the investors in Greenpoint Fine Art Fund, the investors in Greenpoint Tactical Income Fund, or the Fund's auditor.

152.    On August 22, 2013, Hull borrowed $265,000 of investor funds from Greenpoint Tactical Income Fund.  The loan was repayable over five years.  It was repaid in late 2018, primarily with a credit against Greenpoint Management II's fees.  Nohl approved the loan on behalf of the Fund.  Nohl, through one of his entities, was paid $7,424 from investor funds as an origination and underwriting fee on the loan to Hull.  Neither this loan to Hull nor Nohl's $7,424 origination and underwriting fee was disclosed to the investors.

153.    On August 22, 2013, the same day that Nohl approved the $265,000 loan to Hull, Hull signed an agreement entitled Finder's Fee Agreement for Greenpoint Fine Art Fund to pay Nohl a finder's fee for locating artwork that is purchased by and then resold by Greenpoint Fine

Art Fund.  Under that agreement, Nohl receives 20% of any profits Greenpoint Fine Art Fund

makes on the sale of any painting that Nohl found for Greenpoint Fine Art Fund.  This 20%

commission is in addition to the $580,000 commission Nohl received for the painting the

Greenpoint Fine Art Fund purchased on July 30, 2013.  Hull, Nohl, Chrysalis, and Greenpoint

Management II did not disclose this commission agreement to the investors or the Fund's auditor.

Neither the $265,000 loan to Hull nor the Finder's Fee Agreement for Nohl are disclosed in the

July 29, 2016 Audit Report despite the transactions taking place during the February 6, 2013

through December 31, 2015 period covered by the July 29, 2016 Audit Report.

> **2.     Hull and Nohl Loaned Money to the Fund and Charged Exorbitant
> Interest Rates Without Disclosure to the Investors**

154.     Greenpoint Tactical Income Fund often did not have sufficient cash to pay all of its

obligations.  Whenever cash was available Chrysalis and Greenpoint Management II, through Nohl

and Hull, respectively, paid themselves management and other fees.

155.     On numerous occasions the Fund was behind on investment commitments

including payments due on the Emperor emerald and money that was due to be invested in Private

Company 1.  When the Fund had not received funds from new investors, Hull and Nohl loaned

money to the Fund and charged the Fund high interest rates.  The effective annual percentage rate

on several of these loans exceeded 100%.

156.     On November 7, 2016, Nohl loaned Greenpoint Tactical Income Fund $100,000.

The Fund repaid the loan on November 18, 2016.  Nohl received interest of $7,500 for this 11-day

loan to the Fund he co-manages.  The effective annual percentage rate on this loan was 249%.

Hull signed the loan agreement as the manager of the Greenpoint Tactical Income Fund.  Hull,

Nohl, Chrysalis, and Greenpoint Management II did not disclose this loan, its terms, amount, and

interest rate to the investors or the Fund's auditor.

157.     On November 23, 2016, Hull loaned Greenpoint Tactical Income Fund $25,000. The Fund repaid the loan on December 22, 2016.  The Fund paid Hull interest of $1,500 for this 29-day loan to the Fund he co-manages.  The effective annual percentage rate on this loan was 76%.  Hull, Nohl, Chrysalis, and Greenpoint Management II did not disclose this loan, its terms, amount, and interest rate to the investors or the Fund's auditor.  Hull loaned money to Greenpoint Tactical Income Fund at a higher interest rate than he was paying on a personal loan he took from the Fund at a time when he had not repaid the loan to the Fund.  The annual percentage rate Hull was paying to the Fund was 14% while Hull charged the Fund a 76% annual percentage rate.

158.     On December 7, 2016, Nohl loaned Greenpoint Tactical Income Fund $105,000. The Fund repaid the loan on December 22, 2016.  The Fund paid Nohl interest of $15,000 for this 15-day loan to the Fund he co-manages.  The effective annual percentage rate on this loan was 348%.  Hull signed the loan agreement as the manager of Greenpoint Tactical Income Fund.  Hull, Nohl, Chrysalis, and Greenpoint Management II did not disclose this loan, its terms, amount, and interest rate to the investors or the Fund's auditor.

159.     On December 1, 2017, Nohl loaned Greenpoint Tactical Income Fund $100,000. The Fund repaid the loan on December 11, 2017.  The Fund paid Nohl interest of $2,867 for this 10-day loan to the Fund he co-manages.  The effective annual percentage rate on this loan was 104%.  Hull signed the loan agreement as the manager of the Greenpoint Tactical Income Fund. Hull, Nohl, Chrysalis, and Greenpoint Management II did not disclose this loan, its terms, amount, and interest rate to the investors.  The Fund has not had its financial statements for 2017 audited.

160.     On March 26, 2018, Nohl and his wife loaned Greenpoint Tactical Income Fund $150,000.  The Fund repaid the loan on April 18, 2018.  Nohl charged the Fund interest of $1,000 for this 23-day loan to the Fund that he co-manages.  The effective annual percentage rate on this

loan was 11%.  Hull signed the loan agreement as the manager of Greenpoint Tactical Income Fund.  Hull, Nohl, Chrysalis, and Greenpoint Management II did not disclose this loan, its terms, amount, and interest rate to the investors.  The Fund has not had its financial statements for 2018 audited.

161.    On June 29, 2018, Chrysalis loaned Greenpoint Tactical Income Fund $120,000. The Fund repaid the loan on October 24, 2018.  Chrysalis charged the Fund interest of $12,905.66 for this 117-day loan to the Fund it co-manages.  The effective annual percentage rate on this loan was 34%.  Hull signed the loan agreement as the manager of Greenpoint Tactical Income Fund. Hull, Nohl, Chrysalis, and Greenpoint Management II did not disclose this loan, its terms, amount, and interest rate to the investors.

162.    On July 25, 2018, Nohl loaned Greenpoint Tactical Income Fund $18,250.  The Fund repaid the loan on October 2, 2018.  Nohl charged the Fund interest of $2,500 for this 69-day loan to the Fund that he co-manages.  The effective annual percentage rate on this loan was 72%. Hull, Nohl, Chrysalis, and Greenpoint Management II did not disclose this loan, its terms, amount, and interest rate to the investors.

163.    On July 25, 2018, Nohl loaned Greenpoint Tactical Income Fund approximately $38,000 to $40,000.  The Fund repaid the loan on October 2, 2018.  Nohl charged the Fund interest of $5,459.81 to $7,459.81 for this 69-day loan to the Fund that he co-manages.  The effective annual percentage rate on this loan was 72% to 104%.  Hull, Nohl, Chrysalis, and Greenpoint Management II did not disclose this loan and interest rate to the investors.

164.    This chart summarizes the undisclosed loans from managers to the Fund:

| Date | Manager Lender | Loan Amount | Repayment Date (Term) | Interest Paid to Manager | Effective APR |
|---|---|---|---|---|---|
| 11/7/16 | Nohl | $100,000 | 11/18/16 (11 days) | $7,500 | 249% |
| 11/23/16 | Hull | $25,000 | 12/22/16 (29 days) | $1,500 | 76% |
| 12/7/16 | Nohl | $105,000 | 12/22/16 (15 days) | $15,000 | 348% |
| 12/1/17 | Nohl | $100,000 | 12/11/17 (10 days) | $2,867 | 104% |
| 3/26/18 | Nohl | $150,000 | 4/18/18 (23 days) | $1,000 | 11% |
| 6/29/18 | Chrysalis | $120,000 | 10/24/18 (117 days) | $12,905.66 | 34% |
| 7/25/18 | Nohl | $18,250 | 10/2/18 (69 days) | $2,500 | 72% |
| 7/25/18 | Nohl | $38,000 to $40,000 | 10/2/18 (69 days) | $5,459.81 - $7,459.81 | 72% to 104% |

**3.    Hull and Nohl Caused the Fund to Borrow Money from Another Greenpoint Fund at High Interest Rates Without Adequate Disclosure to Investors**

165.    Hull and Nohl caused Greenpoint Tactical Income Fund to borrow money from other Greenpoint Funds.

166.    On or about December 23, 2015, an investor invested $400,000 in Greenpoint Global Mittelstand Fund.  On or about December 28, 2015 another investor invested $500,000 in Greenpoint Global Mittelstand Fund.

167.    On or about January 19, 2016, the Fund borrowed $750,000 from Greenpoint Global Mittelstand Fund.  Hull was a manager of the Greenpoint Global Mittelstand Fund.  The loan was due on February 29, 2016.  The amount of interest to be paid was $50,000.  On or about February 29, 2016, the due date was extended to July 31, 2016.  On or about July 31, 2016, the due date was extended to November 30, 2016.  On or about November 30, 2016, the due date was

extended to May 31, 2017.  Hull signed the loan agreements and extensions on behalf of Greenpoint Global Mittelstand Fund.  Nohl signed the loan agreements and extensions on behalf of Greenpoint Tactical Income Fund.  Hull, Nohl, Chrysalis, and Greenpoint Management II did not adequately disclose this loan, its terms, and the extensions to the Greenpoint Tactical Income Fund investors or the Fund's auditor.

168.    Hull did not disclose to the two investors in Greenpoint Global Mittelstand Fund that their funds would be loaned to Greenpoint Tactical Income Fund.

169.    Hull made this $750,000 loan without the consent or approval of all of the managers of Greenpoint Global Mittelstand Fund.  This $750,000 loan to Greenpoint Tactical Income Fund was contrary to Greenpoint Global Mittelstand Fund's stated investment strategy of investing in Korean companies.

170.    On or about September 14, 2016, the Fund borrowed an additional $275,000 from Greenpoint Global Mittelstand Fund.  Hull was a manager of the Greenpoint Global Mittelstand Fund.  The loan was due on October 31, 2016.  The amount of interest to be paid was $10,000.  On or about October 31, 2016, the due date of the loan was extended to November 30, 2016.  On or about November 30, 2016, the due date of the loan was extended to May 31, 2017.  Hull signed the loan agreements and extensions on behalf of Greenpoint Global Mittelstand Fund.  Nohl signed the loan agreements and extensions on behalf of Greenpoint Tactical Income Fund.  Hull, Nohl, Chrysalis, and Greenpoint Management II did not adequately disclose this loan, its terms, and the extensions to the Greenpoint Tactical Income Fund investors or the Fund's auditor.

171.    On February 24, 2017, Greenpoint Tactical Income Fund made a partial payment on the loans of $100,000 to Greenpoint Global Mittelstand Fund.

172.    On May 31, 2017, Hull on behalf of Greenpoint Global Mittelstand Fund and Nohl

on behalf of Greenpoint Tactical Income Fund entered into an agreement to create a third loan in the amount of $995,000 to ostensibly pay off the $750,000 loan and $275,000 loan. However, Greenpoint Tactical Income Fund did not pay $995,000 to Greenpoint Global Mittelstand Fund. The $995,000 includes the $935,000 that was still due on the $750,000 and $275,000 loans plus interest of $60,000. This third loan and the fact that the original two loans in the amounts $750,000 and $275,000 had not been paid by the due dates were not disclosed to the investors.

173.     Greenpoint Tactical Income Fund eventually repaid the loans on or about November 20, 2018. The $750,000 loan was originally due on February 29, 2016 and thus was finally paid more than two years and eight months after it was due. The $275,000 loan was originally due on October 31, 2016 and thus was finally paid more than two years after it was due.

### 4.     Hull and Nohl Caused the Fund to Borrow Money from Certain Investors Without Disclosure to Other Investors

174.     On April 14, 2016, Investor Number 2 loaned the Fund $1,000,000. Investor Number 2 charged the Fund $100,000 in interest. The loan was to be repaid in three months. The effective annual percentage rate on this loan was supposed to be 40%. However, on July 1, 2016, the loan and interest were converted to $1,100,000 in equity. Hull, Nohl, Chrysalis, and Greenpoint Management II did not disclose this loan, its terms, interest rate, or its eventual conversion to equity to the investors or the Fund's auditor.

175.     On December 7, 2016, Investor Number 2 loaned the Fund $250,000. The Fund repaid the loan on January 6, 2017. The Fund paid $30,000 in interest for this 30-day loan. The effective annual percentage rate on this loan was 146%.   Hull and Nohl signed the loan agreement as managers of the Fund. Hull, Nohl, Chrysalis, and Greenpoint Management II did not disclose this loan, its terms, and interest rate to the investors or the Fund's auditor.

176.     On February 10, 2017, Investor Number 2 loaned the Fund $250,000. The loan

was due to be repaid on April 17, 2017 with $50,000 in interest.  On April 17, 2017, the Fund and

Investor Number 2 extended the due date of the loan to June 19, 2017.  Hull signed the loan

agreement and extensions as manager of the Fund.  On June 19, 2017, the due date of the loan was

again extended until September 30, 2017 in exchange for a $25,000 interest payment.  Investor

Number 2 then gifted the $25,000 to his son, who is Investor Number 1.  Investor Number 1 then

directed the Fund to pay the $25,000 to one of Nohl's entities in exchange for a diamond for an

engagement ring.  Nohl wrote a check to his entity from Greenpoint Tactical Income Fund's bank

account thus using investor funds to repay a personal debt Investor Number 1 owed to Nohl's

entity.

177.    On September 30, 2017, the due date of the loan was again extended.  The Fund

finally repaid the loan on November 30, 2018.  Thus, the term of the loan including the extensions

was 658 days. The Fund paid $100,000 in interest for a 658-day loan from an investor, of which

$25,000 was paid to Nohl's entity.  Hull, Nohl, Chrysalis, and Greenpoint Management II did not

disclose to the investors this loan, its terms, its interest rate, the extensions of the due date, that

$25,000 was paid to extend the loan, or that $25,000 went to Nohl's entity.

### 5.    Nohl's and Hull's Entities Have Engaged in Transactions with the Fund That Were Not Disclosed to Investors

178.    Nohl has and continues to own and operate his own gem and mineral business

while managing Greenpoint Tactical Income Fund, which also buys and sells gems and minerals.

Nohl's gem and mineral business has engaged in transactions with GP Rare Earth, which is the

wholly-owned subsidiary of Greenpoint Tactical Income Fund that holds the Fund's gems and

minerals.  On June 25, 2014, an entity owned by Nohl purchased 14 minerals from the Fund for

$93,671.  On October 11, 2016, GP Rare Earth gave Chrysalis a mineral in exchange for a credit of

$12,110 against Chrysalis' management fees.  On February 23, 2018, GP Rare Earth and Nohl's

entity engaged in another mineral transaction.  On May 23, 2018, GP Rare Earth gave Nohl's

entity two minerals in exchange for a $4,750 credit.  Hull, Nohl, Chrysalis, and Greenpoint

Management II did not disclose these transactions to the investors or the Fund's auditor.

179.   On September 15, 2014, an entity co-owned by Hull acquired a piano from

Greenpoint Tactical Income Fund for $58,000.  On September 22, 2014, an entity co-owned by

Hull purchased a sapphire from GP Rare Earth for $58,000.  The piano went to Hull's residence.

The sapphire was put into jewelry that Hull's wife wears.  Hull, Nohl, Chrysalis, and Greenpoint

Management II did not disclose these transactions to the investors or the Fund's auditor.

### H.   Hull And Nohl Improperly Increased The Value Of Some Of The Minerals And Acted In Violation Of Greenpoint Tactical Income Fund's Operating Agreements

#### 1.   The Fund Was Obligated to Value the Gems and Minerals at the Purchase Price During the Year the Fund Acquired Them

180.   The Amended and Restated Operating Agreement of Greenpoint Tactical Income

Fund, LLC ("Amended Operating Agreement") became effective on November 7, 2013.  It was

effective until January 1, 2016.

181.   The Amended Operating Agreement defines Fair Market Value as "the value of

non-current assets determined by appraisal.  Provided, however, the value of any assets shall be its

purchase price for the year within which it is acquired."

#### 2.   Hull and Nohl Reported to the Investors Higher Values Than the Purchase Prices

182.   Hull and Nohl as managers of the Fund repeatedly violated Greenpoint Tactical

Income Fund's Amended Operating Agreement's requirement that the Fund value its gems and

minerals at cost during the year the Fund acquired them.  Hull and Nohl had 22 of the minerals that

the Fund purchased in 2014 appraised in 2014 rather than being valued at the purchase prices as

required by the Amended Operating Agreement.  The appraisals for 21 of the 22 mineral specimens assigned a higher value than the purchase price.  Hull and Nohl had the Fund report the higher appraised values in the Fund's financial statements.

183.    Using the appraised values rather than the purchase prices in violation of the Amended Operating Agreement resulted in unrealized gains of $4.4 million on the 21 minerals, yielding a reported return on investment of 111.9% through unrealized gains.  Hull and Nohl through Greenpoint Management II and Chrysalis, respectively, received increased management fees by using the appraised values rather than the purchase prices as required by the Amended Operating Agreement.

184.    In 2015, the Fund purchased approximately 175 mineral specimens that were improperly revalued later in 2015.  Hull and Nohl had them appraised in 2015 and used the appraised values rather than valuing them at the purchase price as required by the Amended Operating Agreement.  Hull and Nohl had the Fund report the higher appraised values in the Fund's financial statements.

185.    Included in the 175 minerals were the three mineral specimens Nohl agreed to purchase for $6.8 million from Dealer Number 1.  Just weeks after the Fund agreed to purchase the three mineral specimens, but before the Fund paid for them or took possession, Hull and Nohl had them appraised for $14 million.  Hull and Nohl had the Fund record $14 million as the value, rather than the $6.8 million purchase price.  Hull's and Nohl's actions resulted in $7.2 million in unrealized gains on the three mineral specimens.

186.    Hull and Nohl's use of the appraised values, rather than the purchase prices, in violation of the Amended Operating Agreement, resulted in unrealized gains of $14.8 million on the 175 minerals, yielding a reported return on investment of 133.8% through unrealized gains on

43

those minerals.  Hull and Nohl through Greenpoint Management II and Chrysalis, respectively,

received increased management fees by using the appraised values rather than the purchase prices

as required by the Amended Operating Agreement.

**I.      Nohl Misrepresented the Appraisal Process To The Investors And The Fund's Auditor**

187.    Note 3 to Greenpoint Tactical Income Fund's Financial Statements as of December

31, 2015 and for the Period February 6, 2013 through December 31, 2105 states:

> Fine minerals and gems are valued using third party appraisals based on
> underlying market driven events.  Sales occur throughout the year but generally
> will occur in low volumes and are based on private third party transactions of
> which information may not and generally is not readily available to market
> participants.  Observable data is generally available at market driven sales shows
> and special events typically in the first quarter of each year.  These events provide
> public and semi-public transactions that utilized in development estimates of fair
> value for the portfolio of the Fund.  The valuations of these investments are
> further evaluated throughout the year as of the reporting date based on other
> market data available, generally the Fund's own transactions or semi-public
> information used by appraisal experts of large scale market participants.

188.    Nohl provided this information about the appraisal process to the Fund's auditor.

189.    Nohl's representations about the appraisal process for the gems and minerals are

false and misleading.  The third party appraisals were not based on underlying market driven

events.  Observable data from market driven sales shows was not used in the appraisals.  The

appraisals were not evaluated throughout the year based on other available market data.

190.    Nohl hired Appraiser Number 1 to perform most of the appraisals for the minerals

owned by the Fund.  Appraiser Number 1's appraisals were not based on underlying market driven

events.  Appraiser Number 1 did not collect and use sales data from sales shows in performing the

appraisals of the Fund's minerals.   Appraiser Number 1 did not further evaluate the valuations

throughout the year.   Appraiser Number 1's appraisal process was to look at a specimen for a few

seconds and write down a value.  Nohl knew this was Appraiser Number 1's process.  Nohl knew

the appraisal process for the Fund's minerals was subjective, not the objective process he represented to the Fund's investors and auditors.

**J.     Nohl Improperly Interfered In The Appraisal Process to Generate Higher Appraised Values**

191.    Nohl improperly meddled in the appraisals of the Fund's minerals in several ways. Nohl engaged in undisclosed purchases of minerals from Appraiser Number 2; rejected appraised values that he deemed too low; cherry-picked higher appraisals of the minerals; had appraised values changed; and pressured appraisers over the values they reported.

192.    Hull, Nohl, Chrysalis, and Greenpoint Management II did not disclose Nohl's interference in the appraisal process to Greenpoint Tactical Income Fund's investors or auditor.

**1.     Nohl Engaged in Prohibited Transactions With Appraiser Number 2 and Did Not Disclose Them to the Fund's Investors or Auditor**

193.    On April 7, 2015, Nohl agreed that the Fund would purchase several minerals from Appraiser Number 2 for $275,000.  Part of the agreement was that Appraiser Number 2 would appraise some of the Fund's minerals.  On April 8 and 9, 2015, Nohl had Appraiser Number 2 appraise eight mineral specimens.  Five of the specimens, including the three minerals in the $6.8 million set, had been purchased by the Fund two months earlier.  Hull and Nohl reporting appraised values rather than the purchase prices was therefore improper and in violation of the Amended Operating Agreement.

194.    Hull and Nohl had the Fund record unrealized gains of $13.7 million based on the eight appraisals done by Appraiser Number 2.

195.    The Fund did not initially pay Appraiser Number 2 the full $275,000.

196.    On December 2, 2015, Nohl sent an email to Appraiser Number 2 stating, "[o]ur auditors want your signature on the appraisals you did for us in the summer.  Can you sign and

send them through?"  Appraiser Number 2 refused to sign the appraisals until Nohl paid him the remaining balance of $125,000 either in cash or in minerals.

197.    The Second Amended and Restated Operating Agreement of Greenpoint Tactical Income Fund, LLC ("Second Amended Operating Agreement") became effective on January 1, 2016.

198.    For fine minerals, the Second Amended Operating Agreement states, "No other business other than the business of appraising may be entered with respective appraisers."

199.    In June 2016, after the Second Amended Operating Agreement became effective, Nohl paid Appraiser Number 2 the remaining $125,000 that the Fund owed for the minerals it had purchased from Appraiser Number 2.  On or about June 13, 2016, Appraiser Number 2 sent a Facebook message to Nohl stating, "I know we can figure out a trade on the remaining balance of the collection you got from me . . .  and I can sign those appraisals finally."  Later that same day, Nohl gave Appraiser Number 2 a check for $125,000 and insisted Appraiser Number 2 conduct more appraisals of the Fund's minerals.  The same day that he received the check, Appraiser Number 2 appraised ten of the Fund's mineral specimens.

200.    Nohl and Hull recorded unrealized gains of $7.6 million based on the appraisals of the ten mineral specimens by Appraiser Number 2.

201.    Hull and Nohl's use of the appraisals by Appraiser Number 2 was improper because the Fund purchased minerals from him.

202.    Nohl falsely represented to the Fund's auditor that the Fund did not have a relationship with Appraiser Number 2 other than as an appraiser.

203.    Hull, Nohl, Chrysalis, and Greenpoint Management II did not disclose to the Fund's investors or to the auditor that the Fund was purchasing minerals from Appraiser Number 2

and that purchases and payments occurred contemporaneously with the two sets of appraisals conducted by Appraiser Number 2.

204.     Hull, Nohl, Chrysalis, and Greenpoint Management II obtained money by not disclosing the mineral purchase to the investors.  Hull, Nohl, Chrysalis, and Greenpoint Management II obtained increased management fees resulting from recording the unrealized gains of $13.7 million based on the appraisals of the eight mineral specimens in 2015 and from recording the unrealized gains of $7.6 million based on the appraisals of the ten mineral specimens in 2016.

### 2.     Nohl Rejected Appraisals He Deemed Too Low And Accepted Higher Appraisals On the Same Gems and Minerals

#### a.   March 2015 Appraisal of Set of Tourmalines

205.     On two different occasions, Nohl rejected appraisals of a set of tourmaline gemstones.  The Fund purchased the set of tourmaline gemstones in October 2013 for $1.2 million.

206.      In March 2015, a gemologist ("Appraiser Number 3") appraised the set of tourmaline gemstones for approximately $3 million, which was $1.8 million more than the Fund paid for the tourmalines.

207.     Nohl told Appraiser Number 3 that the appraisals were unreasonably low. Appraiser Number 3's boss told her to keep the customer happy.  Appraiser Number 3 then increased the appraised value of the set of tourmaline gemstones to $6,340,730.  Based on the revised appraisals, Hull and Nohl had the Fund record approximately $5.1 million ($6.3 million minus $1.2 million) in unrealized gains.

208.     Hull, Nohl, Chrysalis, and Greenpoint Management II did not disclose to the Fund's investors or auditor that Appraiser Number 3 appraised the set of tourmaline gemstones for approximately $3 million and changed the appraised value to $6,340,730 after Nohl complained that the $3 million was too low.

209.    Nohl falsely represented to the Fund's auditor that Appraiser Number 3's process was to compare the gems to others that have been sold to determine fair market.  Nohl falsely represented to the Fund's auditor that there was no impairment to Appraiser Number 3's objectivity.  Nohl did not disclose his interference in the appraisal process.

210.    Hull, Nohl, Chrysalis, and Greenpoint Management obtained money as a result of Nohl misrepresenting the appraisal process and failing to disclose his interference in the appraisal process.  Hull, Nohl, Chrysalis, and Greenpoint Management obtained increased management fees by recording the unrealized gains of approximately $5.1 million based on the revised appraisals of the set of tourmaline gemstones.

### b.    August 2017 Appraisal of Set of Tourmalines

211.    In August 2017, another gemologist ("Appraiser Number 4") appraised the same set of tourmaline gemstones discussed above for $1,546,251.  In March 2015, Appraiser Number 3 had appraised the same set of tourmaline gemstones for $6,340,730 after Nohl influenced the appraisals.  In June 2016, Appraiser Number 2 had appraised the same set of tourmaline gemstones for $8,156,100.  This set of appraisals was performed at the same time Appraiser Number 2 received the $125,000 from Nohl.

212.    Hull and Nohl had the Fund record unrealized gains based on the $8,156,100 appraised value assigned by Appraiser Number 2 in 2016.

213.    Nohl rejected the $1,546,251 appraised value from Appraiser Number 4 in 2017. Hull and Nohl continued to use the $8,156,100 appraised value from 2016.

214.    Hull, Nohl, Chrysalis, and Greenpoint Management II charged higher management fees based on the $8,156,100 appraised value rather than the $1,546,251 appraised value.

215.    Hull, Nohl, Chrysalis, and Greenpoint Management II did not disclose to the

48

Fund's investors that Nohl rejected the $1,546,251 appraised value and continued to use the $8,156,100 appraised value for the set of tourmaline gemstones.

216.     Hull, Nohl, Chrysalis, and Greenpoint Management II obtained money by means of falsely representing the appraised value of the set of tourmaline gemstones.  Hull, Nohl, Chrysalis, and Greenpoint Management obtained increased management fees by using the old appraised value of $8,156,100.

### 3.     Nohl Cherry-Picked Higher Appraised Values

217.     In April 2015, Nohl had several fine mineral specimens appraised by both Appraiser Number 1 and Appraiser Number 2.  Appraiser Number 2 emailed Nohl values for all 14 of the specimens he was appraising.  Nohl told Appraiser Number 2 not to complete appraisals for six of the 14 specimens.  Just days earlier, Appraiser Number 1 had given Nohl higher appraised values for those six specimens than Appraiser Number 2 had emailed to Nohl.  The eight appraisals that Nohl told Appraiser Number 2 to complete were for specimens that Appraiser Number 1 had given lower values or had not appraised.

218.     Nohl cherry-picked higher values from Appraiser Number 1 and Appraiser Number 2.  By using a combination of the higher appraised values from the two appraisers, Nohl caused the Fund to record the value of the set of 14 specimens as $1.75 million more than if he had used Appraiser Number 2's values for all of the 14 specimens.

219.     Hull, Nohl, Chrysalis, and Greenpoint Management II did not disclose to the Fund's investors or the auditor that Nohl had certain specimens appraised by two different appraisers and selected the higher appraised values; nor did they disclose the lower appraised values to the Fund's investors or auditor.

220.     Hull, Nohl, Chrysalis, and Greenpoint Management II obtained money by means of

Nohl failing to disclose that he cherry-picked higher appraised values.  Hull, Nohl, Chrysalis, and Greenpoint Management obtained increased management fees by using the higher cherry-picked appraised values.

### 4.    Nohl Relied on Altered Appraised Values

221.    Appraiser Number 1 conducted his first appraisals of the Fund's gem and mineral specimens in March 2014.  Appraiser Number 1 emailed an initial list of appraised values to a mineral dealer working for Nohl.  The mineral dealer working for Nohl responded via email and sent a list of changes increasing the appraised values of 29 of the specimens.   The mineral dealer working for Nohl wrote "I printed out and added some changes that we need to have for certain specimens."  A screenshot of the email and one of the three pages of value changes are below:



TABLE #3

1231130011 Amethyst $4500 — *19,000.00*
1231130012 Amethyst $4000 — *19,000.00*
1231130013 Beryl $400000 → *450,000.00*
1231130014 Beryl $45000 → *50,000*
1231130015 Tourmaline $225000 - *250,000.00*
1231130016 Tourmaline $60000 — *85,000*
1231130017 Beryl $200000 — *250,000*
1231130018 Tourmaline $35000
1231130019 Topaz $15000 → *35,000.00*
1231130020 Sulphur $45000 → *50,000.00*
1231130022 Tourmaline $20000 → *30,000.00*
1231130023 Fluorite $3500 → *Exsample → 15,000.00*
1231130024 Tourmaline $10000 → *30,000.00*
1231130025 Tourmaline $35000 → *50,000*

*→ 5000 Grams USK*

ON FLOOR

506130002 Gold $175000 → *200,000*
506130003 Tourmaline $150000 → *250,000.00*
523130001 Rhodochrosite $150000 - *200,000.00*
603130001 Beryl $35000 - *41,000.00*

IN SAFE

FCCOMOTO1007130001 Tourmaline 29.13ct $12,000/ct
FCCOMOTO1007130005 Tourmaline 108.46ct $25,000/ct
FCCOMOTO1007130004 Tourmaline 83.37ct $22,000/ct
FCCOMOTO1007130002 Tourmaline 34.40ct $12,000/ct
FCCOMOTO1007130003 Tourmaline 44.59ct $12,000/ct
FCCOBREU31113004 Euclase 3.28ct $300/ct *3800 ct / Dudley Appraised @*
FCCOBREU31113003 Euclase 15.72ct $350/ct *wholesale*
FCCOCARH718130032 Rhodochrosite 2.45ct $325/ct
FCCOCARH718130031 Rhodochrosite 2.72ct $325/ct
FCCOCARH718130033 Rhodochrosite 6.26ct $500/ct
FCWOUSFL718131092 Fluorite 17.10ct $50/ct

AT COLLECTOR'S EDGE

Large gold Australia $675,000

222.     The total of the increases was $577,864, a 34% increase.

223.     The final version of Appraiser Number 1's appraisal report that is contained in the

Fund's auditor's work papers includes all of the increased values provided by the mineral dealer

working for Nohl without any indication that the original values provided by Appraiser Number 1

had been changed.

224.     Hull, Nohl, Chrysalis, and Greenpoint Management II did not disclose to the

Fund's investors or auditor that the values had been increased.

225.     Hull, Nohl, Chrysalis, and Greenpoint Management II obtained money by failing to

disclose that the appraised values were increased.  Hull, Nohl, Chrysalis, and Greenpoint Management obtained increased management fees by using the increased appraised values.

### 5.   Nohl Asked Appraisers to Increase Values Without an Objective Basis for Doing So

226.   In April 2015, Nohl asked Appraiser Number 2 to increase a specimen's appraised value from $7 million to $10 million.  Appraiser Number 2 refused to increase the value.

227.   In 2017, Nohl called Appraiser Number 1 and asked him to reconsider an appraised value of $5 million that he had assigned a specimen.  Appraiser Number 1 changed the value to $7.5 million.

228.   Hull, Nohl, Chrysalis, and Greenpoint Management II did not disclose to the investors or auditors that Nohl asked Appraiser Number 1 to change the value from $5 million to $7.5 million and asked Appraiser Number 2 to increase a value from $7 million to $10 million.

229.   Hull, Nohl, Chrysalis, and Greenpoint Management II obtained money as a result failing to disclose that Nohl asked for appraised values to be increased.  Hull, Nohl, Chrysalis, and Greenpoint Management obtained increased management fees by using the increased appraised values.

### K.   Hull and Nohl Drastically Increased the Valuation of Private Company 1 Despite Knowing That It Was in Serious Financial Trouble

230.   Between October 2015 and June 30, 2018, Greenpoint Tactical Income Fund, through its wholly owned subsidiary GP Chemical, invested approximately $9.0 million (including a mineral that the Fund valued at $2.5 million) in stock, options, and convertible notes to acquire approximately 42% of Private Company 1.  Hull and Nohl recorded large, unreasonable unrealized gains on the investment in Private Company 1.  As of June 30, 2018, Hull and Nohl valued the Fund's 42% interest in Private Company 1 at $46.2 million, composed of approximately $37.2

million in unrealized gains and $9 million in cost.  Hull and Nohl's valuations of Private Company 1 were misleading, unreasonable, lacked an objective basis, and ignored significant negative facts.

231.    Private Company 1 was an environmental remediation company that had its principal place of business in Wisconsin.  It is now defunct.  Both Hull and Nohl were members of Private Company 1's Board of Directors from at least the third quarter of 2016.

232.    Nohl, as President and Director of managing member Chrysalis, drafted or validated the valuation reports for Private Company 1.  At all relevant times, Nohl was responsible for determining the value of Private Company 1 and the Fund's position in Private Company 1.  At all relevant times, Hull, as Managing Director of managing member Greenpoint Management II, and Nohl, as President and Director of managing member Chrysalis, shared authority for the valuations.

       **1.**       **At the End of 2015, Hull and Nohl Made Material Misrepresentations About The Value Of Private Company 1, Withheld Negative Facts, and Valued the Company at $40 Million, Which was Misleading and Unreasonable**

233.    By the fourth quarter of 2015, when Greenpoint Tactical Income Fund through GP Chemical first invested in Private Company 1, the company's primary business was participating as a subcontractor on a pilot program to remediate oil pollution in Kuwait.

234.    On September 30, 2015, Greenpoint Tactical Income Fund through GP Chemical agreed to invest $2 million in Private Company 1 by purchasing securities issued by Private Company 1.  By December 31, 2015, the Fund through GP Chemical had paid only $1 million of the $2 million it had agreed to pay.  Hull and Nohl knew that Private Company 1 needed the money GP Chemical was investing in order to operate.

235.    Greenpoint Tactical Income Fund's Financial Statements for the year ended December 31, 2015 represented that the Fund's interest in Private Company 1 was valued at

$4,260,564.  Hull and Nohl through Greenpoint Management II and Chrysalis, respectively, shared authority for the valuation.  Hull and Nohl's $4,260,564 valuation was misleading, unreasonable, and lacked an objective basis.

236.     The Fund's Financial Statements for the year ended December 31, 2015 were distributed to investors and used to attract new investors and new investments from existing investors in the Fund.

237.     Hull and Nohl derived the $4,260,564 value from the Quarterly Valuation for Private Company 1 with an evaluation effective date of December 31, 2015 ("December 31, 2015 Quarterly Valuation Report").  The December 31, 2015 Quarterly Valuation Report was Hull and Nohl's first valuation of Private Company 1.  Nohl authored the December 31, 2015 Quarterly Valuation Report.  Nohl certified that "[t]his report has been made completely to the best of my ability considering all factors known to me at the time of its creation."  Hull and Nohl through Greenpoint Management II and Chrysalis, respectively, shared authority for the December 31, 2015 Quarterly Valuation Report and valuations.

238.     The December 31, 2015 Quarterly Valuation Report was distributed to and/or made available to investors.

239.     In the December 31, 2015 Quarterly Valuation Report, Hull and Nohl stated that Private Company 1 as a whole was valued at $40,390,533.06.  Hull and Nohl further stated that the Fund's investment in Private Company 1 was valued at $4,270,840.45.  Hull and Nohl's $40,390,533.06 valuation of the company as a whole and the $4,270,840.45 valuation of the Fund's interest in Private Company 1 were misleading, unreasonable, and lacked an objective basis.

240.     For the fourth quarter of 2015, Hull and Nohl caused the Fund to record

approximately $760,564 in unrealized gains on Private Company 1's securities that GP Chemical had purchased.

241.    Hull and Nohl based the $40 million valuation on a limited offering of Private Company 1's stock that happened in 2010 ("2010 Offering").  The 2010 Offering was conducted in anticipation of Private Company 1 receiving a $220 million contract from the United States Environmental Protection Agency ("EPA").

242.    For the 2010 Offering, Private Company 1 offered to sell 1,000 shares of stock at a price of $4,000 per share.  If Private Company 1 had been able to sell all of the shares at the offering price, it would have sold 10% of its stock for $4 million.  In the 2010 Offering, Private Company 1 sold approximately half of the shares it offered for sale.  All of the shares were sold for less than $4,000 per share.

243.    Based on the anticipated $220 million EPA contract, the prospectus for the 2010 Offering projected that Private Company 1 would have annual revenues of $137.5 million and net income of $39.5 million by 2015.

244.    By May 2011, Private Company 1 had been informed by the EPA that it would not receive that $220 million EPA contract.

245.    In 2015, before Greenpoint Tactical Income Fund through GP Chemical invested in Private Company 1, Hull and Nohl knew that Private Company 1 had not received that $220 million EPA contract; had not sold all of the shares in the 2010 Offering; and had not sold any shares in the 2010 Offering for the full offering price of $4,000 per share.

246.    Private Company 1's actual 2015 revenues were only approximately $3.98 million and net income was only $100,000, not the projected annual revenues of $137.5 million and net income of $39.5 million by 2015.

247.     Despite knowing these material facts, as of December 31, 2015 Hull and Nohl used that $40 million value based on the price at which shares were unsuccessfully offered in the 2010 Offering as the 2015 value of Private Company 1.

248.     In valuing Private Company 1 at $40 million in 2015, Hull and Nohl ignored material facts.  Their $40 million valuation was misleading, unreasonable, and lacked an objective basis.  Their $40 million valuation was contrary to facts known to Hull and Nohl including that Private Company 1 had not received the $220 million EPA contract and did not have revenue anywhere near $137.5 million by 2015.

249.     Hull and Nohl in the December 31, 2015 Quarterly Valuation Report falsely and misleadingly represented, "[t]he enterprise value of $40,000,000 was established before major events that positively affected enterprise value.  Since establishing that value the Company has become a tier 1 contractor with both [Major Energy Company] and [Foreign Government Entity]."

250.     At the time of the December 31, 2015 Quarterly Valuation Report, Hull and Nohl knew that the $40 million valuation was based on the 2010 Offering, which was conducted in anticipation of Private Company 1 receiving a $220 million EPA contract, and that Private Company 1 had not received an EPA contract for $220 million.  In the December 31, 2015 Quarterly Valuation Report, Hull and Nohl ignored, withheld, and failed to disclose the material facts that the $40,000,000 value was based on an offering price in 2010 when Private Company 1 anticipated receiving an EPA contract for $220 million and the shares that were sold in the 2010 Offering were all sold at a lower price than the offering price.  In the December 31, 2015 Quarterly Valuation Report, Hull and Nohl further ignored, withheld, and failed to disclose the material fact that Private Company 1 was notified in 2011 that it did not receive that EPA contract for $220 million.

251.     As of December 31, 2015, Hull and Nohl knew that Private Company 1 did not have a contract with Major Energy Company and had not been paid any money by Major Energy Company.  As of December 31, 2015, Hull and Nohl also knew that Private Company 1 did not have a contract with Foreign Government Entity and had not been paid any money by Foreign Government Entity.

252.     Despite knowing these facts, Hull and Nohl in the December 31, 2015 Quarterly Valuation Report ignored, withheld, and failed to disclose the material facts that Private Company 1 did not have a contract with Major Energy Company; had not been paid any money by Major Energy Company; did not have a contract with Foreign Government Entity; and had not been paid any money by Foreign Government Entity.

253.     Before the Fund invested in Private Company 1 in the fourth quarter of 2015, the company's management told Nohl and an employee of the Fund ("Fund Employee Number 1"), that the pilot program's general contractor had not paid Private Company 1 any money; only one of Private Company 1's two plants in Kuwait was operating; and the one plant of Private Company 1 that was operating was not meeting the mandated performance standards.  Despite Nohl knowing these facts, Nohl in the December 31, 2015 Quarterly Valuation Report ignored, withheld, and failed to disclose any of these material facts.

254.     The December 31, 2015 Quarterly Valuation Report falsely and misleadingly stated, "[d]ue to the Company's successful on-going operation of its full-scale pilot plant, it likely will be awarded a contract by the end of 2016 that will generate $60+ million in revenue per year over an eight year period."  Before December 31, 2015, Nohl knew this representation was false and misleading because he knew the plant was not operating successfully.

255.     Hull and Nohl using in 2015 a $40 million value for Private Company 1 that had

been derived from the unsuccessful 2010 Offering conducted in anticipation of Private Company 1 receiving a $220 million EPA contract when the company had been informed in 2011 that it would not receive the EPA contract was misleading and unreasonable.  Hull and Nohl's $40 million valuation ignored material negative facts that were known to Nohl and Hull and lacked an objective basis.

256.    Hull, Nohl, Greenpoint Management II, and Chrysalis obtained money in the form of management fees by means of the misleading and unreasonable $4,260,564 valuation of the Fund's interest in Private Company 1.

### 2.    The Fund Was Chronically Late Funding Private Company 1, Which Caused The Company Not To Have The Funds It Needed To Operate

257.    On September 30, 2015, Greenpoint Tactical Income Fund through its wholly owned subsidiary GP Chemical agreed to invest $2 million in Private Company 1 through the purchase of securities.  The first payment of $500,000 was due on October 1, 2015.  The second payment of $500,000 was due on November 1, 2015.  The third payment of $500,000 was due on December 1, 2015.  The fourth payment of $500,000 was due on January 1, 2016.  By January 15, 2016, the Fund through GP Chemical had paid only $1 million of the $2 million it had agreed to pay.

258.    Private Company 1 needed the other $1 million that the Fund had agreed to pay. Private Company 1 was on the brink of having to shut down its operations in Kuwait.  The failure to make the agreed upon investments caused Private Company 1 financial distress.

259.    On December 31, 2015, the Fund gave the founder of Private Company 1 a mineral in exchange for 932 shares of Private Company 1.  The Fund did not have the cash to pay for the shares.  As of December 31, 2015, the Fund had paid over $5.9 million in management and other fees to Chrysalis and Greenpoint Management II.  The Fund claimed the mineral was worth $2.5

million.  The founder of Private Company 1 has not sold the mineral so Private Company 1 never received any money for the mineral.

260.    During 2016, Greenpoint Tactical Income Fund repeatedly failed to meet its funding obligations to Private Company 1.

261.    In February 2016, Greenpoint Tactical Income Fund through GP Chemical purchased six option agreements to acquire additional shares of Private Company 1 for approximately $7.6 million.  GP Chemical paid $6,000 for the option agreements.  The option agreements entered into by GP Chemical on behalf of the Fund and Private Company 1 stated that time is of the essence.

262.    Greenpoint Tactical Income Fund through GP Chemical agreed to exercise its options by paying for the shares of Private Company 1 on a schedule.  GP Chemical's payments were consistently late and as time went on increasingly late.

263.    On April 5, 2016, $250,190.25 was due.  GP Chemical did not pay the $250,190.25 by April 5, 2016.  On April 11, 2016, GP Chemical paid $250,000.

264.    On April 25, 2016, $250,190.25 was due.  GP Chemical did not pay the $250,190.25 by April 25, 2016.  On May 16, 2016, GP Chemical paid $100,000.  On May 20, 2016, GP Chemical paid $150,190.25.

265.    On May 20, 2016, $1,000,760.50 was due.  GP Chemical did not pay the $1,000,760.50 by May 20, 2016.  On May 27, 2016, GP Chemical paid $500,000.  On July 5, 2016, GP Chemical paid $500,000.

266.    On June 30, 2016, $1,500,016.30 was due.  GP Chemical did not pay the $1,500,016.30 by June 30, 2016.  On August 9, 2016, GP Chemical paid $150,000.  On August 16, 2016, GP Chemical paid $150,000.  On August 29, 2016, GP Chemical paid $250,000.  On

September 22, 2016, GP Chemical paid $100,000.  On October 7, 2016, GP Chemical paid

$200,000.  On October 21, 2016, GP Chemical paid $100,000.  On November 8, 2016, GP

Chemical paid $100,000.  On November 18, 2016, GP Chemical paid $100,000.  On November

23, 2016, GP Chemical paid $75,000.  On December 8, 2016, GP Chemical paid $300,000.

267.     For a $1,500,016.30 funding commitment that was due on June 30, 2016,

Greenpoint Tactical Income Fund through GP Chemical did not finish paying the commitment

until over five months after the due date.

> **3.     Hull and Nohl Made False and Misleading Statements In The Fund's March 31, 2016 Financial Statements and Quarterly Valuation Report for Private Company 1**

268.     Greenpoint Tactical Income Fund's financial statements for the period ended March

31, 2016 represented that the Fund's interest in Private Company 1 was valued at $7,032,588.99.

269.     Hull and Nohl through Greenpoint Management II and Chrysalis, respectively,

shared authority for this valuation.  Hull and Nohl's $7,032,588.99 valuation was misleading,

unreasonable, and lacked an objective basis.

270.     The Fund's financial statements for the period ended March 31, 2016 were

distributed to investors and used to attract new investors and new investments from existing

investors in the Fund.

271.     As of March 31, 2016, Greenpoint Tactical Income Fund had invested $4,500,000

in Private Company 1, consisting of a mineral that the Fund valued at $2.5 million and $2,000,000

in cash.

272.     For the first quarter of 2016, Hull and Nohl caused the Fund to record

approximately $1.7 million in new unrealized gains on Private Company 1's securities that GP

Chemical had purchased.

273.   Hull and Nohl derived the $7,032,588.99 value from the Quarterly Valuation for Private Company 1 with an evaluation effective date of March 31, 2016 ("March 31, 2016 Quarterly Valuation Report").

274.   Chrysalis drafted the March 31, 2016 Quarterly Valuation Report.  Hull and Nohl through Greenpoint Management II and Chrysalis, respectively, shared authority for the March 31, 2016 Quarterly Valuation Report and the valuations in the March 31, 2016 Quarterly Valuation Report.

275.   The March 31, 2016 Quarterly Valuation Report was distributed to and/or made available to investors.

276.   In the March 31, 2016 Quarterly Valuation Report, Hull and Nohl stated the enterprise value for Private Company 1 was $40,390,533.06 and the investment value was $6,033,177.25.  Hull and Nohl's $40,390,533.06 valuation of Private Company 1 as a whole and the $6,033,177.25 valuation of the Fund's interest in the company were misleading, unreasonable, and lacked an objective basis.

277.   In valuing Private Company 1 at $40,390,533.06, Hull and Nohl ignored material negative facts that were known to Hull and Nohl.

278.   In 2016, Private Company 1 was experiencing increasingly severe financial problems.  It still was not being paid for the pilot program to remediate oil pollution in Kuwait. For the first quarter of 2016, Private Company 1's revenue was $84,990 and losses were $995,438.

279.   Throughout 2016, Greenpoint Tactical Income Fund through GP Chemical was chronically late paying its funding commitments to Private Company 1.

280.   Hull and Nohl in the March 31, 2016 Quarterly Valuation Report falsely and misleadingly represented:

The prior enterprise value of $40,000,000 was established before a number of major events that positively affected enterprise value.  First, the Company has become a tier 1 contractor with both [Major Energy Company] and [Foreign Government Entity].  This designation is invaluable to the Company . . .

281.    At the time of the March 31, 2016 Quarterly Valuation Report, Hull and Nohl knew that the $40 million valuation was based on an unsuccessful offering in 2010 that was conducted in anticipation of Private Company 1 receiving an EPA contract for $220 million; that Private Company 1 did not receive an EPA contract for $220 million; and that the shares did not sell at the offering price of $4,000 per share even when Private Company 1 anticipated receiving the $220 million contract from the EPA.  Hull and Nohl in the March 31, 2016 Quarterly Valuation Report ignored, withheld, and failed to disclose the material facts that (1) the $40,000,000 value was based on an unsuccessful offering in 2010 that was conducted in anticipation of Private Company 1 receiving an EPA contract for $220 million; (2) that Private Company 1 was notified in 2011 that it did not receive that EPA contract for $220 million; and (3) the shares did not sell at the full offering price of $4,000 per share even when Private Company 1 anticipated receiving the $220 million contract from the EPA.

282.    At the time of the March 31, 2016 Quarterly Valuation Report, Hull and Nohl knew that Private Company 1 did not have a contract with Major Energy Company and had not been paid any money by Major Energy Company.  Hull and Nohl in the March 31, 2016 Quarterly Valuation Report ignored, withheld, and failed to disclose the material facts that as of March 31, 2016, Private Company 1 did not have a contract with Major Energy Company and had not been paid any money by Major Energy Company.

283.    At the time of the March 31, 2016 Quarterly Valuation Report, Hull and Nohl knew that Private Company 1 did not have a contract with Foreign Government Entity and had not been paid any money by Foreign Government Entity.  Hull and Nohl in the March 31, 2016 Quarterly

Valuation Report ignored, withheld, and failed to disclose the material fact that as of March 31, 2016, Private Company 1 did not have a contract with and had not been paid any money by Foreign Government Entity.

284.     Hull and Nohl in the March 31, 2016 Quarterly Valuation Report falsely and misleading represented that the "two cleaning plants being used" in Kuwait and "presently each have a capacity of 60+ tons of sand/hour or 360,000 tons per year."  By March 31, 2016, Hull and Nohl knew that only one plant was operating and that plaint was not meeting the mandated performance standards.

285.     Hull and Nohl in the March 31, 2016 Quarterly Valuation Report falsely and misleading represented that "[p]ending continued success running the second [Foreign Government Entity] pilot in Kuwait we anticipate bidding on and winning a significant portion of; A. the SEED 2 [Foreign Government Entity] initiative at mid year with the potential to generate revenue of $25mm/year for three years B. KERP (United Nations Funded) initiative in Q3 with potential to generate revenue as high as $75mm/year for 5 years."  As of March 31, 2016, Nohl and Hull knew that Private Company 1 was not having "continued success running" the pilot program. Hull and Nohl knew only one of two plants was operating and that plant was not meeting the performance standards.  Despite knowing these material facts, in the March 31, 2016 Quarterly Valuation Report, Hull and Nohl ignored, withheld, and failed to disclose any of these material facts.

286.     Hull and Nohl in the March 31, 2016 Quarterly Valuation Report falsely and misleading represented:

> To maximize the advantage of the Fund's position, the Fund is acquiring newly issued non-dilutive units with which money [Private Company 1] is paying for the construction of the equipment necessary to meet the obligations of the [Foreign Government Entity] and other contracts.  It is the aim of the Fund to acquire in total

between 30% and 45% of all [Private Company 1] units within the next 12 months. The intent is that this convertible debt financing serve as a means to [Private Company 1] reaching its objectives while at the same time increasing revenue for a near term exit for the Fund.  When complete, the Fund will sell its full interest in [Private Company 1] to the Greenpoint Green Fund (GGF) which is currently in final document preparation.  . . . At the time of the sale of the [Greenpoint Tactical Income Fund's] interest to the GGF, we expect the sale price to be between $85MM $100mm and $110 MM $140mm. Thus, provided all parties working toward this end are successful, the [Greenpoint Tactical Income Fund] will exit with net proceeds between $31.25MM and $48MM within the next 12 months.

287.     At the time of the March 31, 2016 Quarterly Valuation Report, Hull and Nohl knew that Greenpoint Tactical Income Fund through GP Chemical had not timely or completely paid the funding commitments to Private Company 1 in order to acquire more securities of Private Company 1; Private Company 1 needed money to operate; and Private Company 1 could not perform its remediation contracts without the Fund paying its funding commitments.  Despite knowing these material facts, in the March 31, 2016 Quarterly Valuation Report, Hull and Nohl ignored, withheld, and failed to disclose any of these material facts.

288.     Hull, Nohl, Greenpoint Management II, and Chrysalis obtained money in the form of management fees by means of the unreasonable and misleading $7,032,588.99 valuation of the Fund's interest in Private Company 1.

### 4.     Hull and Nohl Made False and Misleading Statements In The Fund's June 30, 2016 Financial Statements and the Quarterly Valuation Report for Private Company 1

289.     Greenpoint Tactical Income Fund's financial statements for the period ended June 30, 2016 represented that the Fund's interest in Private Company 1 was valued at $12,637,747.71.

290.     Hull and Nohl through Greenpoint Management II and Chrysalis, respectively, shared authority for the valuation.  Hull and Nohl's $12,637,747.71 valuation was misleading, unreasonable, and lacked an objective basis.

291.     The Fund's financial statements for the period ended June 30, 2016 were distributed

to investors and used to attract new investors and new investments from existing investors in the Fund.

292.    For the second quarter of 2016, Hull and Nohl caused the Fund to record approximately $1.867 million in new unrealized gains on Private Company 1's securities that GP Chemical had purchased.

293.    Hull and Nohl derived the $12,637,747.71 valuation from the Quarterly Valuation for Private Company 1 with an evaluation effective date of June 30, 2016 ("June 30, 2016 Quarterly Valuation Report").

294.    Chrysalis drafted the June 30, 2016 Quarterly Valuation Report.  Hull and Nohl through Greenpoint Management II and Chrysalis, respectively, shared authority for the June 30, 2016 Quarterly Valuation Report and the valuations in the report.  Hull and Nohl in the June 30, 2016 Quarterly Valuation Report stated the enterprise value for Private Company 1 was $41,501,140.50 and the investment value was $12,000,767.71.

295.    The June 30, 2016 Quarterly Valuation Report was distributed to and/or made available to investors.

296.    Hull and Nohl's $41,501,140.50 valuation of the company as a whole and the $12,000,767.71 valuation of the Fund's interest in Private Company 1 were misleading, unreasonable, and lacked an objective basis.

297.    In valuing Private Company 1 at $41,501,140.50, Nohl and Hull ignored material negative facts that were known to Nohl and Hull.

298.    In the second quarter of 2016, Private Company 1 was still experiencing severe financial problems.  It still was not being paid for the pilot program to remediate oil pollution in Kuwait.  Its revenue for the first two quarters of 2016 was $430,049.  Private Company 1 had

$1,361,719 in losses for the first two quarters of 2016.  Hull and Nohl knew these facts.

299.    Throughout 2016, Greenpoint Tactical Income Fund through GP Chemical was chronically late paying its funding commitments to Private Company 1.

300.    Hull and Nohl in the June 30, 2016 Quarterly Valuation Report falsely and misleadingly represented:

> In addition, the Company has strengthened its position [sic] a tier 1 contractor with both [Major Energy Company] and [Foreign Government Entity] and has been repeatedly singled-out as the best available technology for their remediation challenges.  This designation is invaluable to the Company as it possesses the number one proven solution (per [Foreign Government Entity] decree) to cleaning up the Kuwaiti oil fields environmental disaster for which $4 billion USD are already sequestered.

301.    At the time of the June 30, 2016 Quarterly Valuation Report, Hull and Nohl knew that Private Company 1 did not have a contract with Major Energy Company and had not been paid any money by Major Energy Company.  Hull and Nohl in the June 30, 2016 Quarterly Valuation Report ignored, withheld, and failed to disclose the material facts that as of June 30, 2016, Private Company 1 did not have a contract with Major Energy Company and had not been paid any money by Major Energy Company.

302.    At the time of the June 30, 2016 Quarterly Valuation Report, Nohl and Hull knew that Private Company 1 did not have a contract with Foreign Government Entity and had not been paid any money by Foreign Government Entity.  Hull and Nohl in the June 30, 2016 Quarterly Valuation Report ignored, withheld, and failed to disclose the material facts that as of June 30, 2016, Private Company 1 did not have a contract with Foreign Government Entity and had not been paid any money by Foreign Government Entity.

303.    Hull and Nohl in the June 30, 2016 Quarterly Valuation Report falsely and misleadingly represented:

To maximize the advantage of the Fund's position, the Fund is acquiring newly issued non-dilutive units with which money [Private Company 1] is paying for the construction of the equipment necessary to meet the obligations of the [Foreign Government Entity] and other contracts.  It is the aim of the Fund to acquire in total between 30% and 45% of all [Private Company 1] units within the next 12 months.  The intent is that this convertible debt financing serve as a means to [Private Company 1] reaching its objectives while at the same time increasing revenue for a near term exit for the Fund.  When complete, the Fund will sell its full interest in [Private Company 1] to the Greenpoint Green Fund (GGF). . . . At the time of the sale of the [Greenpoint Tactical Income Fund's] interest to the GGF, we expect the sale price to be between $85MM $100mm and $110 MM $140mm.  Thus, provided all parties working toward this end are successful, the [Greenpoint Tactical Income Fund] will exit with net proceeds between $31.25MM and $48MM within the next 12 months.

304.    At the time of the June 30, 2016 Quarterly Valuation Report, Hull and knew that Greenpoint Tactical Income Fund through GP Chemical had not timely or completely paid the funding commitments to Private Company 1 in order to acquire more securities of Private Company 1; Private Company 1 needed money to operate; and Private Company 1 could not perform its remediation contracts without the Fund timely and completely paying its funding commitments.  Despite knowing these material facts, in the June 30, 2016 Quarterly Valuation Report, Hull and Nohl ignored, withheld, and failed to disclose any of these material facts.

305.    Hull and Nohl in the June 30, 2016 Quarterly Valuation Report falsely and misleadingly represented that "[s]ince units are still being sold via private sales of the Company with an enterprise value of $41.50mm, that value is contemporaneously [sic] by many sales events."  At the time of the June 30, 2016 Quarterly Valuation Report, Hull and Nohl knew that no other private sales of Private Company 1's securities (other than to GP Chemical) had been made in 2016, let alone at an enterprise value of $41.5 million.

306.    Hull, Nohl, and their entities obtained money in the form of management fees by means of the unreasonable and misleading $12,637,747.71 valuation of the Fund's interest in Private Company 1.

5. **The Fund Continued to be Chronically Late Funding Private Company 1, Which Caused The Company Not To Have The Funds It Needed To Operate**

307.    The Fund through GP Chemical continued to be late providing the agreed upon funding to Private Company 1.  The funding commitments were paid in small, irregular installments.  Private Company 1 needed the money the Fund had agreed to pay in order to fund its operations.  On September 30, 2016, $1,374,077.90 was due.  The Fund through GP Chemical did not begin paying the September 30, 2016 commitment until almost three months after it was due. The Fund through GP Chemical made the following late and small payments:

- On December 23, 2016, $100,000 was paid.

- On January 9, 2017, $300,000 was paid.

- On January 12, 2017, $200,000 was paid.

- On February 10, 2017, $250,000 was paid.

- On February 13, 2017, $250,000 was paid.

- On April 12, 2017, $30,000 was paid.

- On January 3, 2018, $20,000 was paid.

- On April 19, 2018, $300,000 was paid.

308.    For a $1,374,077.90 funding commitment that was due on September 30, 2016, GP Chemical did not finish paying the commitment until over 18 months after the due date.

309.    Private Company 1's management regularly complained to Nohl about the late, irregular, and incomplete payments.

6. **Nohl And Hull Made False and Misleading Statements In The Fund's September 30, 2016 Financial Statements and Quarterly Valuation Report for Private Company 1**

310.    Greenpoint Tactical Income Fund's financial statements for the period ended

September 30, 2016 represented that the Fund's interest in Private Company 1 was valued at $14,112,200.19. Hull and Nohl through Greenpoint Management II and Chrysalis, respectively, shared authority for the valuation. Hull and Nohl's $14,112,200.19 valuation was misleading, unreasonable, and lacked an objective basis.

311.    The Fund's financial statements for the period ended September 30, 2016 were distributed to investors and used to attract new investors and new investments from existing investors in the Fund.

312.    As of September 30, 2016, Greenpoint Tactical Income Fund's paid in capital was $6,650,190.25 including a mineral the Fund valued at $2.5 million.

313.    For the third quarter of 2016, Hull and Nohl caused the Fund to record approximately $820,000 in new unrealized gains on Private Company 1's securities that GP Chemical had purchased.

314.    Hull and Nohl derived the $14,112,200.19 valuation from the Quarterly Valuation for Private Company 1 with an evaluation effective date of September 30, 2016 ("September 30, 2016 Quarterly Valuation Report").

315.    Chrysalis authored the September 30, 2016 Quarterly Valuation Report. Nohl validated the September 30, 2016 Quarterly Valuation Report and the valuations. On October 28, 2016, Nohl certified the September 30, 2016 Quarterly Valuation Report stating, "[t]his report has been made according to all of the knowledge known to me at the time without omission and to the best of my ability."

316.    Nohl also represented that "[t]his report is written for internal purposes to communicate and coordinate with management, staff and members, information considered relevant by the authors, editors and/or managing members at the time of this document's creation."

317.     In Nohl's Validator Commentary for the September 30, 2016 Quarterly Valuation Report, with respect to Private Company 1 he stated, "[t]his allowed us to restructure the Board of Directors where we hold 3 of the 6 seats."

318.     The September 30, 2016 Quarterly Valuation Report was distributed to and/or made available to investors.

319.     In the September 30, 2016 Quarterly Valuation Report, Hull and Nohl stated the enterprise value for Private Company 1 was $42,150,190.00 and the period investment value was $11,258,832.92.  Hull and Nohl through Greenpoint Management II and Chrysalis, respectively, shared authority for the September 30, 2016 Quarterly Valuation Report, the $42,150,190.00 valuation of Private Company 1 as a whole, and the $11,258,832.92 valuation of the Fund's interest in the company.  Hull and Nohl's valuations were misleading, unreasonable, and lacked an objective basis.

320.     In valuing Private Company 1 at $42,150,190.00, Nohl and Hull ignored material negative facts that were known to Nohl and Hull.

321.     In the third quarter of 2016, Private Company 1 was still experiencing severe financial problems.  It still was not being paid for the pilot program to remediate oil pollution in Kuwait.  Its revenue through the third quarter of 2016 was $565,615.  Private Company 1 had $1,516,022 in losses through the third quarter of 2016.  Hull and Nohl knew these facts.

322.     Throughout 2016, Greenpoint Tactical Income Fund through GP Chemical was chronically late paying its funding commitments to Private Company 1.

323.     Hull and Nohl in the September 30, 2016 Quarterly Valuation Report falsely and misleadingly represented:

In addition, despite running over 5 months late with the start-up of plant 2 the Company has strengthened its position as a tier 1 contractor with both [Major

70

Energy Company] and [Foreign Government Entity] and has been repeatedly singled-out as the best available technology for their remediation challenges. This designation is invaluable to the Company as it possesses the number one proven solution (per [Foreign Government Entity] decree) for cleaning up the Kuwaiti oil fields environmental disaster for which $3 billion USD are already sequestered by the United Nations.

324.    At the time of the September 30, 2016 Quarterly Valuation Report, Hull and Nohl knew that Private Company 1 did not have a contract with Major Energy Company and had not been paid any money by Major Energy Company. Hull and Nohl in the September 30 2016 Quarterly Valuation Report ignored, withheld, and failed to disclose the material facts that as of September 30, 2016, Private Company 1 did not have a contract with Major Energy Company and had not been paid any money by Major Energy Company.

325.    At the time of the September 30, 2016 Quarterly Valuation Report, Nohl and Hull knew that Private Company 1 did not have a contract with Foreign Government Entity and had not been paid any money by Foreign Government Entity. Hull and Nohl in the September 30 2016 Quarterly Valuation Report ignored, withheld, and failed to disclose the material facts that as of September 30, 2016, Private Company 1 did not have a contract with and had not been paid any money by Foreign Government Entity.

326.    Hull and Nohl in the September 30, 2016 Quarterly Valuation Report falsely and misleadingly represented:

> To maximize the advantage of the Fund's position, the Fund's first $2.0mm investment was in newly issued non-dilutive units with which money [Private Company 1] was and is paying for the construction of the equipment necessary to meet the obligations of the [Foreign Government Entity] and other contracts. It is the aim of the Fund to acquire in excess of 40% of all [Private Company 1] units within the next 12 months. When complete, the Fund will sell its full interest in [Private Company 1] to the GreenPoint Green Fund (GGF). The GGF is the vehicle by which the core [Private Company 1] technologies will be spun off into subsidiaries and capitalized. At the time of the sale of the [Greenpoint Tactical Income Fund's] interest to the GGF, we expect the sale price to be between $85MM $100mm and $110 MM - $140mm. Thus, provided all parties working

71

toward this end are successful, the [Greenpoint Tactical Income Fund] will exit with net proceeds between $31.25MM and $48MM within the next 12 months.  The likelihood of these events coming to pass is boosted by the pre-commitment of capital in an amount exceeding $50MM for the GGF . . .

327.    At the time of the September 30, 2016 Quarterly Valuation Report, Hull and Nohl knew that Greenpoint Tactical Income Fund through GP Chemical had not timely or completely paid the funding commitments to Private Company 1 in order to acquire more securities of Private Company 1; Private Company 1 needed the money to operate; and Private Company 1 could not perform its remediation contracts without the Fund timely and completely paying its funding commitments.  Despite knowing these material facts, in the September 30, 2016 Quarterly Valuation Report, Hull and Nohl ignored, withheld, and failed to disclose any of these material facts.

328.    Hull and Nohl in the September 30, 2016 Quarterly Valuation Report falsely and misleadingly represent that "[s]ince units are still being sold via private sales of the Company with an enterprise value of $41.50mm, that value is contemporaneously confirmed by many sales events."  At the time of the September 30, 2016 Quarterly Valuation Report, Hull and Nohl knew that no other private sales of Private Company 1's securities (other than to GP Chemical) had been made in 2016, let alone at an enterprise value of $41.5 million.

329.    Hull, Nohl, and their entities obtained money in the form of management fees by means of the unreasonable and misleading $11,258,832.92 valuation of the Fund's interest in Private Company 1.

**7.    Hull and Nohl Made Misleading Statements In The Fund's December 31, 2016 Financial Statements and Quarterly Valuation for Private Company 1**

330.    Greenpoint Tactical Income Fund's financial statements as of and for the year ended December 31, 2016 represented that the Fund's interest in Private Company 1 was valued at

$16,625,977.  Hull and Nohl through Greenpoint Management II and Chrysalis, respectively, shared authority for the valuation.  Hull and Nohl's $16,625,977 valuation was misleading, unreasonable, and lacked an objective basis.

331.    The Fund's financial statements as of and for the year ended December 31, 2016 were distributed to investors and used to attract new investors and new investments from existing investors in the Fund.

332.    As of December 31, 2016, the paid in capital by the Fund through GP Chemical was $7,625,190.26 including the mineral the Fund valued at $2.5 million.

333.    For the fourth quarter of 2016, Hull and Nohl caused the Fund to record approximately $2,460,000 in new unrealized gains on Private Company 1's securities that GP Chemical had purchased.

334.    Hull and Nohl derived the $16,625,977 valuation from the Quarterly Valuation for Private Company 1 with a valuation effective date of December 31, 2016 ("December 31, 2016 Quarterly Valuation Report").

335.    Chrysalis authored the December 31, 2016 Quarterly Valuation Report.  Nohl validated the December 31, 2016 Quarterly Valuation Report.  On February 16, 2017, Nohl certified the December 31, 2016 Quarterly Valuation Report stating, "[t]his report has been made completely to the best of my ability considering all factors known to me at the time of its creation."

336.    In his validation Nohl represented that he was Chief Financial Officer, Treasurer, and Board Member for Private Company 1.

337.    The December 31, 2016 Quarterly Valuation Report was distributed to and/or made available to investors.

338.    In the December 31, 2016 Quarterly Valuation Report, Hull and Nohl stated the

enterprise value for Private Company 1 was $45,168,868.80 and the period investment value was $14,402,610.18 ($16,625,977.45 minus $2,223,367.27 in outstanding payables due to the founder of Private Company 1).  Hull and Nohl through Greenpoint Management II and Chrysalis, respectively, shared authority for the December 31, 2016 Quarterly Valuation Report, the $45,168,868.80 valuation of Private Company 1 as a whole, and the $16,625,977.45 valuation of the Fund's interest in the company.  Hull and Nohl's valuations were misleading, unreasonable, and lacked an objective basis.

339.    In valuing Private Company 1 at $45,168,868.80, Nohl and Hull ignored material negative facts that were known to Nohl and Hull.

340.    In the fourth quarter of 2016, Private Company 1 was still experiencing severe financial problems.  It still was not being paid for the pilot program to remediate oil pollution in Kuwait.  Its revenue for all of 2016 was $725,000.  Private Company 1 had $2.7 million in losses for the 2016.  Hull and Nohl knew these facts.

341.    The Fund through GP Chemical continued to be chronically late providing funding to Private Company 1.  GP Chemical agreed to pay Private Company 1 $1,374,077.90 by December 31, 2016 in exchange for 1,222 shares of Private Company 1.  On May 25, 2018, the Fund through GP Chemical paid $200,000 of the $1,374,077.90.  Thus, 17 months after the $1,374,077.90 was due, the Fund through GP Chemical paid $200,000 of the $1,374,077.90.  Hull and Nohl knew these facts.

342.    During 2016, Private Company 1 needed money.  On November 4, 2016, the main subsidiary of Private Company 1 took out a $1.85 million line of credit from Bank Number 1.  The line of credit was secured by all of the subsidiary's assets.  Private Company 1 and all of its other subsidiaries were guarantors on the line of credit.  Greenpoint Tactical Income Fund's entire

interest in Private Company 1 was subordinated to Bank Number 1's liens.  Bank Number 1's Uniform Commercial Code liens were filed with the Wisconsin Department of Financial Institutions and available to the public.

343.     Hull and Nohl knew all of these material facts at the time December 31, 2016 Quarterly Valuation Report.  Despite knowing these material negative facts, Hull and Nohl ignored, withheld, and failed to disclose them in the December 31, 2016 Quarterly Valuation Report or otherwise.

344.     Given these material negative facts, Hull and Nohl's $45,168,868.80 valuation of Private Company 1 as a whole and their $16,625,977.45 valuation of the Fund's interest in the company are misleading, unreasonable, and lacked an objective basis.

345.     Hull, Nohl, Greenpoint Management II, and Chrysalis obtained money in the form of management fees by means of the unreasonable and misleading $16,625,977.45 valuation of the Fund's interest in Private Company 1.

**8.     Throughout 2017 Hull and Nohl Increased the Valuation of Private Company 1 Despite Knowing Material Negative Facts**

346.     Greenpoint Tactical Income Fund's financial statements for the period ended March 31, 2017 represented that the Fund's interest in Private Company 1 was valued at $18,433,549.16. Hull and Nohl through Greenpoint Management II and Chrysalis, respectively, shared authority for the valuation.  Hull and Nohl's $18,433,549.16 valuation was misleading, unreasonable, and lacked an objective basis.

347.     The Fund's financial statements for the period ended March 31, 2017 were distributed to investors and used to attract new investors and new investments from existing investors in the Fund.

348.     As of March 31, 2017, Greenpoint Tactical Income Fund's paid in capital was

$8,625,190.26 including a mineral the Fund valued at $2.5 million.

349.    For the first quarter of 2017, Hull and Nohl caused the Fund to record approximately $2,430,938.98 in new unrealized gains on Private Company 1's securities that GP Chemical purchased.

350.    Hull and Nohl derived the $18,433,549.16 valuation from the Quarterly Valuation for Private Company 1 with a valuation effective date of March 31, 2017 ("March 31, 2017 Quarterly Valuation Report").

351.    Chrysalis authored and Nohl validated the March 31, 2017 Quarterly Valuation Report.  On April 18, 2017, Nohl certified the March 31, 2017 Quarterly Valuation Report stating, "[t]his report has been made completely to the best of my ability considering all factors known to me at the time of its creation."

352.    The March 31, 2017 Quarterly Valuation Report was distributed to and/or made available to investors.

353.    In the March 31, 2017 Quarterly Valuation Report, Hull and Nohl stated the enterprise value for Private Company 1 was $46,693,665.93 and the period investment value was $18,141,585.62.  Hull and Nohl through Greenpoint Management II and Chrysalis, respectively, shared authority for the March 31, 2017 Quarterly Valuation Report, the $46,693,665.93 valuation of Private Company 1 as a whole, and the $18,141,585.62 valuation of the Fund's interest in the company.  Hull and Nohl's valuations were misleading, unreasonable, and lacked an objective basis.

354.    In valuing Private Company 1 at $46,693,665.93, Nohl and Hull ignored material negative facts that were known to Nohl and Hull.

355.    Hull and Nohl in the March 31, 2017 Quarterly Valuation Report falsely and

misleadingly represented:

> To maximize the advantage of the Fund's position, the Fund's first $2.0mm investment was in newly issued non-dilutive units with which money [Private Company 1] was and is paying for the construction of the equipment necessary to meet the obligations of the [Foreign Government Entity] and other contracts.  It is the aim of the Fund to acquire more than 40% of all [Private Company 1] units within the next six months.  When complete, the Fund will sell its full interest in [Private Company 1] to the GreenPoint Green Fund (GGF).  The GGF is the vehicle by which the core [Private Company 1] technologies will be spun off into subsidiaries and capitalized.  At the time of the sale of the [Greenpoint Tactical Income Fund's] interest to the GGF, we expect the sale price to be between $85MM - $140mm.  Thus, provided all parties working toward this end are successful, the [Greenpoint Tactical Income Fund] will exit with net proceeds between $31.25MM and $48MM within the next 12 months.  The likelihood of these events coming to pass is boosted by the pre-commitment of capital in an amount exceeding $50MM for the GGF . . .

356.    At the time of the March 31, 2017 Quarterly Valuation, Hull and Nohl knew that Greenpoint Tactical Income Fund through GP Chemical had not timely or completely paid the funding commitments to Private Company 1 in order to acquire more securities of Private Company 1; Private Company 1 needed the money to operate; and Private Company 1 could not perform its remediation contracts without the Fund timely and completely paying its funding commitments.  Despite knowing these material facts, in the March 31, 2017 Quarterly Valuation Report, Hull and Nohl ignored, withheld, and failed to disclose any of these material facts.

357.    Hull, Nohl, and their entities obtained money in the form of management fees by means of the unreasonable and misleading $18,141,585.62 valuation of the Fund's interest in Private Company 1.

358.    In the March 31, 2017 Quarterly Valuation Report, Hull and Nohl still ignored, withheld, and failed to disclose that the $1.85 million line of credit from Bank Number 1 was secured by all of the assets of Private Company 1's main subsidiary; Private Company 1 was a guarantor on the line of credit; and Greenpoint Tactical Income Fund's entire interest in Private

Company 1 was subordinated to Bank Number 1's liens.

359.    Greenpoint Tactical Income Fund's financial statements for the period ended June 30, 2017, for the period ended September 30, 2017, and for the period and year ended December 31, 2017 represented that the Fund's interest in Private Company 1 was valued at $18,285,637.25. Hull and Nohl through Greenpoint Management II and Chrysalis, respectively, shared authority for the valuation.  Hull and Nohl's $18,285,637.25 valuation was misleading, unreasonable, and lacked an objective basis.

360.    The Fund's financial statements for the period ended June 30, 2017, the period ended September 30, 2017, and period and year ended December 31, 2017 were distributed to investors and used to attract new investors and new investments from existing investors in the Fund.

361.    Hull and Nohl derived the $18,285,637.25 valuation from the Quarterly Valuation for Private Company 1 with a valuation effective date of June 30, 2017 ("June 30, 2017 Quarterly Valuation Report"); from the Quarterly Valuation for Private Company 1 with a valuation effective date of September 30, 2017 ("September 30, 2017 Quarterly Valuation Report"); and from the Quarterly Valuation for Private Company 1 with a valuation effective date of December 31, 2017 ("December 31, 2017 Quarterly Valuation Report").

362.    The Managing Members, namely Greenpoint Management II and Chrysalis, authored the June 30, 2017 Quarterly Valuation Report, September 30, 2017 Quarterly Valuation Report, and December 31, 2017 Quarterly Valuation Report.  Nohl performed the valuations and certified all three reports as "Managing Member Representative, Chief Evaluation Officer."

363.    Hull and Nohl through Greenpoint Management II and Chrysalis, respectively, shared authority for the June 30, 2017 Quarterly Valuation Report, September 30, 2017 Quarterly

Valuation Report, December 31, 2017 Quarterly Valuation Report, and the valuations in the reports.

364.     The June 30, 2017 Quarterly Valuation Report, September 30, 2017 Quarterly Valuation Report, and December 31, 2017 Quarterly Valuation Report were distributed to and/or made available to investors.

365.     In the June 30, 2017 Quarterly Valuation report, Hull and Nohl stated the total equity interest of GP Chemical in Private Company 1 was $18,831,731.81.  Hull and Nohl shared authority for the $18,831,731.81 valuation of the Fund's interest in the company.  Hull and Nohl's valuation was misleading, unreasonable, and lacked an objective basis.

366.     In valuing the Fund's interest in Private Company 1 at $18,831,731.8, Hull and Nohl ignored material negative facts that were known to Hull and Nohl.

367.     In the September 30, 2017 Quarterly Valuation report, Hull and Nohl stated the total equity interest of GP Chemical in Private Company 1 was $18,841,738.18.  Hull and Nohl shared authority for the $18,841,738.18 valuation of the Fund's interest in the company.  Hull and Nohl's valuation was misleading, unreasonable, and lacked an objective basis.

368.     In valuing the Fund's interest in Private Company 1 at $18,841,738.18, Hull and Nohl ignored material negative facts that were known to Hull and Nohl.

369.     In the December 31, 2017 Quarterly Valuation report, Hull and Nohl stated the total equity interest of GP Chemical in Private Company 1 was $18,936,288.49.  Hull and Nohl shared authority for the $18,936,288.49 valuation of the Fund's interest in the company.  Hull and Nohl's valuation was misleading, unreasonable, and lacked an objective basis.

370.     In valuing the Fund's interest in Private Company 1 at $18,936,288.49, Hull and Nohl ignored material negative facts that were known to Hull and Nohl.

371.    By mid-2017, the $1.85 million line of credit was maxed out.  Private Company 1 could not meet payroll.  Private Company 1 had not paid its vendors, and the vendors were pursuing collections.  By August 2017, the pilot program had been cancelled.  Private Company 1 had never received any payment for the pilot program.  Hull and Nohl knew these material facts.

372.    Despite knowing these material negative facts, in the June 30, 2017 Quarterly Valuation Report, September 30, 2017 Quarterly Valuation Report, and December 31, 2017 Quarterly Valuation Report, Hull and Nohl ignored, withheld, and failed to disclose any of these material facts.

373.    On or about September 11, 2017, representatives of Bank Number 1 had a meeting with representatives of Private Company 1.  Nohl, Fund Employee Number 1, and Fund Employee Number 2 attended the meeting.  At the meeting, Bank Number 1 informed Private Company 1, Nohl, Fund Employee Number 1, and Fund Employee Number 2 that the line of credit would not be renewed and had to be repaid when it matured on November 4, 2017.  At the September 11, 2017 meeting, Bank Number 1 also informed Private Company 1, Nohl, Fund Employee Number 1, and Fund Employee Number 2 that any payments deposited into Private Company 1's bank account at Bank Number 1 would automatically be applied to the outstanding balance on the line of credit.

374.    At the September 11, 2017 meeting, Nohl stated to the representatives of Bank Number 1 that he and Fund Employee 1 would serve as the points of contact relating to the line of credit.

375.    Private Company 1's subsidiary failed to pay off the line of credit when it matured on November 4, 2017.

376.    On or about November 14, 2017, Bank Number 1 sent a notice of delinquency to

the subsidiary of Private Company 1.

377.    On or about November 24, 2017, Bank Number 1 sent another notice of delinquency to the subsidiary of Private Company 1.

378.    On or about December 4, 2017, Bank Number 1 sent a notice of delinquency to Private Company 1.

379.    On or about December 8, 2017 Bank Number 1 sent a notice of default to Private Company 1.

380.    Despite knowing these material negative facts, Hull and Nohl ignored, withheld, and failed to disclose any of these material facts in the September 30, 2017 Quarterly Valuation Report and December 31, 2017 Quarterly Valuation Report.

> **9.    In The First Two Quarters of 2018 Hull and Nohl More Than Doubled the Valuation of the Fund's Interest in Private Company 1 Despite Knowing Even More Material Negative Facts**

381.    Greenpoint Tactical Income Fund's financial statements for the period ended March 31, 2018 represented that the Fund's interest in Private Company 1 was valued at $38,516,264.81. Hull and Nohl through Greenpoint Management II and Chrysalis, respectively, shared authority for the valuation.  Hull and Nohl's $38,516,264.81 valuation was misleading, unreasonable, and lacked an objective basis.

382.    By December 2017, Hull and Nohl knew that Private Company 1's main subsidiary was in default on the line of credit.  Despite knowing this material negative fact, in the first quarter of 2018 Hull and Nohl increased the value of GP Chemical's equity interest in Private Company 1 by approximately $20.1 million, from $18,285,637.25 to $38,516,264.81.

383.    The Fund's financial statements for the period ended March 31, 2018 were distributed to investors and used to attract new investors and new investments from existing

investors in the Fund.

384.     For the first quarter of 2018, Hull and Nohl caused the Fund to record approximately $20.1 million in new unrealized gains on Private Company 1's securities that GP Chemical had purchased.

385.     Hull and Nohl derived the $38,516,264.81 valuation from the Quarterly Valuation for Private Company 1 with a valuation effective date of March 31, 2018 ("March 31, 2018 Quarterly Valuation Report").

386.     The Managing Members authored the March 31, 2018 Quarterly Valuation Report. Nohl performed the valuation and certified the report as "Managing Director." Hull and Nohl through Greenpoint Management II and Chrysalis, respectively, shared authority for the March 31, 2018 Quarterly Valuation Report.

387.     The March 31, 2018 Quarterly Valuation Report was distributed to and/or made available to investors.

388.     In the March 31, 2018 Quarterly Valuation Report, Hull and Nohl stated that GP Chemical's interest in Private Company 1 was valued at $38,370,479.81 and Private Company 1 as a whole was valued approximately $90.8 million. Hull and Nohl shared authority for the March 31, 2018 Quarterly Valuation report, the $90.8 million valuation of Private Company 1 as a whole, and the $38,370,479.81 valuation of the Fund's interest in the company. Hull and Nohl's valuations were misleading, unreasonable, and lacked an objective basis.

389.     At the time of the March 31, 2018 Quarterly Valuation Report, Hull and Nohl knew that on or about March 2, 2018, Bank Number 1 proposed a standstill agreement to Fund Employee Number 1. Under the proposed standstill agreement Bank Number 1 would defer legal action until at least September 30, 2018 in exchange for $500,000 followed by a payment schedule.

Hull and Nohl as managers of the Greenpoint Tactical Income Fund failed to do anything to facilitate the $500,000 payment. The standstill agreement was never executed.

390.    Despite knowing these material facts about the default on the line of credit; Private Company 1's dire financial condition; and the fact that the standstill agreement was not executed, Hull and Nohl more than doubled the value of the Fund's interest in Private Company 1 in the first quarter of 2018.

391.    Hull, Nohl, and their entities obtained money in the form of management and other fees by means of the unreasonable and misleading $38,370,479.81 valuation of the Fund's interest in Private Company 1.

392.    Greenpoint Tactical Income Fund's financial statements for the period ended June 30, 2018 represented that the Fund's interest in Private Company 1 was valued at $46,192,616.34. Hull and Nohl through Greenpoint Management II and Chrysalis, respectively, shared authority for the valuation. Hull and Nohl's $46,192,616.34 valuation was misleading, unreasonable, and lacked an objective basis.

393.    The Fund's financial statements for the period ended June 30, 2018 were distributed to investors and used to attract new investors and new investments from existing investors in the Fund.

394.    For the first quarter of 2018, Hull and Nohl caused the Fund to record approximately $7.1 million in new unrealized gains on Private Company 1's securities that GP Chemical had purchased.

395.    Hull and Nohl derived the $46,192,616.34 valuation from the Quarterly Valuation for Private Company 1 with a valuation effective date of June 30, 2018 ("June 30, 2018 Quarterly Valuation Report").

396.   The June 30, 2018 Quarterly Valuation Report was distributed to and/or made available to investors.

397.   In the June 30, 2018 Quarterly Valuation Report, Hull and Nohl stated that GP Chemical's interest in Private Company 1 was valued at approximately $45.49 million.  Hull and Nohl shared authority for the June 30, 2018 Quarterly Valuation Report and the $45.49 million valuation of the Fund's interest in the company.  Hull and Nohl's valuations were misleading, unreasonable, and lacked an objective basis.

398.   In May 2018, Nohl hired a debt workout firm to try to negotiate a settlement with Bank Number 1.  On June 21, 2018, outside counsel for Bank Number 1 sent a demand letter to Private Company 1.  Knowing that legal action by Bank Number 1 was imminent, Hull and Nohl increased the value of the Fund's interest in Private Company 1 from $38,516,265 to $46,192,616. Hull and Nohl ignored, withheld, and failed to disclose these material negative facts.

399.   On July 5, 2018—just five days after the end of the Fund's second quarter— Bank Number 1 filed suit to foreclose on the loan.

400.   On October 2, 2018, Bank Number 1 obtained a default judgment against Private Company 1.

401.   Private Company 1 is now defunct and worthless.  Greenpoint Tactical Income Fund's financial statements for the third quarter of 2018 have not been prepared and distributed to investors.  On information and belief, the Fund has not informed the investors of the loss of more than one-third of the Fund's value.

402.   Hull, Nohl, and their entities obtained money in the form of management and other fees by means of the unreasonable and misleading $46,192,616.34 valuation of the Fund's interest in Private Company 1.

403.    Below is a table summarizing by quarter Hull and Nohl's valuations of the Fund's interest in Private Company 1 and the percentage change in those valuations from quarter to quarter, as well as Hull and Nohl's valuations of Private Company 1 as a whole and the quarterly percentage change in those valuations.  The value of the Fund's interest in Private Company 1 come from the Fund's financial statements.  The valuations of Private Company 1 as a whole come from Hull and Nohl's quarterly valuation reports on Private Company 1.  The valuations for Private Company 1 as a whole as of June 30, 2017, September 30, 2017, and December 31, 2017 are derived from the value of the Fund's investment in and its ownership percentage of Private Company 1 as reported in Hull and Nohl's quarterly valuation reports.

| Quarter Ending | Value of Investment in Private Company 1 per Fund Financial Statements | % Change in Investment Value | Value of Private Company 1 per Fund Valuation Reports | % Change in Private Company 1 Value |
|---|---|---|---|---|
| Dec. 31, 2015 | $4,260,564 | - | $40,390,533 | - |
| March 31, 2016 | $7,032,589 | 65% | $40,390,533 | 0% |
| June 30, 2016 | $12,637,748 | 80% | $41,501,140 | 3% |
| Sept. 30, 2016 | $14,112,200 | 12% | $42,150,190 | 2% |
| Dec. 31, 2016 | $16,625,977 | 18% | $45,168,869 | 7% |
| March 31, 2017 | $18,433,549 | 11% | $46,693,666 | 3% |
| June 30, 2017 | $18,285,637 | -1% | $47,079,330 | 1% |
| Sept. 30, 2017 | $18,285,637 | 0% | $47,104,345 | 0% |
| Dec. 31, 2017 | $18,285,637 | 0% | $47,128,641 | 0% |
| March 31, 2018 | $38,516,265 | 111% | $90,800,000 | 93% |
| June 30, 2018 | $46,192,616 | 20% | | |

## COUNT I

**Violations of Section 17(a)(1) of the Securities Act**
**(Against Defendants Hull, Nohl, Greenpoint Management II, Chrysalis, and Bluepoint)**

404.     The SEC realleges and incorporates by reference paragraphs 1 through 403 as though fully set forth herein.

405.     By engaging in the conduct described above including engaging in undisclosed self-dealing and related party transactions and misleading investors about the Fund and their investments and about how the fund was being operated and valuing its assets, Defendants Hull, Nohl, Greenpoint Management II, Chrysalis, and Bluepoint in the offer or sale of securities, by use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, employed devices, schemes, and artifices to defraud.

406.     Defendants Hull, Nohl, Greenpoint Management II, Chrysalis, and Bluepoint acted with *scienter* in that each knowingly or recklessly engaged in the fraudulent conduct described above.

407.     By reason of the foregoing, Defendants Hull, Nohl, Greenpoint Management II, Chrysalis, and Bluepoint violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

**Violations of Section 17(a)(2) of the Securities Act**
**(Against Defendants Hull, Nohl, Greenpoint II, Chrysalis, and Bluepoint)**

408.     The SEC realleges and incorporates by reference paragraphs 1 through 403 as though fully set forth herein.

409.     By negligently engaging in the conduct described above including making false and misleading verbal statements and making false and misleading statements in the Confidential Investment Letters, financial statements, valuation reports, and other offering materials,

Defendants Hull, Nohl, Greenpoint Management II, Chrysalis, and Bluepoint in the offer or sale of securities, by use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have obtained money or property by means of any untrue statement of a material fact and any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

410.    By reason of the foregoing, Defendants Hull, Nohl, Greenpoint Management II, Chrysalis, and Bluepoint violated Sections 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT III

**Violations of Section 17(a)(3) of the Securities Act**
**(Against Defendants Hull, Nohl, Greenpoint II, Chrysalis, and Bluepoint)**

411.    The SEC realleges and incorporates by reference paragraphs 1 through 403 as though fully set forth herein.

412.    By negligently engaging in the conduct described above including engaging in undisclosed self-dealing and related party transactions and misleading investors about the Fund and their investments and about how the fund was being operated and valuing its assets, Defendants Hull, Nohl, Greenpoint Management II, Chrysalis, and Bluepoint in the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

413.    By reason of the foregoing, Defendants Hull, Nohl, Greenpoint Management II, Chrysalis, and Bluepoint violated Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT IV

### Violations of 10(b) of the Exchange Act
### and Exchange Act Rule 10b-5
### (Against Defendants Hull, Nohl, Greenpoint II, Chrysalis, and Bluepoint)

414.     The SEC realleges and incorporates by reference paragraphs 1 through 403 as though fully set forth herein.

415.     By engaging in the conduct described above including making false and misleading verbal statements; making false and misleading statements in the Confidential Investment Letters, financial statements, valuation reports, and other offering materials; engaging in undisclosed self-dealing and related party transactions; and misleading investors as to how they were operating the Fund and valuing its assets, Defendants Hull, Nohl, Greenpoint Management II, Chrysalis, and Bluepoint in connection with the purchase or sale of securities, by the use of any means or instrumentalities of interstate commerce or by the use of the mails, or any national securities exchange, directly and indirectly: used and employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon sellers and purchasers and prospective purchasers of securities.

416.     Defendants Hull, Nohl, Greenpoint Management II, Chrysalis, and Bluepoint acted with *scienter* in that each knowingly or recklessly engaged in the fraudulent conduct described above.

417.     By reason of the foregoing, Defendants Hull, Nohl, Greenpoint Management II, and Chrysalis violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT V

### Violations of Section 206(1)
### of the Advisers Act
### (Against Defendants Hull, Nohl, Greenpoint Management II, and Chrysalis)

418.    The SEC realleges and incorporates by reference paragraphs 1 through 403 as though fully set forth herein.

419.    At all relevant times, Chrysalis and Greenpoint Management II were investment advisers to Greenpoint Tactical Income Fund.  They made investment decisions in exchange for compensation.

420.    By engaging in the conduct described above including engaging in undisclosed self-dealing and undisclosed related party transactions; operating the Fund and valuing its assets in violation of the operating agreements; and valuing its assets without an objective basis and by ignoring material negative facts, Chrysalis and Greenpoint Management II by use of the mails or means or instrumentalities of interstate commerce, directly or indirectly, employed devices, schemes, and artifices to defraud one or more clients or prospective clients.

421.    Chrysalis and Greenpoint Management II acted with *scienter* in that each knowingly or recklessly engaged in the devices, schemes, and artifices to defraud one or more clients or prospective clients.

422.    At all relevant times, Hull controlled and co-owned Greenpoint Management II. Greenpoint Management was an investment adviser to Greenpoint Tactical Income Fund in exchange for compensation.  Hull thereby acted as an investment adviser to Greenpoint Tactical Income Fund.  Hull made investment decisions in exchange for compensation.  Hull also acted as an investment adviser to Greenpoint Global Mittelstand Fund and Greenpoint Fine Art Fund.  Hull made investment decisions in exchange for compensation.

423.     At all relevant times, Nohl controlled and owned Chrysalis.  Chrysalis was an investment adviser to Greenpoint Tactical Income Fund in exchange for compensation.  Nohl thereby acted as an investment adviser to Greenpoint Tactical Income Fund.  He made investment decisions in exchange for compensation.

424.     By engaging in the conduct described above including engaging in undisclosed self-dealing and undisclosed related party transactions; operating the Fund and valuing its assets in violation of the operating agreements; and valuing its assets without an objective basis and by ignoring material negative facts, Hull and Nohl by use of the mails or means or instrumentalities of interstate commerce, directly or indirectly, employed devices, schemes, and artifices to defraud Greenpoint Tactical Income Fund.

425.     By engaging in the conduct described above including engaging in undisclosed self-dealing and undisclosed related party transactions and operating the funds in violation of the offering documents, Hull by use of the mails or means or instrumentalities of interstate commerce, directly or indirectly, employed devices, schemes, or artifices to defraud Greenpoint Global Mittelstand Fund and Greenpoint Fine Art Fund.

426.     Hull and Nohl acted with *scienter* in that each knowingly or recklessly engaged in the devices, schemes, or artifices to defraud one or more clients or prospective clients.

427.     By reason of the foregoing, Hull, Nohl, Greenpoint Management II, and Chrysalis violated Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT VI

**Violations of Section 206(1)
of the Advisers Act
(Against Defendants Bluepoint and Hull)**

428.     The SEC realleges and incorporates by reference paragraphs 1 through 403 as

though fully set forth herein.

429.     At all relevant times, Bluepoint was an investment adviser.  Bluepoint made investment decisions in exchange for compensation.  Hull was a principal and an investment adviser representative of Bluepoint.

430.     At all relevant times, Hull controlled and co-owned Bluepoint and received compensation through Bluepoint for providing investment advice to its clients.  Bluepoint through Hull advised all of Bluepoint's individual clients to invest in the Greenpoint Funds.  For a majority of these individual clients, all of their assets under Bluepoint's management were invested in the Greenpoint Funds.

431.     By engaging in the conduct described above including Hull and Bluepoint through Hull recommending that all of Bluepoint's individual clients and nearly all of the assets under management be invested in the Greenpoint Funds without regard for each investor's individual needs and circumstances and contrary to disclosures in Bluepoint's Form ADV; making false and misleading verbal statements; and engaging in undisclosed self-dealing and related party transactions, Bluepoint and Hull by use of the mails or means or instrumentalities of interstate commerce, directly or indirectly, employed devices, schemes, or artifices to defraud one or more of these clients or prospective clients.

432.     Bluepoint acted with *scienter* in that it knowingly or recklessly engaged in the devices, schemes, and artifices to defraud one or more clients or prospective clients.

433.     Hull acted with *scienter* in that he knowingly or recklessly engaged in the devices, schemes, and artifices to defraud one or more clients or prospective clients.

434.     By reason of the foregoing, Bluepoint and Hull violated Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT VII

### Aiding and Abetting Violations of Section 206(1)
### of the Advisers Act
### (Against Defendants Hull and Nohl)

435.     The SEC realleges and incorporates by reference paragraphs 1 through 403 as though fully set forth herein.

436.     As alleged, Bluepoint, Chrysalis, and Greenpoint Management II, acting as investment advisers, violated Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

437.     By engaging in the conduct described above, Hull knowingly or recklessly aided, abetted, counseled, commanded, induced, or procured Greenpoint Management II's violations of Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

438.     By engaging in the conduct described above, Hull knowingly or recklessly aided, abetted, counseled, commanded, induced, or procured Bluepoint's violations of Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

439.     By engaging in the conduct described above, Nohl knowingly or recklessly aided, abetted, counseled, commanded, induced, or procured Chrysalis' violations of Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

440.     By reason of the foregoing, Hull aided and abetted Greenpoint Management II's violations of Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

441.     By reason of the foregoing, Hull aided and abetted Bluepoint's violations of Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

442.     By reason of the foregoing, Nohl aided and abetted Chrysalis' violations of Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT VIII

**Violations of Section 206(2)
of the Advisers Act
(Against Defendants Hull, Nohl, Greenpoint Management II, and Chrysalis)**

443.    The SEC realleges and incorporates by reference paragraphs 1 through 403 as though fully set forth herein.

444.    At all relevant times, Chrysalis and Greenpoint Management II were investment advisers to Greenpoint Tactical Income Fund.  They made investment decisions in exchange for compensation.

445.    By engaging in the conduct described above including engaging in undisclosed self-dealing and undisclosed related party transactions; operating the Fund and valuing its assets in violation of the operating agreements; and valuing its assets without an objective basis and by ignoring material negative facts, Chrysalis and Greenpoint Management II by use of the mails or means or instrumentalities of interstate commerce, directly or indirectly, engaged in transactions, practices, and courses of business which operated as a fraud or deceit upon Greenpoint Tactical Income Fund.

446.    Chrysalis and Greenpoint Management II negligently engaged in the transactions, practices, and courses of business which operated as a fraud or deceit upon one or more clients or prospective clients

447.    At all relevant times, Hull controlled and co-owned Greenpoint Management II. Greenpoint Management II was an investment adviser to Greenpoint Tactical Income Fund in exchange for compensation.  Hull thereby acted as an investment adviser to Greenpoint Tactical Income Fund.  Hull made investment decisions in exchange for compensation.  Hull also acted as an investment adviser to Greenpoint Global Mittelstand Fund and Greenpoint Fine Art Fund.  Hull

made investment decisions in exchange for compensation.

448.    At all relevant times, Nohl controlled and owned Chrysalis.  Chrysalis was an investment adviser to Greenpoint Tactical Income Fund in exchange for compensation.  Nohl thereby acted as an investment adviser to Greenpoint Tactical Income Fund.  Nohl made investment decisions in exchange for compensation.

449.    By engaging in the conduct described above including engaging in undisclosed self-dealing and undisclosed related party transactions; operating the Fund and valuing its assets in violation of the operating agreements; and valuing its assets without an objective basis and by ignoring material negative facts, Hull and Nohl by use of the mails or means or instrumentalities of interstate commerce, directly or indirectly, engaged in transactions, practices, and courses of business which operated as a fraud or deceit upon Greenpoint Tactical Income Fund.

450.    By engaging in the conduct described above including engaging in undisclosed self-dealing and undisclosed related party transactions and operating the funds in violation of the offering documents, Hull by use of the mails or means or instrumentalities of interstate commerce, directly or indirectly, employed devices, schemes, and artifices to defraud Greenpoint Global Mittelstand Fund and Greenpoint Fine Art Fund.

451.    Hull and Nohl negligently engaged in the transactions, practices, and courses of business which operated as a fraud or deceit upon one or more clients or prospective clients.

452.    By reason of the foregoing, Hull, Nohl, Chrysalis, and Greenpoint Management II violated Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## COUNT IX

### Violations of Section 206(2)
### of the Advisers Act
### (Against Defendants Bluepoint and Hull)

453.     The SEC realleges and incorporates by reference paragraphs 1 through 403 as though fully set forth herein.

454.     At all relevant times, Bluepoint was an investment adviser in exchange for compensation.  Hull was a principal and an investment adviser representative of Bluepoint.

455.     At all relevant times, Bluepoint through Hull advised all of Bluepoint's individual clients to invest in the Greenpoint Funds.  For a majority of these individual clients, all of their assets under management by Bluepoint were invested in the Greenpoint Funds.

456.     By engaging in the conduct described above including Hull and Bluepoint through Hull recommending that all of Bluepoint's individual clients and nearly all of the assets under management be invested in the Greenpoint Funds without regard for the investor's individual needs and circumstances and contrary to disclosures in Bluepoint's Form ADV; making false and misleading verbal and written statements; and engaging in undisclosed self-dealing and related party transactions, Bluepoint and Hull by use of the mails or means or instrumentalities of interstate commerce, directly or indirectly, engaged in transactions, practices, and courses of business which operated as a fraud or deceit upon one or more clients or prospective clients.

457.     Bluepoint negligently engaged in the transactions, practices, and courses of business which operated as a fraud or deceit upon one or more clients or prospective clients.

458.     Hull negligently engaged in the transactions, practices, and courses of business which operated as a fraud or deceit upon one or more clients or prospective clients.

459.     By reason of the foregoing, Bluepoint and Hull violated Section 206(2) of the

Advisers Act [15 U.S.C. § 80b-6(2)].

## COUNT X

### Aiding and Abetting Violations of Section 206(2)
### of the Advisers Act
### (Against Defendants Hull and Nohl)

460.     The SEC realleges and incorporates by reference paragraphs 1 through 403 as though fully set forth herein.

461.     As alleged, Bluepoint, Chrysalis, and Greenpoint Management II, acting as investment advisers, violated Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

462.     By engaging in the conduct alleged above, Hull knowingly or recklessly aided, abetted, counseled, commanded, induced, or procured Greenpoint Management II's violations of Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

463.     By engaging in the conduct alleged above, Hull knowingly or recklessly aided, abetted, counseled, commanded, induced, or procured Bluepoint's violations of Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

464.     By engaging in the conduct alleged above, Nohl knowingly or recklessly aided, abetted, counseled, commanded, induced, or procured Chrysalis' violations of Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

465.     By reason of the foregoing, Hull aided and abetted Greenpoint Management II's violations of Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

466.     By reason of the foregoing, Hull aided and abetted Bluepoint's violations of Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

467.     By reason of the foregoing, Nohl aided and abetted Chrysalis' violations of Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## COUNT XI

### Violations of Section 206(4) of the Advisers Act
### and Rule 206(4)-8
### (Against Defendants Hull, Nohl, Greenpoint Management, II, and Chrysalis)

468.    The SEC realleges and incorporates by reference paragraphs 1 through 403 as though fully set forth herein.

469.    From at least January 1, 2018, Chrysalis and Greenpoint Management II were investment advisers to a pooled investment vehicle including Greenpoint Tactical Income Fund.

470.    By engaging in the conduct described above including making false and misleading statements in the Confidential Investment Letters, financial statements, valuation reports, and other offering materials; engaging in undisclosed self-dealing and undisclosed related party transactions; operating the Fund and valuing its assets in violation of the operating agreements; and valuing its assets without an objective basis and by ignoring material negative facts, Chrysalis and Greenpoint Management by use of the mails or means or instrumentalities of interstate commerce, directly or indirectly, negligently made untrue statements of material fact and omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to one or more investors or prospective investors in the pooled investment vehicle; and engaged in acts, practices, and courses of business that were fraudulent, deceptive, or manipulative with respect to one or more investors or prospective investor in the pooled investment vehicle.

471.    At all relevant times, Hull controlled and co-owned Greenpoint Management II. Hull thereby was an investment adviser to a pooled investment vehicle including Greenpoint Tactical Income Fund.

472.    At all relevant times, Nohl controlled and owned Chrysalis.  Nohl thereby was an

investment adviser to a pooled investment vehicle including Greenpoint Tactical Income Fund.

473.    By engaging in the conduct described above including making false and misleading statements in the Confidential Investment Letters, financial statements, valuation reports, and other offering materials; engaging in undisclosed self-dealing and undisclosed related party transactions; operating the Fund and valuing its assets in violation of the operating agreements; and valuing its assets without an objective basis and by ignoring material negative facts, Hull and Nohl by use of the mails or means or instrumentalities of interstate commerce, directly or indirectly, negligently made untrue statements of material fact and omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to one or more investors or prospective investors in the pooled investment vehicle; and engaged in acts, practices, and courses of business that were fraudulent, deceptive, or manipulative with respect to one or more investors or prospective investor in the pooled investment vehicle.

474.    By reason of the foregoing, Hull, Nohl, Chrysalis, and Greenpoint Management II violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 [275.206(4)-8].

## COUNT XII

**Aiding and Abetting**
**Violations of Section 206(4) of the Advisers Act**
**and Rule 206(4)-8**
**(Against Defendants Hull and Nohl)**

475.    The SEC realleges and incorporates by reference paragraphs 1 through 403 as though fully set forth herein.

476.    As alleged, Chrysalis and Greenpoint Management II, were investment advisers to a pooled investment vehicle including Greenpoint Tactical Income Fund.

477.    At all relevant times, Hull controlled and co-owned Greenpoint Management II.

478.     At all relevant times, Nohl controlled and owned Chrysalis.

479.     By engaging in the conduct described above, Hull knowingly or recklessly aided, abetted, counseled, commanded, induced, or procured Greenpoint Management II's violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 [275.206(4)-8].

480.     By engaging in the conduct described above, Nohl knowingly or recklessly aided, abetted, counseled, commanded, induced, or procured Chrysalis' violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 [275.206(4)-8].

481.     By reason of the foregoing, Hull aided and abetted Greenpoint Management II's violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 [275.206(4)-8].

482.     By reason of the foregoing, Nohl aided and abetted Chrysalis' violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 [275.206(4)-8].

## RELIEF REQUESTED

**WHEREFORE,** the SEC respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendants Hull, Nohl, Bluepoint, Chrysalis, and Greenpoint Asset Management II committed the violations charged and alleged herein.

### II.

Enter an Order of Permanent Injunction restraining and enjoining Defendants Hull, Nohl, Bluepoint, Chrysalis, and Greenpoint Management II from, directly or indirectly, engaging in the transactions, acts, practices, and courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5]; and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C §§ 80b-6(1) and 80b-6(2)], and as to Defendants Hull, Nohl, Chrysalis, and Greenpoint Management II enter an Order of Permanent Injunction restraining and enjoining them from, directly or indirectly, engaging in the transactions, acts, practices, and courses of business described above, or in conduct of similar purport and object, in violation Section 206(4) of the Advisers Act [15 U.S.C § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## III.

Enter an Order requiring Defendants Hull, Nohl, Bluepoint, Chrysalis, and Greenpoint Management II to disgorge all of their ill-gotten gains received as a result of the violations alleged in this Complaint including prejudgment interest.

## IV.

With regard to Defendants Hull's, Nohl's, Bluepoint's, Chrysalis', and Greenpoint Management II's violative acts, practices, and courses of business set forth herein, issue an Order imposing upon Defendants Hull, Nohl, Bluepoint, Chrysalis, and Greenpoint Management II appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C § 80b-9(e)].

## V.

Retain jurisdiction of this action in accordance with the principals of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such other relief as this Court deems appropriate.

September 30, 2019

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION

By: /s/Doressia L. Hutton
Doressia L. Hutton (HuttonD@sec.gov)
Christopher H. White (WhiteCh@sec.gov)
175 West Jackson Boulevard, Suite 1450
Chicago, IL 60604-2615
(312) 353-7390
(312) 353-7398 (fax)

*Attorneys for Plaintiff the United States
Securities and Exchange Commission*
