UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

       Plaintiff,

   v.

Case No. 19-cv-809

BLUEPOINT INVESTMENT COUNSEL,
LLC, et al.,

       Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT AND TO STRIKE

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................... 1

ARGUMENT ....................................................................................................... 2

I.    Applicable Legal Standards ....................................................................... 2

      A.    Elements of Securities Claims Pleaded by SEC ................................... 2

            1.    SEC's Fraud Claims Require that Material Omissions and Scienter
be Established ...................................................................... 3

            2.    SEC's Non-Fraud Claims Require that Material Omissions and
Negligence Be Established ...................................................... 4

      B.    SEC Has Not Met the Pleading Requirements of Rule 8, for Non-Fraud
Claims, or Rule 9(b), for Fraud Claims ............................................... 5

            1.    SEC's Allegations Fall Short of the Pleading Standards Applicable
to Valuation Issues and Statements of Intent in Securities Matters ........... 7

            2.    The Incorporation by Reference Doctrine Provides that Defendants
may Cite Documents Cited by SEC to Demonstrate that SEC's
Allegations Misstate Defendants' Representations ................................. 9

II.    The Complaint Should be Dismissed Under Rule 12(b)(6) for Failure to Comply
with the "Short and Plain Statement" Requirement of Rule 8(a)(2) or, in the
Alternative, the Court Should Order a More Definite Statement under Rule 12(e) ......... 10

      A.    The Complaint Should be Dismissed under Rule 12(b)(6) for Failure to
State a Claim or, in the Alternative, Insufficient Allegations Should be
Stricken under Rule 12(f) ................................................................. 12

      B.    Complaint Paragraphs 37-38 – SEC's Allegations Regarding GTIF as an
Income Fund Fail to State a Claim ..................................................... 13

      C.    Complaint Paragraphs 39-44 – SEC's Allegations about Michael Hull's
Alleged False Statements to Advisory Clients Fail to State a Claim ............. 15

      D.    Complaint Paragraphs 63-64 – Allegations regarding a "False Contract"
and Booking Gains on an Installment Sale do not Relate to SEC's Claims
for Relief ..................................................................................... 18

TABLE OF CONTENTS

Page

E.     Complaint Paragraphs 73-82 – SEC's Allegations about the Second
       Confidential Investment Letter Misstate that Document and Do Not
       Otherwise Demonstrate that the Document was Misleading ............................... 19

F.     Complaint Paragraphs 90-99 – SEC's Allegations about the Third
       Confidential Investment Letter Misstate that Document and do not
       Otherwise Demonstrate that the Document was Misleading ............................... 28

G.     Complaint Paragraphs 100-112 – SEC's Allegations Concerning Fees
       Charged do not Sufficiently Relate to SEC's Claims for Relief or
       Adequately Allege Material Omissions ................................................................. 33

H.     Complaint Paragraphs 149-179 – SEC's Allegations of Breaches of
       Fiduciary Duty and Undisclosed Related Party Transactions Relate to
       Immaterial Transactions....................................................................................... 34

I.     Complaint Paragraphs 180-86 – SEC's Allegations of Improper Timing of
       Valuations do not Relate to any Actionable Misrepresentation........................... 40

J.     Complaint Paragraphs 187-190 – SEC's Allegations of Misrepresentation
       of the Appraisal Process Misstate What Investors were Told About the
       Appraisal Process ................................................................................................. 41

K.     Complaint Paragraphs 191-229 – SEC's Allegations of Interference with
       the Appraisal Process Fail to State Sufficient Facts to Establish a Plausible
       Right to Relief ...................................................................................................... 43

L.     Complaint Paragraphs 230-403 – SEC's Allegations Concerning
       Valuations of Private Company 1 Misstate the Valuation Statements and
       Fail to Identify Material Misrepresentations........................................................ 48

       1.     Complaint Paragraphs 233-267 – December 2015 Valuation ................. 49

       2.     Complaint Paragraphs 268-288 – March 2016 Valuation ....................... 55

       3.     Complaint Paragraphs 289-309 – June 2016 Valuation .......................... 56

       4.     Complaint Paragraphs 310-329 – September 2016 Valuation................. 57

       5.     Complaint Paragraphs 330-345 – December 2016 Valuation ................. 58

       6.     Complaint Paragraphs 346-380 – 2017 Valuations ................................. 58

       7.     Complaint Paragraphs 381-403 – 2018 Valuations ................................. 59

III.   The Complaint Should be Dismissed to the Extent it Seeks Disgorgement Because
       SEC is not Statutorily Authorized to Seek that Remedy ................................... 60

CONCLUSION ................................................................................................ 61

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**<u>Cases</u>**

*Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll.*,
  77 F.3d 364 (11th Cir. 1996) ................................................................................................ 11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ....................................................................................................... 5, 6, 7

*Basic Inc. v. Levinson*,
  485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988) .............................................. 5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................................ 5, 6

*CP Stone Fort Holdings, LLC v. Does*,
  2017 U.S. Dist. LEXIS 42069,
  Fed. Sec. L. Rep. (CCH) P99,662,
  2017 WL 1093166 (N.D. Ill. March 22, 2017) .......................................................... 3

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ...................................................................................... 5, 35

*Eckstein v. Balcor Film Investors*,
  8 F.3d 1121 (7th Cir. 1993) ......................................................................................... 9

*Eclectic Properties E., LLC v. Marcus & Millichap Co.*,
  751 F.3d 990 (9th Cir. 2014) .................................................................................... 12

*Eisenstadt v. Centel Corp.*,
  113 F.3d 738 (7th Cir. 1997) ................................................................................. 9, 33

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
  479 F. Supp. 2d 349 (S.D.N.Y. 2007) .................................................................... 7, 44

*Greenhouse v. MCG Capital Corp.*,
  392 F.3d 650 (4th Cir. 2004) ...................................................................................... 9

*Hinck v. United States*,
  550 U.S. 501 (2007) ..................................................................................................... 60

*Holder v. Fraser Shipyards, Inc.*,
  No. 16-CV-343-WMC, 2017 WL 11438557 (W.D. Wis. Sept. 12, 2017) .............. 9

*In re Allied Capital Corp. Securities Litigation*,
  Fed Sec. L. Rep. P. 92,411, 2003 WL 1964184 (S.D.N.Y. 2003) ................. 8, 9, 42

TABLE OF AUTHORITIES

Page(s)

*In re BP p.l.c. Sec. Litig.*,
   852 F. Supp. 2d 789 (S.D. Tex. 2012) ..................................................................... 9

*In re Salomon Analyst Level 3 Litigation*,
   373 F. Supp. 2d 248 (S.D.N.Y. 2005) ..................................................................... 8

*Jennings v. Emry*,
   910 F.2d 1434 (7th Cir. 1990) ............................................................................. 11

*Kokesh v. SEC*,
   137 S. Ct. 1635 (2017).......................................................................................... 60

*Lipsky v. Commonwealth United Corp.*,
   551 F.2d 887 (2d Cir. 1976) ................................................................................. 13

*Luv N' Care Ltd. v. Toys "R" Us, Inc.*,
   No. 12 CIV. 0228 SAS, 2012 WL 5265723 (S.D.N.Y. Oct. 24, 2012)................... 6

*Makor Issues Rights, Ltd. v. Tellabs, Inc.*,
   437 F.3d 588 (7th Cir. 2006) ................................................................................. 9

*Maryland Staffing Servs., Inc. v. Manpower, Inc.*,
   936 F. Supp. 1494 (E.D. Wis. 1996)..................................................................... 10

*McCauley v. City of Chicago*,
   671 F.3d 611 (7th Cir. 2011) ................................................................................. 7

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   135 S. Ct. 1318, 191 L. Ed. 2d 253 (2015) ........................................................... 8

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*,
   631 F.3d 436 (7th Cir. 2011) ................................................................................. 6

*Rowe v. Maremont Corp.*,
   850 F.2d 1226 (7th Cir. 1988) ............................................................................... 4

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*,
   786 F.3d 510 (7th Cir. 2015) ................................................................................. 1

*San Leandro Emer. Medical Group Profit Sharing Plan v. Philip Morris Cos., Inc.*,
   75 F.3d 801 (2d Cir. 1996) ............................................................................... 9, 41

*Sandoz Inc. v. Amgen, Inc.*,
   137 S. Ct. 1664 (2017)......................................................................................... 60

*SEC v. Bauer*,
   723 F.3d 758 (7th Cir. 2013) ................................................................................. 3

TABLE OF AUTHORITIES

Page(s)

*SEC v. Contrarian Press, LLC,*
   No. 16-CV-6964 (VSB), 2019 U.S. Dist. LEXIS 40697 (S.D.N.Y. Mar. 13, 2019)................ 3

*SEC v. ITT Educ. Servs.,*
   303 F. Supp. 3d 746 (S.D. Ind. 2018) .................................................................................... 3

*SEC v. Liu,* 754 Fed. Appx. 505 (9th Cir. 2018) *cert. granted Liu v. SEC*, No. 18-1501,
   2019 WL 5659111, at *1 (U.S. Nov. 1, 2019)...................................................................... 60

*SEC v. Maio,*
   51 F.3d 623 (7th Cir. 1995) .................................................................................................... 3

*SEC v. Nutmeg Group, LLC,*
   162 F. Supp. 3d 754 (N.D. Ill. 2016) .................................................................................... 4

*SEC v. Penn,*
   225 F. Supp. 3d 225 (S.D.N.Y. 2016) .................................................................................... 3

*SEC v. Pimco Advisors Fund Mgmt. LLC,*
   341 F. Supp. 2d 454 (S.D.N.Y. 2004) .................................................................................... 4

*SEC v. Rio Tinto plc,*
   No. 17 CIV. 7994 (AT),
   2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) ......................................................................... 8

*SEC v. Wey,*
   246 F. Supp. 3d 894 (S.D.N.Y. 2017) .................................................................................... 4

*Swanson v. Citibank, N.A.,*
   614 F.3d 400 (7th Cir. 2010) .................................................................................................. 7

*Tull v. United States,*
   481 U.S. 412 (1987).............................................................................................................. 60

*U.S. ex rel. Garst v. Lockheed-Martin Corp.,*
   No. 98 C 5072, 2002 WL 1794004 (N.D. Ill. Aug. 2, 2002),
   *aff'd,* 328 F.3d 374 (7th Cir. 2003).............................................................................. 10, 16

*United States and Wisc. ex rel. Presser v. Acacia Mental Health Clinic, LLC,*
   836 F.3d 770 (7th Cir. 2016) .................................................................................................. 6

*United States v. Finnerty,*
   533 F.3d 143 (2d Cir. 2008) ................................................................................................... 3

*United States v. Home Healthcare & Nursing Servs., Ltd.,*
   No. 14-CV-1098, 2017 WL 2653070 (N.D. Ill. June 20, 2017)........................................... 6, 7

TABLE OF AUTHORITIES

Page(s)

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
   987 F.2d 429 (7th Cir. 1993) ................................................................................................. 9

*Zagami v. Nat. Health Trends Corp.*,
   540 F. Supp. 2d 705 (N.D. Tex. 2008) ................................................................................. 5

**Statutory Authorities**

15 U.S.C. § 77t(b) ................................................................................................................ 60

15 U.S.C. § 78(u)(d)(1), (3), (5) .......................................................................................... 60

15 U.S.C. § 78j(b) .................................................................................................................. 2

**Rules and Regulations**

Fed. R. Civ. P. 12 ........................................................................................... 5, 10, 11, 12, 13

Fed. R. Civ. P. 8 ........................................................ 1, 5, 10, 12, 13, 16, 22, 31, 32, 38, 42, 45, 61

Fed. R. Civ. P. 9 .......................................................... 1, 5, 6, 13, 16, 22, 31, 32, 38, 45, 61

## INTRODUCTION

The United States Securities and Exchange Commission's ("SEC's") 482-paragraph Complaint alleges that Defendants[1] committed fraud in the offer and sale of securities and in their roles as investment advisors. It similarly alleges that they engaged in negligent misrepresentations or omissions to investors and the funds Defendants advised. The alleged frauds concern, primarily, valuation of assets for Greenpoint Tactical Income Fund, LLC ("GTIF" or "the Fund") and representations to investors and potential investors in that Fund.

Following years of SEC investigation, a failed referral for criminal investigation by DOJ, and for all of its impressive verbosity, the Complaint fails to state a claim for fraud under Rule 9(b), and does not even allege sufficient facts to state its non-fraud claims under Rule 8. And where it might appear that the allegations could sufficiently state claims under either standard, they are based on quotes from documents that SEC has taken wildly out of context; in context, these excerpts are not fairly represented and do not plausibly plead a violation.

These deficiencies are glaring, particularly in light of the case background prior to the filing of the Complaint and the amount of information available to SEC. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana,* 786 F.3d 510, 528 (7th Cir. 2015) ("plaintiffs' pleading burden should be commensurate with the amount of information available to them." (internal quotation marks and citations omitted)). SEC has been investigating Defendants since 2013. SEC discontinued its first investigation after making a referral to the Department of Justice ("DOJ") which resulted in a raid of Greenpoint Rare Earth Trading Account LLC's ("GPRE's")[2] vault of gems and minerals. DOJ returned the entirety of the seized

---

[1] "Defendants" as used herein, refers to Bluepoint Investment Counsel, Inc. ("Bluepoint"), Michael G. Hull ("Hull"), Christopher J. Nohl ("Nohl"), Chrysalis Financial, LLC ("Chrysalis"), and Greenpoint Asset Management II, LLC ("GAM").
[2] GPRE is a wholly-owned subsidiary of GTIF which holds its gem and mineral assets.

investment assets, has not filed charges against anyone, and has not apparently continued its investigation since 2018.

SEC informed Defendants of its second, related investigation on March 22, 2017, the day of the search warrant execution. It then spent over two years further investigating Defendants before filing its Complaint on September 30, 2019, the day the SEC closes its fiscal year and tallies it purported achievements.  In the course of the SEC investigation, Defendants produced hundreds of thousands of pages of documents, gave multiple days of testimony, and SEC took testimony of numerous other witnesses not affiliated with Defendants. After SEC notified Defendants of its intention to pursue a suit, further documents and information were provided, including supplemental information requested by SEC. Given the amount of time spent investigating Defendants, Defendants' cooperation, and the amount of evidence gathered, the pleading defects in the Complaint are patently in violation of applicable requirements and strongly suggest an improper purpose and course of conduct on the part of the SEC. Accordingly, SEC should be given a short leash when it comes to repleading its defective claims.

<u>**ARGUMENT**</u>

I.      <u>**APPLICABLE LEGAL STANDARDS**</u>

A.      <u>**Elements of Securities Claims Pleaded by SEC**</u>

The SEC has alleged violations of several statutes and rules, including Sections 17(a)(1), (a)(2), and (a)(3) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 thereunder, and Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act"), and Rule 206(4)-8 thereunder.  *See* 15 U.S.C. § 78j(b).

2

In general, all of these statutes and rules prohibit the same kind of conduct; the differences between them are to whom or what situation they apply (e.g., to investment advisors or in the offering of securities), and whether they are fraud claims or require a lesser showing.

1.    **SEC's Fraud Claims Require that Material Omissions and Scienter be Established**

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder require SEC to show that Defendants (1) made a material misrepresentation or a material omission as to which they had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities. *SEC v. Bauer*, 723 F.3d 758, 768-69 (7th Cir. 2013). Section 17(a)(1) of the Securities Act has the same elements but applies to an offer of securities, rather than the sale thereof. *SEC v. Maio*, 51 F.3d 623, 631 (7th Cir. 1995). Section 206(a)(1) of the Advisers Act has the same elements except it applies to investment advisors rather than to a purchase or offer. *SEC v. Penn*, 225 F. Supp. 3d 225, 237 (S.D.N.Y. 2016).

Counts I, IV, V, VI, and VII, then, alleging claims under these provisions, are fraud claims that require a showing of scienter. Liability under these sections "requires something more [than just misstatements] – deceptive acts along with misstatements or omissions." *SEC v. ITT Educ. Servs.*, 303 F. Supp. 3d 746, 765 (S.D. Ind. 2018). A "manipulative or deceptive act" is "some act that gives the victim a false impression." *SEC v. Contrarian Press, LLC,* No. 16-CV-6964 (VSB), 2019 U.S. Dist. LEXIS 40697 (S.D.N.Y. Mar. 13, 2019) (quoting *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008)); *CP Stone Fort Holdings, LLC v. Does*, 2017 U.S. Dist. LEXIS 42069 *6-*7, Fed. Sec. L. Rep. (CCH) P99,662, 2017 WL 1093166 (N.D. Ill. March 22, 2017) ("Such conduct closely resembles fraud and is patently manipulative, serving no purpose other than to transmit false information to the market and thereby artificially affect price."). Furthermore, the defendant must himself "have participated in an illegitimate, sham or

3

inherently deceptive transaction where *their conduct or role* had the purpose and effect of creating a false appearance." *SEC v. Wey*, 246 F. Supp. 3d 894, 918 (S.D.N.Y. 2017) (emphasis added).

### 2.    SEC's Non-Fraud Claims Require that Material Omissions and Negligence Be Established

Meanwhile, Sections 17(a)(2) and 17(a)(3) of the Securities Act, Sections 206(2) and 206(4) of the Advisers Act, and Rule 206(4)-8 thereunder are non-fraud provisions; their elements are similar to the above counts except that they apply to merely negligent conduct. *See SEC. v. Pimco Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 470 (S.D.N.Y. 2004).[3] These elements apply to Counts II, III, VIII, IX, X, XI, and XII.

However, negligence does not mean just that a mistake or misstatement has been made. If a valuation is ultimately shown to be incorrect, for example, that does not make it negligent; there must be some unreasonable action connected to the valuation. Although negligence may be established by showing that a defendant "should have" acted differently, a person is negligent "by doing what no reasonable person would do, or by not doing what every reasonable person would do." *SEC v. Nutmeg Group, LLC*, 162 F. Supp. 3d 754, 775 (N.D. Ill. 2016).

Within all of the fraud and non-fraud elements, only "material" representations or omissions violate the law – those for which "a substantial likelihood exists that a reasonable investor would find the omitted or misstated fact significant in deciding whether to buy or sell a security, and on what terms to buy or sell." *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1233 (7th Cir. 1988). The misstatement must be one that would have, had the truth been stated, altered the

---

[3] Additionally, Section 206 of the Advisers Act regulates the conduct of investment advisers, and Rule 206(4)-8 applies only to advisers to a "pooled investment vehicle." Without conceding that the definition of a "pooled investment vehicle" is satisfied, Defendants' Motion to Dismiss does not challenge this element.

"total mix" of information available to the reasonable investor. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988).

Related-party transactions are not automatically material. Where a related party transaction constitutes a "minute fraction of assets" on a balance sheet it may not, as a matter of law, be material. *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 202 (2d Cir. 2009). Although there is no bright-line test, a low percentage (2%) of assets affected by a representation may be held to be immaterial as a matter of law. *Id.* at 204. The SEC's internal guidance, as reflected in Staff Accounting Bulletin (SAB) No. 99, suggests a "rule of thumb" that a misstatement is immaterial if it is below 5% assets, liabilities, revenues, or net income, provided that certain qualitative factors are considered, even below that threshold. *Id.* at 197-98. These qualitative factors include whether there was concealment of an unlawful transaction, the significance of the misstatement in relation to the company's operations, and any expectation as to market reaction to the misstatement. *Id.* Only information about transactions with related parties that would make a difference in investor decision-making is material. *Zagami v. Nat. Health Trends Corp.*, 540 F. Supp. 2d 705, 711 (N.D. Tex. 2008).

**B.      SEC Has Not Met the Pleading Requirements of Rule 8, for Non-Fraud Claims, or Rule 9(b), for Fraud Claims**

For non-fraud claims, Rule 8(a)(2) requires a "short and plain statement" demonstrating the entitlement to relief. The Supreme Court has expanded on this formulation, stating that a plaintiff must articulate a viable claim against each defendant named in a complaint.  Under Rule 12(b)(6), a complaint must be dismissed if it does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] formulaic recitation of the elements of a cause of action" or "naked assertions" without supporting facts is inadequate. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557

(2007).  Rather, the plaintiff bears the burden of pleading facts sufficient "to raise a right to relief above the speculative level," *id.* at 555, and to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678. If the facts alleged in the complaint lend themselves to equally plausible lawful and unlawful explanations, the complaint must be dismissed. *See Luv N' Care Ltd. v. Toys "R" Us, Inc.*, No. 12 CIV. 0228 SAS, 2012 WL 5265723, at *3 (S.D.N.Y. Oct. 24, 2012).

As demonstrated more fully below, SEC has not met this standard. SEC's allegations are conclusory. In many instances, SEC simply asserts the elements of its claims – that a representation was "misleading," without description of how, or that an assertion was "unreasonable." Without supporting factual allegations making it at least plausible that a representation was misleading or unreasonable, SEC's claims are insufficient.

For fraud claims, Rule 9(b) compels a higher pleading standard, again unmet by SEC's allegations. A plaintiff must follow the "newspaper rule," and describe the "who, what, when, where, and how of the fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 441−42 (7th Cir. 2011). "Precision and some measure of substantiation" must be injected into the fraud allegations. *United States and Wisc. ex rel. Presser v. Acacia Mental Health Clinic, LLC,* 836 F.3d 770, 776 (7th Cir. 2016). The failure to contextualize or demonstrate how a single data point is related to a scheme is fatal to a fraud complaint. *See Pirelli*, 631 F.3d at 444. Failure to allege how a practice deviates from industry norms or violates a regulation, for example, may be fatal to a fraud claim. *Presser,* 836 F.3d at 780. The purpose of these higher standards is to avoid strike suits, but also the reputational damage that comes from being merely accused of fraud. *United States v. Home Healthcare & Nursing Servs., Ltd.,* No. 14-CV-1098, 2017 WL 2653070, at *5 (N.D. Ill. June 20, 2017).

Again, SEC's allegations do not meet this standard. SEC makes assertions about representations that are out of context and fails to demonstrate how omissions, representations, or practices deviate from norms. And in some paragraphs, SEC fails to identify even the "newspaper" items relevant to supposed misrepresentations.

This Court will, at the motion to dismiss stage, accept the well-pleaded facts in the complaint as true, but not legal conclusions or conclusory allegations "merely reciting the elements of the claim." *McCauley v. City of Chicago,* 671 F.3d 611, 617 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. 662). Once it has discarded facts which are not well-pleaded, the Court must decide whether the remaining factual allegations "plausibly suggest an entitlement to relief." *Iqbal*, 129 S. Ct. at 1951. The Seventh Circuit has held that this requirement means a plaintiff must provide specific facts that "give enough details about the subject-matter of the case to present a story that holds together." *McCauley*, 671 F.3d at 617. The more complex the case, the more detail is required. *Id.* (citing *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)). Here, discounting SEC's patently conclusory allegations, sufficient allegations do not remain to plausibly suggest entitlement to relief.

1.     **SEC's Allegations Fall Short of the Pleading Standards Applicable to Valuation Issues and Statements of Intent in Securities Matters**

SEC's claims, as discussed above, all require showing of misrepresentations or omissions, and that those misrepresentations or omissions are material. In addition, SEC's allegations raise several other established points of law related to representations by management of investment funds and valuation of assets; these cases demonstrate the insufficiency of SEC's allegations.

SEC alleges problems with respect to valuations of assets. But there is a high standard for showing that a valuation is faulty. Valuations are matters of opinion, not fact. *Fraternity Fund*

*Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 362 (S.D.N.Y. 2007) (given the nature of the market for a certain class of assets, statements of value "may be considerably more a statement of opinion than a report of objectively determinable fact."); *In re Salomon Analyst Level 3 Litigation*, 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005) (a party "who sets out his own opinion of a stock's value based on the valuation model he finds most persuasive does not omit a material fact by failing to note that others may have different opinions or analytic approaches.")

A statement of belief or opinion is not false, for securities-law purposes, unless the speaker did not hold the belief when it was made, if the supporting facts supplied were untrue, or if an omission makes the statement misleading to a reasonable person. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* 135 S. Ct. 1318, 1327, 191 L. Ed. 2d 253 (2015); *see also SEC v. Rio Tinto plc,* No. 17 CIV. 7994 (AT), 2019 WL 1244933, at *8 (S.D.N.Y. Mar. 18, 2019) (summarizing *Omnicare* opinion). *Omnicare* specifically concerned Section 11 of the Securities Act, which is not at issue here, but which requires "full and fair disclosure" of information in public offerings and which does not require any showing of intent. *Omnicare*, 145 S. Ct. at 1323. It is thus equally applicable to fraud- and non-fraud provisions.

Further, a complaint pleading fraudulent misvaluation of assets must plead what the plaintiff contends is the true valuation and specific facts as to how the valuation used was incorrect, or resulted in an overstatement. *In re Allied Capital Corp. Securities Litigation*, Fed Sec. L. Rep. P. 92,411, 2003 WL 1964184, at *4 (S.D.N.Y. 2003) (to plead fraud with particularity, a plaintiff must allege specific facts showing an overvaluation and the specific extent thereof). Where, as here, the subject asset is illiquid and multiple factors may be appropriately taken into account, alleging disagreement with the valuation does not equate to

alleging fraud – or even that the valuation was in fact incorrect. *Id., citing San Leandro Emer. Medical Group Profit Sharing Plan v. Philip Morris Cos., Inc.* 75 F.3d 801, 813 (2d Cir. 1996).

Similarly, many of the Complaint allegations concern statements of intent (for example, what assets would be invested in) or goals (for example, to produce returns). Such statements are not actionable just because they did not turn out to be correct. *See, e.g., In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d, 787, 789 (S.D. Tex. 2012). Similarly, "loose predictions," such as that there are "high" gains expected, or statements of opinion such as that management "feels very, very good about the growth" it is experiencing are not actionable. *See Eisenstadt v. Centel Corp.,* 113 F.3d 738 (7th Cir. 1997); *Makor Issues Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006). To show that a prediction was fraudulent, it must be shown that the statements were not believed by the maker when made or that they lacked a reasonable basis. *Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1132 (7th Cir. 1993).

**2.      The Incorporation by Reference Doctrine Provides that Defendants may Cite Documents Cited by SEC to Demonstrate that SEC's Allegations Misstate Defendants' Representations**

Defendants generally may not introduce outside evidence in a Motion to Dismiss. One narrow exception is the incorporation by reference doctrine.  Defendants may attach documents to a motion to dismiss if they are referred to in the complaint and central to the claim. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993); *Holder v. Fraser Shipyards, Inc.,* No. 16-CV-343-WMC, 2017 WL 11438557, at *9 (W.D. Wis. Sept. 12, 2017). Here, SEC has alleged that numerous statements in offering materials, valuations, and materials allegedly provided to investors were false and misleading. These documents are therefore incorporated by reference into the Complaint and where appropriate, Defendants have attached portions of these documents sufficient to show that SEC has taken a number of these statements out of context and that alleged misrepresentations did not occur. *See Greenhouse v. MCG*

9

*Capital Corp.,* 392 F.3d 650, 656 (4th Cir. 2004) (in evaluating materiality of misstatements at 12(b)(6) stage, court may look to "documents or articles cited in the complaint, SEC filings, press releases, stock price tables, and other material on which the plaintiff's allegations necessarily rely."). Here, SEC's allegations necessarily rely on the materials specifically cited, but also on the body of representations made to investors. SEC has routinely cited offering materials in a deceptive manner, or has simply ignored that facts it claims were not disclosed were, in fact, disclosed to investors.

**II.   THE COMPLAINT SHOULD BE DISMISSED UNDER RULE 12(B)(6) FOR FAILURE TO COMPLY WITH THE "SHORT AND PLAIN STATEMENT" REQUIREMENT OF RULE 8(A)(2) OR, IN THE ALTERNATIVE, THE COURT SHOULD ORDER A MORE DEFINITE STATEMENT UNDER RULE 12(E)**

FRCP Rule 8(a)(2) states that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The SEC's Complaint is not that. It does not tell one, or even several, stories alleging a theory of SEC's case. Instead, the Complaint lists many alleged bad acts and supposed misrepresentations, without any narrative thread or other linkage connecting them in any sort of cohesive theory, much less to the relief sought. It does so in 482 paragraphs and over 100 pages.

The SEC's Complaint is, in other words, a "shotgun complaint." Such a complaint may be dismissed for violating the short and plain statement rule of Rule 8(a)(2). *U.S. ex rel. Garst v. Lockheed-Martin Corp.*, No. 98 C 5072, 2002 WL 1794004, at *2 (N.D. Ill. Aug. 2, 2002), *aff'd*, 328 F.3d 374 (7th Cir. 2003) (dismissing 109-page, 345-paragraph False Claims Act complaint which was "needlessly prolix and confusing" and stating that complicated subject matter was no excuse); *Maryland Staffing Servs., Inc. v. Manpower, Inc.*, 936 F. Supp. 1494, 1497 (E.D. Wis. 1996) (advising that Plaintiffs could have sought dismissal of the entire 84-page, 231-paragraph, 19-count Complaint for failure to comply with Rule 8(a)(2)).

A shotgun complaint risks pleading by obfuscation; allegations "must be presented with clarity sufficient to avoid requiring a district court or opposing party to forever sift through its pages in search of" an understanding of what the claim is. *Jennings v. Emry*, 910 F.2d 1434, 1436 (7th Cir. 1990) (dismissing on other grounds but describing 55-page, 433-paragraph Complaint as "prolix, disjointed, confusing, and at times unintelligible"). Unless a case is pleaded clearly and concisely, "issues are not joined, discovery is not controlled, the trial court's docket becomes unmanageable, the litigants suffer, and society loses confidence in the court's ability to administer justice." *Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 367 (11th Cir. 1996) (stating that appropriate remedy for such a complaint is Motion for More Definite Statement Under Rule 12(e)). It is especially troubling that an agency of the United States would bring such a Complaint, and strongly suggests an agenda that conflicts with any notion of fairness or justice in the enforcement of securities laws.

The Complaint identifies dozens of statements made by or under the supervisions of Defendants that are alleged to be misleading. Yet frequently, there are not sufficient factual allegations to show the representations were incorrect. Further, the SEC has not attached documents it quotes, nor has it cited individual page numbers, when in some cases such documents are voluminous.

Defendants have undertaken the task of "sifting through" the allegations in full, below; but that analysis demonstrates that the individual Complaint allegations are unmoored from any overarching narrative or theory of relief, do not supply linkages to the counts they claim to support, and needlessly but purposely risk a sprawling case based on poorly formed allegations of bad acts. The Court need not engage in such analysis, and Defendants urge it not to. The

11

Complaint should be dismissed in its entirety for violating Rule 8(a)(2), or in the alternative, the Court should order a more definite statement under Rule 12(e).

###### A.   The Complaint Should be Dismissed under Rule 12(b)(6) for Failure to State a Claim or, in the Alternative, Insufficient Allegations Should be Stricken under Rule 12(f)

As described above, a complaint must allege sufficient facts to make it plausible that the plaintiff is entitled to relief, and must allege elements with particularity where fraud is alleged. SEC's Complaint fails to meet either of these standards. A plaintiff's complaint must do more than "offer allegations that are merely consistent with their favored explanation but which are also consistent with" an alternative explanation indicated by the facts in the complaint; some facts "tending to exclude the possibility that the alternative explanation is true" must be set forth. *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996–97 (9th Cir. 2014).

Yet SEC has failed to do this. SEC suggests that Defendants misled or withheld material information from investors. But SEC rests many of these allegations on selectively quoted materials, the full context of which demonstrate that nothing represented by Defendants was misleading. Other allegations of misleading or omitted statements lack requisite allegations establishing materiality. Still other allegations seem to be generic allegations of bad acts that do not connect to the elements of the claims actually pleaded. And what is left is generally susceptible to a simple explanation inconsistent with SEC's claims – that Defendants made reasonable statements about their goals and predictions about the future, and intervening events altered those goals or prevented those predictions from coming to pass. Defendants do not suggest that SEC needs to plead specific facts to foreclose all other explanations than wrongdoing, but it must offer some facts tending to discount alternative explanations. SEC has not done so.

The Complaint as a whole should be dismissed. It alleges dozens of acts or instances that SEC apparently believes would establish its entitlement to relief; but these allegations lack the factual underpinnings required under either Rule 8 or Rule 9. To the extent that the Complaint may not be dismissed in its entirety, the allegations that are not well-pleaded should be dismissed, or, in the alternative, stricken under Rule 12(f).[4]

Defendants address the defects in specific portions of the Complaint below; Defendants do not address every single paragraph of the Complaint, as many paragraphs contain background information that is not directly related to whether the Complaint states a claim, or that summarize information that is then alleged with more specificity later. Those portions of the Complaint alleging misrepresentations or wrongdoing are addressed directly.

**B.**   **Complaint Paragraphs 37-38 – SEC's Allegations Regarding GTIF as an Income Fund Fail to State a Claim**

Paragraphs 37 and 38 of the Complaint allege that GTIF improperly represented itself as an "income fund," as follows:

> 37.     Hull, Nohl, Chrysalis, and Greenpoint Management II have portrayed Greenpoint Tactical Income Fund as an "income" fund.  A fact sheet distributed to the investors entitled "Income Strategy Q4 2015" states that the Fund:
>
> > Seeks to Provide total return through a combination of current income, capital gains, and capital appreciation.
> >
> > Invests primarily in assets that produce investment return through interest payments, trading profits, or operational cash flow.
> >
> > Takes positions in operating businesses for cash flow, but also to secure the lending opportunities related to the company.

---

[4] Rule 12(f) provides that a Court may strike from a pleading any matter that is "redundant, immaterial, impertinent, or scandalous." Although Rule 12(f) should be construed strictly against striking portions of pleadings, it may be appropriate in some cases, for a complaint to be "pruned with care." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 894 (2d Cir. 1976). Here, such pruning should be used to reduce the scope of the Complaint if the Court finds that some allegations are well-pleaded but a large number of others are not and do not connect to the counts under which relief is sought.

> 38.    Contrary to these representations, the Fund's holdings are almost entirely non-income-generating and illiquid assets.

The referenced Income Strategy Fact Sheet for the Fourth Quarter of 2015 is attached hereto as Exhibit A. SEC alleges three statements about how GTIF intended to operate were misleading, as was GTIF's very name as an "income" fund. But these statements all describe GTIF's intention or goals. And calling GTIF an "income" fund must necessarily be a statement expressing a goal – all companies and investments seek to produce income in some form or another, though not all succeed.

SEC's only allegation supporting the falsity of these statements is that GTIF's holdings "*are* almost entirely non-income generating and illiquid assets." (emphasis added) Complaint, ¶ 48. But SEC does not allege that the statements were not believed to be true, or were unreasonable, when stated. Rather, SEC's allegation seems to be that the assets held by GTIF as of September 30, 2019, when the Complaint was filed, show that GTIF's claims about its investment strategy in 2015 are false. Obviously, in the absence of more factual allegations, what GTIF's assets were in 2019 has little bearing on whether its stated investment goals in 2015 were true or not; SEC has not alleged that management did not purchase or intend to purchase liquid and income-generating assets, just that GTIF did not hold them by 2019.

But even if the composition of GTIF's 2019 assets did bear upon the accuracy of statements made in 2015, holding "non-income-generating and illiquid assets" is not contrary to the quoted statements on the Fact Sheet, which describes not just investing in assets that generate cash flow, but also seeking returns through capital gains, appreciation, and trading profits. Exhibit A. That assets were "almost entirely" "non-income-generating and illiquid" is not inconsistent with the Fact Sheet, and certainly does not give rise to a plausible inference that

management's representations were false and misleading, when GTIF described strategies that clearly pertained to illiquid and non-income generating assets, like trading for profit and holding for appreciation.

Further, this allegation lacks sufficient supporting allegations providing context. The notion that an "income fund" should not have holdings in "non-income-generating and illiquid assets" roughly six years from inception may seem logical. But absent some allegation describing what an "income fund" is understood to be in the marketplace, or what the expected allocation of assets in such a fund should be, this allegation is simply not sufficiently pleaded.

C.    **Complaint Paragraphs 39-44 – SEC's Allegations about Michael Hull's Alleged False Statements to Advisory Clients Fail to State a Claim**

These paragraphs generally refer to Defendant Michael Hull in his role as an investment adviser, and allege that he:

- Represented that investments in GTIF "(1) were safe, (2) would generate high returns, and (3) could be withdrawn as needed," and that these were material misrepresentations because "the investments were not safe and the reported returns were inflated. Furthermore, the investors' funds could not be withdrawn as needed." Complaint, ¶40.

- Represented "that Greenpoint Tactical Income Fund was actively selling minerals and often had arranged a sale of the mineral before the Fund even committed to purchase the mineral. Greenpoint Tactical Income Fund did not often have sales arranged before even committing to a purchase." *Id.* at ¶ 41.

- Convinced investors to invest in GTIF even where it was not an appropriate investment, including investors on fixed income, older individuals, and others for whom risky, illiquid investments were not appropriate. *Id.* at ¶ 43.

15

At the outset, it should be noted that none of these allegations can support a fraud claim because they do not meet the Rule 9(b) standard. A party alleging fraud is required to plead the "who, what, when, and where" of the statements. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 441−42 (7th Cir. 2011). SEC does not plead to whom or when any such representations were made. It pleads only vague "verbal" statements were made.

Similarly, SEC offers no factual detail whatsoever on how investors were allegedly "convinced" to make supposedly inappropriate investments. *See* Complaint, ¶ 43. SEC's allegation is not inconsistent with investors, fully aware of the risks, making informed decisions to nevertheless invest. If SEC is alleging that Mr. Hull improperly assessed the investment needs of his clients, that may be a licensure matter or a claim for his clients to raise against him. It is not a securities fraud matter. On the other hand, if SEC is alleging that investors were deceived into making these investments, that allegation should be stated in accordance with the newspaper rule.

Nor do these allegations even meet the non-fraud pleading standard. Rule 8 requires a plaintiff to plead "sufficient facts to give Defendants fair notice of their claims and state a plausible claim for relief." But the Complaint does not identify any specific facts, just conclusions, that would support an inference that the representations made by Hull to his advisory clients were false. For example, SEC claims that Michael Hull represented that investments in unspecified Greenpoint Funds were "safe," but that this allegation was false because the investments "were not safe." The use of these labels or conclusions is insufficient without allegations of fact supporting SEC's claim that they were not safe, or what "safe" in the context of an investment means (as it surely would not mean "risk-free").

16

Furthermore, even if these claims were well-pleaded, they are irrelevant – full and complete disclosures were made to investors prior to their investments, meaning that these supposed misrepresentations are immaterial. The Complaint references and quotes confidential investment letters throughout; these letters identified the terms and risks of investment. Each GTIF investor was also a party to an operating agreement (included in the confidential investment letters). These documents were signed by investors, disclose investment risks, and govern their ability to withdraw money from the funds. In other words, they disclose the items Hull is alleged not to have disclosed.

For example, the GTIF Second Confidential Investment Letter ("CIL"), in the summary information at the beginning of the document, stated:

| Risk Factors | Substantial.  See page 4 and Exhibit E. |
|---|---|

Exhibit B, p. BIC_0158317. Page 4, which this reference directed investors to, states "An investment … is highly speculative and involves various substantial risks," before spending two pages further summarizing risk factors. *Id.* at BIC_0158323. And Exhibit E to the Second CIL, referenced in this summary, is a four-page exhibit to the CIL further detailing those risks. *Id.* at p. BIC_0158369. Similarly, the Second CIL disclosed to investors that distributions were only available if cash was available and then subject to the discretion of managing members. *Id.* at B, p. BIC_0158336.

Further, the operating agreements, again included in the CILs, contain an integration clause, stating that the operating agreement "supersedes all prior oral or written agreements or understandings between the parties." *Id.* at p. BIC_0158350. Investors were fully apprised of all relevant facts before investing and could not, as a matter of law, rely on any oral representations. Those representations are therefore necessarily immaterial.

**D.** **Complaint Paragraphs 63-64 – Allegations regarding a "False Contract" and Booking Gains on an Installment Sale do not Relate to SEC's Claims for Relief**

In these paragraphs, the SEC alleges that, in relation to an installment purchase, Nohl created a false contract and that unrealized gains on the assets involved were booked before all payments were made or possession was taken of the assets. These claims do not connect to the SEC's alleged counts and are not supported by sufficient factual allegations.

Paragraph 63 states:

> 63.     Nohl created a false contract with Dealer Number 1.  The false contract is the same as the actual contract with Dealer Number 1, but has handwritten on it "time is not of the essence and all payments are best efforts."  The false contract also has a signature on it.  Dealer Number 1 did not sign the false contract.

This is the full set of allegations about the "false contract." A copy of the purportedly "false contract" is attached as Exhibit C. SEC does not allege whose signature is on the contract. The signature is Christopher Nohl's, although reading the SEC's allegations that "the contract also has a signature on it," and that "Dealer Number 1 did not sign the false contract," one would be led to, incorrectly, believe that the signature was a false signature for Dealer Number 1.

The allegation that this is a "false contract" could imply numerous things that SEC does not actually allege. It implies that the statement that "time is not of the essence and all payments are best efforts" was not, in fact, a correct representation of the terms of the transaction. It implies that, at some point, this was presented to someone as something it was not – something signed by someone other than Chris Nohl. It would also seem to imply that the signature was not, in fact, Nohl's. Yet SEC does not allege any of those things.

Without further allegations, SEC's allegations do not connect to any misrepresentation. Rather, the SEC's allegations reflect an attempt to impugn Nohl's credibility by alleging, without

support, generic bad acts (the creation of a "false contract") not directly related to any claim for relief.

The Complaint goes on to state that unrealized gains on the specimens purchased under that contract were booked as follows:

> 64.    Nohl recorded large, unrealized gains on the three specimens even though the Fund through GP Rare Earth did not make the payments according to schedule; still has not completely paid for them; did not have possession of two of the pieces until months after the contract date; and did not have possession of the third specimen until February 2019.

Complaint, ¶ 64. The Complaint does not allege, however, that this treatment was improper, and it is not clear why it would be. Nothing is alleged to be false or misleading. To the extent SEC implies that there was something improper about recording the acquisition or values of these assets on GTIF's books, it does not identify what it was. The allegation shows that GTIF had a contract and had made payments on the assets acquired; SEC's allegations, without more, simply do not tie to its claims of fraud or even negligent misrepresentation.

**E.**    **Complaint Paragraphs 73-82 – SEC's Allegations about the Second Confidential Investment Letter Misstate that Document and Do Not Otherwise Demonstrate that the Document was Misleading**

Paragraphs 73-82 of the Complaint detail alleged false statements in the Second CIL. These paragraphs are addressed in turn.

Paragraph 73 states:

> 73. The Second Confidential Investment Letter falsely and misleadingly represents to investors that "[f]unds will be used primarily [sic] acquisition of investments in three arenas: (1) distressed real estate assets, specifically in the petroleum, oil markets, but may also include multifamily and commercial markets; and (2) mining, minerals and precious stones; and (3) intellectual property." As of June 30, 2018, the gem and mineral collection represented approximately 52% of the Fund's purported value, and a portfolio of debt and equity securities of private companies represented approximately 46% of the Fund's purported value.

Here, SEC once more suggests that statements identifying what assets GTIF intended to invest in were false and cites to asset allocations made years afterward. But those allocations, years later, do not mean that statements of what investments were intended were false *when made* or that GTIF's managers did not intend to invest as they stated. The allegation intended to "disprove" that intent is wholly consistent with the possibility that distressed real estate assets and intellectual property were purchased and sold, rather than being held for appreciation, resulting in their not being a large portion of the balance sheet years later.

More concerning, the SEC's allegation is based on a misleading and selective quotation that takes the quoted language wholly out of context. The full quote is as follows, with the portion omitted by SEC highlighted:

| Use of Funds: | Funds will be used primarily acquisition of investments in three arenas: (1) distressed real estate assets, specifically in the petroleum, oil markets, but may also include multifamily and commercial markets; and (2) mining, minerals and precious stones; and (3) Intellectual property. The Company will not, however, limit its investments to these initial strategies and will remain open to all investment opportunities in which its' managers have experience that promise to increase return on investment for its Members. |
|---|---|

Exhibit B, p. BIC_0158317. The text SEC chose to omit is significant and far from accidental. Investors were specifically advised, *in the very passage SEC alleges advised them otherwise –*

that GTIF's managers would not limit its investments to the initial strategies identified in the Second CIL, and would take advantage of all opportunities to increase returns on investment. This is not a warning buried in fine print or a footnote. It is the very next sentence, in summary information at the beginning of the Second CIL. And the whole passage is consistent with the possibility that years later, the asset allocation of GTIF did not reflect the intended allocation in this letter.

Similarly, paragraph 74 states as follows:

> 74.    The Second Confidential Investment Letter also falsely and misleadingly represents to investors that "[t]he Company's goal is to achieve a high level of current income through purchases of distressed real estate notes and other assets of a distressed nature."   To the contrary, the Fund's holdings have been largely composed of non-income-generating assets and illiquid assets.

As discussed, *supra*, at 14, this is a statement of intent. There is no allegation that it was not intended to be true, or was unreasonable when made; rather, SEC alleges falsity based on what GTIF's ultimate investments were, and the allegation is defective for the same reason.

But again, SEC has quoted the document in a deliberately misleading manner. The full Second CIL is 86 pages, including attached exhibits. *See* Exhibit B. It contains numerous detailed references to investment strategy which provide more detail than the quoted passage. Although there are numerous examples, just two pages later, GTIF described its business to date as including: 1) distressed real estate notes, 2) gem and mineral investments, and 3) intellectual property (through investment in the underlying company or in the technology itself). *See* Exhibit B, p. BIC_0158322. Cherry-picking a single sentence out of a much longer document that fully discloses GTIF's investment strategy is not just inappropriate, it suggests that SEC's true

motivation and goal in this case is to damage the Defendants without regard to the merits of any properly pleaded claims.

Paragraph 75 states as follows:

> 75.    The Second Confidential Investment Letter falsely and misleadingly represents to investors that "[f]urther the fund has made investments in the gem and mineral markets.  Many of these transactions are short term in nature and provide strong cash flow as well."  The vast majority of the gem and mineral transactions were not short term in nature and did not provide strong cash flow.

This paragraph is too vague to plausibly allege a false or misleading statement because it relies on mere labels, not facts. GTIF represented that "many" transactions were short term in nature and provided "strong" cash flow. SEC alleges "the vast majority" were not short term and "did not provide strong cash flow."

SEC has voluminous records of GTIF's sales but has declined to put specific numbers in this portion of its Complaint. But those numbers are important to deciding if a plausible allegation of falsity has been made. If GTIF engaged in 3,000 transactions, and 10% were short-term, the 300 short-term transactions could easily be "many," but the "vast majority" would not be short-term. In addition, "strong cash flow" is a vague term (used by GTIF); without an allegation about what that cash flow was, the Court and the Defendants are not in a position to even evaluate what SEC thinks was misleading about that claim. Under Rule 9(b), SEC must plead with particularity. Using terms like "many" and conclusory allegations like "did not provide strong cash flow" does not meet that standard, and it does not even meet the non-fraud standard of Rule 8 because it does not provide sufficient factual detail for the court to evaluate the plausibility of the Complaint.

Further, this paragraph contains yet another misleading quotation. The full quote is as follows (the portion omitted by SEC is highlighted):

> Further the fund has made Investments in the gem and mineral markets.  Many of these transactions are short term in nature and provide strong cash flow as well.  In some cases assets are held for longer periods of time where their value can be maximized through this holding period.  The Fund has acquired some of the finest specimens of their kind in the world, at valuations dramatically lower than their appriased value.

GTIF's management disclosed that it intended to hold certain assets for a longer period to maximize their value. GTIF did not commit to any particular percentage or allocation, or even imply one. There was no falsity to this statement, nor was it in any way misleading.

Paragraph 76 states:

> 76.    With respect to gems and minerals, the Second Confidential Investment Letter falsely and misleadingly represents to investors that "[t]he Company is working on a number of large acquisitions, in some cases entire collections from some of the most respected collectors in the world.  The company will acquire these collections at a fraction of their current value . . . The global demand for world class specimens cannot be overstated."  The Fund had no reasonable expectation of acquiring, and did not acquire, large acquisitions and entire collections at a fraction of their current value.

This allegation, again, does not support a claim of falsity. SEC offers a conclusory statement that "[t]he Fund had no reasonable expectation of acquiring…" any "large acquisitions and entire collections at a fraction of their current value." "[N]o reasonable expectation" is a legal conclusion that must be discarded, and it is unsupported by any factual allegation – whether sufficient to support a fraud allegation or otherwise.

Further, GTIF did not represent that it would complete such acquisitions, but specifically that it was "working on" such acquisitions.  This is not a forward-looking statement, it is a statement of fact. It can be proven or disproven. SEC does not allege that it was untrue. That is

not sufficient; if SEC believes the representation that such acquisitions were being "worked on" was inaccurate, it should so allege. It has not, and so has not alleged falsity as to the statements actually made by GTIF.

Paragraph 78 of the Complaint states:

> 78.     The Business Plan falsely and misleadingly represents to investors "[d]emand for the finest mineral specimens is spreading like a wild-fire throughout the world and it is imperative to acquire these assets now before truly unique, utterly rare and beautiful things are locked up in private collections completely where they are nearly impossible to acquire. . . . The upper or tip-top of mineral specimens, those being represented by less than 0.0005% of total salable specimens by quality and size, are the most sound investment as possessors get whatever price they demand for the very best in existence and get the same without delay or negotiation.  It is truly a seller's market."  The Fund had no reasonable expectation of getting, and has not gotten, "whatever price they demand[ed]" "without delay or negotiation" in the sale of mineral specimens.

First, the quoted passage, even as provided by SEC, is describing the market generally, not necessarily mineral and gem assets GTIF would obtain. In fact, it specifically states that this statement applies to ".0005% of total saleable specimens" – that is, five out of every million specimens, or only the ultra-rare.

That said, the full quote once again reveals SEC's misleading and selective quoting from referenced records. The portions omitted by SEC are again, highlighted:

The planet is experiencing a commodities boom as ever increasing populations compete for limited resources.  Historically, for the past 100 or so years, the large majority of these resources have been consumed and/or purchased by the United States.   A sea chance is underway fueled by the wind of abominable demand from China, Japan, India, Korea and Singapore as well as not insignificant demand from oil rich countries such as Dubai and UAE.  The phenomenon of worldwide wealth concentration has allowed for the escalation in value of the best assets in many categories to historic highs.  This includes things such as diamonds, gems, art, and world-class mineral specimens which, while extremely popular in Germany for ages, have been relatively over-looked as both aesthetic pieces and as extremely rare stores of stable value.  Demand for the finest mineral specimens is spreading like a wild-fire throughout the world and it is imperative to acquire these assets now before truly unique, utterly rare and beautiful things are locked up in private collections completely where they are nearly impossible to acquire.  The bottom to middle range of specimen trade between $50 and $5000 per piece.  This market segment is the most vibrant but also the most prone to stagnation in prices as the average person can only afford a limited expenditure.  The upper or tip-top of mineral specimens, those being represented by less than 0.0005% of total salable specimens by quality and size, are the most sound investment as possessors get whatever price they demand for the very best in existence and get the same without delay or negotiation.  It is truly a seller's market.  There are opportunities within the midrange with specimens priced $5,000 - 125,000 to score potential 3x to 10x profits so long as the buying itself occurs in a deeply networked, experienced and knowledgeable manner.

The full quote makes clear that the market, not GTIF's intentions, is being described. But that said, GTIF certainly sought to acquire pieces within the .0005% referenced, but it also indicated that there was a significant opportunity to generate returns in the "midrange." GTIF was describing that it intended to take advantage of that whole market, not just the portion highlighted by SEC. In context, the alleged failure to obtain returns described as applicable to five out of every million pieces does not suggest that GTIF in any way misstated its intention.

Paragraph 79 states:

79.    The Business Plan also falsely and misleadingly represents to investors that "[t]he second stance includes an allocation of fund assets to serve as a revolving line upon which the fund will arbitrage mid-range minerals in rapid succession.  Typical returns of 'fast-moving' material (transactions within hours or days) realize returns of 10 – 30% but may, when purchased most advantageously, yield 100 – 300% IRR within 30 days of inception for each respective instance." The Fund rarely, if ever, sold gems and minerals in "rapid succession," in "fast-moving" transactions" "within hours or days," or for profits of 100-300% within 30 days of acquiring them.

Again, SEC quotes management's description of the market. SEC does not allege that the description was inaccurate when made. SEC instead alleges that "The Fund rarely, if ever, sold gems and mineral in 'rapid succession,' or for profits of 100-300% within 30 days of acquiring them." Once more, SEC has the sales data that shows exactly what was or was not sold, but provides no factual allegations, just the bare allegation that this "rarely" happened. But SEC does not offer any alleged facts concerning how GTIF inaccurately described the market or to support the notion that it was unreasonable in thinking it could perform similarly to the market for these assets. Accordingly, this allegation is deficient and simply does not support SEC's claims of fraud or misrepresentation.

Paragraph 80 states:

> 80.     The Business Plan additionally falsely and misleadingly represents to investors that "[b]y far the greatest returns on midlevel specimens can be realized through sales to collectors and dealers in China and other southeast Asian countries which currently exist in a non-contiguous bubble from American dealers (even at the very top).  The fund will seek to rapidly build a database of Chinese collectors and dealers to make pieces available where no other American dealer is doing business although it is the place of highest and most rapidly increasing demand."  The Fund never did any work to build a database of Chinese collectors and dealers.

Once again, this was a forward-looking statement, describing GTIF's intended course of action. Even assuming that SEC's factual allegation – that GTIF did not build such a database – is correct, the fact that a forward-looking statement did not come to pass does not mean that it was inappropriate when made. SEC alleges "The Fund never did any work to build a database of Chinese collectors and dealers." It does not allege that it did not intend to or had no reasonable expectation that it could. This allegation is insufficient to support any claim of misrepresentation.

Similarly, Paragraph 81 attacks another statement of intention:

> 81. The Business Plan further falsely and misleadingly represents to investors that [t]o facilitate the trading and acquisition goals of this stance the Fund will, once cash flow supports it, open a small sorting and clearing house operation in the Milwaukee, Wisconsin area.  Contained within that space will be vaults for security, as well as a phone bank for deal coordination." The Fund never opened a sorting and clearing house.  The Fund never opened a phone bank for deal coordination.

First, this statement is forward-looking and conditional in that the space would be opened "once cash flow supports it." The Complaint is rife with allegations that GTIF had cash flow or liquidity problems. *See, e.g.,* Complaint ¶¶ 10 (after paying management fees, GTIF has "has frequently lacked cash to pay its obligations and make investments"); 111 (managers have not taken redemptions since 2016 because GTIF "has not had adequate liquidity"). If those allegations are true, they are consistent with an allegation that GTIF was unable to complete capital projects it intended.

Further, management stated that it would "open a small sorting and clearing house" which would contain "vaults for security, as well as a phone bank for deal coordination." In fact, a vault was built, and court filings made by DOJ, in cooperation with SEC, demonstrate that to be the case. DOJ, on SEC's referral, obtained a search warrant for the property within which the vault was located and seized access to it in 2017. *See* Exhibit D, pp. 31-32, ¶¶ 55-58 (identifying that BIC represented to SEC that it had a vault, and purchase records confirmed the installation of a vault).[5]

---

[5] Defendants ask the Court to take judicial notice of the search warrant affidavit, which was filed in the Eastern District of Wisconsin. *See* Case No. 17-mj-0036, Docket No. 1, filed March 31, 2017.

There is no dispute a vault was built, exists, and holds GTIF mineral and gem assets. SEC's allegation is that no "sorting and clearing house" and no "phone bank" were opened. But one of the components of the "sorting and clearing house" referenced in Paragraph 81 was the vault. That leaves the allegation that there was no phone bank contained therein. It is impossible to imagine how the presence or absence of a phone bank could be material in any way to investors, and there is no allegation sufficient to establish a claim of misrepresentation.

### F.   Complaint Paragraphs 90-99 – SEC's Allegations about the Third Confidential Investment Letter Misstate that Document and do not Otherwise Demonstrate that the Document was Misleading

The allegations concerning the Third CIL (a copy of which is attached hereto as Exhibit E), are similar to those concerning the Second CIL, and, again, center on a number of items that SEC has taken out of context or selectively quoted.

Paragraph 90 states:

> 90.    The Third Confidential Investment Letter falsely and misleadingly represents to prospective investors and investors:
>
> > Proceeds of the Offering will be used primarily for the acquisition of investments in the Company's four asset categories: 1) purchasing real assets, possibly of a distressed nature, improving and then subsequently leasing or reselling them, 2) investing in private businesses that have either high net income or the potential for high net income, 3) advancing and/or lending money secured by purchase orders (known as production factoring) and/or participating in commercial lending of other types of lending or debt transactions that are likely to produce net interest income, (4) acquiring rare minerals and precious gemstones.
>
> As of June 30, 2018, the gem and mineral collection was approximately 52% of the Fund's purported value, and a portfolio of debt and equity securities of private companies, including a now-worthless position in Private Company 1, was approximately 46% of the Fund's purported value.

At the outset, it is not clear how SEC intends the allegation that 98% of the Fund's value was in gems and minerals or securities of private companies to demonstrate the falsity of the

intended use of offering funds. Investing in private businesses and acquiring rare minerals are two of the four asset classes specifically identified in the quoted passage, which does not purport to set an allocation among these classes. Further, a snapshot of GTIF's value at a given point in time does not establish what it invested in (because it does not take into account sales, gains, or losses), much less what GTIF *intended* to invest in. SEC does not allege that Defendants did not intend to invest in these categories, or that claims that they would do so were unreasonable, much less factual allegations that would make those conclusions plausible.

And a mere two pages later, the Third CIL states "the vast majority of the funds raised through this Offering will be utilized" in relation to the investment in Private Company 1. Exhibit E, p. BIC_0158408. In light of this statement, the allegation that the majority of the Fund's assets were tied up in two asset classes does not suggest falsity; the Third CIL as a whole is completely consistent with the alleged asset allocation, as investors were advised that most funds raised would be used to increase ownership in Private Company 1.

Paragraph 93 states that:

> 93.   The Third Confidential Investment Letter falsely and misleadingly represents to prospective investors and investors "[t]he current $40MM evaluation on [Private Company 1] was set by [Private Company 1] prior to engagement with the [Fund] and by all calculations is well below the current value given contracts, approvals and opportunities realized by [Private Company 1] in the last 6 months." "Contracts, approvals and opportunities realized by [Private Company 1] in the last 6 months" did not by all calculations show that a $40 million valuation of Private Company 1 was well below its current value.

As discussed more thoroughly below in the discussion of Private Company 1's valuation, using the prior $40 million valuation as a baseline for determining Private Company 1's value

was appropriate under the facts and circumstances existing at the time, because it was used as a justification for a lower valuation than other factors called for. In addition, the Third CIL has an "Effective Date" of May 1, 2016. The CIL reflected Private Company 1's valuation as of that date, and that valuation was subject to change. The Third CIL further reflects that "the plan is thus to ramp up the … equity position and receivable pool simultaneously enhancing fund cash flow in the process while also exiting with approximately $50MM cash on an $8.2MM investment within 12-18 months of beginning to take the position." Exhibit E, p. BIC_0158408. An investor who received the CIL on January 1, 2018, a year and a half after the "effective date" date of the Third CIL, would have understood that no exit had, in fact, taken place between the effective date and that date, and that that information was no longer current; that investor would and could not have been misled.

      Paragraph 94 states:

> 94.     The Third Confidential Investment Letter falsely and misleadingly represents to prospective investors and investors "the [Fund] has made investments in the precious stone and very fine mineral markets and has amassed one of the top 5 collections of fine minerals in the world public or private according to numerous experts.  Many of these transactions are short term in nature and provide cash flow as well."  Few of the transactions were short term in nature and few, if any, provided significant cash flow.

      This is another statement SEC has misleadingly quoted. The full statement follows. The omitted portion is highlighted.

> Further, the Company has made investments in the precious stone and very fine mineral markets and has amassed one of the top 5 collections of fine minerals in the world public or private according to numerous experts.  Many of these transactions are short term in nature and provide strong cash flow as well.  In some cases assets are held for longer periods of time where their value can be maximized through this holding period.  Historically, the greatest rates of appreciation have occurred for the very finest pieces which also, at least in the fine mineral arena, have consistently demonstrated a non-correlative nature.  The Company has acquired some of the very finest and most famous specimens of their kind in the world including major species like aquamarine, heliodor, emerald, morganite, kunzite and tourmaline.  The year-end 2015 catalogue of fine minerals in the collection numbered 2,742 while the number of precious stones in the vault numbered 198.

Exhibit E, p. BIC_0158400. The quote makes it appear that the representation was that transactions were made primarily or solely to generate short-term profits on these ultra-high-end pieces. The full quote reveals a different picture. Nearly 3,000 pieces were in GTIF's gem and mineral collection as of December 31, 2015, and many of those were being held for appreciation. As discussed, *supra*, in the context of that many pieces, "many" could be a relatively small percentage of the total. SEC is in a position to provide factual allegations as to what "few" transactions being short term means, and what it means when it says they did not provide significant cash flow. Vague, conclusory terms like "few" and "significant," without some context, are not sufficient to satisfy Rule 9(b), or even Rule 8.

Paragraph 95 states:

> 95.     The Third Confidential Investment Letter falsely and misleadingly represents to prospective investors and investors that "[d]iscussions are underway to sell somewhere between $10MM and $30MM of the collection on a 3-7 year amortized terms to the most prominent dealer in the world who is New York City based." The Third Confidential Investment Letter is dated May 1, 2016.  As of May 1, 2016, Greenpoint Tactical Income Fund had no reasonable expectation of selling between $10 million to $30 million of minerals from its collection to one person.

SEC makes a conclusory allegation  that GTIF "had no reasonable expectation of selling" assets as described in the quoted passage. Yet, the Third CIL states that "discussions are underway," and SEC does not allege that they were not. Stating that there was "no reasonable

expectation" is a conclusory allegation incorporating the words of the legal test; it does not establish a plausible claim for purposes of Rule 8 or Rule 9(b). Absent an allegation that such discussions were not underway, this paragraph is not well-pleaded.

Paragraph 96 states as follows:

> 96.    The Third Confidential Investment Letter falsely and misleadingly represents to prospective investors and investors that "[r]elationships have been developed to capitalize upon the Company's well-developed catalogue for conversion to an internet sales format within the near future."  The Fund's collection was not converted to an internet sales format "within the near future."  Significant pieces were never offered for sale in an internet sales format.

Yet again, SEC alleges that a planned event did not happen without supporting factual allegations. SEC does not allege that the relationships in question were not in fact developed, that there was no such intention, or that such an intention was unreasonable. There is simply not a sufficient factual allegation to support a claim of falsity.

Paragraph 97 states:

> 97.    The Third Confidential Investment Letter falsely and misleadingly represents to prospective investors and investors that "[a]ll of the [Fund's] portfolio companies are exhibiting strong growth."  As of the date of the Third Confidential Investment Letter, Private Company 1 was not exhibiting strong growth.  Private Company 1's actual 2015 revenues were approximately $3.98 million, and its net income was $100,000.  For the first quarter of 2016, Private Company 1's revenue was $84,990 and losses were $995,438.  Through the second quarter of 2016, Private Company 1's revenue was $430,049 and losses were $1,361,719.

GTIF's evaluations of and representations concerning Private Company 1 are addressed more fully below, given that over 150 paragraphs of the Complaint deal with valuations of

Private Company 1. However, value judgments like "strong growth" are generally not actionable. *See Eisenstadt v. Centel Corp.,* 113 F.3d 738 (7th Cir. 1997). And further, quarterly revenue is not dispositive of growth – revenues can be seasonal or, otherwise cyclical. But, as will be addressed below, Private Company 1 was in the process of bringing online a second plant on a major project and had reason to believe, in 2016, that it was going to receive large contracts. *See* p. 55, *infra.* Quarterly revenue does not tell a sufficient story in light of those facts.

G. **Complaint Paragraphs 100-112 – SEC's Allegations Concerning Fees Charged do not Sufficiently Relate to SEC's Claims for Relief or Adequately Allege Material Omissions**

Paragraphs 100 through 105 and 107-112 describe the financial arrangements between GTIF, its managers, and related companies, but do not themselves allege misrepresentation or other issues supporting SEC's claims for relief – presumably they are intended to provide background for those claims.

Paragraph 106 alleges that with respect to the company that provided GTIF's accountant, Alt Asset Portfolio Services ("Alt"), Hull and Nohl did not disclose that Alt charged GTIF "approximately $100,000 more than the accountant [employed by Alt] received in compensation" over the course of 2016 through 2018.

SEC offers no explanation for why a company associated with the managers would not be allowed to make a profit (which SEC characterizes as Hull and Nohl "pocketing" amounts paid in excess of salary). Nor does SEC offer any basis for the implication that the profit margins of a company providing services to GTIF must be disclosed to the investors. In any event, these amounts are immaterial. Hull and Nohl each, per this allegation, received about $17,000 a year from Alt's relationship with GTIF. Paragraph 108 of the Complaint alleges that Chrysalis and GAM II each received between $5 and $6 million from GTIF from 2014 to 2019. An additional $50,000 for each manager is not material relative to either assets under management or total fees.

In fact, GTIF disclosed to investors that it was utilizing Alt, "a sister Company to the managing members" for accounting work and audit coordination. Confidential Letter to Investors, Quarter 3, 2016, attached hereto as Exhibit F, p. BIC_0197504. In addition, the Risk Factors identified in GTIF's offering materials clearly note that entities owned by the managing members might provide services to GTIF: "The Company may use the services of external entities that may have common ownership with the managing members of the company.  The common ownership creates a potential conflict of interest as the managing members could benefit on both sides of the transaction." *See* Exhibit E, p. BIC_0158415. That "benefit" would be that management would profit. Absent some allegation supporting how the specific amount of profit is required to be disclosed, this matter cannot form the basis for any claim.

### H.   Complaint Paragraphs 149-179[6] – SEC's Allegations of Breaches of Fiduciary Duty and Undisclosed Related Party Transactions Relate to Immaterial Transactions

Paragraphs 149-179 of the Complaint allege failure to disclose related-party transactions and self-dealing. SEC alleges that "Hull and Nohl received millions of dollars of investor funds but did not disclose to the investors in the Fund their conflicts of interest and related party transactions…" Complaint, ¶ 149. The Complaint then describes numerous transactions that the SEC alleges should have been disclosed.

At the outset, it should be noted that GTIF did in fact disclose that related-party transactions were contemplated. The Second CIL states:

---

[6] Paragraphs 113-148 primarily detail the preparation and contents of GTIF's financial statements and do not, for the most part, contain allegations of misrepresentation or falsity. Complaint Paragraphs 119 and 126 allege failures to disclose related-party loans in financial statements. These allegations are duplicative of those in Paragraphs 152-177, and are addressed in response to those paragraphs.

> There could be conflicts of interest and potential conflicts of interest among certain owners, investors, and service providers of the Company.
>
> The company may use the services of external entities that may have common ownership with the managing members of the company. The common ownership creates a potential conflict of interest as the managing members could benefit on both sides of the transaction.

Second CIL, p. BIC_0158371. Investors were on notice that related-party transactions were contemplated. The deficiency alleged by SEC, then, must relate to the *sufficiency* of disclosure. Matters must only be disclosed if they are "material." As discussed above, a matter may not be material, as a matter of law, if it constitutes only a minor amount in relation to total assets. *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 202 (2d Cir. 2009). The amounts identified below by SEC are not material, as a matter of law.

SEC alleges that GTIF had total net assets of $135 million as of June 30, 2018 (Complaint ¶ 5). Yet the total amounts alleged to be realized by all Defendants in paragraphs 149-179 are $864,687.[7] Further, the Complaint alleges that the managers are awarded 30% of GTIF's profits in the form of Unit B shares, worth at least $30 million, plus that they have received management fees of over $11 million. Complaint ¶¶ 108-112. These transactions are not material, constituting only .64% of the net asset value of GTIF and only 2.1% of the approximately $41 million due and owing to management. Further, SEC has not alleged any defect in the transactions, or anything that might make them otherwise improper.

Paragraph 151 concerns a commission Nohl received – from the sellers of a painting who sold it to Greenpoint Fine Arts Fund – and a payment he subsequently made to Bluepoint. It is stated that the commission was not disclosed to investors in Greenpoint Fine Art Fund, GTIF, or GTIF's auditor. With respect to GTIF or its auditor, no allegation is made as to why such a disclosure would have been necessary, since the transaction does not involve GTIF money.

---

[7] This number includes all interest payments to the managers, $580,000 in finders fees alleged in Paragraph 151 of the Complaint, and the full amount of assets the mangers purchased from GTIF.

Nor would the transaction be material as to GTIF. A $580,000 payment to Nohl and a subsequent $200,000 payment to Hull are simply not significant compared to GTIF's $135 million in assets under management.

Nor are the allegations sufficient to establish materiality as to Greenpoint Fine Arts Fund (which neither Nohl nor Chrysalis is alleged to have any involvement in the management of).[8] There are no allegations as to the amount of money raised in that fund, or what is or is not a customary commission arrangement in the fine art world that would indicate whether such a matter would be required to be disclosed or whether it would be material. Absent sufficient facts to establish these matters, the allegation cannot support any claim.

Paragraph 152 concerns a loan between Michael Hull and GTIF, and a $7,424 fee Nohl received for originating the loan. There is no factual allegation regarding the interest rate for the loan relative to prevailing market rates, or that it in any way harmed investors. Hull's mortgage was a relatively small one. The origination fees are wholly immaterial: given SEC's own allegations about the alleged levels of payments to managers, $7,424 is not material.

Paragraph 153 concerns a Finder's Fee Agreement for Greenpoint Fine Art Fund to pay Nohl a finder's fee for any sale of the painting Nohl found for the Fine Art Fund. Again, there is no indication why this should have been disclosed to GTIF investors. Further, given that there is no sale or value alleged for this piece, 20% of the profits for the painting may or may not be material, but SEC has not alleged sufficient facts to determine whether this element is met. Without an allegation regarding whether such an agreement was inappropriate, not customary in the industry, or, otherwise impacted either fund, it is not clear why it would have needed to be

---

[8] It is also unclear from the Complaint whether any of the claims against Hull or any other party are intended to relate to the management of Greenpoint Fine Arts Fund.

disclosed to investors in any fund, but especially to investors in GTIF, which, again, is not a party to the transaction.

Paragraphs 154-164 concerns short-term loans from Defendants to GTIF. SEC makes much of the "exorbitant" interest rates on these loans. But all were short-term loans to the Fund, which, as recognized by SEC, arise in the context of a fund having liquidity problems. SEC has not alleged facts that would demonstrate that these amounts were, in context, in any way inappropriate; it seems obvious that a short-term, instant loan to a cash-strapped company would come with high interest rates. Further, SEC identifies eight loans, with total interest payments of $43,000, over a span of two years. Complaint, ¶ 164. Again, the amounts are simply not material in light of total payments to management over this time period, much less in context of the total assets under management.

Paragraphs 165-173, meanwhile, concern loans from another fund to GTIF. SEC alleges that Defendants "did not adequately disclose this loan, its terms, and the extensions to [GTIF] Investors or the Fund's auditor." ¶ 167. Paragraph 170 states a similar allegation. But alleging a lack of "adequate" disclosure indicates that there was disclosure but that it was insufficient. Yet SEC does not detail what was disclosed, only that extensions were not disclosed; without knowing what was disclosed, it is impossible to judge whether the disclosure was sufficient, or whether any omissions were material or not. Simply put, this allegation is not sufficient to plausibly allege a claim.

SEC further alleges that it was not disclosed to investors in the fund that lent money to GTIF that "their funds would be loaned to" GTIF. Complaint, ¶ 168. SEC also alleges that the loan was made without consent or approval of all managers of the lending fund. Complaint, ¶ 169. But there is no sufficient allegation – much less reason to believe – that advance notice to

37

the investors in the other fund was required. Similarly, there is no allegation that the consent or approval of the other fund's other manager was required (or that failure to obtain such consent would be a material misrepresentation to investors in either fund).

Paragraph 172, meanwhile, details a third loan and further payment details that "were not disclosed to the investors." But it is unclear which investors this paragraph refers to – GTIF's or the other fund's.. This is not a minor omission. Rule 9(b) requires that, to support a fraud claim, an allegation be made with specificity as to whom a misrepresentation or omission was made. Even under Rule 8, a Complaint must also plead some facts that would tend to show how each Defendant is alleged to have met the elements of the alleged violation – but without knowing which fund's investors were not notified, it is impossible to know which Defendants are alleged to have not made a disclosure they should have or how materiality might be judged, and even the Rule 8 standard cannot be met.

SEC further alleges, in paragraphs 174-177, that Defendants failed to disclose to investors loans from Investor Number 2 to GTIF. SEC cites nothing to suggest there was any disclosure obligation. In fact, GTIF's Amended and Restated Operating Agreement, part of its offering materials, specifically, contemplated that GTIF might take out loans from its members. Second CIL, p. BIC_0158348, § 9.5(d)(i) (defining priority of payments in a termination and creating special rule for loans made by members). It is unclear why or how SEC believes that there was an obligation to disclose each individual loan from an investor.

SEC next presents a somewhat convoluted chain of events in Paragraph 176 where, in short, Investor Number 2 directed that an interest payment he was owed be used to pay one of Defendant Nohl's entities for an engagement ring purchased by Investor Number 2's son, Investor Number 1, "thus using investor funds to repay a personal debt Investor Number 1 owed

38

to Nohl's entity." But that is, in spite of SEC's conclusory characterization, not what the allegations show. Investor Number 2 was owed money by GTIF; he gifted part of the right to receive that money to his son, Investor Number 1. Investor Number 1 then exchanged that right with Nohl. Complaint, ¶ 176. And the total amount received by Nohl was $25,000, which is, again, a tiny fraction of net fund value or even Chrysalis's management fees.

Finally, SEC alleges that Nohl and Hull engaged in certain specific purchases from GTIF that were not disclosed to investors. SEC's allegations as to these transactions are insufficient. SEC alleges that over the course of four years, GTIF sold seventeen minerals to Nohl or his entities for approximately $109,000, or approximately $6,400 per specimen. There is no allegation the transactions were for anything but market rates. Complaint, ¶ 178. These transactions are not material compared to the total GTIF assets or management fees paid to Nohl.

Similarly, Hull is alleged to have purchased $116,000 in assets from GTIF in 2014; the transactions are not alleged to have been for anything but market rates. Complaint, ¶ 179. The theory under which these transactions, which are immaterial and which are not alleged to have been to any untoward advantage for the managers, should have been disclosed, is not articulated, and nothing in this section of the Complaint states a claim upon which relief can be granted.

This whole section of the Complaint, then, seems to relate to an unwarranted supposition on the SEC's part that *any* transaction between GTIF and an investor or manager needed to be disclosed, at some unspecified level of detail, to all investors. That is not the law. Only material transactions need to be disclosed, and given the amounts alleged and that SEC has made no allegations suggesting the transactions were otherwise improper, it has not sufficiently alleged facts that can establish that element.

I.       **Complaint Paragraphs 180-86 – SEC's Allegations of Improper Timing of Valuations do not Relate to any Actionable Misrepresentation**

The Complaint, at paragraphs 180-86, alleges that GTIF's managers violated GTIF's Amended Operating Agreement in the valuation of assets. Specifically, the Complaint alleges that assets were to be valued at their purchase price in the year in which they were acquired. This resulted in, according to the SEC, gains of $4.4 million in 2014 and $14.8 million in 2015 that should not have been recorded in those years. It is important to note that the allegation in these paragraphs is not that GTIF could never record those gains; just that the gains should not have been recorded in the year of purchase and should not have been used to compute Fund value until the next year.

The SEC's interpretation of the Amended Operating Agreement is unreasonable; an example helps demonstrate this fact. If GTIF had been funded initially by one investor's ("Investor A's") million dollar investment on January 1, 2014, and on February 1, 2014, GTIF used that $1 million to purchase a mineral worth $2 million at a discount, if the piece could be revalued that day, Investor A's capital account would be $2 million (less management fees and Class A shareholders' portion of gains). But if GTIF could not revalue the piece until January 1, 2015, and prior to that date, another $9 million in new investment came in (but no other gains were recorded) then, in 2015 when the mineral was revalued at $2 million, Investor A's share of the gain would be $100,000, and Investor A's capital account would be $1.1 million (less management fees and Class A shareholders' portion of gains). Investors who did not assume any of the risk that the piece might not be obtained would share in the gains and Investor A's position would be diluted. A fund operating under these rules would have numerous disadvantaged investors.

The position that GTIF took, then, was in the best interests of its shareholders, and is not obviously contrary to the Operating Agreement's language. Further, there is no allegation that the recording of gains in the year of purchase was concealed or in any way misrepresented to shareholders, auditors, or prospective investors. If the Amended Operating Agreement was violated, that is a matter between the members and managers of GTIF; if it does not involve a material misrepresentation of some sort, it is not a matter relevant to the claims alleged in the Complaint. However, given that GTIF's practice of valuing assets in the year of purchase guaranteed investors would not find their investments diluted promptly after they were made, this practice cannot plausibly have hurt investors, and therefore, is not be material. Although none of SEC's claims requires a showing of damages, it is telling that so much ink is wasted on an allegation that a deviation was made from the operating agreement that could not have harmed investors.

J.   **Complaint Paragraphs 187-190 – SEC's Allegations of Misrepresentation of the Appraisal Process Misstate What Investors were Told About the Appraisal Process**

The Complaint next alleges that Nohl "misrepresented the appraisal process" to investors and GTIF's auditor. SEC seeks to avoid the precedent which says that, if a party alleges misvaluation of an asset, it must come forward with allegations concerning the actual value. *See San Leandro Emer. Medical Group Profit Sharing Plan v. Philip Morris Cos., Inc.* 75 F.3d 801, 813 (2d Cir. 1996) (without allegation about true value, allegation of falsity not supported). By claiming that the "process" is what was misrepresented, SEC is attempting to work around this problem. But SEC cannot avoid this authority, which naturally flows from the specificity requirements imposed on a pleading party. A "misrepresentation" of the appraisal process is only actionable under any of the provisions cited by SEC if it is material. Absent some allegation of what the true value of assets is, it cannot be shown that the misrepresentations alleged in the

valuation process are material.[9] The valuation and its accuracy are material to investors. If a deviation from the process as described to investors does not result in a change to value, it is not possible to understand how that deviation is material. No such change has been alleged, and SEC's allegations fail for this reason.

Paragraphs 187 through 190 state that "appraisals were not based on underlying market driven events," "observable data from market driven sales shows was not used in the appraisals," and "appraisals were not evaluated throughout the year based on other available market data," contrary to representations made to investors. *See* Complaint, ¶ 187.

The sole factual allegation supporting this claim is a set of summary allegations about Appraiser Number 1: that his appraisals "were not based on underlying market driven events," that he "did not collect and use sales data from sales shows," that he "did not further evaluate the valuations throughout the year," and that his process was to "look at a specimen for a few seconds and write down a value." ¶ 190. SEC alleges this process was "subjective," that Nohl knew so, and that this was different than the "objective process he represented to the Fund's investors and auditors." *Id.*

The allegations concerning Appraiser Number 1's process are wholly conclusory. Treating them as correct, as the Court will for purposes of this motion, they do not discount the equally plausible possibility that Appraiser Number 1 was sufficiently qualified and had sufficient experience with the market and with sales data that he was able to evaluate these assets easily and quickly. A sufficiently skilled and experienced appraiser can no doubt, at a glance, reach a conclusion about the value of many pieces without the need to review comparables.  Nor does the quoted language represent that the appraiser would "evaluate the valuations throughout

_____

[9] Per *Allied*, *supra* at 8, under the fraud pleading standard an actual value needs to be alleged. But even under Rule 8, Defendants submit that the plausibility standard requires some allegation sufficient to establish that a misstatement about the appraisal process would have resulted in a change that would have been material.

the year." Rather, the quoted text states that these evaluations would be generally based on "the Fund's own transactions," meaning that at least some of this evaluation was to be done by GTIF's managers, not by appraisers.

Nor was the appraisal process represented – to investors or auditors – to be wholly objective, as falsely alleged by SEC. *See* Complaint, ¶ 190. The financial statements, in a portion unquoted by SEC in its Complaint, state that gems, minerals, private equity, and investor capital investment valuations are based on "unobservable inputs and require significant judgment and estimation."   GTIF 2016 Financial Statements, attached hereto as Exhibit G, p. BIC_0158185. These are identified as "Level 3" investments in the financial statements. *Id.* at p. BIC_0158194. The financial statements further state, regarding these investments:

> ➤ **Level 3-** Fair value is based upon inputs that are unobservable for the asset or liability and include situations where there is little, if any, market activity for the asset or liability. The inputs into the determination of fair value are based upon the best information in the circumstances and may require significant management judgment or estimation.

*Id.* at p. BIC_0158192 (emphasis added). Given the limited market information available on these types of assets, it was anticipated that managers would have to exercise their judgment. SEC's interpretation of events ignores this statement altogether and imagines that GTIF represented that it would commission appraisals which would not involve the exercise of any judgment on the part of the appraiser, and then, in turn, would blindly accept those appraisals with, again, no exercise of management judgment. This is simply not the case.

**K.    Complaint Paragraphs 191-229 – SEC's Allegations of Interference with the Appraisal Process Fail to State Sufficient Facts to Establish a Plausible Right to Relief**

The above strict view of "objectivity" heavily influences SEC's subsequent allegations of "interference" by Nohl in the appraisal process. Managers have a duty to assign valuations to assets that are appropriate and reasonable – a valuation that is too high would be problematic, but

so would one that is too low, as it would result in reductions to members' capital accounts and allows new investors to invest at favorable rates. Appraisers can be wrong or unreasonable, and an unreasonably or obviously incorrect low appraisal should not be followed by managers.

This is why the case law, as referenced *supra*, puts such a high standard on pleading valuation issues. An appraisal cannot be truly objective – it is by definition someone's opinion on what the value of an asset is. *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 362 (S.D.N.Y. 2007). So it is not enough to say that the valuation used is incorrect; some facts must be alleged that would show that this is the case, generally a competing valuation.

To the extent, then, that the SEC's allegations are that valuations were too high, the allegations should be rejected out of hand. SEC has alleged no competing valuations, and they have not met the burden they have, even at this stage, to support these allegations. And to the extent that this is not the allegation, a deviation from the appraisal process an investor expects, absent some resulting change in valuation, is not material, and the allegation must again be rejected as supporting any claim.

In addition, to the extent that SEC's allegations are that Nohl improperly interfered in the valuation process, those allegations should also be rejected. Contrary to SEC's suggestion, it was specifically represented to investors that "significant management judgment" would be involved in the valuation process. Exhibit G, p. BIC_0158192.

Defendants further address specific paragraphs below:

With respect to paragraphs 193 to 204, SEC alleges that prohibited transactions were engaged in with Appraiser Number 2 that were not disclosed to investors or GTIF's auditor. There were no such prohibited transactions to disclose.

SEC alleges that on April 7, 2015, GTIF agreed to purchase several minerals from Appraiser Number 2 for $275,000. Complaint, ¶ 193. It is also alleged that Appraiser Number 2 subsequently performed appraisals in 2015 and 2016 for GTIF, and that $125,000 of payment for the April 7, 2015 transaction was not made until June 13, 2016, the same day Appraiser Number 2 appraised ten specimens. Complaint, ¶ 199. It is alleged that the Second Amended and Restated Operating Agreement of GTIF provides that "[n]o other business other than the business of appraising maybe entered into with respective appraisers." Complaint, ¶ 198. There is no allegation that the Amended Operating Agreement, which was in effect prior to January 1, 2016, prohibited such transactions. In fact, it does not. *See* Exhibit B, p. BIC_0158353 (defining fair market value and putting no restrictions on the use of appraisers). The transaction of April 7, 2015 was not prohibited; the fact that payment was not made until 2016 does not change that fact. And SEC offers no other reason to believe that disclosure was required beyond this prohibition.

SEC also alleges that "Nohl falsely represented to the Fund's auditor that the Fund did not have a relationship with Appraiser Number 2 other than as an appraiser." *Id.* at 203. This allegation is not pleaded with adequate specificity. It clearly does not satisfy the Rule 9(b) standard – it does not plead when such a representation was made, to whom at the auditor this representation was made, the form of the representation, or the content thereof. Nor does the statement satisfy Rule 8 because it does not plausibly suggest the auditor would not have been aware of the transaction – particularly where, as here, an auditor would have access to GTIF's books and records and would have, presumably, seen this transaction in GTIF's general ledger.

Nor are there sufficient facts pleaded to determine whether this conduct is material. No allegations are made regarding the appraiser's qualifications, the amounts paid to the appraiser,

or to suggest that the transactions with the appraiser were for anything other than fair market value of the items exchanged. If the appraiser had qualifications beyond reproach, was paid a significant amount for the appraisals, and the gem transactions were at a reasonable price, there is no reason to think that his appraisals would be affected. And in the absence of any prohibition on such transactions when they were made, there is no reason to think disclosure or lack thereof would be material.

Paragraphs 205 through 220 concern Nohl "cherry-picking" or rejecting appraisals. But the allegations do not support any claim of wrongdoing, nor do they offer any allegation of a correct value. As discussed above, appraisals that are either too high or too low could harm investors, and managers should safeguard against both.

Paragraph 207 indicates only that Nohl told Appraiser Number 3 that appraisals were unreasonably low and that Appraiser Number 3's boss told her to revise the appraisals. Nohl is not alleged to have communicated with the boss, nor is there any allegation about the basis of Nohl's belief that the appraisals were unreasonably low. It is equally plausible, if not likely, that Nohl had a valid basis for his complaint, and this allegation does not support any claim.

Paragraph 211 similarly indicates that the same set of gemstones appraised by Appraiser Number 3 were appraised by Appraiser 4 in August 2017, and these appraisals were rejected by Nohl. Again, SEC does not provide any factual allegations concerning why the appraisals were rejected. But SEC has alleged that these gemstones were appraised by Appraiser Number 4 for $1,546,251. Complaint, ¶ 211. This is approximately half of the $3 million SEC alleges Appraiser Number 3 initially appraised these stones for before Nohl allegedly "interfered." Complaint, ¶ 207. There is a very likely explanation for why the appraisal was rejected, then –

because it was lower than even the lowest plausible value. Absent further allegations by SEC, this allegation simply does not support any claim of misrepresentation or fraud.

Paragraphs 217 through 220 allege that Nohl cherry-picked appraised values among a set of specimens appraised by both Appraiser Number 1 and Appraiser Number 2. This is based on a set of 14 specimens out of almost 3,000 in GTIF's collection. And sufficient facts are not alleged that would tend to negate the plausible explanation that the two appraisers' work was being compared or that Nohl had independent information concerning the values of these specimens that affected his selection. Absent allegations as to actual value, there is no reason to think that there was any problem with having both appraisers look at these assets, or any reason to make a specific disclosure of that fact.

Paragraphs 221 to 225 concern an allegation that "Nohl relied on altered appraised values." But these allegations fall short of failing to state a claim because they do not allege that Nohl knew, or even should have known, that values were altered.

It is alleged that "a mineral dealer working for Nohl" was provided with preliminary valuations and suggested changes, which were accepted by Appraiser Number 1, and that this fact was not disclosed by GTIF. (Complaint, ¶ 221). But it is not alleged that Nohl knew of the changed values, or that this "mineral dealer" was involved in the management of GTIF and was acting within the scope of his duties. This allegation is not well-pleaded insofar as it does not allege a sufficient linkage between Defendants and the alleged bad acts, or offer any reason to think that the Defendants were in a position to know what they are alleged to have failed to disclose.

Finally, paragraphs 226 through 229 state that Nohl asked Appraiser Number 2 to increase a specimen's value in 2015 (which he refused to do)[10] and Appraiser Number 1 to change a value in 2017 (which he did) and that these facts were not disclosed. There are no factual details alleged at all to evaluate the basis for these requests. SEC's heading suggests there was "no basis," for the requests, but that is a heading only. Nor are there sufficient facts alleged to make materiality plausible – it is unclear, without some additional detail, why the mere fact that discussions were had regarding value would require disclosure, and SEC offers no such detail.

**L.   Complaint Paragraphs 230-403 – SEC's Allegations Concerning Valuations of Private Company 1 Misstate the Valuation Statements and Fail to Identify Material Misrepresentations**

Paragraphs 230 through 402 of the Complaint identify alleged defects in the valuations of Private Company 1, a company which GTIF invested in. [11] The Complaint alleges that the valuations of Private Company 1 accepted by Nohl and Hull were unreasonable because they did not take into account certain negative facts, and that those negative facts were not adequately disclosed to investors. These claims are without basis.

First, several of these valuations were not prepared by Chris Nohl, but rather, by a Chrysalis employee, Mark Leipold. *See* Exhibit I, p. BIC_0304035; Exhibit J, p. BIC_0304201; Exhibit K, p. BIC_0304249, Exhibit L, p. BIC_0304343; Exhibit M, p. BIC_0304382 (identifying authorship of March 31, 2016 through June 30, 2017 reports). In addition, the reports state that they are prepared based on information provided by Private Company 1. *See,*

---

[10] SEC has also alleged that Appraiser Number 2 and GTIF engaged in prohibited transactions. Given that SEC is here alleging that Appraiser Number 2 was asked, and refused, to change a valuation, this suggests that Appraiser Number 2's independence was obviously not compromised or in question.

[11] The relevant valuation reports for Private Company 1 are attached hereto as follows: December 31, 2015 (Exhibit H); March 31, 2016 (Exhibit I), June 30, 2016 (Exhibit J), September 30, 2016 (Exhibit K), December 31, 2016 (Exhibit L), March 31, 2017 (Exhibit M), June 30, 2017 (Exhibit N), September 30, 2017 (Exhibit O), December 31, 2017 (Exhibit P), March 31, 2018 (Exhibit Q), and June 30, 2018 (Exhibit R).

*e.g.,* Exhibit H, p. BIC_0305155 (relying on company financial projections); Exhibit I, p. BIC_0304052 (noting "apparent accuracy of the 2016 projections of revenue by management"). A plaintiff must allege allegations sufficient to tie each Defendant to the claims. Here, Chrysalis, in its management capacity may be implicated, but it is unclear how Nohl (or Hull) is alleged to bear responsibility, as an individual, for representations made by Chrysalis employees.

Further, within this section, SEC again seeks to skirt the case law that says that to challenge a valuation as unreasonable, it needs to offer some evidence of what the value actually is. SEC has not done this. Instead, SEC frames the issue as one of inadequate disclosure – however, it is unclear how, if the facts in question do not affect the ultimate valuation, the omission or disclosure could be material – there is absolutely no reason to think GTIF's investors cared if one of the companies in which it invested had its quarterly revenue rise or fall, or where they were opening plants, except insofar as it affected the ultimate value of the investment. For that reason, the Court should dismiss these allegations – they are, in the end, allegations about an allegedly inaccurate or unreasonable valuation, unsupported by any claim as to what the correct valuation should be.

In that context, Defendants further address these allegations as follows:

### 1.    Complaint Paragraphs 233-267 – December 2015 Valuation

The Complaint alleges that the December 31, 2015 valuation for Private Company 1 was based on a corporate valuation determined in a 2010 offering, and that factors between 2010 and 2015 had rendered that offering unreasonable. *See* Complaint, ¶¶ 241-245. SEC is correct that the 2010 offering formed part of the basis for the valuation dated December 31, 2015, but it was hardly the only input, as implied by SEC's Complaint.

In fact, the 2015 valuation placed heavy weight on multiples of projected revenue for early-stage companies, citing 8x-15x multiples based on projected revenue. Exhibit H, p.

49

BIC_0305185. Further, a number of additional factors were cited which supported a higher valuation than the $4,000 per share 2010 valuation – positive events including being named as a Tier 1 Contractor by the Kuwaiti government, projected 2016 revenue of $9.78 million, and the company's early-stage status. *Id.* at pp. BIC_0305184-BIC_0305185. In this regard, it is important to note that the valuation of the company (both in this report and in later ones) is based on predictions – projected revenues and assumptions about what the company would sell for at the time of a planned exit. SEC has made no allegations tending to discount the likelihood that intervening events are responsible for the alleged failures of these predictions.

In any event, the valuation report determined, based on these predictions and judgments, that a higher valuation than the 2010 $40 million valuation could be warranted, but defaulted to the price GTIF was paying, which represented an enterprise value of about $40 million, consistent with the earlier valuation. *Id.* at p. BIC_0305186. In other words, the valuation was not based just on the 2010 valuation, but the fact that GTIF's own purchase of shares was consistent with that price and other factors justified a higher valuation served as independent. Although there had been negative events between 2010 and 2015, positive factors such as anticipated revenues and contracts believed to be coming up justified a higher valuation. SEC's theory, to the extent one is discernible from its shotgun complaint, is that asset values were inflated to increase fees paid to management. Yet, the 2015 valuation was far *lower* than could have been justified by an aggressive valuation method.

To the extent that the SEC's claim is that the factors that suggested the 2010 valuation was too high were omitted and should have been disclosed, they would not have changed the total mix of information available to investors, and are therefore immaterial. GTIF more than justified its valuation by the use of multiples and revenue projections supported by specific

50

contracts and opportunities available. *Id.* at p. BIC_0305185 (identifying potential valuation of up to $146.75 million).

Perhaps anticipating that fact, paragraph 251 of the Complaint alleges that that Private Company 1 did not have contracts with "Major Energy Company" or "Foreign Government Entity" as of December 31, 2015. But that is not what the valuation report for December 31, 2015 represents. Instead, the report states that Private Company 1 became a "tier 1 contractor." *Id.* at p. BIC_0305184. This is specifically noted as a "designation," and not an active contract. *Id.* The December 31, 2015 valuation indicates that Private Company 1 is "likely to be awarded" a contract from Foreign Government Entity and that it had a pilot plant there. *Id.* at p. BIC_0305153. The report further indicates that there is a contract with another entity – not the government entity itself – to expand business in that country. *Id.* SEC's allegation of falsity simply does not offer any negation of the representations made.

Paragraphs 253-54 allege that the December 31, 2015 valuation for Private Company 1 falsely and misleadingly stated "due to the Company's successful on-going operation of its full-scale pilot plant, it likely will be awarded a contract by the end of 2016 that will generate $60+ million in revenue per year over an eight-year period." However, the allegation that is apparently intended to show that this is false is that the plant was not "successful." Complaint, ¶ 253 (alleging performance standards not being met). There is no that the contract was not, in fact, anticipated at this time. And what the performance standards supposedly were is not addressed. It is highly unlikely that, if Private Company 1 was performing sufficiently that new contracts were anticipated, an investor would find the fact that its plant did not meet all performance standards relevant to the decision to invest or not to invest. Without more, there is simply not sufficient information in the allegation to support materiality.

Paragraphs 257-267 allege that GTIF was "chronically late" in paying funding commitments to Private Company 1 in 2015 and beyond. In general, these allegations do not relate to any of the claims SEC has raised – there simply is not a linkage between the alleged violations and a failure to timely pay funds owed to a company in which GTIF invested. SEC alleges that the alleged failure to make timely payments resulted in "financial distress" to Private Company 1, but does not allege misrepresentation or omission of material facts from shareholders in this regard, or any material facts supporting that these payments were necessary to avoid such distress. Complaint, ¶ 258.

In addition, SEC fails to consider the language of the option agreements under which it alleges GTIF "repeatedly failed to meet its funding obligations to Private Company 1." Complaint, ¶ 260. Copies of the six option agreements referenced in paragraph 261 are attached hereto as Exhibit S. SEC alleges that GTIF agreed to exercise its options and its payments were increasingly late. Complaint ¶ 262. SEC also alleges that the option agreements stated "time is of the essence." Complaint ¶ 261. But the Option agreements actually state the following:

> b.      Grantee may choose to exercise all, but not less than all of the option rights in this Option Agreement, subject to the Notice limitations of this Section 1. In addition, Grantee must pay for the shares, if exercised, in no more than three payments. The payments for the Stock, if exercised, shall be minimally due as follows:
>
> | Date | Minimum Total Cumulative Value of Exercised and Closed Stock | Cumulative Paid-For Shares |
> |---|---|---|
> | April 5, 2016 | $250,190.25 | 222.5 |
> | April 25, 2016 | $250,190.00 | 222.5 |
> | Total | $500,380.25 | 445 |
>
> If Grantee fails to exercise options and close on those exercised options by completing payment within the schedule provided above (including a ten (10) day grace period), then Grantor may declare Grantee in default, and at Grantor's option, cancel this Option Agreement. Any Notice of default or cancellation shall be sent in the same manner provided in Section 1(a), and shall be effective upon delivery. If Grantor cancels this Agreement in accordance with this Section, any amount contributed under this agreement through previous option exercise tranches will remain valid and any stock given for exercised options shall remain the property of Grantee. All Closings shall be at Grantor's office.
>
> If Grantor elects not to cancel this agreement after a default in the closing schedule by Grantee, it does not waive Grantor's right to later cancel the agreement so long as Grantee remains in default. Nevertheless, so long as this Agreement is active, Grantee may continue to deliver Exercise Notices to Grantor and Grantor may choose to honor Exercise Notices or cancel this Option Agreement upon receipt of Exercises Notices which do not comply with the above schedule.

Exhibit S, p. BIC_0304225. Furthermore:

> 5.   Failure to Exercise Option, Termination of Option.
>
> Failure to exercise this Option on the terms and within the time specified herein shall terminate this Option without further notice or action, time being of the essence of this Option. If this Option is not exercised, consideration given for this Option shall be automatically forfeited to and retained by Grantor.

*Id.* at p. BIC_0304226.

SEC again misleadingly quotes the documents it cites. First, the "time is of the essence" language applies specifically to the *exercise* of the options, not to payment. Second, the language on payments makes clear that the Grantor (Private Company 1) could, at its option, honor exercise notices which did not comply with the schedule and that, similarly, Grantor had the *option* to enforce the payment schedule. Once GTIF exercised an option, it was subject to a presumptive payment schedule, but if it did not make payments on that schedule, it only gave Grantor the option to cancel that option agreement. SEC's statement that these were funding obligations on which GTIF was behind is misleading. Exercising an option to preserve one's

rights to obtain stock does not obligate one to make additional investments.[12] SEC seems to suggest that because Private Company 1's management asserted it needed the money, GTIF should have made the payments. But second-guessing management decisions that are not the subject of misrepresentations is not SEC's role.

Further, paragraph 259 contains especially misleading allegations. It states as follows:

> 259.    On December 31, 2015, the Fund gave the founder of Private Company 1 a mineral in exchange for 932 shares of Private Company 1.  The Fund did not have the cash to pay for the shares.  As of December 31, 2015, the Fund had paid over $5.9 million in management and other fees to Chrysalis and Greenpoint Management II.  The Fund claimed the mineral was worth $2.5 million.  The founder of Private Company 1 has not sold the mineral so Private Company 1 never received any money for the mineral.

First, the transaction described is a transaction between the founder of Private Company 1 and GTIF, not between the company itself and GTIF. So the allegation that Private Company 1 never received money from the mineral is irrelevant – if GTIF purchased the founder's stock rather than company shares, the company would never have received this money, the founder would, and it is irrelevant to funding commitments to the company.[13]

Second, the allegation that "the Fund had paid over $5.9 million in management and other fees to Chrysalis and Greenpoint Management II" is immaterial. The Complaint does not allege that management fees were inappropriate – although it alleges defects in the determination

---

[12] Although in this section, SEC does not tie the "late" payments to any representation to investors, similar allegations about these agreements are made later in the Complaint (see, e.g., Complaint ¶¶ 287, 304, 327, 356), given the actual language of the option agreements, GTIF exercised the options and then paid for shares on a schedule it found acceptable; Private Company 1's management chose to accept the payments and issue the shares; it is unclear what material fact should have been disclosed to investors in this circumstance.

[13] It should also be noted that although SEC represents that GTIF "claimed the mineral was worth $2.5 million," in fact the transaction was negotiated at arm's length, as evidenced by the fact that the transactional documents are interlined and reveal that the initial valuation proposed by GTIF was $3.1 million, which was the subject of negotiation. *See* Exhibit T, p. BIC_030815. The $2.5 million was the result of negotiation by adverse parties, not a "claim" on GTIF's part.

of Net Asset Value, it does not suggest that managers were not entitled to fees under the operating agreements. SEC cannot mean to suggest that managers are expected to work for free (or even for less than investors agreed to pay them). If the standard urged by SEC is that fund managers should not be paid because it would be in the best interests of investors to have every possible dollar reinvested into a fund's business, then no fund is being or could be operated to that standard.

### 2.   Complaint Paragraphs 268-288 – March 2016 Valuation

The allegations related to the March 31, 2016 valuation of Private Company 1 largely rehash the allegations related to December 31, 2015, and are immaterial for the same reasons.[14] There are some new allegations, however, which are addressed herein.

Paragraph 284 states that GTIF falsely represented that there were "two cleaning plants being used" in Kuwait which "presently each have a capacity of 60+ tons of sand/hour or 360,000 tons per year," and that this was false because in fact only one plant was operating and was not reaching the mandated performance standards. Of course, there was no representation made about performance standards (nor has SEC alleged how or what performance standards were not being met). Rather, SEC alleges that the representation is false because only one plant was operating. But in fact, the report specifically states that the second plant was *not* operating "a second plant under direct [Private Company 1] control… is expected to begin operations May 1, 2016." Exhibit I, p. BIC_0304040. The second plant was not operating, nor was it misrepresented otherwise. The valuation was neither misleading nor unreasonable in this regard.

---

[14] Paragraphs 268-275 state background facts including valuation dates and timing; Paragraphs 276 and 277 state that the March 31, 2016 valuation was "misleading, unreasonable, and lacked an objective basis," and "ignored material negative facts," presumably for the reasons stated in the subsequent paragraphs. Paragraph 278 is an allegation about quarterly revenue similar to Paragraph 97; Paragraph 279 again alleges chronic late payments of funding obligations similar to Paragraphs 257-67; Paragraphs 280-83 again attack the use of the $40 million valuation, similar to Paragraphs 241-45.

Paragraph 285 contains similar allegations – that revenue projections were unreasonable because they withheld that Private Company 1 was not meeting performance standards and only one of the two plants was operating.  But these representations are on the same page indicating that the second plant was expected to soon begin operations. In other words, in context, the representation was neither misleading nor false; they were premised on a specific future event that SEC has not alleged was unreasonable to anticipate.

Finally, paragraph 287 alleges that GTIF owed funding commitments and had made untimely payments to GTIF, but it is not clear what funding commitments SEC refers to that were payable by March 31, 2016, the date stated in this paragraph. Whether or not the timing of payments was material, it is unclear from the Complaint that by this point, there was anything that could have been disclosed in this regard.

### 3.      Complaint Paragraphs 289-309 – June 2016 Valuation

Paragraphs 289-306 largely contain similar allegations to those alleged with respect to earlier valuations, and those allegations fail for the same reasons.[15] Paragraph 304 alleges that GTIF had not timely or completely paid its funding commitments and that projections of an expected exit within 12 months (cited in Paragraph 303) were, therefore, false. Yet, again, the funding commitments (in the form of exercised potions) were never paid more than a few months late, and the latest commitment, alleged by SEC to have been paid in full five months late, was paid on a rolling basis. SEC has specifically not alleged that it actually harmed Private Company 1 to be paid in this manner or that GTIF's unit value was reduced or, otherwise,

---

[15] Paragraphs 289 to 295 are background information. Paragraphs 296 and 297 contain conclusory allegations that the valuation was misleading and that material facts were ignored, again presumably in relation to the subsequent paragraphs. Paragraph 298 again describes that Private Company 1 was not being paid for its pilot program; Paragraph 299 again addresses GTIF being chronically late in funding Private Company 1. Paragraphs 300 through 302 again allege that assertions about being a Tier 1 contractor were false because contracts were not awarded, similar to Paragraph 251.

affected. Without such an allegation, it is unclear how this could possibly be a material item that required disclosure.

Paragraph 305 alleges that the June 30, 2016 valuation was false because GTIF represented that "[s]ince units are still being sold via private sales of the Company with an enterprise value of $41.5MM, that value is contemporaneously [sic] by many sales events," but that in fact "no other private sales of Private Company 1's securities" had been made in 2016. But the valuation does not allege that there were other buyers. And again, this is one line out of several paragraphs dealing with the appropriate multiples to apply to various revenue projections. The statement, even if it could be interpreted as misleading, was not material. *See* Exhibit J, p. BIC_0304217 (identifying revenue projections and value of underlying intellectual property as justifying higher valuations).

Paragraph 307 alleges that further funding commitments were paid late after September 30, 2016, and on a longer timeline than earlier allegations. But the allegation is that "Private Company 1 needed the money the Fund had agreed to pay" and that "Private Company 1's management regularly complained" about the payments. Complaint, ¶ 309. There is no allegation that Private Company 1 was actually harmed, or could not fund any operation; without such allegations, there is not a sufficient pleading of materiality.

### 4. Complaint Paragraphs 310-329 – September 2016 Valuation

Paragraphs 310 through 329 allege misstatements in the September 30, 2016 valuation. These allegations rehash allegations related to prior quarters concerning the continued validity of the $40 million valuation, the lateness of funding under option agreements, and lack of contracts with the entities with which Private Company 1 was a Tier 1 Contractor.[16]

---

[16] Paragraphs 310 to 318 are, again, background allegations. Paragraphs 319 and 320 are boilerplate allegations of misleading valuations and omitted material facts. Paragraphs 321-322 and 326-27 again address lack of payment for

### 5.    Complaint Paragraphs 330-345 – December 2016 Valuation

Paragraphs 330 through 345 address alleged deficiencies in the December 31, 2016 valuation. The only allegation in this section that is new is that GTIF's interest in Private Company 1 was subordinated to a bank loan.[17] However, the bank loan is alleged to have been less than $2 million, and GTIF's interest in Private Company 1 was, to this point, $14 million; the amount was not material. More importantly, the report noted that "Financial control and discipline" were problems, with reporting and control of finance having been handled by a family member of the CEO, and noted that the valuation was discounted in part because of this and other risk factors. Exhibit L, p. BIC_0304360. The bank loan may not have been mentioned specifically, but the valuation report paints a fair picture.

### 6.    Complaint Paragraphs 346-380 – 2017 Valuations

It is alleged that the June 30, 2017 and subsequent valuation reports do not disclose that Private Company 1 had financial problems and that valuations were therefore unreasonable. But in fact, the Complaint fails to acknowledge that the entire basis of valuation changed in this period. Pages 20 and 21 of the June 30, 2017 valuation report discusses the failure of mezzanine financing, the need to stabilize Private Company 1, and "relaunch" the company. SEC suggests that valuations were increased because a misleading, rosy picture was being presented. It was not. The need for a restructuring was considered, and the value of assets subsequent to a restructuring was used as the basis for valuation. This fact renders SEC's allegations (for example, paragraph 356, alleging that GTIF was still behind on its funding commitments) irrelevant, because the valuation was not based on Private Company 1's ability to continue its

_____

the pilot program, and late payments of funding commitments. Paragraph 323-325 again addresses the tier 1 contractor issue. Paragraph 328 contains a similar allegation to paragraph 305.

[17] Paragraphs 330-337 are background allegations. Paragraphs 338 and 339 are summary allegations that valuations were misleading and ignored material facts. Paragraph 340 again addresses the pilot program and quarterly losses. Paragraph 341 again alleges that GTIF was behind on funding commitments.

operations, but rather on the underlying asset values when rolled over into a new operating company.

It is also alleged at paragraphs 378-79, that it was not disclosed that the lender to Private Company 1 had declared a default. However, the valuation report clearly states that significant amounts were owed and past due, but indicates a workout is being attempted. Exhibit P, p. BIC_0305000. SEC's allegation is simply not accurate as to the document quoted.

### 7.      **Complaint Paragraphs 381-403 – 2018 Valuations**

The primary deficiency alleged by SEC in these paragraphs is that GTIF's valuation of its investment in Private Company 1 doubled in 2018. But the Complaint makes no mention of the reason for this – it is not that negative factors were being ignored. Rather, recognizing that Private Company 1 might not continue as a going concern, GTIF valued directly the underlying assets in which it had interests that could be used in a reorganization. Exhibit Q, p. BIC_0305226 (valuing direct and indict interests in assets). On that basis, the valuation increased due to assessment of those interests, not to factors directly related to Private Company 1's worth as a going concern.

In light of this methodology, it is not that the worthlessness of Private Company 1 resulted in a loss of a third of the value of GTIF. Complaint, ¶ 401. Rather, GTIF was positioning for a relaunch of Private Company 1's business in a different corporate, and an asset sale was contemplated. Exhibit Q, p. BIC_0305253. Private Company 1 is not a going concern, but that does not mean GTIF's position is necessarily worthless. *Id.* Accordingly, whatever should have been disclosed to investors was not that Private Company 1 was worthless, but what their new position was; SEC has not addressed this in its allegations.

III.   **THE COMPLAINT SHOULD BE DISMISSED TO THE EXTENT IT SEEKS DISGORGEMENT BECAUSE SEC IS NOT STATUTORILY AUTHORIZED TO SEEK THAT REMEDY**

The Complaint should be dismissed to the extent that it seeks disgorgement, because SEC is not authorized to seek that remedy. SEC has statutory authority to seek injunctive relief, equitable relief, or civil monetary penalties in federal district court. *See* 15 U.S.C. §§ 77t(b), 78(u)(d)(1), (3), (5). In 2017, the Supreme Court held that disgorgement to the SEC is a penalty. *Kokesh v. SEC*, 137 S. Ct. 1635 (2017). In doing so, the Court expressed surprise that SEC would seek this penalty when it has "a full panoply of enforcement tools" other than disgorgement. *Id.* at 1640. The Court further held that "[t]he primary purpose of disgorgement orders is to deter violations of the securities laws by depriving violators of their ill-gotten gains." *Id.* at 1643. In that way, disgorgement is duplicative of SEC's penalty authority.

Congress has not authorized disgorgement as a form of relief available to SEC. Where there is a detailed remedial scheme, the courts should not read additional remedies into the law. *See Sandoz Inc. v. Amgen, Inc.,* 137 S. Ct. 1664, 1675 (2017); *Hinck v. United States*, 550 U.S. 501, 506 (2007). And disgorgement, as a penalty, is outside the equitable authority inherent to the courts. *Tull v. United States*, 481 U.S. 412, 424 (1987) ("[A] court in equity . . . may not enforce civil penalties.").[18]

Because disgorgement is not a remedy which the SEC is statutorily authorized to seek, and is a penalty not subject to SEC's authority to seek equitable remedies, the Complaint must be dismissed to the extent that it seeks such relief – as a matter of law, such relief cannot be granted to SEC.

---

[18] On November 1, 2019, the United States Supreme Court granted certiorari on this issue. *See SEC v. Liu,* 754 Fed. Appx. 505 (9th Cir. 2018) *cert. granted Liu v. SEC*, No. 18-1501, 2019 WL 5659111, at *1 (U.S. Nov. 1, 2019).

## <u>CONCLUSION</u>

For all of the bulk of its Complaint, SEC has failed to state a claim upon which relief can be granted. The provisions under which SEC claims relief require showings of misrepresentations or omissions, which were either negligent or fraudulent, and that such misrepresentations or omissions were material. SEC has failed to establish any of these elements with the specificity required by Rule 9(b) or even to the satisfaction of Rule 8. This shotgun complaint and the dearth of proper or sufficient allegations strongly suggests a fundamental problem with SEC's real intentions and ability to sustain its claims. This circumstance is further aggravated by the fact that years of investigation put SEC in possession of information far in excess of that possessed by the average plaintiff (government or otherwise). Further, in an effort to attempt to inflict further damage to Defendants regardless of the merits of this dispute, SEC has improperly and selectively quoted documents to give the false impression of misrepresentations where none exist. The Complaint should be dismissed in full and SEC should be given very little leeway to replead.

Dated this 29th day of November, 2019.

HUSCH BLACKWELL LLP
Attorneys for Defendants


By:    /s/*Patrick S. Coffey*
          Patrick S. Coffey
          State Bar No. 1002573
          Robert M. Romashko
          State Bar No. 1106485

555 E. Wells Street, Suite 1900
Milwaukee, Wisconsin 53202-3819
(414) 273-2100
(414) 223-5000 (fax)
Robert.Romashko@huschblackwell.com
Patrick.Coffey@huschblackwell.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of November, 2019, a true and correct copy of the foregoing **Memorandum of Law in Support of its Motion to Dismiss, or in the Alternative, for a More Definite Statement and to Strike** was filed and served via the CM/ECF system, to all parties receiving CM/ECF notices in this Chapter 11 case.

/s/*Patrick S. Coffey*
Patrick S. Coffey