IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

_____
                                                    )
UNITED STATES SECURITIES                            )
AND EXCHANGE COMMISSION,                             )
                                                    )
              Plaintiff,                            )
                                                    )
       v.                                            )        Case No.  19-cv-809-wmc
                                                    )
BLUEPOINT INVESTMENT COUNSEL,                        )
LLC, MICHAEL G. HULL,                                )
CHRISTOPHER J.  NOHL,                                )
CHRYSALIS FINANCIAL LLC, and                         )
GREENPOINT ASSET MANAGEMENT II                       )
LLC,                                                 )
                                                    )
              Defendants.                            )

**PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

I.  INTRODUCTION ...........................................................................................................1

II. SUMMARY OF THE FACTS ........................................................................................2

III. DEFENDANTS FACE A HIGH BAR TO OBTAIN  DISMISSAL OF THE AMENDED COMPLAINT .........................................................................................4

IV. DEFENDANTS GO FAR BEYOND THE INCORPORATION BY REFERENCE DOCTRINE .....................................................................................................................7

V.  DEFENDANTS HAVE NOT DEMONSTRATED THAT THE AMENDED COMPLAINT FAILS TO STATE A CLAIM...................................................................8

   A. The Amended Complaint States A Claim Pursuant To Section 17(a)(2) of the Securities Act .............................................................................................................8

      1. Section 17(a)(2) ...................................................................................................8

      2. Defendants Failed to Show The Amended Complaint Does Not State A Claim Under Section 17(a)(2) ........................................................................................8

   B. The Amended Complaint States Claims Under Sections 17(a)(1) and (3) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5(a) and (c)...............................................................................................................9

      1. Sections 17(a)(1) and (3) ....................................................................................9

      2. Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).........................9

      3. Defendants Failed to Show The Amended Complaint Does Not State A Claim Under Sections 17(a)(1) and (3), 10(b), and Rule 10b-5(a) and (c) ...............10

   C. The Amended Complaint States Claims Under Section 10(b) of the Exchange Act and Rule 10b-5(b)  . . . . . . . . . . . . . . . . . . . . . . . . .……………………….. ..… …....10

      1. Section 10(b) of the Exchange Act and Rule 10b-5(b)....................................10

      2. Defendants Failed to Show the Amended Complaint Does Not State a Claim Under Section 10(b) and Rule 10b-5(b)......................................................... 11

   D. The Amended Complaint States Claims Under Sections 206(1) and 206(2) of the Advisers Act.............................................................................................................11

      1. Sections 206(1) and 206(2) of the Advisers Act..............................................11

      2. Defendants Failed to Show the Amended Complaint Does Not State a Claim Under Sections 206(1) and 206(2) of the Advisers Act...................................12

i

E. The Amended Complaint States Claims Under Section 206(4) of the Advisers Act and Rule 206(4)-8.................................................................................12

    1. Section 206(4) of the Advisers Act and Rule 206(4)-8 ...................................12

    2. Defendants Failed to Show The Amended Complaint Does Not State A Claim Under Section 206(4) of the Advisers Act and Rule 206(4)-8 .......................13

VI.    DEFENDANTS HAVE NOT DEMONSTRATED THAT THE AMENDED COMPLAINT IS A SHOTGUN PLEADING.............................................................13

VII.   THE AMENDED COMPLAINT STATES CLAIMS FOR DEFENDANTS ENGAGING IN SELF-DEALING AND UNDISCLOSED CONFLICTS OF INTEREST (AMENDED COMPLAINT ¶¶ 108, 158 THROUGH 188)....………..14

A. Examples Of Defendants' Self-Dealing And Undisclosed Conflicts Of Interest..15

B. Defendants Did Not Disclose The Conflicts Of Interest .......................................17

C. Materiality Is An Issue To Be Decided By The Trier Of Fact..............................18

VIII.  DEFENDANTS FAILED TO SHOW THAT THE AMENDED COMPLAINT DOES NOT STATE CLAIMS FOR HULL AND NOHL WITHHOLDING MATERIAL NEGATIVE FACTS WHILE DOUBLING THE VALUE OF AMIRAN WHEN ITS MAIN SUBSIDIARY WAS IN DEFAULT ON A SECURED LOAN (AMENDED COMPLAINT ¶¶ 238 THROUGH 411).....................................................................21

A. The December 2015 $40 Million Valuation And Subsequent Valuations Did Not Fairly Align With Information In Hull And Nohl's Possession At The Time.......23

B. Hull's And Nohl's $45 Million Valuation As Of December 2016 And $47 Million Valuations For 2017 Did Not Align With The Material Facts That Amiran's Main Subsidiary Had Taken Out A Line Of Credit To Fund Operations And The Fund's Interest Was Subordinated ....................................................................................25

C. Hull and Nohl Doubled The Value Of Amiran When They Knew The Main Subsidiary Was In Default On A Secured Loan ....................................................28

D. Hull And Nohl Made False And Misleading Statements In The Valuation Reports .................................................................................................................29

E. Defendants Have Not Shown That The Valuations Of Amiran Are Immaterial As A Matter Of Law...............................................................................................30

F. The Amended Complaint Alleges That Hull And Nohl Are Responsible For The Valuations .........................................................................................................34

G. Defendants Improperly Offer Speculation To Challenge Well-Pleaded Allegations ........................................................................................................36

IX.    DEFENDANTS FAILED TO SHOW THAT THE AMENDED COMPLAINT DOES NOT STATE CLAIMS FOR HULL AND NOHL MISREPRESENTING HOW THEY VALUED THE GEMS AND MINERALS  (AMENDED COMPLAINT ¶¶ 189 THROUGH 195) ........................................................................................... 37

X.    DEFENDANTS FAILED TO SHOW THE AMENDED COMPLAINT DOES NOT STATE  CLAIMS FOR NOHL MAKING FALSE AND MISLEADING STATEMENTS ABOUT THE APPRAISAL PROCESS AND INTERFERING IN THE APPRAISAL PROCESS (AMENDED COMPLAINT ¶¶ 196 THROUGH 237) ...................................................................................................................... 39

    A. Nohl Misrepresented The Appraisal Process ......................................................... 39

    B. Nohl's Interference In The Appraisal Process ....................................................... 41

XI.    DEFENDANTS FAILED TO SHOW THAT THE AMENDED COMPLAINT DOES NOT STATE CLAIMS FOR THE  MANAGERS MISREPRESENTING THE FUND AS AN INCOME FUND WHILE INVESTING IN NON-INCOME GENERATING ASSETS ............................................................................................ 45

XII.    DEFENDANTS FAILED TO SHOW THAT THE AMENDED COMPLAINT DOES NOT STATE CLAIMS FOR HULL AND BLUEPOINT MAKING MISREPRESENTATIONS TO THEIR ADVISORY CLIENTS ............................... 47

XIII.    DEFENDANTS FAILED TO SHOW THAT THE AMENDED COMPLAINT DOES NOT STATE CLAIMS FOR NOHL CREATING A FALSE CONTRACT ............. 50

XIV.    DEFENDANTS FAILED TO SHOW THAT THE AMENDED COMPLAINT DOES NOT STATE CLAIMS FOR MAKING FALSE AND MISLEADING STATEMENTS IN OFFERING MATERIALS ......................................................... 51

    A. Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical Income Fund Made The False And Misleading Representation That The Fund Would Achieve Current Income Through Purchases Of Distressed Real Estate Notes ..................................................................................................................... 52

    B. Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical Income Fund Made The False And Misleading Representation That Many Of The Gem And Mineral Transactions Are Short Term In Nature And Provide Strong Cash Flow ............................................................................................................ 53

    C. Hull, Nohl, Chrysalis,  Greenpoint Management II, and Greenpoint Tactical Income Fund Misrepresented That They Will Acquire Collections Of Gems And Minerals At A Fraction Of Their Current Value .................................................... 54

    D. Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical Income Fund Misrepresented That Possessors Of The Top Minerals Get Whatever Price They Demand Without Delay Or Negotiation ............................................... 55

E.   Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical Income Fund Made The False And Misleading Representation That They Will Arbitrage Mid-Range Minerals In Rapid Succession ...........................................56

F.   Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical Income Fund Made The False And Misleading Representation That They Will Seek To Rapidly Build A Database Of Chinese Collectors And Dealers..............56

G.   Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical Income Fund Made The False And Misleading Representation That They Will Open A Sorting And Clearing House Operation ....................................................57

H.   Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical Income Fund Made the False and Misleading Representation that the Offering Proceeds Would Be Used Primarily to Acquire Investments in Four Asset Categories ...............................................................................................................58

I.   Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical Income Fund Made The False And Misleading Representation That "Contracts, Approvals And Opportunities" Realized By Amiran Show That A $40 Million Valuation Is Well Below Its Current Valuation....................................................59

J.   Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical Income Fund Made The False And Misleading Representation That The Gem And Mineral Transactions Were Short Term And Provide Strong Cash Flow .....60

K.   Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical Income Fund Had No Reasonable Expectation Of Selling Between $10 Million To $30 Million Of Minerals From Its Collection To One Person ........................61

XV.   THE AMENDED COMPLAINT SHOULD NOT BE DISMISSED BECAUSE IT SEEKS DISGORGEMENT.........................................................................................61

XVI.   CONCLUSION...........................................................................................................62

# TABLE OF AUTHORITIES

**CASES**

*Aaron v. SEC,*
   446 U.S. 680 (1980) ........................................................................................ 8, 9

*Amoroso v. Schuh,*
   278 F. Supp. 3d 1106 (W.D. Wis. 2017) ...............................................................5

*AnchorBank, FSB v. Hofer,*
   649 F.3d 610 (7th Cir. 2011) ...................................................................... 1, 5, 36

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ........................................................................................ 4, 7

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988) ...........................................................................................19

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................................ 4

*Berthold Types Ltd. v. Adobe Systems Inc.,*
   242 F.3d 772 (7th Cir. 2001) ............................................................................... 7

*Eclectic Properties East, LLC v. Marcus & Millichap Co.,*
   751 F.3d 990 (9th Cir. 2014) ........................................................................... 5, 6

*Eisenstadt v. Centel Corp.,*
   113 F.3d 738 (7th Cir. 1997) ............................................................................. 53

*In re Allied Capital Corp. Securities Litigation,*
   2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003) ............................................... 31, 32

*In re Bear Stearns Companies, Inc.,*
   763 F. Supp. 2d 423 (S.D.N.Y. 2011) ............................................................... 30

*In re BP P.L.C.*
   852 F. Supp. 2d 767 (S.D. Tex. 2012) ............................................................... 53

*In re New Century,*
   588 F. Supp. 2d 1206 (C.D. Cal. 2008) ............................................................. 20

*In re Oppenheimer Rochester Funds Group Securities Litigation,*
   838 F. Supp. 2d 1148 (D. Col. 2012) ................................................................. 31

*Kelsey v. Allin,*
   2016 WL 825236 (N.D. Ill. Mar. 2, 2016).......................................................... 25

*Kokesh v. SEC,*
    137 S. Ct. 1635 (2017) ................................................................................................ 61, 62

*Liu v. SEC,*
    2019 WL 5659111 ............................................................................................................62

*Lorenzo v. SEC,*
    139 S. Ct. 1094 (2019) .................................................................................................. 9, 10

*Makor Issues & Rights, Ltd. v. Telllabs, Inc.,*
    437 F. 3d 588 (7th Cir. 2006) vacated and remanded by *Telllabs, Inc. v. Makor Issues &
    Rights, Ltd.,* 551 U.S. 308 (2007) ........................................................................................ 53

*Matrixx Initiatives, Inc. v. Siracusano,*
    563 U.S. 27 (2011)............................................................................................................19

*Monetta Fin. Servs., Inc. v. SEC,*
    390 F.3d 952 (7th Cir. 2004) ........................................................................................... 15

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
    135 S. Ct. 1318 (2015) ............................................................................................ passim

*Owner-Operator Indepen. Drivers Ass'n v. Mayflower Transit,*
    Inc., 161 F. Supp. 2d 948 (S.D. Ind. 2001) ............................................................... 4

*Reed v. Palmer,*
    906 F.3d 540 (7th Cir. 2018) ................................................................... 4, 7, 8, 36

*San Leandro Emergency Medical Group Profit Sharing Plan v. Phillip Morris Cos., Inc.,*
    75 F.3d 801 (2d Cir. 1996) ............................................................................................ 40

*SEC v. Buntrock,*
    No. 02 C 2180, 2004 WL 1179423 (N.D. Ill. May 25, 2004) ................................ 6, 45, 51-52

*SEC v. Capital Gains Research Bureau, Inc.,*
    375 U.S. 180 (1963). ...................................................................................................... 15

*SEC v. Conrad,*
    354 F. Supp. 3d 1330 (N.D. Ga. 2019) ........................................................................ passim

*SEC v. Dalmy,*
    2019 WL 6465362 (D. Col. Dec. 2, 2019) *amended and superseded by,* 2020 WL 108664, (D.
    Col. Jan. 9, 2020).......................................................................................................... 62

*SEC v. e-Smart Techs.,*
    31 F. Supp. 3d 69 (D.D.C. 2014) ................................................................................. 53

*SEC v. Infinity Group Co.,*
    212 F.3d 180 (3rd Cir. 2000) ........................................................................................ 23

*SEC v. Kimmes*,
   799 F. Supp. 852 (N.D. Ill. 1992) ........................................................................ 8

*SEC v. Langford*,
   No. 8:12cv344, 2013 WL 1943484 (D. Neb. May 9, 2013) ................................... 5

*SEC v. Lipson*,
   278 F.3d 656, 662 (7th Cir. 2002) ...................................................................... 61

*SEC v. Lucent Technologies, Inc.*,
   363 F. Supp. 2d 708 (D.N.J. 2005) ..................................................................... 31

*SEC v. Mannion*,
   2013 WL 1291621 (N.D. Ga. Mar. 25, 2013) ................................................ 30, 31

*SEC v. Merchant Capital, LLC*,
   483 F.3d 747 (11th Cir. 2007) ............................................................................ 60

*SEC v. Morgan Keegan & Co.*,
   678 F.3d 1233 (11th Cir. 2012) ............................................................ 6, 7, 45, 51

*SEC v. Nutmeg Group, LLC*,
   162 F. Supp. 3d 754 (N.D. Ill. 2016) ....................................................... 14, 15, 43

*SEC v. Penthouse International, Inc.*,
   390 F. Supp. 2d 344 (S.D.N.Y. 2005) ............................................................ 31, 32

*SEC v. Rio Tinto PLC*,
   No. 17 Civ. 7994, 2019 WL 1244933 ............................................................ 20, 27

*SEC v. Shapiro*,
   No. 4:05cv364, 2008 WL 819945 (E.D. Tex. Mar. 25, 2008) .............................. 31

*SEC v. Team Resources Inc.*,
   942 F.3d 272 (5th Cir. Nov. 5, 2019) *certiorari* granted ..................................... 62

*SEC v. Thompson*,
   238 F. Supp. 3d 575 (S.D.N.Y. 2017) ...................................................... 53, 56- 57

*SEC v. Trabulse*,
   526 F. Supp. 2d 1001 (N.D. Cal. 2007) .............................................................. 49

*SEC v. Ustian*,
   229 F. Supp. 3d 739 (N.D. Ill. 2017) ............................................................ passim

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ........................................................................5, 6

*TSC Industries, Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976) ............................................................................. 19- 20, 40

## STATUTES

Securities Act of 1933, Section 17(a)(1), 15 U.S.C. § 77q(a)(1) .......................................... passim

Securities Act of 1933, Section 17(a)(2), 15 U.S.C. § 77q(a)(2) .......................................... passim

Securities Act of 1933, Section 17(a)(3), 15 U.S.C. § 77q(a)(3) .......................................... passim

Securities Exchange Act of 1934, Section 10(b), 15 U.S.C. § 78j(b) .................................... passim

Investment Advisors Act of 1940, Section 206(1), 15 U.S.C. § 80b-6(1) ............................. passim

Investment Advisors Act of 1940, Section 206(2), 15 U.S.C. § 80b-6(2) ............................. passim

Investment Advisors Act of 1940, Section 206(4), 15 U.S.C. § 80b-6(4) ........................ 12,13,14

Investment Advisors Act of 1940, Section 206(4), 15 U.S.C. § 80b-6(4)-8 ..................... 12,13,14

15 U.S.C. 77z-2(c) ............................................................................................................... 53, 57

28 U.S.C. § 2462 ....................................................................................................................... 62

## RULES

Securities Exchange Act of 1934 Rule 10b, 17 C.F.R. § 240.10b ...................................... 9, 10, 11

Securities Exchange Act of 1934 Rule 10b-5, 17 C.F.R. § 240.10b-5 ............................... 9, 10, 11

Securities Exchange Act of 1934 Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a) ........................ passim

Securities Exchange Act of 1934 Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b) ........................ passim

Securities Exchange Act of 1934 Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c) ........................ passim

Federal Rules of Civil Procedure 9(b) ....................................................................................... 5

Federal Rules of Civil Procedure 12(b) ..................................................................................... 7

Federal Rules of Civil Procedure 12(b)(6) ............................................................................ 4, 5, 6

Federal Rules of Civil Procedure 56 .......................................................................................... 7

Plaintiff United States Securities and Exchange Commission ("SEC") respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss ("Motion") (Dkt. No. 46) and accompanying Defendants' Memorandum of Law in Support of Their Motion to Dismiss First Amended Complaint ("Memorandum") (Dkt. No. 47).  For the reasons set forth below, the Motion should be denied.

## I.    INTRODUCTION

From April 2014 to at least the filing of the Complaint on September 30, 2019 and now the First Amended Complaint ("Amended Complaint"), Defendants have defrauded at least 129 investors in 10 states out of over $52 million.  To prevent the trier of fact from ever hearing all of the evidence in this case including testimony from the very investors they defrauded, Defendants have filed a summary judgment-like motion that improperly asks the Court to decide material issues of fact at the motion to dismiss stage.  The Seventh Circuit has held "[o]ur task in reviewing the sufficiency of a complaint is necessarily a limited one.  The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011) (internal quotations and citation omitted).  Faced with a well-pleaded Amended Complaint, Defendants resort to introducing a multitude of speculation and purported facts outside of the Amended Complaint[1] and asking this Court to improperly conduct a trial on the briefs at the motion to dismiss stage. In order for Defendants to prevail this Court would have to decide material issues of fact without having all of the evidence before it and without having fact and expert witnesses testify.

Defendants attached **20** documents to their motion to dismiss including an affidavit for a search warrant and Letter to Investors Quarter 3 2016 (Dkt. Nos. 48-4, 48-6) that are not even

---

[1] The SEC does not concede the accuracy of Defendants' speculation or purported factual assertions.  The SEC is not offering evidence that contradicts their purported facts because that is improper on a motion to dismiss.  The Memorandum also makes misstatements about the SEC's investigation.

mentioned in the Amended Complaint. If the Court considers all of these exhibits thereby converting Defendants' motion to dismiss to a summary judgment motion, the SEC requests discovery and adequate time to respond.

## II.  SUMMARY OF THE FACTS

Michael G. Hull ("Hull") and his entity, Greenpoint Asset Management II LLC ("Greenpoint Management II"), and Christopher J. Nohl ("Nohl") and his entity, Chrysalis Financial LLC ("Chrysalis"), perpetrated an offering fraud through Greenpoint Tactical Income Fund ("Greenpoint Tactical Income Fund" or the "Fund"). Hull, Nohl, and their entities are investment advisers to Greenpoint Tactical Income Fund and owe fiduciary duties to the Fund including a duty of loyalty.

Hull, Nohl, and their entities have unlawfully enriched themselves at the expense of investors by engaging in undisclosed self-dealing and related party transactions. As fiduciaries, they were obligated not to engage in self-dealing and to disclose these related party transactions but did not. After paying management fees to Chrysalis and Greenpoint Management II, Greenpoint Tactical Income Fund has frequently lacked cash to pay its obligations and make investments including paying its funding commitments to Amiran Technologies, LLC ("Amiran")[2] and making installment payments on minerals the Fund purchased. Hull and Nohl made numerous short-term loans to the Fund. For a number of the loans, Hull and Nohl charged the Fund interest exceeding 100% annual percentage rate. Hull and Nohl also caused the Fund to borrow money from investors in the Fund and other funds without disclosure.

Hull, Nohl, and their entities defrauded investors by reporting valuations of Amiran that were misleading, unreasonable, lacked an objective basis, and ignored significant negative facts.

---

[2] In the Complaint, the SEC used "Private Company 1" to refer to Amiran. Defendants attached documents to their Memorandum that identify Amiran as Private Company 1. Therefore, the Amended Complaint and this Opposition use Amiran.

Defendants initially valued the Fund's ownership interest in Amiran at over $4.2 million as of December 31, 2015 and through markups increased the value of the Fund's interest to over $46 million as of June 30, 2018. Egregiously, Hull, Nohl, and their entities increased the value by approximately $20.1 million from $18 million in the fourth quarter of 2017 to $38 million in the first quarter of 2018 while knowing that the primary subsidiary of Amiran was in default on a line of credit secured by all of the subsidiary's assets and guaranteed by Amiran. They also knew the Fund's interest was subordinated to the bank's security interest. Hull, Nohl, and their entities received management fees that were based on their valuations of Amiran. Therefore, the higher the value of Amiran the higher the management fees. Hull and Nohl's valuations were reported in the Fund's financial statements, which were distributed to investors and used to attract new investors and additional investments by existing investors. Amiran is now defunct and worthless. Hull and Nohl's valuations were misleading, unreasonable, and lacked an objective basis. Hull, Nohl, and their entities also made false and misleading statements in the valuation reports for Amiran.

Hull is also the co-owner of Bluepoint Investment Counsel, LLC ("Bluepoint"), a now de-registered investment adviser that claimed to have as much as $145 million in assets under management. Bluepoint through Hull recommended that all of Bluepoint's individual clients invest in the Greenpoint Tactical Income Fund and other affiliated Greenpoint Funds. Hull made these recommendations without regard for each individual investor's needs and circumstances. Hull and, through him, Bluepoint made verbal false and misleading representations to Bluepoint's individual clients. Hull falsely stated that investments in Greenpoint Tactical Income Fund (1) were safe, (2) would generate high returns, and (3) could be withdrawn as needed. The investors' funds could not be withdrawn as needed. Since 2017, Hull, Nohl, and

their entities have been paid more than $5.9 million by the Fund.  At the same time, many investors have been told the Fund has no liquidity to meet investor redemption requests. Redemption requests by investors, other than favored investors, have been delayed or unfulfilled, and when they are fulfilled, it is when funds are received from new investors.

## III.    DEFENDANTS FACE A HIGH BAR TO OBTAIN  DISMISSAL OF THE COMPLAINT

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the  ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (citation omitted).  To survive a motion to dismiss, a complaint need merely "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (citation omitted).

"A party moving to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) bears a weighty burden." *Owner-Operator Indepen. Drivers Ass'n v. Mayflower Transit, Inc.*, 161 F. Supp. 2d 948, 950-951 (S.D. Ind. 2001).  "In other words, dismissal is justified only when the allegations of the complaint itself clearly demonstrate that plaintiff does not have a claim." *Id. quoting* 5A Charles A. Wright and Arthur R. Miller, *Federal Practice & Procedure: Civil* § 1357.  "To state a 'plausible' claim, a plaintiff need not include every detail or fact related to the basis of her allegations." *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018).

4

"In evaluating the sufficiency of the complaint, we view it in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB*, 649 F.3d at 614; *see also Amoroso v. Schuh*, 278 F. Supp. 3d 1106, 1111 (W.D. Wis. 2017). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *AnchorBank, FSB*, 649 F.3d at 614 (internal quotations and citations omitted).

Federal Rule of Civil Procedure 9(b) states, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." To comply with Rule 9(b), the complaint has to "state with particularity the circumstances constituting fraud. This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB,* 649 F.3d at 615 (citation omitted). "Although a plaintiff need not allege specific details of every alleged fraud, the plaintiff must provide some representative examples of the alleged misconduct." *SEC v. Langford*, No. 8:12cv344, 2013 WL 1943484, at *5 (D. Neb. May 9, 2013).

Defendants misleadingly claim that the SEC's Amended Complaint must be dismissed if there is an alternative explanation for Defendants' conduct. (Memorandum at ECF[3] p. 21) Defendants rely on *Eclectic Properties East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990 (9th Cir. 2014). Contrary to Defendants' assertions, that case states "[i[f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so

---

[3] "ECF p." refers to the page number at the top of the page of the filing that was assigned by the CM/ECF system.

convincing that plaintiff's explanation is *implausible.*" *Id.* at 996 *quoting Starr v. Baca,* 652 F.3d 1202, 1216 (9th Cir. 2011) (emphasis in original). Accordingly, the case relied on by Defendants supports denial of their Motion.

The Amended Complaint alleges considerable facts. It states with particularity the circumstances constituting the fraud. In seeking dismissal of the well-pleaded claims, Defendants ignore key allegations and mischaracterize others. They ask this Court to rely on hypotheticals; to accept their version of purported facts; and to resolve factual disputes. All of which are improper for determining the sufficiency of the Amended Complaint. Additionally, Defendants contend that certain allegations should be "rejected." (Memorandum at ECF p. 53) At other times, they state the allegations are false (Memorandum at ECF p. 51) or "simply not accurate" (Memorandum at ECF p. 67). They also claim that the allegations have to negate any other interpretations. (Memorandum at ECF pp. 55, 60) Simply put, Defendants are asking this Court to ignore well-established case law on dismissing complaints pursuant to Rule 12(b)(6) and instead to rely on improper grounds to dismiss the Amended Complaint.

Defendants also ask this Court to dissect allegations of their fraudulent conduct and consider each in isolation. Specifically, Defendants invite the Court to render a separate ruling on the viability of each misrepresentation. The Court does not have to and should not separately adjudicate each and every misrepresentation in the Amended Complaint. *See SEC v. Buntrock*, No. 02 C 2180, 2004 WL 1179423, at *5 (N.D. Ill. May 25, 2004) (denying motion to dismiss on materiality grounds an SEC complaint that alleged "misstatements relating to dozens of accounting categories.") Even one violation of the federal securities laws is actionable in an SEC enforcement case. *SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1248 (11th Cir. 2012)

("the materiality test requires the court to consider *all* the information available to the hypothetical reasonable investor" (emphasis in original)).

As the Supreme Court has stated "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. The SEC's Amended Complaint meets this standard. Defendants' motion to dismiss should therefore be denied.

## IV. DEFENDANTS GO FAR BEYOND THE INCORPORATION BY REFERENCE DOCTRINE

"Under Rule 12(b), when 'matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." *Berthold Types Ltd. v. Adobe Systems Inc*., 242 F.3d 772, 775 (7th Cir. 2001) (citation omitted). "[O]nce the district court *actually considers* additional documents, the motion must be treated as one for summary judgment, with multiple procedural consequences" including "the opportunity for discovery." *Id.* (emphasis in original) Defendants offer purported facts that are outside of the Amended Complaint without ever demonstrating that their purported facts are true or with support. Defendants have attached at least two documents that are not referenced in the Amended Complaint, an application for a search warrant including an affidavit and a document entitled Confidential Letter to Investors Quarter 3 2016. (Dkt. Nos. 48-4, 48-6) If this Court considers the purported facts outside of the Amended Complaint and all of the documents attached to Defendants' motion to dismiss, the SEC requests discovery and a chance to respond to the summary judgment motion.

Moreover, the documents that are properly incorporated on a motion to dismiss "rarely develop a robust factual record, given that, at the pleading stage, a plaintiff need only state a

claim to relief that is plausible on its face." *Reed*, 906 F.3d at 548 (internal quotations and citations omitted). Here, we do not have a complete record that would allow the Court to decide questions of fact at the motion to dismiss stage.

## V. DEFENDANTS HAVE NOT DEMONSTRATED THAT THE AMENDED COMPLAINT FAILS TO STATE A CLAIM

### A. The Amended Complaint States A Claim Pursuant To Section 17(a)(2) Of The Securities Act

#### 1. Section 17(a)(2)

Section 17(a)(2) of the Securities Act of 1933 ("Securities Act") prohibits a person, in the offer or sale of any securities, from directly or indirectly, "obtain[ing] money or property by means of any untrue statement of a material fact or any omission to state a material fact ..." 15 U.S.C. § 77q(a)(2). The SEC does not have to allege scienter for violations of 17(a)(2). *Aaron v. SEC*, 446 U.S. 680, 697 (1980). Section 17(a) "is a general antifraud provision" and "is given broad scope and flexible interpretation in order to encompass all of the ingenious variations of securities fraud that may arise." *SEC v. Kimmes*, 799 F. Supp. 852, 858 (N.D. Ill. 1992).

The Amended Complaint alleges that Defendants obtained money by means of untrue statements of material facts and omissions of material facts in the Confidential Investment Letters, financial statements, valuation reports, and other offering materials. (*See, e.g.*, Amended Complaint, ¶¶ 39, 40, 42, 43, 46, 75-78, 80- 83, 92, 95-99, 212, 218, 224, 228, 233, 237, 264, 296, 314, 337, 353, 365, 399, 410) They also obtained money by making false and misleading verbal statements to entice investors to invest in the Fund.

#### 2. Defendants Failed To Show The Amended Complaint Does Not State A Claim Under Section 17(a)(2)

Defendants cite some cases that they contend state the elements of a claim under Section 17(a)(2), but they fail to apply that law to any of the allegations in the Amended Complaint or

otherwise demonstrate that the Amended Complaint does not state a claim. (Memorandum at

ECF p. 13) This is fatal to their Motion and requires that it be denied.

**B.** **The Amended Complaint States Claims Under Sections 17(a)(1) and (3) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5(a) and (c)**

**1.** **Sections 17(a)(1) and (3)**

The Amended Complaint alleges with particularity that Defendants perpetrated a

fraudulent scheme in violation of Sections 17(a)(1) and 17(a)(3) of the Securities Act, Section

10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Exchange Act Rule 10b-

5(a) and (c). Sections 17(a)(1) and (3), respectively, prohibit a person, in the offer or sale of any

securities, from directly or indirectly:

> employ[ing] any device, scheme, or artifice to defraud,
>
> or
>
> engag[ing] in any transaction, practice, or course of business which operates or
> would operate as a fraud or deceit upon the purchaser.

15 U.S.C. §§ 77q(a)(1) and (3). The SEC does not have to allege scienter under section 17(a)(3).

*Aaron v. SEC*, 446 U.S. at 697.

**2.** **Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)**

"Section 10(b) makes it unlawful to 'use or employ ... any manipulative or deceptive

device or contrivance' in contravention of Commission rules and regulations. 15 U.S.C. §

78j(b)." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1100 (2019). "By its authority under that section, the

Commission promulgated Rule 10b–5." *Id*. Subsection (a) of Rule 10b-5 makes it unlawful to

"employ any device, scheme, or artifice to defraud." *Id*. Subsection (c) makes it unlawful to

"engage in any act, practice, or course of business" that "operates ... as a fraud or deceit." *Id*.; 17

C.F.R. § 240.10b-5.

The Supreme Court stated, "[a] 'device,' we have observed, is simply '[t]hat which is devised, or formed by design'; a 'scheme' is a 'project,' 'plan[,] or program of something to be done'; and an 'artifice' is 'an artful stratagem or trick.'" *Lorenzo v. SEC*, 139 S. Ct. at 1101 (citations and some internal quotes omitted). "The words 'act' and 'practice' in subsection (c) are similarly expansive." *Id.* "These provisions capture a wide range of conduct." *Id.*

The Amended Complaint alleges that Defendants, by engaging in undisclosed self-dealing and related party transactions and misleading investors about the Fund and their investments and about how the Fund was being operated and valuing its assets, employed devices, schemes, and artifices to defraud and engaged in acts, practices, and courses of business that operated as a fraud or deceit upon the purchaser. (*See, e.g.*, Amended Complaint ¶¶ 108, 158 - 411)

### 3. Defendants Failed to Show The Amended Complaint Does Not State A Claim Under Sections 17(a)(1) and (3), 10(b), and Rule 10b-5(a) and (c)

Defendants again merely cite some cases that they contend state the elements of a claim under Sections 17(a)(1) and (3) of the Securities Act, 10(b) of the Exchange Act, and Exchange Act Rule 10b-5(a) and (c). They fail to apply the law to the allegations in the Amended Complaint or otherwise demonstrate that the Amended Complaint does not state a claim under these sections and rule. (Memorandum at ECF pp. 11 -13) This is fatal to their Motion and requires that it be denied.

### C. The Amended Complaint States Claims Under Section 10(b) of the Exchange Act and Rule 10b-5(b)

### 1. Section 10(b) of the Exchange Act and Rule 10b-5(b)

Subsection (b) of Rule 10b-5 makes it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in

the light of the circumstances under which they were made, not misleading." 17 C.F.R.§

240.10b-5. The Amended Complaint alleges that Defendants by making false and misleading

verbal statements; making false and misleading statements in the Confidential Investment

Letters, financial statements, valuation reports, and other offering materials violated Section

10(b) and Rule 10b-5(b).  (*See, e.g.,* Amended Complaint ¶¶ 68-101, 238 - 411)

**2.      Defendants Failed to Show the Amended Complaint Does Not State a Claim Under Section 10(b) and Rule 10b-5(b)**

For Section 10(b) and Rule 10b-5(b), Defendants do nothing more than cite some cases

that they contend state the elements of a claim.  They fail to apply the law to the allegations in

the Amended Complaint or otherwise demonstrate that the Amended Complaint does not state a

claim under this section and rule.  (Memorandum at ECF pp. 11 - 13)  This is fatal to their

Motion and requires that it be denied.

**D.      The Amended Complaint States Claims Under Sections 206(1) and 206(2) of the Advisers Act**

**1.      Sections 206(1) and 206(2) of the Advisers Act**

Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act")

make it unlawful for any investment adviser, directly or indirectly

> (1) to employ any device, scheme, or artifice to defraud any client or prospective client;
>
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

The Amended Complaint alleges that Defendants, who are investment advisers, by

engaging in undisclosed self-dealing and related party transactions and misleading investors

about the Fund and their investments and about how the Fund was being operated and valuing its

assets, employed devices, schemes, and artifices to defraud and engaged in acts, practices, and

courses of business that operated as a fraud or deceit upon the purchaser.  (*See, e.g.*, Amended

Complaint ¶¶ 108, 158 - 411)

**2.  Defendants Failed to Show the Amended Complaint Does Not State a Claim Under Sections 206(1) and 206(2) of the Advisers Act**

As with the other provisions of the securities laws, Defendants cite some cases that they contend state the elements of a claim under Sections 206(1) and 206(2) of the Advisers Act, but they fail to do any analysis or otherwise demonstrate that the Amended Complaint does not state a claim under these sections.  (Memorandum at ECF pp. 11- 13)  This is fatal to their Motion and requires that it be denied.

**E.  The Amended Complaint States Claims Under Section 206(4) of the Advisers Act and Rule 206(4)-8**

**1.  Section 206(4) of the Advisers Act and Rule 206(4)-8[4]**

It shall constitute a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of section 206(4) of the Act (15 U.S.C. 80b–6(4)) for any investment adviser to a pooled investment vehicle to:

(1) Make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; or

(2) Otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

17 C.F.R. § 206(4)-8.

The Amended Complaint alleges that Defendants, who are investment advisers, by making false and misleading verbal statements and making false and misleading statements in the Confidential Investment Letters, financial statements, valuation reports, and other offering materials violated Section 206(4) and Rule 206(4)-8  (*See, e.g.*, Amended Complaint ¶¶ 68 – 101, 238 - 411)

---

[4] Defendants' Motion to Dismiss does not challenge that they are investment advisers to a pooled investment vehicle.

The Amended Complaint alleges that Defendants, who are investment advisers, by engaging in self-dealing and undisclosed related party transactions and misleading investors about the Fund and their investments and about how the Fund was being operated and valuing its assets, engaged in acts, practices, and courses of business that are fraudulent, deceptive, or manipulative. (*See, e.g.*, Amended Complaint ¶¶ 108, 158 - 411)

**2. Defendants Failed to Show The Amended Complaint Does Not State A Claim Under Section 206(4) of the Advisers Act and Rule 206(4)-8**

Again, Defendants failed to do any analysis or otherwise demonstrate that the Amended Complaint does not state a claim under Section 206(4) and Rule 206(4)-8. (Memorandum at ECF p. 13) This is fatal to their Motion and requires that it be denied.

**VI. DEFENDANTS HAVE NOT DEMONSTRATED THAT THE AMENDED COMPLAINT IS A SHOTGUN PLEADING**

Defendants erroneously assert that the Amended Complaint is a "shotgun" pleading. (Memorandum at ECF pp. 19-21) Defendants do not actually demonstrate that the Amended Complaint is a shotgun pleading or even point to any examples from the Amended Complaint. Rather, without applying the law on shotgun pleadings to any of the allegations in the Amended Complaint, Defendants merely quote several cases and state the conclusion that the Amended Complaint is a shotgun pleading.

Here, the Amended Complaint states with particularity the circumstances constituting fraud against each Defendant. The Amended Complaint advises Defendants of the facts concerning their fraudulent conduct. It states each Defendant's actions or conduct. It also states for each count what the violation is and states which particular counts are against which particular Defendants. This is not a case where there are disparate counts such as a breach of contract count, a conversion count, and a constitutional claim based on different sets of facts and

Defendants do not know which facts relate to which counts.  All of the alleged facts relate to Defendants violating the federal securities laws.  Defendants cannot credibly claim that they do not know the facts alleged against each of them or that they cannot answer the Amended Complaint.

## VII.    THE AMENDED COMPLAINT STATES CLAIMS FOR DEFENDANTS ENGAGING IN SELF-DEALING AND UNDISCLOSED CONFLICTS OF INTEREST (AMENDED COMPLAINT ¶¶ 108, 158 THROUGH 188)

Paragraphs 108 and 158 through 188 of the Amended Complaint detail how Defendants Hull, Nohl, Chrysalis, and Greenpoint Management II misused Fund assets for their own benefit; engaged in extensive self-dealing and undisclosed conflicts of interest that resulted in millions of dollars of investor funds being transferred to them; and misled investors as to how they would operate the Fund.  By engaging in this misconduct, Defendants employed devices, schemes, and artifices to defraud and engaged in acts, practices, and courses of business that operated as a fraud or deceit in violation of Sections 17(a)(1) and (3) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rules 10b-5(a) and (c).  They also obtained money by means of untrue statements of material facts and omissions of material fact in violation of Section 17(a)(2) of the Securities Act.

The Amended Complaint alleges that Defendants Hull, Nohl, Chrysalis, and Greenpoint Management II also violated Sections 206(1), 206(2), and 206(4) of the Advisers Act and Rule 206(4)-8.  Section 206 of the Advisers Act "establishes a statutory fiduciary duty for investment advisers."  *SEC v. Nutmeg Group, LLC*, 162 F. Supp. 3d 754, 778 (N.D. Ill. 2016).  Hull, Nohl, Chrysalis, and Greenpoint Management II are investment advisers to the Fund.  (Amended Complaint ¶¶ 3, 53-55, 57-58)  As investment advisers to the Fund, they were required to disclose all material facts including conflicts of interest.  Hull is also an investment adviser to

many of the individuals invested in the Fund. (Amended Complaint ⁋⁋ 14, 44) The Investment Advisers Act "reflects ... a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline [an] investment adviser ... to render advice which was not disinterested." *SEC v. Conrad*, 354 F. Supp. 3d 1330, 1350 (N.D. Ga. 2019) *quoting SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963).

"[A]s a fiduciary, an investment adviser has 'an affirmative duty of utmost good faith, and full and fair disclosure of all material facts.'" *Monetta Fin. Servs., Inc. v. SEC*, 390 F.3d 952, 955 (7th Cir. 2004) *quoting SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. at 194. "Investment advisers must act in their clients' best interest." *SEC v. Nutmeg Group,* 162 F. Supp. 3d at 778. Investment advisers "must employ reasonable care to avoid misleading clients" and "they must fully and frankly disclose all material facts." *Id*. The existence of a conflict of interest is a material fact that an adviser must fully and fairly disclose to its clients so the clients can understand the conflict and have a basis to consent to the conflict or reject it. *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. at 191-92.

### A. Examples Of Defendants' Self-Dealing And Undisclosed Conflicts Of Interest

Examples of the Defendants' self-dealing and undisclosed conflicts of interest include, but are not limited to:

- Defendants failed to disclose that Hull borrowed investor funds from Greenpoint Tactical Income Fund for a mortgage loan and Nohl, through one of his entities, was paid $7,424 from investor funds as an origination and underwriting fee on the loan to Hull. (Amended Complaint ⁋ 161)

- Hull and Nohl loaned money to the Fund and charged exorbitant interest rates without disclosure to the investors. (Amended Complaint ¶¶ 163 - 173)  This chart summarizes the undisclosed loans from managers to the Fund:

| Date | Manager Lender | Loan Amount | Repayment Date (Term) | Interest Paid to Manager | Effective APR |
|---|---|---|---|---|---|
| 11/7/16 | Nohl | $100,000 | 11/18/16 (11 days) | $7,500 | 249% |
| 11/23/16 | Hull | $25,000 | 12/22/16 (29 days) | $1,500 | 76% |
| 12/7/16 | Nohl | $105,000 | 12/22/16 (15 days) | $15,000 | 348% |
| 12/1/17 | Nohl | $100,000 | 12/11/17 (10 days) | $2,867 | 104% |
| 3/26/18 | Nohl | $150,000 | 4/18/18 (23 days) | $1,000 | 11% |
| 6/29/18 | Chrysalis | $120,000 | 10/24/18 (117 days) | $12,905.66 | 34% |
| 7/25/18 | Nohl | $18,250 | 10/2/18 (69 days) | $2,500 | 72% |
| 7/25/18 | Nohl | $38,000 to $40,000 | 10/2/18 (69 days) | $5,459.81 - $7,459.81 | 72% to 104% |

(Amended Complaint ¶ 173)

- Hull and Nohl caused the Fund to borrow money from another Greenpoint Fund at high interest rates without adequate disclosure to investors  (Amended Complaint ¶¶ 174- 182)

- Hull and Nohl caused the Fund to borrow money from certain investors without disclosure to the other investors (Amended Complaint ¶¶ 183 - 186)

- Nohl's and Hull's entities have engaged in transactions with the Fund that were not disclosed to investors (Amended Complaint ¶¶ 187 - 188)

- Hull and Nohl own Alt Asset Portfolio Services.  Until approximately the beginning of March 2019 the accountant for Greenpoint Tactical Income Fund

was employed by Alt Asset Portfolio Services.  Hull and Nohl through Alt Asset Portfolio Services charged the Fund and pocketed approximately $100,000 more than the accountant received in compensation.  (Amended Complaint ¶ 108)

## B.    Defendants Did Not Disclose The Conflicts Of Interest

Defendants argue that none of the allegations in paragraphs 108 and 158 through 188 state a claim because (1) they made a generic disclosure that there ***could*** be conflicts of interest and that the Fund ***may*** use the services of entities that ***may*** have common ownership with the managers and (2) the related party transactions are not material.  (Memorandum at ECF pp. 43)  Defendants' arguments fail.  Defendants failed to disclose that the Fund actually ***was*** engaged in related party transactions.  "[D]isclosure of a discretionary power is not the same as disclosure of having exercised that power."  *SEC v. Conrad*, 354 F. Supp. 3d at 1357.  In other words, Defendants saying they could or may engage in related party transactions is not disclosure that they ***are*** engaging or ***have*** engaged in related party transactions.  The offering materials failed to disclose related party transactions that had already occurred such as the mortgage loan Hull borrowed from the Fund.

The Fund's audited financial statements, which were distributed to investors, failed to disclose the related party transactions despite having a section entitled "Note 5 – Management Fee and ***Related Parties.***"  (Amended Complaint ¶ 127) (emphasis added)  For example, Note 5 to the Financial Statements for the period ended December 31, 2016 stated in its entirety:

> The Fund pays an annual management fee, payable in quarterly installments, one percent (1%) of assets under management ("AUM") to each of the General Members.  All reasonable and customary out-of-pocket expenses incurred by the General Members in connection with the Fund's business will be paid by the Fund or reimbursed to the General Members by the Fund.

> The Fund has $1,025,000 in outstanding notes payable to Greenpoint Global
> Mittelstand Fund I LLC, a separate investment fund managed by one of the
> General Members.

(Amended Complaint ¶ 127)  Note 5 does not even mention the loans between the Fund and Hull

or Nohl or other related parties or the material terms of such loans.  (Amended Complaint ¶ 128)

Additionally, Note 5 does not adequately disclose the loans from Greenpoint Global Mittelstand

Fund.  (*Id.*)  It states an aggregate amount outstanding, but does not mention the material terms

of the loans including the interest rate, the due date, and the several substantial extensions of the

due dates.  (Amended Complaint ¶¶ 128, 174-182)  Moreover, the Amended Complaint alleges

these loans and other related party transactions were not disclosed to the Fund's auditor.

(Amended Complaint ¶¶ 10, 160, 162, 165, 166, 167, 176, 179, 183, 184, 187, 188)  Thus,

Defendants gave the auditor no opportunity to consider whether the transactions were material or

not.

Furthermore, the Fund's unaudited financial statements for the first quarter of 2017

through the fourth quarter of 2018 state, "[m]anagement has elected to omit substantially all of

the disclosures and the statement of cash flows required by accounting principles generally

accepted in the United States of America."  (Amended Complaint ¶¶ 131, 134, 137, 140, 145,

148, 152, 155)  At the time of the filing of Amended Complaint, Defendants had not provided

the investors with any financial statements after the fourth quarter of 2018.  (Amended

Complaint ¶ 157)  Hence, Defendants have not demonstrated that they disclosed the related party

transactions.

### C.    Materiality Is An Issue To Be Decided By The Trier Of Fact

Defendants' second argument is that the conflicts of interest and related party

transactions are immaterial because the Fund had total net assets of $135 million as of June 30,

2018.  (Memorandum at ECF p. 44)  Defendants cite to paragraph 5 of the Amended Complaint

for the conclusion that the Fund had total net assets of $135 million.  However, paragraph 5 of

the Amended Complaint actually states

> According to the Fund, as of June 30, 2018, it had a net asset value of $135
> million based almost entirely on unrealized gains.  Indeed, 95% of the
> purported gains are unrealized.  These gains are largely fictitious.

Thus, the value of the Fund is alleged to be far less than $135 million.  Defendants' entire

argument that the related party transactions are not material is based on a fictitious number.

Therefore, they did not demonstrate that the related party transaction are immaterial.

Importantly, Defendants ignore that materiality is an issue to be decided by the trier of

fact.  "A fact stated or omitted is material if there is a substantial likelihood that a reasonable

purchaser or seller of a security (1) would consider the fact important in deciding whether to buy

or sell the security or (2) would have viewed the total mix of information made available to be

significantly altered by disclosure of the fact."  *SEC v. Ustian*, 229 F. Supp. 3d 739, 765 (N.D.

Ill. 2017) (citation omitted).  "Materiality is 'an inherently fact-specific finding.'"  *Id. quoting*

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011).  "The materiality requirement does

not set an especially high bar, as its role in the analysis is 'to filter out *essentially useless*

information that a reasonable investor would not consider significant, even as part of a larger

'mix' of factors to consider in making his investment decision.'"  *SEC v. Conrad*, 354 F. Supp.

3d at 1343 (emphasis in original) *quoting Basic Inc. v. Levinson*, 485 U.S. 224, 234 (1988).

"Nonetheless, the materiality determination 'requires delicate assessments of the inferences a

'reasonable shareholder' would draw from a given set of facts and the significance of those

inferences to him, and ***these assessments are peculiarly ones for the trier of fact***.'"  *Conrad*,

354 F. Supp. 3d at 1343 *quoting TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450

(1976)(emphasis added).

"Because materiality requires assessments of how a reasonable investor would interpret facts and the significance the investor would afford the inferences she reaches, ***assessing materiality is for the trier of fact*** and 'rarely appropriate at the summary judgement stage, let alone on a motion to dismiss.'" *SEC v. Ustian*, 229 F. Supp. 3d at 765 (emphasis added); *see also*, *In re New Century*, 588 F. Supp. 2d 1206, 1234 (C.D. Cal. 2008) (declining to decide materiality on a motion to dismiss).

Materiality also has a qualitative component. "[A] court must consider all relevant qualitative circumstances related to the alleged misstatements." *SEC v. Rio Tinto PLC*, No. 17 Civ. 7994, 2019 WL 1244933, *12 (S.D.N.Y. Mar. 18, 2019) (denied motion to dismiss because "considering the qualitative factors, the Court is not persuaded that statements concerning RTCM's value were 'so obviously unimportant' that reasonable minds could not differ as to their importance") (citation omitted). Given that these transactions were directly with the Fund's managers, the Fund was being charged extraordinary interest rates, and involved Hull and Nohl taking Fund assets for their personal benefit, a trier of fact could determine a reasonable investor would find these transactions qualitatively material.

Defendants have not established immaterially as a matter of law. They merely state bare conclusions that the related party transactions are immaterial. (Memorandum at ECF pp. 44 – 48) A trier of fact could determine that a reasonable investor would find it material that Hull borrowed $265,000 in investor funds from the Fund for a mortgage loan and Nohl, through one of his entities, was paid $7,424 from investor funds as an origination and underwriting fee on the loan to Hull. *See SEC v. Conrad*, 354 F. Supp. 3d at 1358-60 (holding a reasonable juror could find that Defendants breached their fiduciary duty to the funds and to the investors by using fund

assets to make an $18,000 loan to his daughter-in-law to pay credit card bills and a $26,499 loan to his son to buy a truck). A trier of fact could determine that a reasonable investor would find it material that a fund that purportedly had $135 million in assets needed to regularly borrow money from Hull and Nohl. A trier of fact could determine that a reasonable investor would find it material that the managers loaned the Fund money and charged the Fund interest at effective APRs of 249% and 348%. (Amended Complaint ¶ 173) Also, a trier of fact could determine that a reasonable investor would find it material that Hull and Nohl through Alt Asset Portfolio Services charged the Fund and pocketed approximately $100,000 more than the accountant received in compensation. (Amended Complaint ¶ 108) Likewise, a trier of fact could determine that a reasonable investor would find it material that Hull and Nohl each acquired more than $100,000 in Fund assets for themselves, regardless of whether they paid market prices or a reduced price. Given that assessing materiality is for the trier of fact, Defendants' motion to dismiss should be denied.

**VIII. DEFENDANTS FAILED TO SHOW THAT THE AMENDED COMPLAINT DOES NOT STATE CLAIMS FOR HULL AND NOHL WITHHOLDING MATERIAL NEGATIVE FACTS WHILE DOUBLING THE VALUE OF AMIRAN WHEN ITS MAIN SUBSIDIARY WAS IN DEFAULT ON A SECURED LOAN (AMENDED COMPLAINT ¶¶ 238 THROUGH 411)**

Hull and Nohl defrauded investors with their valuations of Amiran, which were misleading, unreasonable, and lacked an objective basis. Hull and Nohl's first valuation of Amiran was for the fourth quarter of 2015. Hull and Nohl, through Greenpoint Management II and Chrysalis, represented that Amiran as a whole was valued at $40 million. The Amended Complaint alleges that the $40 million valuation was misleading, unreasonable, and lacked an objective basis because the $40 million valuation was based on Amiran receiving a $220 million contract from the United States Environmental Protection Agency ("EPA") to perform

remediation work.  (Amended Complaint ¶ 249)  However, *four years before* the fourth quarter of 2015 valuation, Amiran had been notified by the EPA that it would **not** receive the $220 million contract.  (Amended Complaint ¶ 252)  Hull and Nohl knew this fact in December 2015 when they valued Amiran at $40 million.  (Amended Complaint ¶ 253)  All of the subsequent valuation reports use this $40 million valuation as a baseline.

To make matters worse, by December 2017, Hull and Nohl knew that Amiran's main subsidiary was in default on a $1.85 million line of credit secured by all of the subsidiary's assets and guaranteed by Amiran.  (Amended Complaint ¶¶ 350, 390)  Hull and Nohl also knew that the Fund's entire interest in Amiran was subordinated to the bank's security interest.  (Amended Complaint ¶¶ 350, 351)  Despite knowing these material negative facts, in the first quarter of 2018 Hull and Nohl *increased* the value of the Fund's equity interest in Amiran by approximately *$20.1 million, from $18.3 million to $38.5 million*.  (Amended Complaint ¶ 390)  Hull and Nohl also *increased* the value of Amiran as a whole from *$46.7 million to $90.8 million* while knowing Amiran's main subsidiary was in default on the $1.85 million line of credit.  (Amended Complaint ¶¶ 350, 381, 388, 396, 411)

Hull and Nohl's valuations of the Fund's equity interest in Amiran were reported in the Fund's financial statements, which were distributed to investors and used to attract new investors and new investments from existing investors in the Fund.  (*See, e.g.*, Amended Complaint ¶ 391)  The Fund and Hull, Nohl, Greenpoint Management II, and Chrysalis, as managers of the Fund, obtained investments from investors by means of the unreasonable and misleading valuations of the Fund's interest in Amiran.  Hull, Nohl, and their entities obtained money in the form of increased management and other fees by means of the unreasonable and misleading valuations of the Fund's interest in Amiran.  (*See, e.g.*, Amended Complaint ¶ 399)

The Supreme Court has set out three different ways statements of opinion may be false or misleading. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015). An expression of opinion "explicitly affirms one fact: that the speaker actually holds the stated belief." *Id*. at 1326. Therefore, an expression of opinion that the speaker does not believe is an untrue statement of fact. *Id.; see also SEC v. Infinity Group Co*., 212 F.3d 180, 194 (3rd Cir. 2000) (holding "an opinion that has been issued without a genuine belief *or reasonable basis* is an untrue statement . . ." (citation omitted)(emphasis in original)). Second, an expression of opinion that contains an underlying fact affirms the accuracy of the fact. *Omnicare,* 135 S. Ct. at 1327. Therefore, if the underlying fact is not true, the expression of opinion would be an untrue statement of fact. *Id.* Third, opinions must "fairly align[] with the information in the issuer's possession at the time." *Id.* at 1329. If material facts are omitted "about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then" it is actionable. *Id.*

A. **The December 2015 $40 Million Valuation And Subsequent Valuations Did Not Fairly Align With Information In Hull And Nohl's Possession At The Time**

By the fourth quarter of 2015, when Greenpoint Tactical Income Fund first invested in Amiran, the company's primary business was participating as a subcontractor on a pilot program to remediate oil pollution in Kuwait ("pilot program"). (Amended Complaint ₱ 241) In the December 31, 2015 Valuation Report, Hull and Nohl stated that Amiran as a whole was valued at $40,390,533.06. (Amended Complaint ₱ 247) The Amended Complaint alleges "Hull and Nohl based the $40 million valuation on a limited offering of Amiran's stock that happened in **2010** ("2010 Offering"). The 2010 Offering was conducted in anticipation of Amiran receiving a

"$220 million contract from the" EPA.  (Amended Complaint ⁋ 249)  The Amended Complaint also alleges "[b]y May 2011, Amiran had been informed by the EPA that it would not receive that $220 million EPA contract."  (Amended Complaint ⁋ 252)  The Amended Complaint further alleges

> In 2015, . . . Hull and Nohl knew that Amiran had not received that $220 million EPA contract; had not sold all of the shares in the 2010 Offering; and had not sold any shares in the 2010 Offering for the full offering price of $4,000 per share.
>
> Amiran's actual 2015 revenues were only approximately $3.98 million and net income was only $100,000, **not** the projected annual revenues of $137.5 million and net income of $39.5 million by 2015.

(Amended Complaint ⁋⁋ 253, 254) (emphasis added)  The Amended Complaint alleges that the $40 million valuation did not have a reasonable basis and did not fairly align with the facts known to Hull and Nohl as of December 31, 2015.  (Amended Complaint ⁋ 256)

The Amended Complaint further alleges that Hull and Nohl omitted material facts that they knew concerning the valuation.  For example:

> In the December 31, 2015 Quarterly Valuation Report, Hull and Nohl ignored, withheld, and failed to disclose the material facts that the $40,000,000 value was based on an offering price in 2010 when Amiran anticipated receiving an EPA contract for $220 million and the shares that were sold in the 2010 Offering were all sold at a lower price than the offering price.  In the December 31, 2015 Quarterly Valuation Report, Hull and Nohl further ignored, withheld, and failed to disclose the material fact that Amiran was notified in 2011 that it did not receive that EPA contract for $220 million.

(Amended Complaint ⁋ 258)

The Amended Complaint also alleges that from the first valuation report forward Hull and Nohl knew the Fund was not timely paying its funding commitments to Amiran and this negatively affected Amiran's ability to perform its remediation contracts, but Hull and Nohl failed to disclose these facts.  (Amended Complaint ⁋⁋ 265 - 275, 295, 315 - 317, 349)  Specifically, the Amended Complaint alleges:

By January 15, 2016, the Fund through GP Chemical had paid only $1 million of the $2 million it had agreed to pay [by January 1, 2016].

Amiran needed the other $1 million that the Fund had agreed to pay. **Amiran was on the brink of having to shut down its operations in Kuwait.** The failure to make the agreed upon investments caused Amiran financial distress.

Hull and Nohl knew . . Amiran needed money to operate; and Amiran could not perform its remediation contracts without the Fund timely and completely paying its funding commitments. Despite knowing these material facts, . . . , Hull and Nohl ignored, withheld, and failed to disclose any of these material facts.

(Amended Complaint ⁋⁋ 265, 266, 312, 335, 364) (emphasis added)

Also, the Amended Complaint alleges that for the Valuation Reports dated December 31, 2015; March 31, 2016; June 30, 2016; and September 30, 2106, Hull and Nohl omitted the material facts that Amiran did not have a contract with and had not been paid any money by either Major Energy Company or Foreign Government Entity. (Amended Complaint, ⁋⁋ 257, 259, 260, 288, 290, 291, 309, 310, 331 – 333) "An omission renders a statement materially misleading when it creates an 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *SEC v. Ustian*, 229 F. Supp. 3d at 765 *quoting Kelsey v. Allin,* No. 14 C 7837, 202016 WL 825236, at *4 (N.D. Ill. Mar. 2, 2016). The omissions created an impression of Amiran that differed from what actually existed.

**B.     Hull's And Nohl's $45 Million Valuation As Of December 2016 And $47 Million Valuations For 2017 Did Not Align With The Material Facts That Amiran's Main Subsidiary Had Taken Out A Line Of Credit To Fund Operations And The Fund's Interest Was Subordinated**

Amiran was in need of cash to fund its operations, but the Fund was chronically late paying its investment/funding commitments to Amiran. (Amended Complaint ⁋⁋ 265 - 275, 295, 315 - 317, 349) Therefore, on November 4, 2016, the main subsidiary of Amiran took out a $1.85 million line of credit from Bank Number 1. (Amended Complaint ⁋ 350) The line of credit was secured by all of the subsidiary's assets. (Amended Complaint, ⁋ 350) Amiran and

all of its other subsidiaries were guarantors on the line of credit. (*Id*.) Greenpoint Tactical Income Fund's entire equity interest in Amiran became subordinated to Bank Number 1's liens. (*Id*.) Hull and Nohl knew all of these negative facts, but ignored, withheld, and failed to disclose them. (Amended Complaint ⁋ 351) Despite knowing all of these facts, for the fourth quarter of 2016, Hull and Nohl valued Amiran as a whole at $45,168,868.80 and the Fund's equity interest in Amiran at $16,625,977.45. (Amended Complaint ⁋ 352) This valuation was misleading, unreasonable, and lacked an objective basis. (Amended Complaint ⁋ 352) Hull and Nohl's December 31, 2016 valuations did not fairly align with the information in their possession at the time. *Omnicare, Inc.*, 135 S. Ct. at 1329.

In 2017, Hull and Nohl increased the value of Amiran despite knowing additional material negative facts about the value of Amiran. They continued to omit the material facts that there was a $1.85 million line of credit; it was secured by all of the main subsidiary's assets; and the Fund's entire equity interest in Amiran was subordinated to Bank Number 1's liens. (Amended Complaint ⁋ 366)

As of March 31, 2017, Hull and Nohl valued Amiran as a whole at approximately $46.7 million and the Fund's equity interest in Amiran at approximately $18.1 million. (Amended Complaint ⁋ 361) For the second, third, and fourth quarters of 2017, Hull and Nohl valued Amiran as a whole at approximately $47 million and the Fund's equity interest in Amiran at approximately $18.285 million. (Amended Complaint ⁋⁋ 367, 369, 411) Hull and Nohl's valuations were unreasonable and did not align with the following material facts:

- By mid-2017, the $1.85 million line of credit was maxed out.

- Amiran could not meet payroll.

- Amiran had not paid its vendors, and the vendors were pursuing collections.

- By August 2017, the pilot program had been cancelled. Amiran had never received any payment for the pilot program.

- On or about September 11, 2017, representatives of Bank Number 1 had a meeting with representatives of Amiran. Nohl and two employees of the Fund attended the meeting. At the meeting, Bank Number 1 informed Amiran, Nohl, and the two employees of the Fund that the line of credit would not be renewed and had to be repaid when it matured on November 4, 2017.

- At the September 11, 2017 meeting, Bank Number 1 also informed Amiran, Nohl, and the two employees of the Fund that any payments deposited into Amiran's bank account at Bank Number 1 would automatically be applied to the outstanding balance on the line of credit.

- At the September 11, 2017 meeting, Nohl stated to the representatives of Bank Number 1 that he and Fund Employee 1 would serve as the points of contact relating to the line of credit.

- Amiran's subsidiary failed to pay off the line of credit when it matured on November 4, 2017.

- On or about December 8, 2017 Bank Number 1 sent a notice of default to Amiran.

(Amended Complaint, ¶¶ 379, 381 - 383) Hull and Nohl knew these material facts. They withheld and failed to disclose them. In *SEC v. Rio Tinto PLC*, 2019 WL 1244933, at *11, the Court held that the SEC adequately alleged that representations about a company having "significant potential going forward" were false when they were made after a meeting in which the defendants learned negative information about the company. Furthermore, Hull and Nohl's valuations were unreasonable and did not fairly align with the information in their possession at

the time.  *Omnicare, Inc.*, 135 S. Ct. at 1329.  Moreover, they used those valuations to increase

the amount of management fees they paid to themselves.

### C.  Hull and Nohl Doubled The Value Of Amiran When They Knew The Main Subsidiary Was In Default On A Secured Loan

The Amended Complaint alleges that by December 2017, Hull and Nohl knew that

Amiran's main subsidiary was in default on the line of credit.  At the time of the March 31, 2018

Quarterly Valuation Report, Hull and Nohl also knew that on or about March 2, 2018, Bank

Number 1 proposed a standstill agreement to Fund Employee Number 1.  (Amended Complaint

¶¶ 397, 398)  Under the proposed standstill agreement Bank Number 1 would defer legal action

until at least September 30, 2018 in exchange for $500,000 followed by a payment schedule.  *Id*.

Hull and Nohl as managers of the Greenpoint Tactical Income Fund failed to do anything to

facilitate the $500,000 payment.  *Id*.  Despite knowing these material negative facts, in the first

quarter of 2018 Hull and Nohl *increased* the value of Fund's equity interest in Amiran by

approximately ***$20.1 million, from $18.3 million to $38.5 million***.  (Amended Complaint ¶ 390)

Hull and Nohl valued Amiran as a whole at $90.8 million, an increase of approximately **$47**

**million** from the prior quarter.  (Amended Complaint ¶¶ 396, 411)

The Amended Complaint also alleges that as of June 30, 2018, Hull and Nohl valued the

Fund's 42% equity interest in Amiran at approximately $46.2 million.  (Amended Complaint ¶

400)  In May 2018, Nohl hired a debt workout firm to try to negotiate a settlement with Bank

Number 1.  (Amended Complaint ¶ 406)  On June 21, 2018, outside counsel for Bank Number 1

sent a demand letter to Amiran.  *Id*.  Knowing that legal action by Bank Number 1 was

imminent, Hull and Nohl increased the value of the Fund's equity interest in Amiran from

approximately $38.5 million to approximately $46.2 million.  *Id*.  Hull and Nohl ignored,

withheld, and failed to disclose these material negative facts.  *Id*.  On July 5, 2018—just five

days after the end of the Fund's second quarter— Bank Number 1 filed suit to foreclose on the loan. (Amended Complaint ⁋ 407)  On October 2, 2018, Bank Number 1 obtained a default judgment against Amiran. (Amended Complaint ⁋ 408)

Amiran is now defunct and worthless. (Amended Complaint ⁋ 409)  The Amended Complaint alleges that the Fund and Hull and Nohl and their entities, as managers of the Fund, obtained investments from investors and Hull, Nohl, and their entities obtained money in the form of increased management and other fees by means of unreasonably and misleadingly increasing the value of the Fund's 42% equity interest in Amiran in the first quarter of 2018 by approximately $20.1 million, from $18.3 million to $38.5 million and by increasing the value of the Fund's 42% equity interest in Amiran in the second quarter of 2018 from approximately $38.5 million to approximately $46.2 million. (Amended Complaint ⁋⁋ 399, 410)

The Amended Complaint alleges that Hull and Nohl's valuations as of March 31, 2018 and June 30, 2018 were unreasonable and did not fairly align with the information in their possession at the time. (Amended Complaint ⁋⁋ 389-409)  *Omnicare, Inc.*, 135 S. Ct. at 1329. In fact, the Amended Complaint alleges that Hull and Nohl dramatically increased the value of Amiran—and therefore their own management fees—at a time when the information in their possession showed the value of Amiran was plummeting rapidly towards $0. (Amended Complaint ⁋⁋ 7 - 9, 379, 381 - 383)

## D. Hull And Nohl Made False And Misleading Statements In The Valuation Reports

The December 31, 2015 Quarterly Valuation Report falsely and misleadingly stated, "[d]ue to the Company's successful on-going operation of its full-scale pilot plant, it likely will be awarded a contract by the end of 2016 that will generate $60+ million in revenue per year over an eight year period." (Amended Complaint ⁋ 262)  At the time it was made, Nohl knew

that Amiran had not been paid any money for operating the plant; only one of Amiran's two plants in Kuwait was operating; and the one plant that was operating was not meeting the mandated performance standards. (Amended Complaint ¶ 261)

Hull and Nohl also falsely represented that the $41.50 million valuation of Amiran was confirmed by "many sales" of shares at the $41.50 million value. (Amended Complaint ¶¶ 313, 336) Specifically, Hull and Nohl in the September 30, 2016 Quarterly Valuation Report falsely and misleadingly represented that "[s]ince units are still being sold via private sales of the Company with an enterprise value of $41.50mm, that value is contemporaneously confirmed by many sales events." (Amended Complaint ¶ 336) At the time of the September 30, 2016 Quarterly Valuation Report, Hull and Nohl knew that no other private sales of Amiran's securities (other than to the Fund through GP Chemical) had been made in 2016, let alone at an enterprise (i.e. company) value of $41.5 million. (Amended Complaint ¶ 336)

### E. Defendants Have Not Shown That The Valuations Of Amiran Are Immaterial As A Matter Of Law

Defendants erroneously claim that the Amended Complaint has to allege "what the value actually is" to state a claim. (Memorandum at ECF p. 57) Courts have rejected the argument that a complaint has to quantify the amount by which a valuation is inflated in order to survive a motion to dismiss. *See, e.g.*, *In re Bear Sterns Companies, Inc.*, 763 F. Supp. 2d 423, 519 (S.D.N.Y. 2011) (holding it is not necessary for a complaint to quantify the amount of the overstatement); *SEC v. Mannion*, 2013 WL 1291621, *10 (N.D. Ga. Mar. 25, 2013)[5] ("Defendants do not cite, and the Court is not aware of, any authority holding that the

---

[5] In *SEC v. Mannion,* in ruling on summary judgment motions the Court held as to one alleged overvaluation that neither Plaintiff nor Defendants were entitled to summary judgment. As to another alleged overvaluation, granted summary judgment to Defendants because the record after the completion of discovery did not contain the extent of overvaluations so materiality could not be determined. Here, we are at the motion to dismiss stage, so it is too early to require evidence of the extent of the inflated valuations.

Commission is required to prove the correct value of Side Pocket in order to demonstrate, *as a threshold matter*, that Defendants' ascribed value was inflated" (emphasis added)); *In re Oppenheimer Rochester Funds Group Securities Litigation*, 838 F. Supp. 2d 1148 (D. Col. 2012) (motion to dismiss denied and a counter valuation was not alleged); *SEC v. Penthouse International, Inc.*, 390 F. Supp. 2d 344, 353-54 (S.D.N.Y. 2005) (denied the motion to dismiss and noted the Supreme Court has "rejected a rigid formula as to materiality, including the use of numerical benchmarks regarding revenue, income and assets"). Moreover, the amount by which Hull and Nohl inflated the value of Amiran is a matter for the trier of fact after all of the evidence has been obtained through discovery and presented at trial.

Defendants rely on *In re: Allied Capital Corp. Securities Litigation*, 2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003) for its assertion that the Amended Complaint has to allege "what the value actually is" to state a claim. (Memorandum at ECF pp. 17, 57) That case is distinguishable. First, that complaint was subject to the Private Securities Litigation Reform Act ("PSLRA"), which has heightened pleading requirements that are not applicable to actions brought by the SEC.[6] Also, that Court held "plaintiffs must allege the magnitude of the overstatements, or at least facts from which it could be inferred that the extent of the overstatements was material." *Id*. at *6. There, the Court noted that the complaint did not allege the securities were worthless and they were just over 10% of the total portfolio. *Id*. at *5. The Court held given the disclosures of how the values were determined, "no reasonable investor could consider the fact that a small proportion of Allied's holdings might have valuations that were debatable (which is all that the Complaint alleges) to be material." *Id*. In *SEC v. Penthouse International, Inc.*, 390 F. Supp. 2d at 353-54, the Court distinguished *In re: Allied* by

---

[6] The PSLRA's heightened pleading requirements are not applicable to actions brought by the SEC. *See, e.g., SEC v. Lucent Technologies, Inc.*, 363 F. Supp. 2d 708, 717 (D.N.J. 2005); *SEC v. Shapiro*, No. 4:05-cv-364, 2008 WL 819945, at *3 (E.D. Tex. Mar. 25, 2008)

noting that those plaintiffs attempted to make only one argument to establish materiality – evidence of stock price movement. Defendant's reliance on *In re: Allied* is misplaced and does not support dismissal of the SEC's Amended Complaint.

Here, by contrast, the Amended Complaint alleges considerable facts from which it can be inferred the inflated valuations of Amiran were material. The Amended Complaint alleges Amiran is defunct and worthless causing the loss of more than one-third of the Fund's value. (Amended Complaint ⁋ 409) The Amended Complaint also alleges that Hull and Nohl **increased** the value of the Fund's 42% equity interest in Amiran by over **$20 million** when they knew Amiran's main subsidiary was in default on a line of credit that was secured by all of the assets; the Fund's entire 42% equity interest in Amiran was subordinate to the bank's security interest; and the standstill agreement proposed by the bank was not executed and the requested $500,000 payment was not made. Moreover, "assessing materiality is for the trier of fact." *See, e.g., SEC v. Ustian*, 229 F. Supp. 3d at 765. A trier of fact could find that a reasonable investor would find the inflated valuations of Amiran material given the numerous negative facts known to Hull and Hull.

Defendants offer nothing but conclusions and speculation in support of their argument that the omissions were immaterial. For example

> **It is highly unlikely** that **if** Amiran was performing sufficiently that new contracts were anticipated, an investor would find the fact that its plant did not meet all performance standards relevant to the decision to invest or not to invest. (Memorandum at ECF p. 60)

> There is **absolutely no reason to think** GTIF's investors cared if one of the companies in which it invested had its quarterly revenues rise or fall, or where they were opening plants, except insofar as it affected the ultimate value of the investment. (Memorandum at ECF p. 58)

This mere speculation by Defendants does not prove immateriality as a matter of law. Defendants are asking the Court to improperly resolve questions of fact at the motion to dismiss stage. These questions of fact are for the trier of fact after discovery and presentation of all of the evidence, not just the documents Defendants attached to their Motion to Dismiss.

Defendants also claim the line of credit was not material because it was only $2 million while Hull and Nohl had valued the Fund's interest at $14 million. (Memorandum at ECF p. 66) This completely misses the point. First, the Amended Complaint alleges that the valuations by Hull and Nohl did not fairly align with the information in their possession at the time. *Omnicare, Inc.*, 135 S. Ct. at 1329. Thus, using their valuation to assess the materiality of the line of credit is faulty. Second, a trier of fact could find that a reasonable investor would find it material that a company valued at $90 million needed a $1.85 million line of credit to fund operations and did not have the funds to repay the line of credit. Third, a trier of fact could find that a reasonable investor would find it material that Hull and Nohl more than doubled the value of the Fund's approximately 42% equity interest in Amiran by ***$20.1 million, from $18.3 million to $38.5 million*** while knowing that

> (1) Greenpoint Tactical Income Fund had not timely and completely paid its funding commitments to Amiran;
>
> (2) Amiran's main subsidiary needed to take out a $1.85 million line of credit to fund its operations;
>
> (3) the line of credit was secured by all of the assets;
>
> (4) the Fund's entire interest was subordinated to the bank's security interest;
>
> (5) the subsidiary had defaulted on the line of credit; and

(6) legal action by Bank Number 1 was imminent because the standstill agreement

proposed by the bank was not entered into and the required $500,000 standstill payment

was not made.

Defendants also incorrectly claim "there simply is not a linkage between the alleged

violations and a failure to timely pay funds owed to a company in which GTIF invested."

(Memorandum at ECF p. 60)  Contrary to Defendants' assertion, the Amended Complaint

alleges that Amiran needed money to operate and could not perform its remediation contracts

because the Fund failed to timely and completely pay its funding commitments.  (Amended

Complaint ¶¶ 266, 267, 315, 317)  The Amended Complaint goes on to allege that Hull and Nohl

ignored, withheld, and failed to disclose any of these material facts.  (Amended Complaint ¶¶

295, 312, 335, 364)  Defendants' assertions about what the option agreements require

(Memorandum at ECF pp. 61-63) do not change the well-pleaded allegations that Amiran needed

money to operate and could not perform its remediation contracts because the Fund failed to

timely and completely pay its funding commitments.  Hull and Nohl failed to disclose these

material facts.  Defendants are also asking this Court to hold that the option agreements they

chose to attach to their Motion to Dismiss are the only evidence relevant to the Fund's funding

commitments to Amiran.  Again, Defendants selectively introducing purported facts outside of

the Amended Complaint and asking the Court to resolve questions of fact without all of the

relevant evidence is improper.

## F.    The Amended Complaint Alleges That Hull And Nohl Are Responsible For The Valuations

Defendants' other arguments do not support dismissal of the Amended Complaint.

Defendants try to blame an employee of Chrysalis for "several" of the valuation reports.

(Memorandum at ECF pp. 57 - 58)  At best, trying to blame an employee for certain valuation

reports creates a question of fact that cannot be resolved at the motion to dismiss stage. The Amended Complaint alleges "[a]t all relevant times, Nohl was responsible for determining the value of Amiran and the Fund's position in Amiran" and "Nohl, as President and Director of managing member Chrysalis, drafted or validated the valuation reports for Amiran." (Amended Complaint ⁋ 240) The Amended Complaint further alleges "[a]t all relevant times, Hull, as Managing Director of managing member Greenpoint Management II, and Nohl, as President and Director of managing member Chrysalis, shared authority for the valuation." (Amended Complaint ⁋⁋ 240, 282; *see also* ⁋⁋ 243, 245, 277, 298, 302, 318, 327, 338, 346, 354, 361, 367, 371, 373, 375, 377, 378, 389, 394, 396, 400, 405)

Furthermore, Nohl certified a number of the valuation reports stating, for example, "[t]his report has been made according to all of the knowledge known to me at the time without omission and to the best of my ability." (Amended Complaint, ⁋ 323; *see also* ⁋⁋ 245, 343, 359, 370, 394) By way of example, the Amended Complaint alleges that "[t]he Managing Members authored the March 31, 2018 Quarterly Valuation Report. Nohl performed the valuation and certified the report as "Managing Director." Hull and Nohl through Greenpoint Management II and Chrysalis, respectively, shared authority for the March 31, 2018 Quarterly Valuation Report." (Amended Complaint ⁋ 394)

Defendants' assertions that a mere employee of Chrysalis, but not Chrysalis itself or the President and Director of Chrysalis, is responsible for the valuations is not plausible. Furthermore, the value of the Fund's equity interest in Amiran was reported in the Fund's financial statements from December 31, 2015 to June 30, 2018. (Amended Complaint ⁋⁋ 243, 276, 297, 318, 338, 354, 367, 389, 400) Management (Hull through Greenpoint Management II

and Nohl through Chrysalis) is responsible for the preparation and fair presentation of the financial statements.  (Amended Complaint ¶¶ 117, 124, 130, 133, 136, 139, 144, 147)

G.     **Defendants Improperly Offer Speculation To Challenge Well-Pleaded Allegations**

"In evaluating the sufficiency of the complaint, we view it in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor."  *AnchorBank, FSB*, 649 F.3d at 614.  In defiance of this well-established law, Defendants repeatedly offer purported facts that are not before the Court.  For example, Defendants speculate "the 2015 valuation was far *lower* than could have been justified by an aggressive valuation method" (Memorandum at ECF p. 59) (emphasis in original) and "recognizing that Amiran might not continue as a going concern, GTIF valued directly the underlying assets in which it had interests that could be used in a reorganization." (Memorandum at ECF p. 67)  In addition to this speculation being improperly asserted in a motion to dismiss, the assertion is directly contradicted by the fact that the Fund's interest, if any, in Amiran's assets was subordinated to the bank's security interest.  (Amended Complaint ¶ 350)  This speculation by Defendants at best raises issues of fact that cannot be resolved on a motion to dismiss.

Defendants assert that they have attached the valuation reports.  However, at the motion to dismiss stage the record is not complete and does not provide all of the relevant facts.  *Reed*, 906 F.3d at 548 (the documents that are properly incorporated on a motion to dismiss "rarely develop a robust factual record, given that, at the pleading stage, a plaintiff need only state a claim to relief that is plausible on its face" (internal quotations and citations omitted)).

In sum, the Amended Complaint states claims for relief as to Hull and Nohl's valuations of Amiran being misleading, unreasonable, and lacking an objective basis and Hull and Nohl ignoring, withholding, and failing to disclose material facts.

## IX. DEFENDANTS FAILED TO SHOW THAT THE AMENDED COMPLAINT DOES NOT STATE CLAIMS FOR HULL AND NOHL MISREPRESENTING HOW THEY VALUED THE GEMS AND MINERALS (AMENDED COMPLAINT ¶¶ 189 THROUGH 195)

In paragraphs 189 through 195, the SEC alleges that the Amended Operating Agreement defines Fair Market Value as "the value of non-current assets determined by appraisal. Provided, however, **the value of any assets shall be its purchase price for the year within which it is acquired**." (Amended Complaint ¶ 190) (emphasis added) In 2014, GP Rare Earth, under the control of Hull and Nohl, had 22 gems and minerals appraised. (Amended Complaint ¶ 191) The appraisals for 21 of the 22 mineral specimens assigned a higher value than the purchase price. (Amended Complaint ¶ 191) GP Rare Earth, under the control of Hull and Nohl, reported the higher appraised values to the Fund rather than the purchase price for the year in which they were acquired. (Amended Complaint ¶ 191) Using the higher appraised values rather than the purchase prices in violation of the Amended Operating Agreement resulted in unrealized gains of $4.4 million on the 21 minerals, yielding a reported return on investment of 111.9% through unrealized gains. (Amended Complaint ¶ 192) For 2015, Hull and Nohl's use of the appraised values on 175 gems and minerals, rather than the purchase prices, in violation of the Amended Operating Agreement, resulted in unrealized gains of $14.8 million on the 175 minerals, yielding a reported return on investment of 133.8% through unrealized gains on those minerals. (Amended Complaint ¶ 193) GP Rare Earth, under the control of Hull and Nohl, had the 175 gems and minerals appraised and reported the appraised values to the Fund. (Amended Complaint ¶ 193)

Hull and Nohl had the Fund report the higher appraised values in the Fund's financial statements and took higher management fees. (Amended Complaint ¶¶ 193, 195) Hull and Nohl obtained higher management fees by using the higher appraised values rather than the required purchase prices. The Amended Complaint further alleges that Hull and Nohl, through Greenpoint Management II and Chrysalis, obtained money by means of untrue statements of material facts in violation of Section 17(a)(2) of the Securities Act. (Amended Complaint ¶ 195) By obtaining and using the higher appraised values rather than the purchase prices, Hull, Nohl, Greenpoint Management II, Chrysalis, the Fund, and GP Rare Earth also employed devices, schemes, and artifices to defraud and engaged in acts, practices, and courses of business that operated as a fraud or deceit in violation of Sections 17(a)(1) and (3) of the Securities Act, Section 10(b) of the Exchange Act, Exchange Act Rule 10b-5(a) and (c). Hull, Nohl, Greenpoint Management II, and Chrysalis also violated Sections 206(1) and 206(2) of the Advisers Act.

Defendants' argument for dismissal of the Amended Complaint is that the SEC's "interpretation" of the Amended Operating Agreement is "unreasonable," then they state a hypothetical, and argue that they did what was in the "best interest of shareholders," notwithstanding their failure to abide by the Amended Operating Agreement. (Memorandum at ECF pp. 48-49) These are not proper bases to dismiss a complaint. Defendants are again improperly asking this Court to decide factual issues on a motion to dismiss (i.e. they did what was in the best interests of investors). Defendants also claim there was no misrepresentation but ignore that the Amended Complaint alleges that they misrepresented the values of the gems and minerals in the financial statements that were distributed to investors. (Amended Complaint ¶¶ 191, 193) They also misrepresented to investors through the Amended Operating Agreement

how they were valuing the gems and minerals in the year in which they purchased them.  These are violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5(b).

## X.   DEFENDANTS FAILED TO SHOW THE AMENDED COMPLAINT DOES NOT STATE  CLAIMS FOR NOHL MAKING FALSE AND MISLEADING STATEMENTS ABOUT THE APPRAISAL PROCESS AND INTERFERING IN THE APPRAISAL PROCESS (AMENDED COMPLAINT ¶¶ 196 THROUGH 237)

In paragraphs 196 through 237, the SEC alleges that Nohl made false and misleading statements in the Fund's financial statements about the appraisal process and that Nohl improperly interfered in the appraisal process to generate higher appraised values thereby generating higher management fees.  The improper interference includes:

- Nohl engaged in prohibited purchases of minerals from Appraiser Number 2, who appraised the Fund's gems and minerals (Amended Complaint ¶¶ 202-212);

- Nohl rejected appraised values that he deemed too low and accepted higher values on the same gems and minerals (Amended Complaint ¶¶ 213-218);

- Nohl cherry-picked higher appraised values of the minerals (Amended Complaint ¶¶ 219-228); and

- Nohl pressured appraisers over the values they reported and relied on altered appraised values (Amended Complaint ¶¶ 229-233).

Hull, Nohl, Chrysalis, Greenpoint Management II, and the Fund did not disclose Nohl's interference in the appraisal process to Greenpoint Tactical Income Fund's investors or auditor. (Amended Complaint ¶ 201)

### A.   Nohl Misrepresented The Appraisal Process

The Amended Complaint alleges that Nohl misrepresented to investors and the Fund's auditor that the "[f]ine minerals and gems are valued using third party appraisals based on underlying market driven events" and "[t]he valuations of these investments are further evaluated

throughout the year as of the reporting date based on other market data available, generally the Fund's own transactions or semi-public information used by appraisal experts of large scale market participants." (Amended Complaint ¶ 196) Defendants concede that the Amended Complaint alleges "Nohl's representations about the *appraisal process* for the gems and minerals are false and misleading." (Memorandum at ECF p. 50 stating the Amended Complaint alleges Nohl "misrepresented the appraisal process") Defendants erroneously claim that the Amended Complaint must allege the "actual value" of the gems and minerals in order to allege that a defendant made material misrepresentations about the *appraisal process*. (Memorandum at ECF p. 50) The case relied on by Defendants, *San Leandro Emergency Medical Group Profit Sharing Plan v. Phillip Morris Cos., Inc.*, 75 F.3d 801 (2d Cir. 1996), does **not** hold such. The issue there was whether "a company has a duty to disclose its consideration of an alternative business plan in order to prevent its prior statements from becoming misleading." *Id*. at 804.

Defendants also did not demonstrate that Nohl's misrepresentations about the *appraisal process* for the gems and minerals are immaterial as a matter of law. Defendants just repeat the conclusion that the misrepresentations are immaterial. The materiality "determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and *these assessments are peculiarly ones for the trier of fact*." *TSC Industries, Inc.*, 426 U.S. at 450 (emphasis added).

> The appraisal process represented to the investors stated in part
>
> Fine minerals and gems are valued using third party appraisals based on underlying market driven events. . . . The valuations of these investments are further evaluated throughout the year as of the reporting date based on other market data available, generally the Fund's own transactions or semi-public information used by appraisal experts of large scale market participants.

(Amended Complaint ¶ 196) The Amended Complaint further alleges

> Nohl hired Appraiser Number 1 to perform most of the appraisals for the minerals
> owned by the Fund. Appraiser Number 1's appraisals were not based on
> underlying market driven events. Appraiser Number 1 did not collect and use
> sales data from sales shows in performing the appraisals of the Fund's minerals.
> Appraiser Number 1 did not further evaluate the valuations throughout the year.
> Appraiser Number 1's appraisal process was to look at a specimen for a few
> seconds and write down a value. Nohl knew this was Appraiser Number 1's
> process. Nohl knew the appraisal process for the Fund's minerals was subjective,
> not the objective process he represented to the Fund's investors and auditors.

(Amended Complaint ¶ 199) Defendants seemingly admit that the appraisals did not follow the

process represented to investors and the Fund's auditor. In attempting to defend Nohl's

misrepresentations, Defendants try to introduce new purported facts and speculation. For

example, they speculate "[a] sufficiently skilled and experienced appraiser can no doubt, at a

glance, reach a conclusion about the value of many pieces without the need to review

comparables" and "at least some of this evaluation was to be done by GTIF's managers, not by

appraisers." (Memorandum at ECF p. 51) Defendants' hypotheticals and speculation do not

require dismissal of the Amended Complaint. Defendants present, at best, questions for the trier

of fact after hearing evidence. It is, of course, improper for a Court to resolve questions of fact at

the motion to dismiss stage.

## B. Nohl's Interference In The Appraisal Process

Defendants claim that the SEC cannot state a claim for Nohl having appraised values

changed, cherry-picking higher appraisals, or engaging in undisclosed purchases from an

appraiser unless the SEC alleges a "competing valuation." (Memorandum at ECF p. 52) That is

not the law. The case[7] cited by Defendants does not hold that a plaintiff has to allege a

"competing valuation" in order to state a claim for securities fraud. The allegations are about

Nohl's interference in a process that was represented one way to investors and the Fund's auditor

---

[7] The case cited by Defendants is *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 362
(S.D.N.Y. 2007)

but was actually being conducted in a very different way.  The manner in which Nohl actually

conducted the process repeatedly resulted in higher valuations of the assets and therefore resulted

in higher management fees to Hull, Nohl, and their entities.  Furthermore, the Amended

Complaint alleges considerable facts about the various appraised values that Nohl rejected or

cherry-picked.  (Amended Complaint ¶¶ 213-237)

The Amended Complaint alleges that in violation of the Second Amended Operating

Agreement Nohl purchased minerals from an appraiser, who was appraising the Fund's minerals.

Specifically,

> For fine minerals, the Second Amended Operating Agreement states, "No other
> business other than the business of appraising may be entered with respective
> appraisers."

(Amended Complaint ¶ 207)

> In June 2016, after the Second Amended Operating Agreement became effective,
> Nohl paid Appraiser Number 2 the remaining $125,000 that the Fund owed for
> the minerals it had purchased from Appraiser Number 2.  On or about June 13,
> 2016, Appraiser Number 2 sent a Facebook message to Nohl stating, "I know we
> can figure out a trade on the remaining balance of the collection you got from me
> . . .  and I can sign those appraisals finally."  Later that same day, Nohl gave
> Appraiser Number 2 a check for $125,000 and insisted Appraiser Number 2
> conduct more appraisals of the Fund's minerals.  The same day that he received
> the check, Appraiser Number 2 appraised ten of the Fund's mineral specimens.

> Nohl and Hull recorded unrealized gains of $7.6 million based on the appraisals
> of the ten mineral specimens by Appraiser Number 2.  Hull and Nohl's use of the
> appraisals by Appraiser Number 2 was improper because the Fund purchased
> minerals from him.

(Amended Complaint ¶¶ 208, 209)

Defendants offer nothing but speculation in asking this Court to dismiss: "*[i]f* the

appraiser had qualifications beyond reproach, was paid a significant amount for the

appraisals . . ."  (Memorandum at ECF p. 54)  Defendants argue that Nohl entered into

the agreement to purchase the minerals before the Second Amended Operating

Agreement became effective; therefore, there is no fraudulent conduct. (Memorandum at ECF p. 53-54) At best, Defendants are asking this Court to resolve a factual dispute about Nohl's conduct. Moreover, Defendants' argument ignores that Nohl actually paid the balance owed to Appraiser Number 2 for the minerals and had Appraiser Number 2 conduct more appraisals *after* the prohibition became effective. Hull and Nohl as investment advisers had to "employ reasonable care to avoid misleading clients" and "fully and frankly disclose all material facts." *SEC v. Nutmeg Group,* 162 F. Supp. 3d at 778. Hull, Nohl, Chrysalis, Greenpoint Management II, and the Fund did not disclose the purchase of minerals from Appraiser Number 2. (Amended Complaint ¶ 211) Furthermore, Nohl falsely represented to the Fund's auditor that the Fund did not have a relationship with Appraiser Number 2 other than as an appraiser. (Amended Complaint ¶ 210)

The allegations regarding Nohl rejecting lower appraised values and cherry-picking appraisals by having two appraisers value the same minerals and then picking the higher appraised value include:

> On two different occasions, Nohl rejected appraisals of a set of tourmaline gemstones. (Amended Complaint ¶ 213)
>
> In August 2017, another gemologist ("Appraiser Number 4") appraised the same set of tourmaline gemstones . . . for $1,546,251. In March 2015, Appraiser Number 3 had appraised the same set of tourmaline gemstones for $6,340,730 after Nohl influenced the appraisals. In June 2016, Appraiser Number 2 had appraised the same set of tourmaline gemstones for $8,156,100. This set of appraisals was performed at the same time Appraiser Number 2 received the $125,000 from Nohl. (Amended Complaint ¶ 219)
>
> Hull and Nohl had the Fund record unrealized gains based on the $8,156,100 appraised value assigned by Appraiser Number 2 in 2016. (Amended Complaint ¶ 220)
>
> Nohl rejected the $1,546,251 appraised value from Appraiser Number 4 in 2017. Hull and Nohl continued to use the $8,156,100 appraised value from 2016. (Amended Complaint ¶ 221)

Hull, Nohl, Chrysalis, and Greenpoint Management II charged higher management fees based on the $8,156,100 appraised value rather than the $1,546,251 appraised value. (Amended Complaint ¶ 222)

Hull, Nohl, Chrysalis, and Greenpoint Management II did not disclose to the Fund's investors that Nohl rejected the $1,546,251 appraised value and continued to use the $8,156,100 appraised value from 2016 for the set of tourmaline gemstones. (Amended Complaint ¶ 223)

Defendants offer nothing but speculation to try to contradict these well-pleaded facts.

That is improper on a motion to dismiss. Defendants speculate for example:

- "It is equally plausible, if not likely, that Nohl had a valid basis for his complaint." (Memorandum at ECF p. 55)

- "There is a very likely explanation for why the appraisal was rejected, then – because it was lower than even the lowest plausible value." (Memorandum at ECF p. 55)

- "the plausible explanation that the two appraisers' work was being compared or Nohl had independent information concerning the values of these specimens that affected his selection." (Memorandum at ECF p. 55)

Defendants' speculation is not sufficient to dismiss the Amended Complaint. Moreover, the speculation does not overcome the well-pleaded facts that Nohl's actions and the lower appraisals were not disclosed to the investors.

By Nohl misrepresenting the appraisal process and interfering in it and Defendants not disclosing it, they employed devices, schemes, and artifices to defraud and engaged in acts, practices, and courses of business that operated as a fraud or deceit in violation of Sections 17(a)(1) and (3) of the Securities Act, Section 10(b) of the Exchange Act, Exchange Act Rule 10b-5(a) and (c), and Sections 206(1) and 206(2) of the Advisers Act. Nohl also made false statements about the appraisal process in violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5(b). The Amended Complaint also alleges that Hull, Nohl, Chrysalis, and Greenpoint Management II obtained money in the form of increased management fees by

Nohl misrepresenting the appraisal process and interfering in it in violation of Section 17(a)(2) of the Securities Act.

XI.    **DEFENDANTS FAILED TO SHOW THAT THE AMENDED COMPLAINT DOES NOT STATE CLAIMS FOR THE MANAGERS MISREPRESENTING THE FUND AS AN INCOME FUND WHILE INVESTING IN NON-INCOME GENERATING ASSETS**

Defendants ask this Court to hold that their false and misleading representations that the Fund is an "income" fund are not actionable. Defendants assert that paragraphs 39 and 40 of the Amended Complaint standing alone do not state a claim. (Memorandum at ECF pp. 22-24) These allegations are part of Defendants employing devices, schemes, and artifices to defraud and engaging in acts, practices, and courses of business that operate as a fraud or deceit. Defendants cherry-picking two paragraphs out of the Amended Complaint is not a basis on which to judge the Amended Complaint as a whole and determine whether claims are stated. As previously explained, the Court need not separately adjudicate each and every misrepresentation in the Amended Complaint. *See SEC v. Buntrock*, 2004 WL 1179423, at *5. Even one violation of the federal securities laws is actionable in an SEC enforcement case. *SEC v. Morgan Keegan & Co.*, 678 F.3d at 1248.

Tellingly, Defendants do not cite any authority for their position that their false and misleading representations to investors about the very nature of the Fund are not fraudulent. Defendants also ask the Court to misread the Amended Complaint and conclude that the Amended Complaint only alleges that as of the date of filing—February 7, 2020— the Fund was invested in non-income generating and illiquid assets. (Memorandum at ECF p. 23 stating "SEC's allegation seems to be that the assets held by GTIF as of February 7, 2020, when the FAC was filed, show that GTIF's claims about its investment strategy in 2015 are false.") The Amended Complaint is replete with allegations that the Fund, from its inception through at least

the filing of the Amended Complaint, has been investing in non-incoming generating, illiquid assets and not generating income:

- 52% of the Fund's purported value was in gems and minerals and 46% of the Fund's value was in a portfolio of debt and equity.  (Amended Complaint ¶ 92)

- "Less than 5% of the Fund's returns were realized gains providing cash income for the Fund."  (Amended Complaint ¶ 111)

- "The Schedule of Operations for the period February 6, 2013 through December 31, 2015 reported realized gain on investments of $310,035."  (Amended Complaint ¶ 118)

- "The Schedule of Operations as of and for the year ended December 31, 2016 reported realized gain on investments of $0."  (Amended Complaint ¶ 125)

- The Schedule of Operations for the quarter ended March 31, 2017; for the quarter ended June 30, 2017; for the quarter ended September 30, 2017; for the quarter ended December 31, 2017; for the quarter ended March 31, 2018; for the quarter ended June 30, 2018; and for the quarter ended September 30, 2018, all reported realized gain on investments of **$0.**  (Amended Complaint ¶¶ 132, 135, 138, 141, 146, 149, 153)

- The Schedule of Operations for the quarter ended December 31, 2018 reported realized gain on investments of $250,090.18."  (Amended Complaint ¶ 156)  As of the filing of the Amended Complaint, Defendants had not provided the investors with any financial statements after the fourth quarter of 2018.  (Amended Complaint ¶ 157)

It is axiomatic that the Fund having $0 in realized gain on investments from January 1, 2016 through September 30, 2018 and only $310,035 in realized gain on investments from February 6, 2013 through December 31, 2015 means the Fund was invested in non-income generating and illiquid assets and not generating income.

Also, Defendants misleadingly imply that Defendants only misrepresented that the Fund was an income fund once in 2015.  Just because the fact sheet was titled "Income Strategy Q4 2015" does mean that it was only used in 2015.  The Amended Complaint alleges that Hull, Nohl, Chrysalis, and Greenpoint Management II have been selling securities in Greenpoint Tactical **Income** Fund from 2013 through the filing of the Complaint.  (Amended Complaint ¶¶ 68, 85)  Thus, they have continuously misrepresented it as an income fund.

In order for Defendants to prevail on this point, the Court would have to make findings of fact regarding representations made to investors about the Fund being an income fund and about the composition of the Fund's investments and whether they are income-producing.  Deciding questions of fact on a motion to dismiss is impermissible.  These factual issues cannot be decided without hearing evidence from the investors to whom the misrepresentations were made and evidence about the Fund's holdings and income.

## XII.  DEFENDANTS FAILED TO SHOW THAT THE AMENDED COMPLAINT DOES NOT STATE CLAIMS FOR HULL AND BLUEPOINT MAKING MISREPRESENTATIONS TO THEIR ADVISORY CLIENTS

Defendants erroneously contend that Hull's and Bluepoint's false and misleading statements to advisory clients about investing in the Fund do not state a claim for relief.  (Memorandum at ECF pp. 24 - 26)  Again, Defendants select a few allegations, namely paragraphs 41 through 46, and assert that those allegations standing alone do not state a claim.  Paragraphs 41 through 46 allege that Hull and Bluepoint made false and misleading statements, employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and courses of business that operate as a fraud or deceit, which are violations of Sections 17(a)(1), (2) and (3) of the Securities Act; Section 10(b) of the Exchange Act; Exchange Act Rule 10b-5; and Sections 206(1) and 206(2) of the Advisers Act.

The Amended Complaint alleges, in part,

At all relevant times, Bluepoint has been an investment adviser, and Hull has been an investment adviser representative of Bluepoint. As an investment adviser, Bluepoint advises others on investing in securities in exchange for compensation. Bluepoint through Hull recommended to all of Bluepoint's individual clients that they invest in the Greenpoint Funds. Hull made these recommendations without regard for the individual investor's needs and circumstances. Hull recommended to the majority of Bluepoint's individual clients that they invest all assets managed by Bluepoint in the Greenpoint Funds. (Amended Complaint ₱ 41)

Hull and, through him, Bluepoint made verbal false and misleading representations to Bluepoint's individual clients. Hull falsely stated that investments in Greenpoint Tactical Income Fund (1) were safe, (2) would generate high returns, and (3) could be withdrawn as needed. These were material misrepresentations and omissions by Hull and Bluepoint because the investments were not safe and the reported returns were inflated. Furthermore, the investors' funds could not be withdrawn as needed. Redemption requests by investors have been delayed or unfulfilled, and when they are fulfilled, it is when funds are received from new investors. (Amended Complaint ₱ 42)

Hull also falsely represented to Bluepoint's clients that Greenpoint Tactical Income Fund was actively selling minerals and often had arranged a sale of the mineral before the Fund even committed to purchase the mineral. Greenpoint Tactical Income Fund did not often have sales arranged before even committing to a purchase. (Amended Complaint ₱ 43)

Hull convinced some investors to invest their entire life savings in the Greenpoint Funds. These investors include people on fixed incomes, older individuals, and others for whom risky illiquid investments were not appropriate. Hull also convinced the board of directors of a small public library to invest in the Greenpoint Funds. (Amended Complaint ₱ 45)

Hull and Bluepoint obtained money by means of the false statements and omissions because the investors paid 1% of assets under management to Bluepoint. Hull received a portion of the management fees because he controls Bluepoint and co-owns it. (Amended Complaint ₱ 46)

Defendants erroneously claim that the SEC does not allege the "to whom" or when the

misrepresentations were made. The Amended Complaint states "Hull and, through him,

Bluepoint made verbal false and misleading representations **to Bluepoint's individual clients.**"

(Amended Complaint ₱ 42) Plus, "[t]he SEC does not have to plead reliance in an action seeking

injunctive relief for alleged violations of Section 10(b) and Rule 10b–5. Therefore, the SEC does not have to identify individual investors who relied upon the alleged misrepresentations or omissions." *SEC v. Trabulse*, 526 F. Supp. 2d 1001, 1005 (N.D. Cal. 2007) (internal citation omitted). As to the when, the SEC does not contend that these representations were a one time or isolated event. They were made during the period of time Hull and, through him, Bluepoint were advising the advisory clients to invest in the Greenpoint Funds.

Defendants dispute what Hull and Bluepoint meant by the investments were "safe." (Memorandum at ECF p. 25) This is a question of fact that cannot be decided on a motion to dismiss. What was meant by "safe" should be decided by the trier of fact after hearing testimony from Hull and the investors to whom the misrepresentations were made.

Defendants again ask this Court to make findings of fact, namely that the "[i]nvestors were fully apprised of all relevant facts before investing" and did not rely on Hull's misrepresentations to them. (Memorandum at ECF p. 26) Such a holding on a motion to dismiss is improper. Those are questions of fact to be decided by the trier of fact after hearing all of the evidence. Plus, the SEC does not have to plead reliance.

Defendants also claim that the false and misleading statements made by Hull were immaterial to investors. (Memorandum at ECF p. 26) This is another issue to be decided by the trier of fact. A trier of fact could find that a reasonable investor would find that telling her the investment is safe and could be withdrawn as needed are material representations.

Defendants also introduce purported facts that are outside of the pleadings. These facts include:

- "[e]ach GTIF investor was also a party to an operating agreement"

- "[t]hese documents were signed by investors."

(Memorandum at ECF p. 26)  Defendants attached a document that is **not** signed by "each investor."  (Dkt. No. 48-2)  Defendants offered nothing to support their contention that **each (or even one)** investor actually signed an operating agreement.  Moreover, the Amended Complaint alleges there were multiple versions of the operating agreement in effect at different times.  (Amended Complaint ¶¶ 189, 206)  Defendants did not prove that each investor signed all of the operating agreements in effect during the relevant period.  The purported facts offered by Defendants are unreliable and incomplete, and therefore, should not be relied on to dismiss the Amended Complaint.  If the Court considers these purported facts, the Court must convert the motion to dismiss to a motion for summary judgment and allow the SEC to conduct discovery.

In sum, none of Defendants' arguments require that the Amended Complaint be dismissed in whole or part.

## XIII.   DEFENDANTS FAILED TO SHOW THAT THE AMENDED COMPLAINT DOES NOT STATE CLAIMS FOR NOHL CREATING A FALSE CONTRACT

Defendants assert that Nohl creating a false contract and recording large, unrealized gains on minerals the Fund did not own or have possession of, thereby increasing management fees paid to entities owned and controlled by Hull and Nohl, "do not connect to the SEC's alleged counts."  (Memorandum at ECF p. 27)  The SEC alleged that the Fund failed to make the required payments on a $6.8 million purchase of three minerals; did not obtain possession of two of the three minerals until months after the contract date; did not obtain possession of the third mineral until **four years after entering into the purchase contract**; and still owes $100,000 on the contract.  (Amended Complaint ¶¶ 63-66)  Despite not having possession of and not having paid for the minerals according to the contract, Hull and Nohl caused the Fund to record large, unrealized gains on the minerals and thereby received increased management fees.  (Amended Complaint ¶ 66)  These allegations are part of Nohl's deceptive misconduct and scheme to

fraudulently increase management fees in violation of Sections 17(a)(1) and (3) of the Securities Act; Section 10(b) of the Exchange Act; Exchange Act Rule 10b-5(a) and (c); and Sections 206(1) and 206(2) of the Advisers Act.

Defendants again offer purported facts that are outside of the Amended Complaint. They attached a copy of the false contract and state the "signature is Christopher Nohl's." (Memorandum at ECF p. 27) If the Court considers this purported fact, the Court must convert the motion to dismiss to a motion for summary judgment and allow the SEC to conduct discovery. Furthermore, Defendants offer nothing to prove this purported fact.

Defendants request that this Court hold on a motion to dismiss that it is not fraudulent, deceitful, or a breach of a fiduciary duty to create a false contract and record large unrealized gains on minerals that the Fund did not own or even have possession of thereby increasing the amount of management fees. Their request should be denied.

## XIV. DEFENDANTS FAILED TO SHOW THAT THE AMENDED COMPLAINT DOES NOT STATE CLAIMS FOR MAKING FALSE AND MISLEADING STATEMENTS IN OFFERING MATERIALS

Defendants ask the Court to view a number of false and misleading statements in the Fund's offering materials in isolation and hold that each standing alone does not state a claim. (Memorandum at ECF pp. 28 - 43) The statements should not be read in isolation because investors were given all of the false and misleading representations. The totality of the false and misleading statements should be considered. "[T]he materiality test requires the court to consider *all* the information available to the hypothetical reasonable investor." *SEC v. Morgan Keegan & Co.*, 678 F.3d at 1248. The Court does not have to and should not separately adjudicate each and every misrepresentation in the Amended Complaint. *See SEC v. Buntrock*, 2004 WL 1179423, at *5 (denying motion to dismiss on materiality grounds an SEC complaint

that alleged "misstatements relating to dozens of accounting categories.")  The SEC addresses

several of the allegations that Defendants complain about.

> ### A. Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical Income Fund Made The False And Misleading Representation That The Fund Would Achieve Current Income Through Purchases Of Distressed Real Estate Notes

Paragraph 76 alleges

> The Second Confidential Investment Letter also falsely and misleadingly represents to investors that "[t]he Company's goal is to achieve a high level of current income through purchases of distressed real estate notes and other assets of a distressed nature."  To the contrary, the Fund's holdings have been largely composed of non-income-generating assets and illiquid assets.

(Amended Complaint ¶ 76)  The Second Confidential Investment Letter was distributed to

prospective investors and investors from September 2013 through at least April 29, 2016.

(Amended Complaint ¶ 69)  Thus, these statements were made from September 2013 through at

least April 29, 2016.  The Schedule of Operations for the period February 6, 2013 through

December 31, 2015 reported realized gain on investments of $310,035.  (Amended Complaint ¶

118)  For a three year period, the Fund had realized gain on investments of only $310,035.

Additionally, the Schedule of Operations as of and for the year ended December 31, 2016

reported realized gain on investments of $0.  (Amended Complaint ¶ 125)  These statements

were false while Defendants were making them.  The reported realized gain on investments

demonstrate that the Fund was not investing to achieve a high level of **current** income through

purchases of distressed real estate notes and other assets of a distressed nature.

Defendants argue that "this is a statement of intent."  (Memorandum at ECF pp. 18, 30)

Defendants are improperly attempting to rely on the "safe harbor" for "forward-looking

statements" contained in the PSLRA. The cases they cite are PSLRA cases.[8] This statutory safe

harbor "applies only to private actions, not enforcement actions." *SEC v. Thompson*, 238 F.

Supp. 3d 575, 602 (S.D.N.Y. 2017) *citing* 15 U.S.C. Section 77z—2(c); *see also*, *SEC v. e-*

*Smart Techs.*, 31 F. Supp. 3d 69, 83-84 (D.D.C. 2014) (denying motion to dismiss and stating the

"limitation of liability for forward-looking statements, however, applies only in private actions,

not enforcement actions brought by the SEC") (internal quotations and citation omitted).

Furthermore, this misrepresentation is not a forward-looking statement because it is

framed in the present tense (i.e. "high level of **current** income"). *SEC v. Ustian*, 229 F. Supp.

3d at 767 (Misrepresentations "framed in the present tense are not forward looking.")

Misrepresentations that deal "with the present business condition of the company" are not

forward-looking. *SEC v. e-Smart Techs.*, 31 F. Supp. 3d at 83-84 ("even the most self-

flagellating disclaimers warning of a company's near-certain *future* collapse will not protect a

company or officer who materially misrepresents the *present* business condition of the company"

(emphasis in original)). Furthermore, even if the statement was determined to be a forward-

looking statement, forward-looking statements that are false are actionable. *SEC* v. *Ustian*, 229

F. Supp. 3d at 767. The Amended Complaint sufficiently alleges the representation is false and

misleading.

> **B.    Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical Income Fund Made The False And Misleading Representation That Many Of The Gem And Mineral Transactions Are Short Term In Nature And Provide Strong Cash Flow**

Paragraph 77 alleges

The Second Confidential Investment Letter falsely and misleadingly represents to
investors that "[f]urther the fund has made investments in the gem and mineral

---

[8] *In re BP P.L.C. Sec. Litig.*, 852 F. Supp. 2d 767, 789 (S.D. Tex. 2012); *Eisenstadt v. Centel Corp.*, 113 F.3d 738
(7th Cir. 1997); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F. 3d 588 (7th Cir. 2006) *vacated and remanded
by Telllabs*, Inc. *v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).

markets.  Many of these transactions are short term in nature and provide strong
cash flow as well."  The vast majority of the gem and mineral transactions were
not short term in nature and did not provide strong cash flow.

(Amended Complaint ⁋ 77)  Defendants argue that their own term "strong cash flow" is vague

and the SEC is therefore required to allege what the cash flow was.  (Memorandum at ECF p. 31)

The Amended Complaint alleges what the realized gains on investments were (in most quarters

$0) and further alleges "[a]lmost all of the money Greenpoint Tactical Income Fund paid to Hull,

Nohl, Chrysalis, Greenpoint Management II, and H Informatics came from funds invested by

investors because **less than 5% of the Fund's returns were realized gains providing cash

income for the Fund**."  (Amended Complaint ⁋⁋ 111, 118, 125, 132, 135, 138, 141, 146, 149,

153, 156 emphasis added)  Defendants also improperly ask the Court to rely on a hypothetical to

dismiss the Amended Complaint.  (Memorandum at ECF p. 31)  The Amended Complaint

sufficiently alleges the representation is false and misleading because the vast majority of the

gem and minerals transactions were not short term and sales of gems and minerals did not

provide strong cash flow.

> **C.     Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical
>          Income Fund Misrepresented That They Will Acquire Collections Of Gems
>          And Minerals At A Fraction Of Their Current Value**

Paragraph 78 alleges

With respect to gems and minerals, the Second Confidential Investment Letter
falsely and misleadingly represents to investors that "[t]he Company is working
on a number of large acquisitions, in some cases entire collections from some of
the most respected collectors in the world.  The company **will acquire** these
collections **at a fraction of their current value** . . . The global demand for world
class specimens cannot be overstated."  The Fund had no reasonable expectation
of acquiring, and did not acquire, large acquisitions and entire collections at a
fraction of their current value.

(Amended Complaint ⁋ 78) (emphasis added)  Defendants argue that the Amended Complaint

does not allege that the Fund was not "working on" acquiring the collections.  This misses the

point.  Defendants falsely stated that the Fund "will acquire" the collections "at a fraction of their

current value."  Defendants chose not to use "may acquire" or "could acquire."  The Amended

Complaint alleges that "[t]he Fund had no reasonable expectation of acquiring, and did not

acquire, large acquisitions and entire collections **at a fraction of their current value**."

(Amended Complaint ⁋ 78) (emphasis added)  The Amended Complaint sufficiently alleges

Defendants' representation is false and misleading.

> ### D.     Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical Income Fund Misrepresented That Possessors Of The Top Minerals Get Whatever Price They Demand Without Delay Or Negotiation

Paragraph 80 alleges

The Business Plan falsely and misleadingly represents to investors "[d]emand for the finest mineral specimens is spreading like a wild-fire throughout the world and it is imperative to acquire these assets now before truly unique, utterly rare and beautiful things are locked up in private collections completely where they are nearly impossible to acquire. . . . **The upper or tip-top of mineral specimens, those being represented by less than 0.0005% of total salable specimens by quality and size, are the most sound investment as possessors get whatever price they demand for the very best in existence and get the same without delay or negotiation.  It is truly a seller's market."**  The Fund had no reasonable expectation of getting, and has not gotten, "whatever price they demand[ed]" "without delay or negotiation" in the sale of mineral specimens.

(Amended Complaint ⁋ 80) (emphasis added)  Defendants argue that they were describing the

market.  (Memorandum at ECF pp. 33-34)  Their argument does not refute the falsity of the

representation that "possessors get whatever price they demand for the very best in existence and

get the same without delay or negotiation**.**  It is truly a seller's market."  The Amended

Complaint sufficiently alleges the representation is false and misleading.

**E.    Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical Income Fund Made The False And Misleading Representation That They Will Arbitrage Mid-Range Minerals In Rapid Succession**

Paragraph 81 alleges

The Business Plan also falsely and misleadingly represents to investors that "[t]he second stance includes an allocation of fund assets to serve as a revolving line upon which the fund **will arbitrage mid-range minerals in rapid succession.**  Typical returns of 'fast-moving' material (transactions within hours or days) realize returns of 10 – 30% but may, when purchased most advantageously, yield 100 – 300% IRR within 30 days of inception for each respective instance."  The Fund rarely, if ever, sold gems and minerals in "rapid succession," in "fast-moving transactions" "within hours or days," or for profits of 100-300% within 30 days of acquiring them.

(Amended Complaint ⁋ 81) (emphasis added)  Defendants argue that they were describing the

market.  (Memorandum at ECF pp. 34-35)  That argument does not refute the falsity of the

representation that the Fund will arbitrage mid-range minerals in rapid succession or fast moving

transactions or within hours or days.  The Amended Complaint sufficiently alleges the

representation is false and misleading.

**F.    Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical Income Fund Made The False And Misleading Representation That They Will Seek To Rapidly Build A Database Of Chinese Collectors And Dealers**

Paragraph 82 alleges

The Business Plan additionally falsely and misleadingly represents to investors that  "[b]y far the greatest returns on midlevel specimens can be realized through sales to collectors and dealers in China and other southeast Asian countries which currently exist in a non-contiguous bubble from American dealers (even at the very top).  The fund **will seek to rapidly build a database of Chinese collectors and dealers to make pieces available where no other American dealer is doing business although it is the place of highest and most rapidly increasing demand.**"  The Fund never did any work to build a database of Chinese collectors and dealers.

(Amended Complaint ⁋ 82) (emphasis added)  Defendants argue that it is a "forward-looking"

statement.  (Memorandum at ECF p. 35)  However, the statutory safe harbor for "forward-

looking" statements "applies only to private actions, not enforcement actions." *SEC v. Thompson*, 238 F. Supp. 3d at 602 *citing* 15 U.S.C. § 77z—2(c).  This is an enforcement action. Furthermore, even if it was determined to be a forward-looking statement, forward-looking statements that are false are actionable.  *SEC v. Ustian*, 229 F. Supp. 3d at 767-68.  Defendants stated they "will seek to rapidly build."  They did not state they "may" seek to build a database. The Fund never did any work to build a database of Chinese collectors and dealers.  Therefore, the statement was false.  The Amended Complaint sufficiently alleges the representation is false and misleading.

### G. Hull, Nohl, Chrysalis, Greenpoint Management II, And Greenpoint Tactical Income Fund Made The False And Misleading Representation That They Will Open A Sorting And Clearing House Operation

Paragraph 83 alleges

The Business Plan further falsely and misleadingly represents to investors that [t]o facilitate the trading and acquisition goals of this stance the Fund will, once cash flow supports it, open a small sorting and clearing house operation in the Milwaukee, Wisconsin area.  Contained within that space will be vaults for security, as well as a phone bank for deal coordination."  The Fund never opened a sorting and clearing house.  The Fund never opened a phone bank for deal coordination.

(Amended Complaint ¶ 83)  Defendants argue that opening the sorting and clearing house with a phone bank was conditional based on having cash flow.  From April 29, 2014 to approximately March 12, 2019, the Fund paid over $13.7 million to entities controlled or owned by Hull or Nohl.  (Amended Complaint ¶ 110)  Hence, the Fund had cash but used it to pay management fees.  Defendants continue their incessant introduction of facts outside of the Amended Complaint including that a search warrant stated that they had a vault.  (Memorandum at ECF p. 36)  Defendants also argue that the misrepresentation is immaterial. Materiality is a matter to be decided by the trier of fact.  The Court cannot resolve these questions at the motion to dismiss

stage.  That is for the trier of fact.  The Amended Complaint sufficiently alleges the

representation is false and misleading.

> ### H.    Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical Income Fund Made The False And Misleading Representation That The Offering Proceeds Would Be Used Primarily To Acquire Investments In Four Asset Categories

Paragraph 92 alleges

> Proceeds of the Offering will be used primarily for the acquisition of investments in the Company's **four** asset categories: 1) purchasing real assets, possibly of a distressed nature, improving and then subsequently leasing or reselling them, 2) investing in private businesses that have either high net income or the potential for high net income, 3) advancing and/or lending money secured by purchase orders (known as production factoring) and/or participating in commercial lending of other types of lending or debt transactions that are likely to produce net interest income, (4) acquiring rare minerals and precious gemstones.

> As of June 30, 2018, the gem and mineral collection was approximately 52% of the Fund's purported value, and a portfolio of debt and equity securities of private companies, including a now-worthless position in Amiran, was approximately 46% of the Fund's purported value.

(Amended Complaint ⁋ 92) (emphasis added)  The Third Confidential Investment Letter has

been distributed to prospective investors and investors from at least May 1, 2016 through the

present.  (Amended Complaint ⁋ 86)  During the time this representation was being made, the

Fund was not primarily invested in the **four** stated asset categories; rather 98% of the Fund's

value was invested in two asset categories.  This paragraph gives an example during the period

of least May 1, 2016 through the present.  It is axiomatic that if 98% of the Fund's value was

invested in two asset categories that the offering proceeds were not used to invest primarily in

four asset categories.  Furthermore, the Amended Complaint also alleges that 84.9% of the

Fund's assets were in a single asset class, namely gems and minerals, and one single company,

namely Amiran.  (Amended Complaint ⁋ 38 stating the "Fund reported that as of June 30, 2018,

its collection of gems and minerals was worth $68.3 million, composed of $21.9 million in

original cost and $46.4 million in unrealized gains.  The Fund also reported that its shares in

Amiran were worth $46.2 million, similarly composed of $9 million in original cost and $37.2

million in unrealized gains.")  The Amended Complaint sufficiently alleges the representation is

false and misleading.

I. **Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical Income Fund Made The False And Misleading Representation That "Contracts, Approvals And Opportunities" Realized By Amiran Show That A $40 Million Valuation Is Well Below Its Current Valuation**

Paragraph 95 alleges

The Third Confidential Investment Letter falsely and misleadingly represents to prospective investors and investors "[t]he current $40MM evaluation on Amiran Technologies was set by Amiran Technologies prior to engagement with the [Fund] and by all calculations is well below the current value given contracts, approvals and opportunities realized by Amiran Technologies in the last 6 months."  "Contracts, approvals and opportunities realized by Amiran in the last 6 months" did not by all calculations show that a $40 million valuation of Amiran was well below its current value.

(Amended Complaint ¶ 95)  Defendants speculate that "An investor who received the CIL on

January 1, 2018, a year and a half after the 'effective date' date of the Third CIL, would have

understood that no exit had, in fact, taken place between the effective date and that date, and that

that [sic] information was no longer current; that investor would and could not have been

misled."  (Memorandum at ECF p. 39)  Defendants seemingly admit that Defendants

misrepresented that the $40 million valuation of Amiran was well below its current value but try

to justify the misrepresentation by saying an investor could not have been misled.  First, that is a

question of fact for the trier of fact.  Furthermore, Defendants were still trying to sell securities in

the Fund through at least the filing of the original Complaint on September 30, 2019.  Once

Defendants became aware of negative or unfavorable information about Amiran, they could not

continue to paint a "rosy picture of the business's prospects" to investors through the offering

materials. *SEC v. Merchant Capital, LLC,* 483 F.3d 747, 769 (11th Cir. 2007) (stating "[h]ere, unfavorable events had already occurred when Merchant made its optimistic statements, which made those statements materially misleading.") Defendants continued to use the offering materials knowing Amiran's main subsidiary was in default on a loan and all assets were subject to the lender's lien. The Amended Complaint sufficiently alleges the representation is false and misleading.

> **J.** **Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical Income Fund Made The False And Misleading Representation That The Gem And Mineral Transactions Were Short Term And Provide Strong Cash Flow**

> Paragraph 96 alleges

> The Third Confidential Investment Letter falsely and misleadingly represents to prospective investors and investors "the [Fund] has made investments in the precious stone and very fine mineral markets and has amassed one of the top 5 collections of fine minerals in the world public or private according to numerous experts. Many of these **transactions are short term in nature and provide cash flow as well**." Few of the transactions were short term in nature and few, if any, provided significant cash flow.

(Amended Complaint ⁋ 96) (emphasis added) Defendants again improperly assert purported facts outside of the Complaint by stating "many of those were being held for appreciation." (Memorandum at ECF pp. 39-40) As alleged in the Amended Complaint, the representation is false because "many" of the transactions were not short term in nature and they did not provide significant cash flow as demonstrated by the numerous allegations that in many quarters the realized gain was $0. The Amended Complaint sufficiently alleges the representation is false and misleading.

**K.     Hull, Nohl, Chrysalis, Greenpoint Management II, and Greenpoint Tactical Income Fund Had No Reasonable Expectation Of Selling Between $10 Million To $30 Million Of Minerals From Its Collection To One Person.**

Paragraph 97 alleges

The Third Confidential Investment Letter falsely and misleadingly represents to prospective investors and investors that "[d]iscussions are underway to sell somewhere between $10MM and $30MM of the collection on a 3-7 year amortized terms to the most prominent dealer in the world who is New York City based." The Third Confidential Investment Letter is dated May 1, 2016.  As of May 1, 2016, Greenpoint Tactical Income Fund had no reasonable expectation of selling between $10 million to $30 million of minerals from its collection to one person.

(Amended Complaint ¶ 97)  Defendants argue that the SEC does not state a claim.  The Amended Complaint alleges that this representation is false and misleading because the Fund had no reasonable expectation of selling between $10 million to $30 million of minerals from its collection to one person.

All of Defendants' false and misleading representations should be considered because they were all made to investors.  The false and misleading representations should not be considered in isolation.  In sum, Defendants have not demonstrated that the Amended Complaint should be dismissed.

**XV.    THE AMENDED COMPLAINT SHOULD NOT BE DISMISSED BECAUSE IT SEEKS DISGORGEMENT**

Defendants incorrectly contend that the Amended Complaint "should be dismissed to the extent that it seeks disgorgement."  (Memorandum at ECF p. 68)  Controlling Seventh Circuit precedent holds that Courts have the authority to order disgorgement in SEC actions.  *SEC v. Lipson*, 278 F.3d 656, 662-663 (7th Cir. 2002).  Defendants' reliance on *Kokesh v. SEC*, 137 S. Ct. 1635 (2017) is seriously misplaced.  (Memorandum at ECF p. 68) The Supreme Court stated, "[t]he question here is whether [28 U.S.C.] § 2462, which applies to any 'action, suit or

proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise,'

also applies when the SEC seeks disgorgement." *Id.* at 1641. The Court held

> Disgorgement in the securities-enforcement context is a **"penalty" within the meaning of § 2462, and so disgorgement actions must be commenced within five years of the date the claim accrues.**

*Id*. at 1639 (emphasis added). Defendants do not claim that this enforcement action is untimely.

Hence, *Kokesh* is not applicable.

Other courts have recognized that, even after the Supreme Court granted *certiorari* in *Liu v. SEC*, No. 18-150, 2019 WL 5659111, courts may continue to award disgorgement under existing precedent. *SEC v. Team Resources Inc.*, 942 F.3d 272 (5th Cir. Nov. 5, 2019) (affirming disgorgement award notwithstanding *certiorari* grant in *Liu*, and noting that "even when the Supreme Court has granted certiorari in a relevant case, we will continue to follow binding precedent") (*certiorari* granted); *SEC v. Dalmy*, No. 19-cv-00745, 2019 WL 6465362, at *5 (D. Col. Dec. 2, 2019) (recognizing that the Supreme Court granted certiorari in *Liu*, but ruling that "the Court will continue to follow settled precedent and order disgorgement"), *amended and superseded by,* 2020 WL 108664, at *5 (D. Col. Jan. 9, 2020) (same).

## XVI. CONCLUSION

Defendants have perpetrated myriad frauds upon investors:

- They engaged in undisclosed self-dealing and related party transactions where they used investor funds to pay themselves interest rates sometimes exceeding 200% APR;

- Hull used investors' funds for a mortgage loan for his lake house without disclosing it;

- Defendants wrote up the value of the Fund's 42% equity interest in Amiran to approximately $46.2 million while knowing Amiran's main subsidiary could not even make installment payments on a $1.85 million line of credit and was in default and that the Fund's interest in Amiran was subordinate to the bank's security interest in all of the assets;

- Hull, Nohl, and their entities pocketed increased management fees on the inflated value of Amiran while the investors received nothing because Amiran is now defunct and worthless;

- Nohl misrepresented the appraisal process for the gems and minerals to the investors and the Fund's auditor. Nohl and Hull used higher appraised values when the Fund was supposed to be using the purchase price. By using the higher appraised values, Hull, Nohl, and their entities were paid higher management fees;

- Nohl interfered in the appraisal process for the gems and minerals by rejecting lower appraised values; having the same minerals appraised by multiple appraisers and cherry-picking the higher appraised values; having the Fund use altered, higher appraised values;

- Defendants have pocketed over $14.5 million in fees and redemptions while many investors, who have requested their money, have been told the Fund has no liquidity to meet the investors' redemption requests; and

- Defendants made material false and misleading representations to investors.

Defendants have failed to show that the Amended Complaint does not state claims under the enumerated securities laws. Rather, in seeking dismissal of the well-pleaded Amended

Complaint, Defendants resort to asking this Court to consider purported facts and documents outside of the Amended Complaint, to consider speculation and hypotheticals, to resolve questions of fact, and to conduct a trial on the briefs without all of the evidence before the Court. If the Court considers all of these purported facts and documents thereby converting Defendants' motion to dismiss to a summary judgment motion, the SEC requests discovery and adequate time to respond.

For all of the stated reasons, Defendants' Motion to Dismiss should be denied.

Date: April 6, 2019

**Respectfully submitted,**

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**
By: /s/Doressia L. Hutton
Doressia L. Hutton (HuttonD@sec.gov)
Christopher H. White (WhiteCh@sec.gov)
Timothy J. Stockwell (StockewellT@sec.gov)
175 West Jackson Boulevard, Suite 1450
Chicago, IL 60604-2615
(312) 596-6050;
(312) 353-7398 (fax)

*Attorneys for Plaintiff the United States
Securities and Exchange Commission*

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2020, I served the foregoing Plaintiff's Opposition to Defendants' Motion to Dismiss the First Amended Complaint on all counsel of record through the Court's ECF filing system.

By: /s/ Doressia L. Hutton