IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

                                    Plaintiff,                          OPINION AND ORDER

        v.                                                              19-cv-809-wmc

BLUEPOINT INVESTMENT COUNSEL,
LLC, MICHAEL G. HULL, CHRISTOPHER
J. NOHL, CHRYSALIS FINANCIAL LLC,
GREENPOINT ASSET MANAGEMENT II LLC,
GREENPOINT TACTICAL INCOME FUND LLC,
& GP RARE EARTH TRADING ACCOUNT LLC,

                                    Defendants.

        In this case, plaintiff the United States Securities and Exchange Commission ("SEC") alleges that defendants Michael Hull, Christopher Nohl, and their respective entities perpetrated an offering fraud in violation of federal securities laws.  Broadly, the SEC claims that defendants defrauded investors by reporting misleading and unreasonable valuations of fund assets in order to charge excessive management and other fees.  The SEC further claims that defendants unlawfully enriched themselves at the expense of investors by engaging in undisclosed self-dealing and related party transactions.  Defendants have moved to dismiss the first amended complaint.  (Dkt. #46.)[1]  For the reasons discussed below, the court will deny defendants' motion.

---

[1] Defendants had previously moved to dismiss the SEC's initial complaint.  (Dkt. #16.)  However, in light of the SEC's amended complaint, and the new motion to dismiss directed at it, defendants' original motion will be DENIED as moot.

ALLEGATIONS OF FACT[2]

**A. Defendants**

Defendant Michael Hull was a principal and investment adviser representative of defendant Bluepoint Investment Counsel, LLC ("Bluepoint") from June 2012 through March 2019.  Bluepoint is controlled by Hull and was a registered investment adviser from June 2012 through March 2019.  Hull and his brother own Greenpoint Asset Management LLC, which in turn owns defendant Greenpoint Asset Management II LLC ("Greenpoint Management II").  Hull controls Greenpoint Management II, and Greenpoint Management II is one of two managing members of defendant Greenpoint Tactical Income Fund ("GTIF").

Defendant Christopher Nohl owns and controls defendant Chrysalis Financial LLC ("Chrysalis").  Chrysalis is the other managing member of GTIF.  Thus, GTIF is owned and controlled by Hull and Nohl through their respective entities.  GTIF is a private investment fund which issued the securities at issue in this case.  As GTIF's managing members, Chrysalis and Greenpoint Management II are investment advisers to GTIF.  Further, as owners of the managing entities, Hull and Nohl are investment advisers to GTIF.  As investment advisers, Chrysalis, Greenpoint Management II, Hull, and Nohl all owe fiduciary duties to GTIF.

---

[2] Unless noted otherwise, the following allegations are summarized from the SEC Amended Complaint ("Am. Compl." (dkt. #33)), and accepted as true for purposes of deciding the defendants' motion to dismiss only.

The final defendant, GP Rare Earth Trading Account LLC ("GP Rare Earth"), is a wholly owned subsidiary of GTIF.  GP Rare Earth is also under the control of Hull and Nohl and purports to hold gems and minerals as assets.

### B.  Other Relevant Entities

In addition to GTIF, Hull manages two other related funds, Greenpoint Global Mittelstand Fund LLC ("GGMF") and Greenpoint Fine Art Fund LLC ("GFAF").  GGMF is a private investment fund managed by Hull and two other individuals.  GGMF's stated investment strategy involves investing in Korean companies, and as of December 31, 2016, it reported net assets of approximately $4.1 million.  GFAF is likewise managed by Hull and two other individuals, with a stated strategy of investing in artwork, and as of December 31, 2016, reported net assets of approximately $4.3 million.

H Informatics LLC ("H Informatics") is owned by Hull and an investor in GTIF. On or about January 1, 2018, the managers of GTIF retained H Informatics to provide information to GTIF's investors in exchange for a fee of 0.85% of GTIF's net assets.

Alt Asset Portfolio Services LLC ("Alt Asset Portfolio Services") is owned by Hull and Nohl, and employed the accountant for GTIF.

Amiran Technologies, Inc. ("Amiran") is a now-defunct environmental remediation company.  GTIF, through GP Chemical, invested in Amiran, acquiring approximately a 42% interest in the company.

**C. Creation of the Greenpoint Funds**

In June of 2012, Hull co-founded Bluepoint.  One year later, he created a series of private investment funds, including GTIF, GGMF, and GFAF (collectively, the "Greenpoint Funds").  Hull, and through him, Bluepoint, allegedly made oral representations to Bluepoint's individual clients that investments in the Greenpoint Funds (1) were safe, (2) would generate high returns, and (3) could be withdrawn as needed.  For a majority of these individual clients, all of their assets under Bluepoint's management were invested in the Greenpoint Funds.  (Am. Compl. (dkt. #33) ¶ 438.)

The SEC alleges that these representations were false and misleading because the investments were not safe and the reported returns were materially inflated.  Further, the investors' funds could not be withdrawn as needed -- redemption requests by investors have been delayed or unfulfilled, and when they are fulfilled, it is when funds are received from new investors.  Moreover, the SEC alleges that Hull made these statements without regard for the individual investor's needs and circumstances.  Finally, the SEC claims that Hull and Bluepoint obtained money by means of these fraudulent statements through investors' payments of 1% of assets under management to Bluepoint, a portion of which Hull received because he controls and co-owns Bluepoint.

As of June 30, 2018,[3] GTIF reported assets with a cost basis of $40.1 million and a fair market value of $135.3 million.  These returns were derived primarily from two sources -- GTIF's gem and mineral collection and its interest in Amiran.  Specifically, GTIF

---

[3] As of the filing of the SEC's amended complaint, this June 30, 2018, statement was the most recent financial statement from GTIF.  (*See* Am. Compl. (dkt. #33) ¶ 37.)

reported that as of June 30, 2018, its collection of gems and minerals was worth $68.3 million, composed of $21.9 million in original cost and $46.4 million in unrealized gains. GTIF also reported that its shares in Amiran were worth $46.2 million, similarly composed of $9 million in original cost and $37.2 million in unrealized gains.  The SEC alleges that any purported unrealized gains were largely fictitious, in particular, and as discussed in greater depth below, the SEC alleges that these valuations of the gem and mineral collection and of Amiran shares were improperly inflated.

### D. The Stock Offerings for GTIF

GTIF had three, separate public security offerings of GTIF stock.  Its first offering was from May 17, 2013, through September 26, 2013, during which it raised approximately $9,250,000 through the sale of securities to investors.  GTIF's second offering occurred from September 2013 through April 29, 2016, and was conducted by Hull, Nohl, Chrysalis, and Greenpoint Management II.  GTIF represented that it raised an additional $32,495,504.57 during this offering.  Finally, GTIF's third public offering was from May 1, 2016, through at least February 7, 2020, and was again conducted by Hull, Nohl, Chrysalis, and Greenpoint Management II.  During that period, GTIF reportedly raised at least $21,723,038.87.

Hull (as Managing Director of Greenpoint Management II) and Nohl (as President of Chrysalis) jointly drafted the primary disclosure document for the second offering ("Second Confidential Investment Letter"), which was issued by GTIF to prospective investors and investors.  Hull, Nohl, Chrysalis, and Greenpoint Management II all had

ultimate authority over the statements in the Second Confidential Investment Letter, which was effective from September 2013 through at least April 29, 2016.

As set forth below, the SEC alleges that this Second Confidential Investment Letter included the following false and misleading statements:

- "[F]unds will be used primarily [for] acquisition of investments in three arenas: (1) distressed real estate assets, specifically in the petroleum, oil markets, but may also include multifamily and commercial markets; and (2) mining, minerals and precious stones; and (3) intellectual property." (*Id.* ¶ 75 (quoting the Second Confidential Letter).) The SEC alleges that this statement was false and misleading because "[a]s of June 30, 2018, the gem and mineral collection represented approximately 52% of the Fund's purported value, and a portfolio of debt and equity securities of private companies represented approximately 46% of the Fund's purported value." (*Id.*)

- "[T]he Company's goal is to achieve a high level of current income through purchases of distressed real estate notes and other assets of a distressed nature." (*Id.* ¶ 76 (quoting the Second Confidential Letter).) The SEC alleges that this statement was false and misleading because, "the Fund's holdings have been largely composed of non-income-generating assets and illiquid assets." (*Id.*)

- "[T]he fund has made investments in the gem and mineral markets. Many of these transactions are short term in nature and provide strong cash flow as well." (*Id.* ¶ 77 (quoting the Second Confidential Letter).) The SEC alleges that this statement was false and misleading because "[t]he vast majority of the gem and mineral transactions were not short term in nature and did not provide strong cash flow." (*Id.*)

- "[T]he Company is working on a number of large acquisitions [of gems and minerals], in some cases entire collections from some of the most respected collectors in the world. The company will acquire these collections at a fraction of their current value . . . The global demand for world class specimens cannot be overstated." (*Id.* ¶ 78 (quoting the Second Confidential Letter).) The SEC alleges that this statement was false and misleading because GTIF "had no reasonable expectation of acquiring, and did not acquire, large acquisitions and entire collections at a fraction of their current value." (*Id.*)

Also, potential investors and investors were provided a document entitled "Greenpoint Tactical Income Fun, LLC Business Plan" (the "Business Plan"), which was

attached to the Second Confidential Letter.  The SEC alleges this Business Plan contained

the following false and misleading statements:

- "[D]emand for the finest mineral specimens is spreading like a wild-fire throughout the world and it is imperative to acquire these assets now before truly unique, utterly rare and beautiful things are locked up in private collections completely where they are nearly impossible to acquire. . . . The upper or tip-top of mineral specimens, those being represented by less than 0.0005% of total salable specimens by quality and size, are the most sound investment as possessors get whatever price they demand for the very best in existence and get the same without delay or negotiation. It is truly a seller's market."  (*Id.* ¶ 80 (quoting the Business Plan).)  The SEC alleges that this statement was false and misleading because GTIF "had no reasonable expectation of getting, and has not gotten, 'whatever price they demand[ed] [. . .]  without delay or negotiation' in the sale of mineral specimens."  (*Id.* (quoting the Business Plan) (first alteration in original).)

- "[T]he second stance includes an allocation of fund assets to serve as a revolving line upon which the fund will arbitrage mid-range minerals in rapid succession. Typical returns of 'fast-moving' material (transactions within hours or days) realize returns of 10 - 30% but may, when purchased most advantageously, yield 100 - 300% IRR within 30 days of inception for each respective instance."  (*Id.* ¶ 81 (quoting the Business Plan).)  The SEC alleges that this statement was false and misleading because GTIF "rarely, if ever, sold gems and minerals in 'rapid succession,' in 'fast-moving transactions' 'within hours or days,' or for profits of 100-300% within 30 days of acquiring them."  (*Id.* (quoting the Business Plan).)

- "[B]y far the greatest returns on midlevel specimens can be realized through sales to collectors and dealers in China and other southeast Asian countries which currently exist in a non-contiguous bubble from American dealers (even at the very top). The fund will seek to rapidly build a database of Chinese collectors and dealers to make pieces available where no other American dealer is doing business although it is the place of highest and most rapidly increasing demand."  (*Id.* ¶ 82 (quoting the Business Plan).)  The SEC alleges that this statement was false and misleading because GTIF "never did any work to build a database of Chinese collectors and dealers."  (*Id.*)

- "[T]o facilitate the trading and acquisition goals of this stance the Fund will, once cash flow supports it, open a small sorting and clearing house operation in the Milwaukee, Wisconsin area. Contained within that space will be vaults for security, as well as a phone bank for deal coordination."  (*Id.* ¶ 83 (quoting the Business Plan).)  The SEC alleges that this statement was false and misleading because GTIF "never opened a sorting and clearing house" and "never opened a phone bank for deal coordination."  (*Id.*)

7

Hull (as Managing Director of Greenpoint Management II) and Nohl (as President of Chrysalis) also jointly drafted the primary offering document for the third offering ("Third Confidential Investment Letter"), which was issued by GTIF to prospective investors and investors from at least May 1, 2016, through February 7, 2020.  Allegedly, Hull, Nohl, Chrysalis, and Greenpoint Management II all had ultimate authority over the statements in the Third Confidential Investment Letter.

The SEC alleges that the Third Confidential Investment Letter included the following false and misleading statements:

- "Proceeds of the Offering will be used primarily for the acquisition of investments in the Company's four asset categories: 1) purchasing real assets, possibly of a distressed nature, improving and then subsequently leasing or reselling them, 2) investing in private businesses that have either high net income or the potential for high net income, 3) advancing and/or lending money secured by purchase orders (known as production factoring) and/or participating in commercial lending of other types of lending or debt transactions that are likely to produce net interest income, (4) acquiring rare minerals and precious gemstones." (*Id.* ¶ 92 (quoting the Third Confidential Investment Letter).)  The SEC alleges that these statements were false and misleading because "[a]s of June 30, 2018, the gem and mineral collection was approximately 52% of the Fund's purported value, and a portfolio of debt and equity securities of private companies, including a now-worthless position in Amiran, was approximately 46% of the Fund's purported value." (*Id.*)

- "[T]he current $40MM evaluation on Amiran Technologies was set by Amiran Technologies prior to engagement with [GTIF] and by all calculations is well below the current value given contracts, approvals and opportunities realized by Amiran Technologies in the last 6 months." (*Id.* ¶ 95 (quoting the Third Confidential Investment Letter).)  The SEC alleges that this statement was false and misleading because "'[c]ontracts, approvals and opportunities realized by Amiran in the last 6 months' did not by all calculations show that a $40 million valuation of Amiran was well below its current value." (*Id.* (quoting the Third Confidential Investment Letter).)

- "[GTIF] has made investments in the precious stone and very fine mineral markets and has amassed one of the top 5 collections of fine minerals in the world public or private according to numerous experts.  Many of these transactions are

8

short term in nature and provide cash flow as well." (*Id.* ¶ 96 (quoting the Third Confidential Investment Letter).)  The SEC alleges that this statement was false and misleading because "[f]ew of the transactions were short term in nature and few, if any, provided significant cash flow." (*Id.*)

- "[D]iscussions are underway to sell somewhere between $10MM and $30MM of the collection on a 3-7 year amortized terms to the most prominent dealer in the world who is New York City based." (*Id.* ¶ 97 (quoting the Third Confidential Investment Letter).)  The SEC alleges that this statement was false and misleading because "[a]s of May 1, 2016, [the date the letter was published,] Greenpoint Tactical Income Fund had no reasonable expectation of selling between $10 million to $30 million of minerals from its collection to one person." (*Id.* ¶ 97.)

- "[R]elationships have been developed to capitalize upon the Company's well-developed catalogue for conversion to an internet sales format within the near future." (*Id.* ¶ 98 (quoting the Third Confidential Investment Letter).)  The SEC alleges that this statement was false and misleading because GTIF's "collection was not converted to an internet sales format 'within the near future'" and "[s]ignificant pieces were never offered for sale in an internet sales format." (*Id.* ¶ 98 (quoting the Third Confidential Investment Letter).)

- "[A]ll of [GTIF's] portfolio companies are exhibiting strong growth." (*Id.* ¶ 99 (quoting the Third Confidential Investment Letter).)  The SEC alleges that this statement was false and misleading because "[a]s of the date of the Third Confidential Investment Letter, Amiran was not exhibiting strong growth. Amiran's actual 2015 revenues were approximately $3.98 million, and its net income was $100,000.  For the first quarter of 2016, Amiran's revenue was $84,990 and losses were $995,438.  Through the second quarter of 2016, Amiran's revenue was $430,049 and losses were $1,361,719." (*Id.* ¶ 99.)

## E. GTIF Purchased Gems and Fine Minerals

Between mid-2013 and early 2015, Nohl committed $21.9 million in GTIF funds to purchase gems and fine mineral specimens.  Of these, the three, most expensive specimens were purchased from "Dealer Number 1" for a combined price of $6.8 million. The written contract with that dealer required GTIF, through GP Rare Earth, to pay this amount in five bi-monthly installments between February 2015 through October 2015.

9

Because GTIF and GP Rare Earth only made some of the required payments timely, Dealer Number 1 delivered just two of the three promised specimens initially.  Ultimately, GTIF did take possession of the third specimen in February of 2019, but only after Dealer Number 1 threatened to sue and GTIF had paid a $500,000 late fee.  GTIF allegedly still owes $100,000 to that dealer related to this transaction.  Nevertheless, Nohl allegedly recorded large, unrealized gains on these three specimens, even when GTIF did not yet own, have possession of, or paid for them.  Nohl also allegedly created a "false contract" with Dealer Number 1, which is the same as the actual contract except for the addition of a handwritten statement that "time is not of the essence and all payments are best efforts." (*Id.* ¶ 65.)

### F.  Fees

GTIF has paid and continues to pay various fees to Chrysalis, Greenpoint Management II, and other entities owned by Hull and Nohl.  By virtue of their ownership of these entities, Hull and Nohl have personally received, and continue to receive, a portion of these fees, which include:

- GTIF paid and continues to pay a management fee equal to 1% of net assets under management to both Chrysalis and Greenpoint Management II, for a total of 2% of net assets under management, which includes unrealized gains.

- GTIF has reimbursed and continues to reimburse Chrysalis and Greenpoint Management II for out-of-pocket expenses.

- GTIF paid and continues to pay Chrysalis and Greenpoint Management II incentive fees of 30% of GTIF's profits, which are calculated on both realized and unrealized gains.

- Since January 1, 2018, GTIF paid and continues to pay a fee of 0.85% to H Informatics LLC (aka H Family Office) purportedly to provide information to the

Funds investors.  H Informatics is owned by Hull and a GTIF investor.  Allegedly, neither this fee nor the ownership of H Informatics was disclosed to other investors.

- Until approximately the beginning of March 2019, GTIF's accountant was employed by Alt Asset Portfolio Services, which is also owned by Hull and Nohl. In 2016, 2017, and 2018, Hull and Nohl, through Alt Asset Portfolio Services, charged GTIF approximately $100,000 more than the accountant received in compensation, which they also allegedly pocketed without disclosure to GTIF investors.

- Bluepoint allegedly also charged its clients a further fee, which was typically 1% of assets under management.

As a result of all of these charges, from April 29, 2014, through approximately March 12, 2019, GTIF allegedly paid out over $13.7 million to entities controlled or owned by Hull or Nohl.[4]  More specifically, the SEC alleges that GTIF paid:  $5,455,027 to Chrysalis; $5,898,747 to Greenpoint Asset Management II; $1,772,155 to Bluepoint; $384,977 to Alt Asset Portfolio Services; and $199,171 to H Informatics and H Family Office.  Moreover, almost all of this money allegedly came from funds invested by investors, because less than 5% of GTIF's booked returns were realized gains providing cash income.

In addition, Chrysalis and Greenpoint Management II share in 30% of GTIF's profits by virtue of their ownership of "Unit B shares," despite having contributed almost no capital to GTIF.  As managers, Hull and Nohl allegedly monetized these gains by

---

[4] Without further explanation, the SEC also alleges at one point in its amended complaint that "Since the inception of the Fund, Greenpoint Tactical Income Fund has paid approximately $14.5 million in fees and redemptions to entities controlled or owned by Hull or Nohl, including Chrysalis, Greenpoint Management II, H Informatics, and Alt Asset Portfolio Services." (*Id.* ¶ 109.) The difference between this $14.5 million figure and the $13.7 million in fees above would appear to be for "redemptions," perhaps to the monetization of so-called Unit B shares in GTIF as discussed above.  Regardless, since the basis for this difference is not material to deciding defendants' pending motion to dismiss, the court adopts the $13.7 million figure, which the SEC generally uses when referring to "fees."  (*See id.* ¶¶ 9, 102, 110.)

redeeming funds from capital accounts associated with those Unit B shares, although they have not taken redemptions since 2016 because GTIF has not had adequate liquidity.  As of June 30, 2018, the combined reported value of the capital accounts associated with the outstanding Unit B shares held by Chrysalis and Greenpoint Management II was $30 million.

### G. GTIF Financial Statements

On July 29, 2016, and July 14, 2017, GTIF distributed to its investors Independent Audit Reports, which were apparently prepared by GTIF's auditor based on the financial statements provided to him by Hull and Nohl.  Both reports state that "[m]anagement is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America." (*Id.* ¶¶ 117, 124.)

The first report was for the period February 6, 2013, through December 31, 2015, and reported:  realized gain on investments of $310,035; net unrealized appreciation on investments of $43,179.994; management fees of $1,821,381; professional fees of $271,180; and other expenses of $292,605.  The second report was for the period ended December 31, 2016, and reported realized gain on investments of $0; net unrealized appreciation on investments of $24,132,862; management fees of $1,627,957; professional fees of $789,860; interest expense of $329,965; and other expenses of $92,306.  Both reports also include a note entitled "management fee and related parties," but neither note makes mention of the loans between GTIF and related parties or the material terms of those loans.

GTIF's financial statements for the year ended December 31, 2017, have not yet been audited.  Still, unaudited accountant's compilation reports have been compiled quarterly for 2017 and 2018.  These reports indicated the following numbers:

| | Net Realized Gain from Investments | Management Fees to Managing Members | Professional Fees | Operating Expenses | Net Loss on Investments |
|---|---|---|---|---|---|
| First Quarter 2017 | $0 | $434,904.50 | $166,104.43 | $52,870.49 | $500,143.91 |
| Second Quarter 2017 | $0 | $433,755.73 | $570,762.23 | $19,341.89 | - |
| Third Quarter 2017 | $0 | $417,584.43 | $79,800.19 | $8,797.57 | - |
| Fourth Quarter 2017 | $0 | $425,493.64 | $188,880.30 | $10,987.59 | - |
| First Quarter 2018 | $0 | $483,347.32 | $250,647.02 Plus an "H Informatics fee" of $203,931.31 | $35,907.35 | $18,525,689.44 |
| Second Quarter 2018 | $0 The document also reports a "change in unrealized gains" of $8,338,707.23 | $512,771.23 | $189,839.36 Plus an "H Informatics fee" of $216,354.62 | $3,655.19 | - |
| Third Quarter 2018 | $0 The document also reports a "change in unrealized losses" of $44,497,120.98 | $331,841.90 | $368,934.60 Plus an "H Informatics fee" of $140,014.02 | $16,021.67 | - |
| Fourth Quarter 2018 | $250,090.18 The document also reports a "change in unrealized gains" of $1,204,870.64 | $337,577.55 | $392,349.73 Plus an "H Informatics fee" of $142,438.40 | $2,896.67 | - |

Each of these unaudited reports state that "[m]anagement is responsible for the accompanying financial statements of Greenpoint Tactical Income Fund LLC" and further that "[m]anagement has elected to omit substantially all of the disclosures and the statement of cash flows required by accounting principles generally accepted in the United States of America." (*Id.* ¶¶ 130, 131, 133, 134, 136, 137, 139, 140, 144, 145, 147, 148, 151, 152, 154, 155.)

### H. Alleged Self-Dealing and Undisclosed Related Party Transactions and Conflicts of Interest

The SEC alleges that Hull and Nohl, as managers of GTIF, engaged in a series of related-party transactions through their various entities, which were not disclosed to GTIF's investors or auditor.  As a result of these transactions, Hull and Nohl allegedly enriched themselves and their entities, as set forth below.

First, Hull and Nohl periodically loaned money to GTIF, allegedly charging exorbitantly high interest rates.  None of the loans were disclosed to GTIF investors or its auditor either.  The loans are summarized as follows:

| Date | Manager Lender | Loan Amount | Repayment Date (Term) | Interest Paid to Manager | Effective APR |
|------|----------------|-------------|-----------------------|--------------------------|---------------|
| 11/7/16 | Nohl | $100,000 | 11/18/16 (11 days) | $7,500 | 249% |
| 11/23/16 | Hull | $25,000 | 12/22/16 (29 days) | $1,500 | 76% |
| 12/7/16 | Nohl | $105,000 | 12/22/16 (15 days) | $15,000 | 348% |
| 12/1/17 | Nohl | $100,000 | 12/11/17 (10 days) | $2,867 | 104% |
| 3/26/18 | Nohl | $150,000 | 4/18/18 (23 days) | $1,000 | 11% |
| 6/29/18 | Chrysalis | $120,000 | 10/24/18 (117 days) | $12,905.66 | 34% |

| 7/25/18 | Nohl | $18,250 | 10/2/18 (69 days) | $2,500 | 72% |
| 7/25/18 | Nohl | $38,000 to $40,000 | 10/2/18 (69 days) | $5,459.81 - $7,459.81 | 72% to 104% |

Similarly, Hull and Nohl allegedly caused GTIF to borrow money from other Greenpoint Funds at similarly high interest rates as follows:

- On or about January 19, 2016, GTIF borrowed $750,000 from GGMF, with $50,000 interest to be paid.  Originally, the loan was due on February 29, 2016, but the due date was extended to May 31, 2017.

- On or about September 14, 2016, GTIF borrowed an additional $275,000 from GGM, with $10,000 interest to be paid.  Originally, the loan was due on October 31, 2016, but the due date was extended to May 31, 2017.

- On May 31, 2017, GTIF borrowed a third loan in the amount of $995,000.

GTIF eventually repaid these loans on or about November 20, 2018.  In each case, Hull signed the loan agreements and extensions on behalf of GGMF, while Nohl signed the documents on behalf of GTIF.  These loans (and the fact that the first two were not paid by the due dates) were also not "adequately" disclosed to GTIF's investors or auditor.[5]  Additionally, Hull made the loans without the consent or approval of all the managers of GGMF, and the loans were contrary to GGMF's stated investment strategy, which was to invest in Korean companies.

---

[5] Unlike other, related-party loans alleged above, the loans from GGMF to GTIF appear to have been at least partially disclosed.  In particular, the Independent Auditor's Report for the period ended December 31, 2016, contains a note stating that GTIF "has $1,025,000 in outstanding notes payable to Greenpoint Global Mittelstand Fund I LLC, a separate investment fund managed by one of the General Members."  (*Id.* ¶ 127.)  However, no mention is made in the report of their material terms.

Further, Hull and Nohl allegedly caused GTIF to borrow money at high interest rates from certain investors that were not disclosed to GTIF's other investors or GTIF's auditor, including:

- On April 14, 2016, "Investor Number 2" loaned GTIF $1,000,000, charging $100,000 in interest.  The loan was to be repaid in three months (resulting in an effective APR of 40%), however, on June 1, 2016, the loan and interest were converted to $1,100,000 in equity.

- On December 7, 2016, Investor Number 2 loaned GTIF $250,000.  GTIF repaid the loan thirty days later plus $30,000 in interest, resulting in an effective APR of 146%.

- On February 10, 2017, Investor Number 2 again loaned GTIF $250,000, to be repaid on April 17, 2017, with $50,000 in interest.  The due date was then extended three times, the final two extensions were in exchange for additional $25,000 interest payments.[6]  The loan was finally repaid on November 30, 2018.  Thus, GTIF paid a total of $100,000 in interest for a 658 day loan of $250,000.

Finally, Nohl and Hull allegedly engaged in other, miscellaneous insider transactions with GTIF that were not disclosed to GTIF's investors or auditor.

- On August 22, 2013, Hull borrowed $265,000 of investor funds from GTIF.  Nohl approved this loan on behalf of GTIF and was paid (through one of his entities) a $7,424 origination and underwriting fee on the loan to Hull.

- Also on August 22, 2013, Hull signed an agreement to pay Nohl a finder's fee for locating artwork that was purchased and then resold by Greenpoint Fine Art Fund.  Under that agreement, Nohl was to receive 20% of any profits Greenpoint Fine Art Fund made on the sale of any painting that Nohl found.

- On June 25, 2014, Nohl (through an entity owned by him) purchased 14 minerals from GTIF for $93,671.

---

[6] As for the second interest payment, Investor Number 2 purportedly gifted that $25,000 to his son, "Investor Number 1," who in turn directed GTIF to pay the $25,000 to one of Nohl's entities in exchange for a diamond for an engagement ring.  Thus, Nohl wrote a check to his entity from GTIF's bank account using investor funds to repay a personal debt Investor Number 1 owed to a Nohl entity.

16

- On October 11, 2016, GP Rare Earth gave Chrysalis a mineral in exchange for a credit of $12,110 against its management fees.

- On February 23, 2018, GP Rare Earth and one of Nohl's entity engaged in another mineral transaction.

- On May 23, 2018, GP Rare Earth gave a Nohl entity two minerals in exchange for a $4,750 credit.

- On September 15, 2014, an entity co-owned by Hull acquired a piano from GTIF for $58,000. The piano went to Hull's residence.

- On September 22, 2014, an entity co-owned by Hull purchased a sapphire from GP Rare Earth for $58,000. The sapphire was put into jewelry that Hull's wife wears.

### I. Valuation of Gems and Minerals

The SEC also alleges that Hull and Nohl improperly increased the valuations of some of the gems and minerals owned by GTIF and acted in violation of GTIF's operating agreements. The appraisals were generally conducted by GP Rare Earth under the control of Hull and Nohl, who then reported the appraised values to GTIF. As a result of the allegedly improper valuations described below, GTIF reported greater unrealized gains, resulting in increased management fees for Hull and Nohl, through Greenpoint Management II and Chrysalis.

#### 1. Valuation during the year acquired

Under the GTIF Amended Operating Agreement, which was in effect from November 7, 2013, through January 1, 2016, "Fair Market Value" was defined as "the value of non-current assets determined by appraisal. Provided, however, the value of any assets shall be its purchase price for the year within which it is acquired." (*Id.* ¶ 190.) However, Hull and Nohl, as managers of GTIF, periodically valued GTIF's gems and

minerals *at cost* (rather than at purchase price) during the year GTIF acquired them.  For

example:

- In 2014, Hull and Nohl had 22 of the minerals that GTIF purchased that year appraised, rather than being valued at their purchase price.  For 21 out of the 22 minerals, the appraisals assigned a higher value than the purchase price.  By using the appraised values, GTIF in turn reported unrealized gains of $4.4 million on the 21 minerals.

- In 2015, Hull and Nohl had 175 of the minerals that GTIF purchased that year appraised, rather than being valued at their purchase price.[7]  By using the appraised values, GTIF reported unrealized gains of $14.8 million on the minerals.

### 2.  Valuation process

GTIF's Independent Audit Reports (referenced above) from both the period ended

December 31, 2015, and the period ended December 31, 2016, state that:

> Fine minerals and gems are valued using third party appraisals based on underlying market driven events. . . . Observable data is generally available at market driven sales shows and special events.  These events provide public and semi-public transactions that utilized in development estimates of fair value for the portfolio of the Fund. The valuations of these investments are further evaluated throughout the year and as of the reporting date based on other market data available, generally the Fund's own transactions or semi-public information used by appraisal experts of large scale market participants.

(*Id.* ¶¶ 119, 126, 196.)  The Independent Audit Reports containing this statement was

distributed to GTIF investors, and Nohl also provided this information to GTIF's auditor.

---

[7] Included in the 175 minerals were the three mineral specimens Nohl agreed to purchase from Dealer Number 1.  Weeks after GTIF agreed to purchase those three specimens, but before GTIF had paid for or took possession of them, Hull and Nohl had them appraised for $14 million. Moreover, Hull and Nohl had GTIF record $14 million as the value of those specimens before ever taking possession, rather than the established $6.8 million purchase price.

However, most of the appraisals were allegedly performed by "Appraiser Number 1," who was hired by Nohl and whose appraisal process was "to look at a specimen for a few seconds and write down a value." (*Id.* ¶ 199.) Thus, these appraisals were neither based on underlying market driven events nor on sales data from sales shows. Further, the appraiser did not make "further evaluations" throughout the year, and Nohl allegedly knew that this was Appraiser Number 1's process.

### 3. Interference with valuations

#### a. Undisclosed transactions with Appraiser Number 2

On April 7, 2015, Nohl also allegedly made an agreement with "Appraiser Number 2" to appraise eight mineral specimens, as well as sell several minerals to GTIF for $275,000. In June of 2016, GTIF fully paid Appraiser Number 2 for the eight appraisals, who also conducted ten additional appraisals for GTIF, which resulted in GTIF recording a total of $23.1 million in assets based on these eighteen appraisals.

The GTIF Second Amended Operating Agreement, effective January 1, 2016, states: "No other business other than the business of appraising may be entered with respective appraisers." (*Id.* ¶ 207.) That GTIF was purchasing minerals from Appraiser Number 2 was not disclosed to GTIF's investors or auditor. To the contrary, Nohl falsely represented to GTIF's auditor that it did not have a relationship with Appraiser Number 2, other than as an appraiser.

### b. Rejection of Appraisals

In October of 2013, GTIF purchased a set of tourmaline gemstones for $1.2 million; in March 2015, "Appraiser Number 3" appraised the value of those gemstones at $3 million. Nohl told Appraiser Number 3 that the appraisals were unreasonably low, and so Appraiser Number 3 increased their appraised value to $6,340,730. This was not disclosed to GTIF's investors or auditor. Also, Nohl represented to GTIF's auditor that there was no impairment to Appraiser Number 3's objectivity.

### c. Cherry-picking appraised values

In August 2017, "Appraiser Number 4" appraised the same set of tourmaline gemstones at $1,546,251. In June 2016, Appraiser Number 2 had appraised the same gemstones at $8,156,100. Nohl rejected the $1,546,251 appraised value from Appraiser Number 4, he instead continued to use the $8,156,100 appraised value from 2016. This, too, was not disclosed to GTIF's investors or auditor.

In April of 2015, Nohl had several fine mineral specimens appraised by both Appraiser Number 1 and Appraiser Number 2. Appraiser Number 1 completed his appraisals, and later Appraiser Number 2 emailed Nohl the values for several of the same specimens. Nohl told Appraiser Number 2 to complete appraisals for only those specimens that he had appraised at a higher value than Appraiser Number 1. By using a combination of the higher appraised values from the two appraisers, Nohl caused GTIF to record the value of the set of specimens as $1.75 million more than if he had used Appraiser Number 2's values for all of the 14 specimens, again without disclosing to GTIF's investors or auditor.

### d. Altered appraised values

In March of 2014, Appraiser Number 1 emailed an initial list of appraised values to a mineral dealer working for Nohl. The mineral dealer working for Nohl responded via email, proposing a list of changes that would increase the appraised values of 29 of the specimens and increase the total value of all specimens by $577,864 or 34%. The final version of Appraiser Number 1's appraisal report includes all the increased values without *any* indication that the original values had been changed. This higher appraised value was reported to GTIF., also without disclosure to GTIF's investors or auditor.

In 2017, Nohl also called Appraiser Number 1 and asked him to reconsider an appraised value of $5 million that he had assigned a specimen. Appraiser Number 1 changed the value to $7.5 million, which was similarly not disclosed to GTIF's investors or auditor.

### J. Valuation of Amiran

Similarly, the SEC alleges that Hull and Nohl improperly increased the valuation of GTIF's interest in Amiran, an environmental remediation company that is now defunct. Between October 2015 and June 30, 2018, GTIF, through its wholly owned subsidiary GP Chemical, invested approximately $9 million in stock, options, and convertible notes to acquire 42% of Amiran. Both Hull and Nohl were members of Amiran's Board of Directors from at least the third quarter of 2016. At all relevant times, Hull and Nohl shared responsibility to value Amiran, including the value of GTIF's minority interest in the company. The SEC alleges that their valuations were misleading, unreasonable, lacked an objective basis, and ignored relevant, negative facts. Moreover, as a result of the specific,

21

allegedly improper valuations described below, GTIF allegedly reported greater unrealized gains, resulting in increased management fees for Hull and Nohl, through Greenpoint Management II and Chrysalis.

### 1. Initial valuation

In a GTIF Quarterly Valuation Report with an effective date of December 31, 2015, Hull and Nohl stated that (a) Amiran as a whole was valued at $40,390,533.06, and (b) GTIF's investment in Amiran was valued at $4,270,840.45.   This quarterly valuation report was distributed to investors.

Hull and Nohl based the $40 million valuation on a limited offering of 1,000 shares of Amiran's stock at a price of $4,000 per share that happened in 2010 ("2010 Offering"). If Amiran had been able to sell all of the shares at this offering price, it would have sold 10% of its stock for $4 million. The offering was conducted in anticipation of Amiran receiving a $220 million contract from the U.S. Environmental Protection Agency ("EPA"), which the prospectus for the 2010 Offering projected would result in Amiran having annual revenues of $137.5 million and net income of $39.5 million by 2015.

However, Amiran sold only about half of the shares it offered for sale, and all of the shares were sold for less than $4,000 per share.  Moreover, by May 2011, Amiran had been informed by the EPA that it would *not* receive the EPA contract.  Further, Amiran's actual 2015 revenues were only approximately $3.98 million, and its net income was only $100,000.  Despite knowing these facts, Hull and Nohl still used this same $40 million valuation as of December 31, 2015, without further disclosure in GTIF's Quarterly Valuation Report.

Additionally, when GTIF first invested in Amiran, the company's primary business was participating as a subcontractor in a pilot program to remediate oil pollution in Kuwait, but even before investing, the company's management told Nohl that: the pilot program's general contractor had not paid Amiran any money; only one of Amiran's two plants in Kuwait was operating; and the one operating plant was not meeting its mandated performance standards. Nevertheless, *none* of these facts were disclosed in GTIF's Quarterly Valuation Report upon acquisition of its interest in Amiran.

### 2. Subsequent valuations

Hull and Nohl continued to report consistent increases in the valuation of Amiran and GTIF's investment in GTIF Quarterly Reports through June 30, 2018. Each subsequent quarterly valuation was derived from the previous quarter's valuation, which was in turn based on the unsuccessful 2010 Offering and failure to win the anticipated EPA contract on which that offering was based. The quarterly valuation reports were distributed to and/or made available to investors as follows:

| Quarter Ending | Value of Investment in Amiran per GTIF Financial Statements | % Change in Investment Value | Value of Amiran per GTIF Valuation Reports | % Change in Amiran Value |
|---|---|---|---|---|
| Dec. 31, 2015 | $4,260,564 | - | $40,390,533 | - |
| March 31, 2016 | $7,032,589 | 65% | $40,390,533 | 0% |
| June 30, 2016 | $12,637,748 | 80% | $41,501,140 | 3% |
| Sept. 30, 2016 | $14,112,200 | 12% | $42,150,190 | 2% |
| Dec. 31, 2016 | $16,625,977 | 18% | $45,168,869 | 7% |
| March 31, 2017 | $18,433,549 | 11% | $46,693,666 | 3% |
| June 30, 2017 | $18,285,637 | -1% | $47,079,330 | 1% |
| Sept. 30, 2017 | $18,285,637 | 0% | $47,104,345 | 0% |
| Dec. 31, 2017 | $18,285,637 | 0% | $47,128,641 | 0% |
| March 31, 2018 | $38,516,265 | 111% | $90,800,000 | 93% |
| June 30, 2018 | $46,192,616 | 20% | - | - |

Contrary to these continuing rosy valuations, other facts became known to Hull and Nohl indicating that Amiran was actually under increasing financial distress during this same period of time, including that throughout 2016, Amiran was still not being paid for the pilot program to remediate oil pollution in Kuwait and its revenue was consistently much lower than its losses. By the end of 2016, Amiran's overall revenue was $725,000, while its losses totaled $2,700,000.

During this same period, GTIF was also frequently late in meeting its funding obligations to Amiran. In particular, on September 30, 2015, GTIF, through GP Chemical, agreed to invest $2 million in Amiran due by January 1, 2016. However, by January 15, 2016, GTIF had paid only $1 million. Apparently, instead of paying the other $1 million, GTIF gave the founder of Amiran a mineral that was purportedly worth $2.5 million in exchange for 932 shares of Amiran. And in February 2016, GTIF, again through GP Chemical, purchased six option agreements to acquire additional shares of Amiran to be paid on a schedule. These agreements each stated that "time is of the essence." (*Id.* ¶ 269.) Still, GP Chemical's payments remained consistently late, and as time went on, increasingly so. For example, for a $1,500,016.30 funding commitment that was due on June 30, 2016, GTIF through GP Chemical did not finish paying the commitment until over five months after the due date. And GP Chemical did not finish paying a $1,374,077.90 funding commitment that was due on September 30, 2016, until over 18 months later. Amiran's management regularly complained to Nohl about these late, irregular, and incomplete payments.

In addition, on November 4, 2016, the main subsidiary of Amiran took out a $1.85 million line of credit from "Bank Number 1."  Not only were Amiran and all of its other subsidiaries guarantors on this line of credit, but GTIF's entire interest in Amiran was subordinated to Bank Number 1's liens.  By mid-2017, Amiran had not only "maxed out" this $1.85 million line of credit, but it could not meet payroll and its unpaid vendors were pursuing collections.  By August 2017, the pilot program in Kuwait, for which Amiran never received any payment, had also been cancelled.

On or about September 11, 2017, representatives of Bank Number 1 had a meeting with representatives of Amiran, including Nohl and other GTIF employees.  At that meeting, Bank Number 1 advised its line of credit would not be renewed and had to be repaid when it matured on November 4, 2017.  The bank also stated that any payments deposited into Amiran's bank account at Bank Number 1 would automatically be applied to the outstanding balance on its line of credit.  After the line of credit went unpaid by the November 4, 2017, deadline and various notice of delinquencies, Bank Number 1 sent a notice of default to Amiran on December 8, 2017.

On or about March 2, 2018, Bank Number 1 next proposed a standstill agreement under which Bank Number 1 would defer legal action until at least September 30, 2018, in exchange for a $500,000 payment upfront to be followed by additional scheduled payments.  However, this agreement was never executed.  In May 2018, Nohl hired a debt workout firm to try to negotiate a settlement with Bank Number 1; on June 21, outside counsel for Bank Number 1 sent a demand letter to Amiran; then on July 5, Bank Number

1 filed suit to foreclose on its loan; and five months later, it obtained a default judgment against Amiran.  Amiran is now defunct and worthless.

Hull and Nohl knew all of the above facts as they were occurring, yet chose not disclose them in the Quarterly Valuation Reports.   Further, the Quarterly Valuation Reports contained additional statements, which the SEC also alleges were false and misleading, including that Amiran was a tier 1 contractor with both "Major Energy Company" and "Foreign Government Entity."  (Id. ¶¶ 257, 288, 308, 331 (December 31, 2015; March 31, 2016; June 30, 2016; and September 30, 2016 Quarterly Valuation Reports).)  However, at the time each of these reports were issued, Hull and Nohl knew that Amiran neither had a contract with Major Energy Company nor a Foreign Government Entity, and (to the extent a past relationship existed) had not been paid *any* money by either.

## OPINION

To survive a motion to dismiss, a complaint must at least contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In addition, claims alleging fraud are subject to the heightened pleading standard set forth in Federal of Civil Procedure 9(b), which requires a party "state with particularity the circumstances constituting fraud or mistake."  Dismissal of a complaint is also proper under Rule 12(b)(6) when the factual allegations do not "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In evaluating the sufficiency of a complaint, a court must view the record "in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). Moreover, the court's task at this point is "necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* (quoting *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997)).[8] Here, defendants argue generally that the SEC's complaint must be dismissed because it fails to state a claim upon which relief may be granted, but before the court considers the sufficiency of the SEC's allegations, two preliminary issues must be addressed.

## I.    Preliminary Matters

First, defendants argue that the SEC's complaint somehow violates the short and plain statement requirement of Rule 8, and thus, should be dismissed or, in the alternative, the court should order a more definitive statement under Rule 12(e). (Defs.' Br. (dkt.

---

[8] Defendants would propose an additional gloss on this standard, quoting in part from the Ninth Circuit's decision in *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996-97 (9th Cir. 2014), that "[a] plaintiff's complaint must do more than 'offer allegations that are merely consistent with their favored explanation but which are also consistent with' an alternative explanation indicated by the facts in the complaint; some facts 'tending to exclude the possibility that the alternative explanation is true' must be set forth." (Defs.' Br. (dkt. #47) 13). However, defendants' selective quotation is misleading at best. While *Eclectic Properties* holds that facts tending to exclude alternative explanations *may* render a plaintiff's claim plausible, it does not *require* such facts. 751 F.3d at 996-97 ("Something more is needed [to survive a motion to dismiss], *such as* facts tending to exclude the possibility that the alternative explanation is true.") (emphasis added). Indeed, the *Eclectic Properties* court specifically holds that "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint *survives* a motion to dismiss under Rule 12(b)(6)." *Id.* at 996 (emphasis added) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

#47) 11.)  However, a plaintiff only risks dismissal for failure to abide by Rule 8 if a complaint is needlessly prolix, confusing, and/or unintelligible.  *See Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 775-76 (7th Cir. 1994).  The purpose of Rule 8 is fair notice, and ensuring that a complaint is "presented with intelligibility sufficient for a court or opposing party to understand whether a valid claim is alleged and if so what it is." *Id.* at 775 (quoting *Wade v. Hopper*, 993 F.2d 1246, 1249 (7th Cir. 1993)).  Relatedly, Rule 12(e) provides that "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response."  Fed. R. Civ. P. 12(e).

Here, the SEC's complaint might be lengthy, but it contains a cohesive story that explains clearly, logically, and in detail the factual allegations against each defendant, as well as the specific legal violations asserted against that defendant.  As for the complaint's length, this is entirely appropriate given the complex nature of defendants' financial dealings, representations, and omissions spanning almost a decade.  *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008) ("For complaints involving complex litigation . . . a fuller set of factual allegations may be necessary to show that relief is plausible.").  Thus, the court will not dismiss the complaint for failure to state a shorter and plainer statement of its claims entitling the SEC to relief, and it certainly will not ask the SEC for a *more* definitive statement under Rule 12(e).

The second preliminary issue concerns what documents, if any, the court may consider among those defendants chose to attach to their motion to dismiss.  As a general rule, matters outside of the pleadings may not be considered on a motion to dismiss under

28

Rule 12(b)(6). *Santana v. Cook Cty. Bd. of Review*, 679 F.3d 614, 619 (7th Cir. 2012). However, under the incorporation by reference doctrine, documents that are referred to in the complaint and central to the claims may generally be deemed part of the pleadings, and so may be properly considered by the court. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). In the context of securities fraud actions in particular, courts have held that stock offering materials and similar information is properly considered on a motion to dismiss provided they were both publicly available to reasonable investors and referenced in the complaint. *See Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 848 (N.D. Ind. 2018) (offering statements referenced by the SEC in complaint considered part of the pleadings); *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656-57 (4th Cir. 2004) ("[A] court ruling on a 12(b)(6) motion may look to "documents or articles cited in the complaint, SEC filings, press releases, stock price tables, and other material on which the plaintiff's allegations necessarily rely."). Overall, however, the incorporation-by-reference doctrine provides only a "narrow exception"; it "is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment." *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998).

Here, defendants have attached some twenty documents to their motion. (*See* Nohl Decl., Exs. A-7 (dkt. #48).) While certain of these documents are properly considered part of the pleadings, others plainly fall outside the pleadings and will be excluded. In particular, Exhibits A, B, E, G, and H through R will be considered. Those documents consist of offering materials, valuations, and other materials that are referenced in the SEC's complaint and directly relate to alleged misrepresentations or material omissions,

29

and as such are all central to the SEC's claims.[9]  However, neither Exhibit D (an application for a search warrant and an affidavit) nor Exhibit F (a document entitled "Confidential Letter to Investors Quarter 3 2016") are even referenced in the complaint or appear to be central to the SEC's claims, and will not be considered.  As for the remaining Exhibits C, T, and S, the court finds that they should also be excluded from consideration at the pleading stage.  Exhibit C is a copy of a contract setting forth the terms of payment between GP Rare Earth and Marcus Budil (who is presumably "Dealer Number 1").  (Nohl Decl., Ex. C (dkt. #48-3).)  Exhibit S is a set of option agreements between GTIF (through GP Chemical) and Amiran.  (Nohl Decl., Ex. S (dkt. #48-19).)  Exhibit T is an agreement between GP Rare Earth and the founder of Amiran.  (Nohl Decl., Ex. T (dkt. #48-20).)  While all three of these exhibits were technically referenced in the complaint, defendants do not explain what makes them "central" to the SEC's claims of fraud, nor is their centrality apparent to the court.  Thus, they will not be considered a part of the pleadings, although defendants are free to argue their possible relevance at summary judgment or trial.

---

[9] Exhibit A is the "Q4 2015 Greenpoint Tactical Income Fund Income Strategy Fact Sheet" (Nohl Decl., Ex. A (dkt. #48-1)); the SEC alleged that this fact sheet contained misrepresentations (FAC (dkt. #33) ¶¶ 39-40)).   Exhibit B is the "Greenpoint Tactical Income Fund, LLC Second Confidential Investment Letter" (Nohl Decl., Ex. B (dkt. #48-2)); the SEC alleged that this letter contained misrepresentations (FAC (dkt. #33) ¶¶ 69-79).   Exhibit E is the "Greenpoint Tactical Income Fund, LLC Third Confidential Investment Letter" (Nohl Decl., Ex. E (dkt. #48-5)), which the SEC alleged contained misrepresentations (FAC (dkt. #33) ¶¶ 86-101).   Exhibit G is the "Greenpoint Tactical Income Fund, LLC Financial Statements for the years ended December 31, 2016" (Nohl Decl., Ex. G (dkt. #48-7)), which the SEC alleged that this document contained misrepresentations (FAC (dkt. #33) ¶¶ 122-28).  Finally, Exhibits H through R are various quarterly valuations of Amiran (Nohl Decl., Exs. H-R (dkt. #48-8 through 48-15), which the SEC alleged were false or misleading (FAC (dkt. #33) ¶¶ 245-411).

## II.     Sufficiency of the SEC's Allegations

### A. Statutory Claims

Having addressed these preliminary matters, the court turns to the central question: whether the SEC has stated any claims on which it may be granted relief. The SEC specifically alleges violations of: Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5; Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933 ("Securities Act"); and Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") and Rule 206(4)-8.

The Exchange Act, Securities Act, and Advisers Act were all "designed to eliminate certain abuses in the securities industry." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963). As defendants observe, these statutes and related rules are all anti-fraud provisions and prohibit the same general conduct, with the most relevant distinctions being to what situation or to whom they apply, as well as whether scienter is required to prove a violation. In particular, to state a claim under § 10(b) and Rule 10b-5, the SEC must establish that defendants: "(1) made a material misrepresentation or a material omission as to which [they] had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Bauer*, 723 F.3d 758, 768-69 (7th Cir. 2013) (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)).[10]   The required elements are "substantially the same" with respect to

---

[10] Unlike in a private enforcement action, "'[j]ustifiable reliance' . . . is not an element of an SEC enforcement action because Congress designated the SEC as the primary enforcer of the securities laws, and a private plaintiff's 'reliance' does not bear on the determination of whether the securities laws were violated, only whether that private plaintiff may recover damages." *SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1244 (11th Cir. 2012).

claims under § 17(a).  *Id.* at 768.  "The primary distinction between these laws is that '§ 10(b) and Rule 10b-5 applies to acts committed in connection with a *purchase or sale of securities* while § 17(a) applies to acts committed in connection with an *offer or sale of securities.*'"  *Id.* (emphases in original) (quoting *SEC v. Maio*, 51 F.3d 623, 631 (7th Cir. 1995)).  In addition, some of the claims brought by the SEC -- namely, Sections 17(a)(2) and 17(a)(3) of the Securities Act, Sections 206(2) and 206(4) of the Advisers Act, and Rule 206(4)-8 -- do not require scienter, and instead may be brought under a negligence theory.  *SEC v. Pimco Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 470 (S.D.N.Y. 2004).  However, because the court concludes below that the SEC has pleaded sufficient facts to infer scienter, which poses a higher standard, the court need not address whether negligence was adequately pled.

The SEC's remaining claims are brought under Section 206 of the Advisers Act and Rule 206(4)-8.  Section 206 "establishes 'federal fiduciary standards' to govern the conduct of investment advisers."  *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979) (quoting *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 471 n.11 (1977)).  Rule 206(4)-8 applies more specifically to conduct by investment advisers regarding pooled investment vehicles.  Again, the elements of these claims are substantially similar to the elements of claims under § 10(b), Rule 10b-5, and § 17(a).  *See SEC v. Penn*, 225 F. Supp. 3d 225, 237 (S.D.N.Y. 2016) ("The elements of a claim under Section 206 are similar to the elements of a claim under Rule 10b-5 and identical to a claim under Section 17(a) of the Securities Act.") (internal citation omitted) (citing *TAMA*, 444 U.S. at 25 n.1 (White, J. dissenting)); *SEC v. Pimco Advisors Fund Mgmt., LLC*, 341 F. Supp. 2d 454, 470 (S.D.N.Y. 2004)).

32

Because of these similarities, many courts consider claims brought under multiple of these statutes and rules together, which the court will do here.  *See, e.g., Bauer*, 723 F.3d at 768 ("[T]he district court properly treated the proscriptions contained in § 17(a), § 10(b) and Rule 10b-5 as 'substantially the same.'  We do the same.") (internal footnote and citation omitted).

### B.  Pleadings

In their pending motion to dismiss, defendants do not directly challenge the sufficiency of SEC's allegations that:  the actions in question were made in connection with the purchase, offer, and/or sale of securities; they acted as investment advisors; or they acted as investment advisors to a pooled investment vehicle.  (*See* Defs.' Br. (dkt. #47) 5 n.3, 5-10, 13-14.)  Instead, defendants focus on whether the SEC has adequately alleged material misrepresentations or omissions with the requisite scienter.  In doing so, they would dissect the SEC's allegations and question the viability of each alleged misrepresentation in isolation.  However, allegations of fraud are not to be considered in isolation; rather, even one violation of the federal securities laws is actionable in an SEC enforcement case.  *See SEC v. Morgan Keegan* & *Co.*, 678 F.3d 1233, 1248 (11th Cir. 2012).  Thus, rather than follow defendants' lead and adjudicate the viability of every alleged material misrepresentation or omission, the court will instead consider generally whether the SEC has pleaded enough facts to support their claims, while at the same time addressing defendants' principal legal arguments.

33

### C. Rule 9(b)

Under Rule 9(b) of the Federal Rules of Civil Procedure, a party who alleges fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." The Seventh Circuit has explained that this rule ordinarily requires a plaintiff to describe the "who, what, when, where, and how" of the fraud. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011). In this way, "[p]recision and some measure of substantiation" must be injected into the fraud allegations. *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016). Still, courts do not take an "overly rigid view" of the particularity requirement, which "may vary on the facts of a given case." *Pirelli*, 631 F.3d at 442. Moreover, district courts in this circuit have held that "[a] plaintiff who pleads a fraudulent scheme involving numerous transactions over a period of years need not plead specifics with respect to every instance of fraud, but [it] must at least provide representative examples." *U.S. ex rel. Grenadyor v. Ukranian Vill. Pharmacy, Inc.*, 895 F. Supp. 2d 872, 878 (N.D. Ill. 2012) (citing *Mason v. Medline Indus.*, 731 F. Supp. 2d 730, 735 (N.D. Ill. 2010)); *United States ex rel. Morgan v. Champion Fitness, Inc.*, No. 1:13-CV-1593, 2018 WL 5114124, at *3 (C.D. Ill. Oct. 19, 2018) ("[I]n cases involving lengthy fraud, courts typically require only representative examples of the fraud to be pleaded with a high level of particularity at the motion to dismiss stage . . . . The Court notes that while the Seventh Circuit appears not to have squarely considered this question, the Central District of Illinois, along with every district court in the circuit, has allowed the use of representative examples to serve as the requisite substantiation for Rule 9(b).") (citing cases).

34

Overall, as the court previously alluded, the SEC alleges a detailed, coherent narrative of fraud by Hull, Nohl, and the entities in their control.  The amended complaint describes various, allegedly false and misleading statements and omissions by specific defendants, who allegedly had ultimate authority over those statements when made, explains how they were false and misleading, and identifies the investors to whom they were communicated.  These allegations state with particularity the circumstances constituting the alleged fraud, and so meet the Rule 9(b) pleading standard.

The only argument from defendants that has any force under Rule 9(b) is the contention that the SEC failed to allege fraud adequately as it relates to Bluepoint's clients.  The main allegation brought by the SEC is that "Hull and, through him, Bluepoint made verbal false and misleading representations to Bluepoint's individual clients. . . . [by] falsely stat[ing] that investments in Greenpoint Tactical Income Fund (1) were safe, (2) would generate high returns, and (3) could be withdrawn as needed."  (Am. Compl. (dkt. #33) ¶ 42.)  The SEC further elaborates in its brief in opposition to dismissal that these alleged statements "were made during the period of time Hull and, through him, Bluepoint were advising the advisory clients to invest in the Greenpoint Funds."  (SEC Opp'n (dkt. #64) 49.)  Certainly, this allegation lacks the detail and specificity included in the SEC's other allegations of fraudulent statements.  Still, given the nature of the statements as "verbal" representations, and more importantly, the overall context of the SEC's other allegations related to Hull and the Greenpoint Funds, the court will not dismiss the claims related to Bluepoint under Rule 9(b).

35

### D. Material Misrepresentations or Omissions

A representation or omission must be either false or misleading to be actionable. *See Bauer*, 723 F.3d at 768-69.  At the pleading stage, a statement or omission is actionable if "the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission."  *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000)). "Even a statement which is literally true, if susceptible to quite another interpretation by a reasonable investor, may properly be considered misleading."  *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 878 (N.D. Ill. 2011) (citing *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)).   Here, defendants primarily argue that the SEC has not adequately alleged the falsity of their statements of valuation or forward looking statements.

### 1. Valuations

First, defendants argue that valuations are a matter of opinion, and the SEC has not met the "high standard for showing that a valuation is faulty." (Defs.' Br. (dkt. #47) 9.) Certainly, as a general proposition, any statement of valuation, including those at issue in this case, are "opinions" insofar as they cannot be definitively proven to be true or false. *Cf. Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt.*, LLC, 479 F. Supp. 2d 349 (S.D.N.Y. 2007) (observing that the valuation of a collateralized mortgage obligation "may be considerably more a statement of opinion than a report of an objectively determinable fact," as such a valuation is not a "precise science"); *CSX Transp., Inc. v. Ga. State Bd. of*

*Equalization,* 552 U.S. 9, 17 418 (2007) (explaining in a non-securities law case that "valuation is not a matter of mathematics . . . .  Rather, the calculation of true market value is an applied science, even a craft.").  Of course, that does not mean statements of valuation are never actionable.

In a recent case, the Supreme Court discussed three scenarios in which a statement of opinion may nevertheless be false or misleading under federal securities laws.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015).  The first scenario is when the speaker did not actually hold the belief when he made the statement. *Id.* at 185.  For example, a "statement about legal compliance ('I believe our marketing practices are lawful') would falsely describe [the speaker's] own state of mind if she thought her company was breaking the law." *Id.* at 185.  Second, a statement of opinion may be false or misleading if it contained embedded facts that were untrue. *Id.*  For example, the statement "I believe our TVs have the highest resolution available because we use a patented technology to which our competitors do not have access" may be read to affirm that the company uses a patented technology. *Id.*  Third, a statement of opinion, though sincerely held and otherwise true as a matter of fact, may be false or misleading if the speaker omits information whose omission makes the statement misleading to a reasonable investor. *Id.* at 194.

The Supreme Court further explained that this analysis will "always depend[] on context." *Id.* at 190.  Thus, for example, "[i]nvestors do not, and are right not to, expect opinions contained in [formal documents filed with the SEC] to reflect baseless, off-the-cuff judgments, of the kind that an individual might communicate in daily life." *Id.*  In a

case addressing the valuation of collateralized mortgage obligations, the District Court for the Southern District of New York similarly emphasized that "context is important"; if, for example, a defendant had stated that the values in all cases would be determined by a particular method, a statement of value could be an "implicit representation" that the value was determined by that method. *Fraternity Fund Ltd.*, 479 F. Supp. 2d at 362.

Here, the patently dubious basis for many of the valuations described in detail by the SEC are actionable, if true. In particular, as to the appraisals of gems and minerals, the SEC has alleged specific facts which, taken as true, involve valuations containing embedded statements of fact that were untrue. For example, the appraisal process described to GTIF's auditor and to investors was that valuations would be "based on underlying market driven events." (*Id.* ¶ 196.) However, the SEC has alleged that the ongoing valuations of gems and minerals were not in fact based on underlying market driven events. Rather, the appraisal process for Appraiser Number 1, who conducted most of the appraisals for the minerals owned by GTIF, allegedly involved looking "at a specimen for a few seconds and writ[ing] down a value." (Am. Compl. (dkt. #33) ¶ 199.) Even if this alleged appraisal method could somehow be deemed "based on underlying market driven events," the method reflects the kind of "baseless, off-the-cuff judgment[]" that an investor reasonably would *not* expect in the context of a third-party appraisal that is then relied upon in an investor fund's financial statements.

The SEC has also alleged other activity related to the gem and mineral valuation process that was both material and not disclosed to investors or GTIF's auditor. For example, defendants did not disclose that GTIF had purchased minerals from Appraiser

Number 2 during the same time period that he was conducting appraisals for GTIF.  Nor did defendants disclose that Nohl asked some appraisers to reconsider appraised values of specimens, and at least one appraiser adopted higher values because of his requests.  A reasonable jury could certainly find such omissions made the valuations misleading to a reasonable investor.

As to the valuation of Amiran, the SEC has again alleged sufficient, specific facts to find the misleading representations of value to be not just actionable, but outrageously so. Indeed, defendants allegedly failed to disclose numerous, material facts related to the valuation of Amiran.  Critically, defendants did not reveal that from the very first quarterly valuation report, which formed the foundation for all the subsequent valuation reports, the basis for estimating value was an outdated 2010 Offering that erroneously predicted Amiran would have annual, new income of $39.5 million by 2015, while its actual net income in 2015 was only $100,000.  Equally outrageous, that offering was conducted in anticipation of a $220 million EPA contract that fell through in 2011.  None of these highly material facts were disclosed by defendants despite their contemporary knowledge of them.

Although unnecessary for the SEC to proceed, other patently actionable omissions include allegations that:  (1) by mid-2017, Amiran could not meet payroll and had not paid its vendors; (2) by August 2017, the Kuwait pilot program was not only cancelled, but Amiran never received a payment for its involvement; (3) during the same period of time that Amiran was in default on a $1.85 million line of credit from Bank Number 1; and (4) defendants more than *doubled* the valuation of Amiran between the fourth quarter

of 2017 and the first quarter of 2018.  Defendants' failure to disclose any of these alleged

facts, much less *all* of them, could certainly render defendants' rosy valuations materially

misleading to a reasonable investor.

Defendants additionally argue that "a complaint pleading fraudulent misvaluation

of assets must plead what the plaintiff contends is the true valuation *and* specific facts as

to how the valuation used was incorrect, or resulted in an overstatement."  (Defs.' Br. (dkt.

#47) 9 (emphasis added).)   Defendants cite to two cases to support this dubious

proposition, but on examination neither case supports defendants' argument.  First, in *In*

*re Allied Capital Corp. Securities Litigation, Fed. Sec. L. Rep. P. 92,411,* 2003 WL 1964184

(S.D.N.Y. 2003), the court stated as follows:

> [P]laintiffs have not sufficiently pled that Allied's valuation
> policies resulted in its overvaluing some of its investments. The
> Complaint simply states plaintiffs' opinion that various
> valuations were inappropriate, and sometimes a brief reason
> for that opinion, but fails to allege what plaintiffs contend was
> the true valuation, *or* to plead specific facts indicating that
> Allied's values were incorrect, *or* how Allied's accounting policy
> caused any overstatement.

*Id.* at *4 (emphases added).  Thus, this case does not *require* an allegation as to the true

valuation; rather, it simply offers this as one way to support an allegation that a valuation

was inappropriate.

Second, in *San Leandro Emer. Medical Group Profit Sharing Plan v. Philip Morris Cos.,*

*Inc.* 75 F.3d 801 (2d Cir. 1996), defendants suggest the court held that "without [an]

allegation about true valuation, [an] allegation of falsity [is] not supported."  (Defs.' Br.

(dkt. #47) 42.)  In *San Leandro*, however, the Second Circuit actually held that plaintiffs

failed to plead sufficient allegations demonstrating the falsity of the statements made by

defendant in that case.  75 F.3d at 812.  Specifically, plaintiffs had alleged that defendant misrepresented that retail sales were declining at a rate of 2.5%, based on an allegation that three weeks later it was shown that retail sales were declining at a rate of 8.3%.  *Id.*  Thus, the court held that plaintiffs:  were making a false comparison between these numbers, failed to show that defendants' statements were not based on facts then available to the company, and did not show defendants lacked a reasonable basis for their predictions.  *Id.* at 812-13.  What this case simply does *not* hold is that a plaintiff must plead an alternate valuation to establish falsity, and defendants' counsel's representation otherwise borders on the sanctionable.

Regardless, other courts have expressly held that that it is *not* necessary to quantify the alleged overstatements in value to be actionable.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F.Supp.2d 429, 467 (S.D.N.Y.2005) (a plaintiff need not "precisely quantify the amount by which financial statements were overstated"); *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 519 (S.D.N.Y. 2011) (same); *SEC v. Mannion*, 2013 WL 1291621, *10 (N.D. Ga. Mar. 25, 2013) ("Defendants do not cite, and the Court is not aware of, any authority holding that the Commission is required to prove the correct value of Side Pocket in order to demonstrate, as a threshold matter, that Defendants' ascribed value was inflated.").  Of course, as discussed below, the SEC must still prove that the defendants represented valuations that were *materially* overstated to a reasonable investor (or at least omitted information that would materially affect a reasonable investor's confidence in those valuations).

41

### 2.  Statements of Intent

Next, defendants argue that many of the allegedly false or misleading statements identified by the SEC were merely statements of intent.  (Defs.' Br. (dkt. #47) 10.)  At the outset, it must be noted that the case cited by defendants to support this argument was a private action brought under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78 et seq.  (*See* Defs.' Br. (dkt. #47) 10 (citing *In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767 (S.D. Tex. 2012)).)  The PSLRA "establishes a 'safe harbor' protecting a forward-looking statement from liability where such a statement is made by a natural person, unless plaintiffs prove that it was made with actual knowledge that the statement was false and misleading."  *In re BP p.l.c.*, 852 F. Supp. 2d at 789.  However, the PSLRA "limitation of liability for forward-looking statements . . . applies only in private actions, not enforcement actions brought by the SEC."  *SEC v. e-Smart Techs.*, Inc., 31 F. Supp. 3d 69, 83-84 (D.D.C. 2014) (quoting *SEC v. U.N. Dollars Corp.*, No. 01–9059, 2003 WL 192181, at *2 (S.D.N.Y. Jan. 28, 2003)).

Of course, even outside of the safe harbor of the PSLRA, a forward-looking statement or prediction may not be actionable if those statements had a reasonable basis when made.  *See Eckstein v. Balcor Film Inv'rs*, 8 F.3d 1121, 1132 (7th Cir. 1993).  As the Seventh Circuit explained in *Eckstein*, "an inability to foresee the future does not constitute fraud, because the securities laws approach matters from an *ex ante* perspective."  *Id.* (internal quotation and alteration omitted).  However, many of defendants' alleged forward-looking statements at issue in this case do not shield them from liability because the SEC also alleges facts demonstrating that they lacked any reasonable basis when made.

42

*See SEC v. Ustian*, 229 F. Supp. 3d 739, 767 (N.D. Ill. 2017); *SEC v. Merchant Capital, LLC,* 483 F.3d 747, 769 (11th Cir. 2007) (holding that statements were misleading when the materially unfavorable events had already occurred when the optimistic statements were made). Especially with respect to the period involving the third stock offering, the SEC plausibly alleges that many of the "planned" investments had already been all but abandoned. Finally, many of the allegedly false and misleading statements identified by the SEC in its amended complaint were demonstrably false and misleading statements about the *present* condition of GTIF and its underlying assets or, at minimum, had become so during the span of the third offering and subsequent quarterly report without defendants disclosing those facts.[11]

### E.  Materiality

As noted, even if a statement is found to be false or incomplete, liability still does not automatically attach. *See Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). This is because only "material" omissions or misstatements violate the law. *See Rowe v. Maremont Corp.*, 850 F.2d 1226, 1232-33 (7th Cir. 1988). Materiality exists "if a substantial likelihood exists that a reasonable investor would find the omitted or misstated fact significant in deciding whether to buy or sell a security, and on what terms to buy or sell." *Id.* In other words, an omission or misstatement is material "if it is substantially likely that a reasonable investor would have viewed the omitted or misstated fact as significantly

---

[11] Again, the allegations related to Bluepoint, especially such allegedly false statements as the Greenpoint funds "were safe," may ultimately not proceed past summary judgment, but at this point the SEC has alleged facts permitting a reasonable inference that the Funds were *not* safe.

altering the 'total mix of information made available.'" *Id.* (quoting *Basic,* 485 U.S. at 232). Thus, the purpose of the materiality requirement is "to filter out essentially useless information that a reasonable investor would not consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision." *Basic,* 485 U.S. at 234.

Assessing the materiality of an omission or misstatement is a "fact-specific inquiry." *Id.* at 240. As such, "a materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Marks v. CDW Computer Centers, Inc.,* 122 F.3d 363, 370 (7th Cir. 1997); *see also McGrath v. Zenith Radio Corp.,* 651 F.2d 458, 466 (7th Cir.1981) (noting that materiality is a question particularly for the trier of fact); *Rowe*, 850 F.3d at 1234 (same). Still, if the alleged omissions or misstatements are so obviously unimportant to an investor that reasonable minds would not differ on the question of materiality, then the issue may be appropriately resolved as a matter of law. *See TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 450 (1976).

Here, among many other allegations, the SEC has pleaded that investors were not appraised of (1) the financial difficulties threatening Amiran's ability to remain a going concern or (2) the questionable appraisal methods for GTIF's gem and mineral holdings. Given that the value of GTIF's minority interest in Amiran and gems/minerals combined to make up most of GTIF's reported returns, the court is in no position to conclude as a matter of law on the pleadings that these omissions were obviously unimportant to an investor. Still, the court addresses defendants' principal arguments related to materiality below.

44

As an initial matter, defendants argue that "full and complete disclosures were made to investors prior to their investments, meaning that these supposed misrepresentations are immaterial."  (Defs.' Br. (dkt. #47) 18.)  As an example, they point to the Second Confidential Letter, which states "Risk Factors[:] Substantial."  (*Id.* (quoting Nohl Decl., Ex. B (dkt. #48-2).)  The letter additionally lists a number of general risk factors, such as the disclaimer that GTIF operates in a highly competitive market" and "may not be able to compete effectively."  (Nohl Decl., Ex. B (dkt. #48-2) 4-6.)  But this list of risks and general disclaimer fails to address or include the omitted facts that the SEC persuasively claims a reasonable investor would consider relevant, such as the related-party transactions, dubious appraisals, or Amiran's various financial problems.  Certainly, defendants do not persuasively show that these broad warnings made investors aware of all of the specific, significant facts calling into question GTIF's actual business practices or basis to question the actual value of and its holdings.

Relatedly, defendants fault the SEC for quoting "documents selectively in ways that materially changed or obscured their meanings."  (Defs.' Br. (dkt. #47) 61.)  Rather than attempt to adjudicate the specific allegations criticized by defendants on the pleadings, however, the court finds for reasons already amply explained in this opinion that consideration of the full text of the documents does not fundamentally alter the SEC's claims.  Regardless, as previously explained, a thorough review of the materiality of those alleged misrepresentations and omissions is appropriate at summary judgment in the context of all the undisputed facts, rather than on a motion to dismiss.

Finally, defendants argue that many of the questionable transactions relied upon by the SEC represent only a small fraction of GTIF's total assets, and thus, are immaterial as a matter of law.  (*See* Defs.' Br. (dkt. #47) 6, 34, 35-37, 40.)  In particular, defendants note that the SEC has addressed the appropriate use of numerical benchmarks in assessing materiality in a staff accounting bulletin:

> The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that -- without considering all relevant circumstances -- a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material. . . .  But quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations.

SEC Staff Accounting Bulletin ("SAB") No. 99, 64 Fed. Reg. at 45,151.  Of course, SAB No. 99 is not binding authority.  *See Christensen v. Harris County*, 529 U.S. 576, 586-88 (2000) (explaining that interpretations contained in opinion letters which are not the result of a formal adjudication or notice-and-comment process lack the force of law). Nevertheless, these bulletins "constitute a body of experience and informed judgment," and so may serve as persuasive authority to the extent that it is well-reasoned and consistent with existing law.  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  Indeed, the Seventh Circuit has cited with approval SAB No. 99, noting the "potential utility" of a 5% yardstick as to materiality, while stressing that this benchmark is a "rule of thumb" and not a "rule of law."  *Higginbotham v. Baxter Int'l, Inc.,* 495 F.3d 753, 759 & n.1 (7th Cir. 2007) (citing SAB No. 99).

Even if such a benchmark were relevant, however, defendants' argument fails as the complaint considered as a whole allows a reasonable inference that the portion of the assets affected by defendants' alleged fraud is far greater than a 5% rule of thumb. Indeed, the SEC alleges that *95%* of GTIF's purported gains were both unrealized and "largely fictitious." (Am. Compl. (dkt. #33) ¶ 5.) It further alleges that defendants used improper valuations to charge GTIF excessive management and other fees, amounting to approximately $13.7 million. (*Id.* ¶ 9, 110.) While defendants would isolate certain alleged transactions, then argue that they should be dismissed because they involve an immaterially small percentage of GTIF's total assets, (*see* Defs.' Br. (dkt. #47) 34, 35-37, 40), materiality is properly considered in light of "*all* the information available to the hypothetical reasonable investor," *SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1248 (11th Cir. 2012) (emphasis in original), and thus it is not proper to argue that certain misstatements are immaterial in isolation.

Here, the SEC effectively alleges a fraudulent plan or scheme to create the illusion of GTIF's growing assets through a series of false and misleading transactions, while draining the company of its investors' cash contributions, creating a proverbial house of cards that would inevitably collapse, which it apparently did. Whatever the truth may be, these allegations are enough for the SEC to proceed past the pleading stage.

### F.  Scienter

Scienter under the relevant securities laws is the mental state requirement embracing an "intent to deceive, manipulate, or defraud" *or* to act in "reckless disregard of the truth." *Bauer*, 723 F.3d at 775 (internal citations omitted). Where an individual acts

within the scope of his position as a corporate principal, his alleged scienter can be imputed to the corporate entity. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 603 (7th Cir. 2006), *vacated and remanded on other grounds,* 551 U.S. 308 (2007). Here, Hull and Nohl -- in their individual positions *and* as principals of defendants Chrysalis, Greenpoint Management II, GTIF, Bluepoint, and GP Rare Earth -- allegedly knew of the falsity and misleading nature of the statements and omissions, or at least acted with reckless disregard for the truth. Accordingly, the SEC's allegations have sufficiently shown that all defendants acted either with an intent to deceive or a reckless disregard of the truth.

### G. Disgorgement

Finally, in the original motion, defendants argued that the SEC's claim for disgorgement should be dismissed. However, after briefing was completed, the Supreme Court decided *Liu v. SEC*, 591 U.S. ___ (2020), which addressed when the SEC may obtain disgorgement awards in judicial enforcement actions. In light of this decision, defendants withdrew this argument. (*See* Defs.' Supp. (dkt. #70).)

ORDER

IT IS ORDERED that:

1) Defendants' motion to dismiss plaintiff's first amended complaint (dkt. #46) is DENIED.

2) Defendants' motion to dismiss plaintiff's initial complaint (dkt. #16) is DENIED AS MOOT in light of plaintiff's first amended complaint.

Entered this 24th day of February, 2021.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge