# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

_____

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.  19-cv-809 |
| BLUEPOINT INVESTMENT COUNSEL, LLC, MICHAEL G. HULL, CHRISTOPHER J.  NOHL, CHRYSALIS FINANCIAL LLC, GREENPOINT ASSET MANAGEMENT II LLC, GREENPOINT TACTICAL INCOME FUND LLC and GP RARE EARTH TRADING ACCOUNT LLC, | ) ) ) ) ) ) ) ) ) | Hon. William M. Conley |
| Defendants. | ) | |

## PLANTIFF'S BRIEF IN SUPPORT OF REMEDIES

## TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………… 1

FACTUAL BACKGROUND………………………………………………………... 2

ARGUMENT…………………………………………………………………… 8

I.  THE COURT SHOULD PERMANENTLY ENJOIN DEFENDANTS…………... 9

    A.  The Relevant Factors Favor Entry of an Injunction Against Future Violations…………………………………………………………………. 9

    B.  The Court Should Enter a Conduct-Based Injunction……………………... 14

II.  DEFENDANTS SHOULD BE ORDERED TO PAY DISGORGEMENT AND PREJUDGMENT INTEREST, AND SHOULD BE HELD JOINTLY AND SEVERALLY LIABLE…………………………………………………………… 16

    A.  Defendants Should Disgorge Their Ill-Gotten Gains Plus Prejudgment Interest, Totaling $19,835,237............................................................... 16

    B.  Defendants are Subject to Joint and Several Liability…………………… 21

    C.  Defendants Should Not Be Allowed to Deduct Expenses……………… 22

III.  HULL, NOHL, GAM II, CHRYSALIS FINANCIAL AND BLUEPOINT SHOULD BE ORDERED TO PAY CIVIL PENALTIES……………………..... 26

CONCLUSION………………………………………………………………….. 30

## Table of Authorities

**Cases**

*Ernst & Ernst v. Hochfelder,*
 425 U.S. 185 (1976) .................................................................................................................. 1

*JCC, Inc. v. CFTC,*
 63 F.3d 1557 (11th Cir. 1995) ............................................................................................... 29

*Kokesh v. SEC,*
 137 S. Ct. 1635 (2017) ........................................................................................................... 17

*Liu v. SEC,*
 140 S. Ct. 1936 (2020) ..................................................................................................... *passim*

*Power v. Summers,*
 226 F.3d 815 (7th Cir. 2000) .......................................................................................... 10, 14

*SEC v. Abernathy,* 11-cv-00580,
 2012 WL 7679270 (W.D. Mich. Nov. 30, 2012) ........................................................... 13-14

*SEC v. Alanar, Inc.,* No. 05-cv-1102,
 2008 WL 1994854 (S.D. Ind. May 6, 2008) ....................................................................... 18

*SEC v. Am. Growth Funding II, LLC,* No. 16-cv-828,
 2019 WL 4623504 (S.D.N.Y. Sept. 24, 2019) ................................................................... 12

*SEC v. Bernath,* No. 15-cv-485,
 2017 WL 527662 (W.D.N.C. Feb. 8, 2017) .................................................................... 17-18

*SEC v. Berrettini,*
 218 F. Supp. 3d 754 (N.D. Ill. 2016) .................................................................................. 26

*SEC v. Bronson,* No. 12-cv-6421,
 2022 WL 1287937 (S.D.N.Y. Apr. 29, 2022) ................................................................. 21-22

*SEC v. Brown,*
 579 F. Supp. 2d 1228 (D. Minn. 2008) ............................................................................... 12

*SEC v. Capital Sols. Monthly Income Fund, LP,*
 818 F.3d 346 (8th Cir. 2016) ................................................................................................. 8

*SEC v. Church Extension of Church of God, Inc.,*
 429 F. Supp. 2d 1045 (S.D. Ind. 2005) ...................................................................... 9, 10, 29

*SEC v. Clay Capital Mgmt.,* No. 11–cv–05020,
 2013 WL 5946989 (D.N.J. Nov. 6, 2013) ........................................................................... 26

*SEC v. Cook,* No. 13–cv–01312,
 2015 WL 5022152 (S.D. Ind. Aug. 24, 2015) ................................................................ 26, 28

*SEC v. Durham,* No. 11-cv-00370,
 2017 WL 3581640 (S.D. Ind. Aug. 18, 2017) ..................................................................... 29

*SEC v. E- Smart Techs., Inc.*,
  139 F. Supp. 3d 170 (D.D.C. 2015) ................................................. 28

*SEC v. Faulkner,* No. 16-cv-1735,
  2021 WL 75551 (N.D. Tex. Jan. 8, 2021) ................................. 16, 17, 18

*SEC v. Fowler*,
  6 F.4th 255, 267 (2d Cir. 2021) ......................................................... 23

*SEC v. Fowler*,
  440 F. Supp. 3d 284 (S.D.N.Y. 2020), *aff'd in relevant part*, 6 F.4th 255 (2d Cir. 2021) ............ 13, 17

*SEC v. Frohling*,
  851 F.3d 132 (2d Cir. 2016) ............................................................. 8

*SEC v. Ginsburg*,
  362 F.3d 1292 (11th Cir. 2004) ........................................................ 13

*SEC v. Global Telecom Services*,
  325 F. Supp. 2d 94 (D. Conn. 2004) ................................................. 12

*SEC v. Goulding*,
  40 F.4th 558 (7th Cir. 2022) ................................................... 10, 14, 23

*SEC v. Griffithe,* No. 20-cv-00124,
  2021 WL 6551385 (C.D. Cal. Nov. 18, 2021) ................................. 23-24

*SEC v. Haligiannis*,
  470 F. Supp. 2d 373 (S.D.N.Y 2007) ................................................ 28

*SEC v. Holschuh*,
  694 F.2d 130 (7th Cir. 1982) ......................................................... 9, 10

*SEC v. Janus Spectrum LLC,* Nos. 17-17042, 18-15403,
  2020 WL 3578077 (9th Cir. July 1, 2020) ....................................... 21

*SEC v. Koenig*,
  557 F.3d 736 (7th Cir. 2009) ............................................................ 18

*SEC v. Koester*,
  13 F. Supp. 3d 928 (S.D. Ind. 2014) ................................................. 10

*SEC v. Lek Sec. Corp.,* No. 17-cv-1789,
  2020 WL 1316911 (S.D.N.Y. Mar. 20, 2020) ................... 18, 26, 27, 28

*SEC v. Levine*,
  279 F. App'x 6 (D.C. Cir. 2008) ........................................................ 9

*SEC v. Levine*,
  517 F. Supp. 2d 121 (D.D.C. 2007) ................................................... 18

*SEC v. Lipson*,
  278 F.3d 656 (7th Cir. 2002) ......................................................... 8, 28

*SEC v. Locke Capital Mgmt., Inc.*,
794 F. Supp. 2d 355 (D.R.I. 2011) .................................................................. 28

*SEC v. Lorin*,
76 F.3d 458 (2d Cir. 1996) ...................................................................... 11-12, 13

*SEC v. Manor Nursing Ctrs., Inc.*,
458 F.2d 1082 (2d Cir. 1972) .................................................................. 16-17

*SEC v. Merchant Capital LLC*,
486 F. App'x 93 (11th Cir. 2012) .............................................................. 17, 18

*SEC v. Mizrahi*, 19-cv-2284,
2020 WL 6114913 (C.D. Cal. Oct. 5, 2020) ................................................ 25

*SEC v. Moran*,
944 F. Supp. 286 (S.D.N.Y. 1996) ............................................................. 14

*SEC v. Navellier & Assocs., Inc.*, No. 17-cv-11633,
2021 WL 5072975 (D. Mass. Sept. 21, 2021) ............................................ 17

*SEC v. Opulentica, LLC*,
479 F. Supp. 2d 319 (S.D.N.Y. 2007) ........................................................ 12

*SEC v. Owings Group, LLC*, 18-cv-2046,
2021 WL 1909606 (D. Md. May 12, 2021) .................................................. 25

*SEC v. Palmisano*,
135 F.3d 860 (2d Cir. 1998) ................................................................... 26-27

*SEC v. Razmilovic*,
738 F.3d 14, 21 (2d Cir. 2013) .................................................................. 23

*SEC v. Savino*, No. 01-cv-2438,
2006 WL 375074 (S.D.N.Y. Feb. 16, 2006), *aff'd in relevant part*, 208 F. App'x 18 (2d Cir. 2006).  12

*SEC v. Savoy Indus., Inc.*,
587 F.2d 1149 (D.C. Cir. 1978) ................................................................. 13

*SEC v. Sekhri*, No. 98-cv-2320,
2002 WL 31100823 (S.D.N.Y. July 22, 2002) ........................................... 12

*SEC v. Slowinski*, No. 19-cv-03552,
2020 WL 7027639 (N.D. Ill. Nov. 29, 2020) .......................................... 18, 25

*SEC v. Smith*, No. 20-cv-1056,
2020 WL 6712257 (C.D. Cal. Oct. 19, 2020) ............................................. 23

*SEC v. Team Resources, Inc.*, No. 15-cv-1045,
2022 WL 463390 (N.D. Tex. Feb. 15, 2022) .............................................. 25

*SEC v. Tourre*,
4 F. Supp. 3d 579 (S.D.N.Y. 2014) ............................................................. 9

*SEC v. U.S. Env't, Inc.,* No. 94-cv-6608,
2003 WL 21697891 (S.D.N.Y. July 21, 2003) ........................................................ 12-13

*SEC v. Warren,*
534 F.3d 1368 (11th Cir. 2008) ......................................................................... 17

*SEC v. Wealth Strategies Partners, LLC,* No. 14-cv-2427,
2019 WL 2504600 (M.D. Fla. May 17, 2019) ...................................................... 17

*SEC v. Zenergy Int'l, Inc.,* No. 13-CV-5511,
2016 WL 5080423 (N.D. Ill. Sept. 20, 2016) ...................................................... 27

**Federal Statutes and Regulations**

17 C.F.R. § 240.10b-5 [Rule 10b-5 of the Exchange Act] ........................................... 1

15 U.S.C. § 77q(a) [Sec. 17(a) of the Securities Act] ........................................... 1, 17

15 U.S.C. § 77t(b) [Sec. 20(b) of the Securities Act] ............................................... 9

15 U.S.C. § 77t(d) [Sec. 20(d) of the Securities Act] .................................... 9, 27, 28

15 U.S.C. § 78j(b) [Sec. 10(b) of the Exchange Act] ........................................... 1, 17

15 U.S.C. § 78u(d) [Sec. 21(d) of the Exchange Act] ................................ 9, 16, 17, 27

15 U.S.C. § 80b-6 [Sec. 206 of the Advisers Act] ................................................. 17

15 U.S.C. § 80b-9(d) [Sec. 209(d) of the Advisers Act] ........................................... 9

15 U.S.C. § 80b-9(e) [Sec. 209(e) of the Advisers Act] ................................... 27, 28

26 U.S.C. § 6621 ............................................................................................. 18

28 U.S.C. § 2462 ............................................................................................. 26

**Other**

www.sec.gov/files/civil-penalties-inflation-adjustments_1.pdf ................................ 27

## INTRODUCTION

On August 2, 2022, after a six-day trial, the jury in this case returned a verdict finding all Defendants liable on nine counts alleging violations of multiple antifraud provisions of the Securities Act of 1933 ("Securities Act"), the Securities Exchange Act of 1934 ("Exchange Act"), and the Investment Advisers Act of 1940 ("Advisers Act").  The evidence at trial showed that Defendants defrauded investors over the span of almost seven years by, among other things, overvaluing fund assets to inflate their compensation, misleading investors about current income, returns, and managing risks, and engaging in rampant undisclosed self-dealing.  In particular, the jury found that all of the Defendants, including Michael Hull ("Hull"), Christopher Nohl ("Nohl"), Bluepoint Investment Counsel, LLC ("Bluepoint"), Chrysalis Financial LLC ("Chrysalis Financial"), Greenpoint Asset Management II LLC ("GAM II"), Greenpoint Tactical Income Fund ("GTIF"), and its subsidiary, GP Rare Earth ("GPRE"), violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 10b-5], and Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)], each of which required a finding that Defendants acted with scienter.  In other words, the jury has already concluded that the Defendants acted with "intent to deceive, manipulate or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  The question now before the Court is how much Defendants should have to pay for defrauding investors, as well as what other remedies the Court should put in place to protect both investors in GTIF and also the investing public in light of the Defendants' extremely serious misconduct.

The SEC requests that the Court impose the following remedies as a result of Defendants' fraudulent conduct: (1) permanent injunctive relief prohibiting all Defendants from future violations of the federal securities laws for which they were found liable at trial; (2) conduct-

based injunctions against all Defendants permanently enjoining them from participating in the issuance, purchase, offer, or sale of any security and/or managing or liquidating Defendant GTIF and its subsidiaries; (3) disgorgement of ill-gotten gains of $15,622,889 as to all Defendants on a joint and several basis determined by a reasonable approximation of the profits causally connected to the violations, along with prejudgment interest of $4,212,349, for a total of $19,835,237; and (4) civil penalties of $10 million apiece against Hull and Nohl and penalties of $1 million apiece against Chrysalis Financial, GAM II, and Bluepoint.

## **FACTUAL BACKGROUND**

While Defendants Hull and Nohl may or may not have commenced with a plan to make money legitimately when they first conceived the idea of organizing Defendant GTIF, the evidence adduced at trial showed that they began defrauding investors almost as soon as GTIF began operations.

In the offering materials for GTIF, Defendants represented to investors that GTIF was an "income" fund.  (*See, e.g.,* Exs. 1, 2.)  But this assertion was not true.  From the outset, GTIF produced only negligible income, buying gems and minerals and holding them without any significant sales.  (*See* 7/25/2022 p.m. Pietrantonio Test., Tr. at 39, 52; 7/25/2022 p.m. Kirchen Test., Tr. at 172-73; Ex. 54.)  Virtually all of GTIF's incoming cash flow was new investor money.  (*See* 7/25/2022 p.m. Pietrantonio Test., Tr. at 52; 7/25/2022 p.m. Kirchen Test., Tr. at 172-73; Exs. 54, 43, 57-68, 321.)  Already in 2013, Defendants began paying themselves, and funding investor redemption requests, with new investor money.  (*See* 7/25/2022 p.m. Pietrantonio Test., Tr. at 38; 7/25/2022 p.m. Kirchen Test., Tr. at 174.)  These Ponzi-type payments continued through 2014, into 2016, and beyond.  (*See* 7/25/2022 p.m. Pietrantonio

Test., Tr. at 52; 7/26/2022 a.m. Kirchen Test., Tr. at 9-10; 7/26/2022 a.m. Constance Test., Tr. at 84-88; Exs. 30-31, 35, 37.)

Defendants began misleading investors about current income as early as 2013 and continued their deception throughout the ensuing years, right up through the time that the SEC filed this case in 2019.  (*See* 7/26/022 p.m. Hallick Test., Tr. at 143-44; 7/27/2022 a.m. Hallick Test., Tr. at 14-15; 7/25/2022 p.m. Schneider Test., Tr. at 73-74, 81-82; Exs. 1, 2, 13-21, 24, 27.) In unrebutted testimony, accountant Pam Kirchen ("Kirchen") testified that she warned Nohl and Hull that it was misleading to tout current cash flow when GTIF had only negligible income apart from new investor money.  (*See* 7/25/2022 p.m. Kirchen Test., Tr. at 182; 7/26/2022 a.m. Kirchen Test., Tr. at 8-11, 13-17; Exs. 24, 106.)  Kirchen also repeatedly warned Nohl about her concerns with GTIF making Ponzi payments, minimizing the risks associated with investing, and making intercompany loans.  (*See* 7/25/2022 p.m. Kirchen Test., Tr. at 183-84; 7/26/2022 a.m. Kirchen Test., Tr. at 8-11, 20-21, 32.)  Nohl and Hull met to discuss Kirchen's concerns, but made a conscious choice to continue with their deceptive statements about current cash flow despite Kirchen's warnings.  (*See* 7/26/2022 a.m. Kirchen Test., Tr. at 11-13; 8/1/2022 Hull Test., Tr. at 133-40; Ex. 24.)  They then fired Kirchen despite Hull admitting that her work product was "excellent."  (*See* 7/26/2022 a.m. Kirchen Test., Tr. at 34-35; 8/1/2022 p.m. Hull Test., Tr. at 140-41.)

Defendants falsely claimed that GTIF was invested in diversified assets.  (*See* 7/25/2022 p.m. Ewens Test., Tr. at 126-28; 7/25/2022 p.m. Schneider Test., Tr. at 75-76; Exs. 1, 2, 8, 13-21.)  The truth, however, was that over 80 percent of GTIF's investments were concentrated in two assets: the gem and mineral collection and Amiran Technologies LLC ("Amiran" or

"Amiran Technologies").  (*See* 7/26/2022 a.m. Constance Test., Tr. at 67-71; 7/27/2022 p.m. O'Connor Test., Tr. at 53; Exs. 43, 57-67, 322.)

Hull falsely assured investors that he and Nohl managed the risks of investing in GTIF. (*See* 7/26/2022 p.m. Hallick Test., Tr. at 133, 145; 7/25/2022 p.m. Ewens Test., Tr. at 128; 7/25/2022 p.m. Schneider Test., Tr. at 75-76, 84-85, 120; Exs. 13-21.)  In letters to investors, Hull downplayed the risks associated with investing in GTIF, claiming that investing in GTIF was "safe" and that he and Nohl were "particularly good at assessing risk and either avoiding it completely, or controlling it."  (*See, e.g.,* Ex. 21.)  When investors asked about risks, Hull dissuaded them from being concerned by going so far as to discourage them from reading the offering documents' risk disclosures and referring to the disclosures as "boilerplate" and "legal speak" and saying he had only included them to comply with SEC requirements.  (*See* 7/26/2022 p.m. Hallick Test., Tr. at 150; 7/25/2022 p.m. Schneider Test., Tr. at 84, 120; Ex. 28.)

Defendants likewise began misleading investors about appreciation of assets as early as 2013 and continued that deception throughout the ensuing years, right up through 2019.  (*See* 7/26/2022 p.m. Hallick Test., Tr. at 143-45; 7/27/2022 a.m. Hallick Test., Tr. at 13-14, 16, 18-19; 7/25/2022 p.m. Ewens Test., Tr. at 142-43; 7/25/2022 p.m. Schneider Test., Tr. at 73, 90-91; Exs. 51-53.)  Despite claims that GTIF was generating enormous returns, it was actually losing millions of dollars in cash – over $11.4 million between 2014 and 2018.  (*See, e.g.,* 7/27/2022 p.m. O'Connor Test., Tr. at 63-65; Ex. 254.)

Hull promised investors that when they were investing, that they could withdraw their money.  But when investors requested redemptions, Defendants routinely refused to grant redemptions, with Hull often "ghosting" investors and giving them "the Heisman."  (*See*

4

7/26/2022 p.m. Hallick Test., Tr. at 134-35; 7/25/2022 p.m. Ewens Test., Tr. at 124, 146, 152; Exs. 20, 30-31, 36, 44.)

The undisclosed self-dealing which came to characterize their management of GTIF began as early as August 2013, with the mortgage loan from GTIF to Hull and the origination fee paid to Nohl through Ace Capital.  (*See, e.g.,* Ex. 70.)  While this transaction may have been listed as a line item in a 2013 financial statement prepared by William Matthews (*see* Ex. 54), there was no evidence that this statement was ever produced to investors and the undisputed evidence showed that Erick Hallick, one of the fund's first investors, was unaware of this transaction.  (*See* 7/26/2022 p.m. Hallick Test., Tr. at 153.)  Also in 2013, Hull and Nohl received an undisclosed finder's fee totaling $580,000 for the purchase of the Splash Waterfall painting.  (*See* 7/26/2022 p.m. Hallick Test., Tr. at 137-40; 7/29/2022 p.m. Nohl Test., Tr. at 66-67; Ex. 100.)  In another example, GTIF took an undisclosed loan from an investor, and then made an undisclosed $25,000 payment to Nohl to extend the term of that loan to purchase a diamond for an engagement ring for the investor's son.  (*See* 7/27/22 a.m. Houden Test., Tr. at 77-78; 7/29/22 p.m. Nohl Test., Tr. at 35-37; Exs. 85-87.)

Given GTIF's constant need for cash, Defendants also engaged in extensive undisclosed self-dealing in the form of loans made to GTIF by Hull, Nohl, Chrysalis Financial, and other Greenpoint Funds controlled by Hull.  (*See, e.g.,* Exs. 75, 79, 90-91, 93-98, 329.)  Many of these loans paid Defendants exorbitant interest rates, including a 4-day loan from Nohl and his wife to GTIF that resulted in GTIF paying them $7,500 in interest, resulting in an annual effective interest rate of approximately 684%.  (*See* 7/27/2022 p.m. O'Connor Test., Tr. at 56-57; Ex. 75.)  Hull further profited by having two entities that he owned and/or controlled – H Informatics LLC ("H Informatics") and H Family Office – provide services to GTIF beginning in or about 2018.

(*See, e.g.,* 7/27/2022 a.m. Houden Test., Tr. at 93-94, 96-97, 99-100; Exs. 104, 322-23.)  Except for two loans from the Greenpoint Global Mittelstand Fund to GTIF referenced in a footnote to the 2016 audited financial statements, none of the related party loans were disclosed to GTIF's auditors or investors.  (*See, e.g.,* 7/25/2022 p.m. Schneider Test., Tr. at 109-10; 7/27/2022 a.m. Hallick Test., Tr. at 43-44; 7/27/2022 p.m. O'Connor Test., Tr. at 45-46; 7/27/2022 a.m. Farrar Test., Tr. at 130-31; Exs. 43, 57-69.)  Further, neither GTIF's investors nor auditors were informed of Hull's ownership and/or control over H Informatics and H Family Office.  (*See, e.g.,* 7/25/2022 p.m. Schneider Test., Tr. at 110; 7/25/2022 p.m. Ewens Test., Tr. at 136; 7/27/2022 a.m. Farrar Test., Tr. at 132-33; Exs. 66-69.)

Defendants' appraisals of GTIF's assets were wholly unreliable and at times entirely inappropriate.  For four years – from 2015 to 2018 – Defendants improperly included in their financial statements appraisals of "The Emperor," a particularly valuable mineral that Defendants never owned, possessed, or paid for until early 2019.  (*See* 7/27/2022 p.m. O'Connor Test., Tr. at 46, 65-66; 7/29/2022 p.m. Nohl Test., Tr. at 14; Exs. 111, 130, 131, 342, 722.)  William Metropolis ("Metropolis"), GTIF's primary appraiser, testified that accurately assessing the values of GTIF's gems and minerals was "extremely difficult," and that he often assigned values based on his "gut."  (*See* 7/26/2022 a.m. Metropolis Test., Tr. at 146.)

In further unrebutted testimony, Ambika Sharma ("Sharma") testified that when she gave Nohl a set of gem appraisals in 2015, Nohl rejected them and demanded new appraisals.  (*See* 7/26/2022 a.m. Sharma Test., Tr. at 112-14.)  Nohl demanded that Sharma raise the values of the individual gems to $1 million or more apiece.  (*See id.* at 115, 123.)  After consulting with her boss, Sharma complied with Nohl's demands.  (*See id.* at 114-15.)  However, the initial, lower valuations were correct.  (*See id.* at 115.)  Metropolis asked Nohl what "numbers" Nohl wanted

for appraised values, and offered to help Nohl attract investors by showing gains in the values of mineral pieces.  (*See* 7/26/2022 a.m. Metropolis Test., Tr. at 159-63, 167; Exs. 149, 153.)  Nohl complied with Metropolis' suggestion that he be provided with "a list of what things last appraised for so that we can show some gains in their values."  (*See* 7/26/2022 a.m. Metropolis Test., Tr. at 169-71; Exs. 130, 153.)  Nohl bought $275,000 of gems from James Zigras ("Zigras") in April 2015, as Zigras was appraising a selection of expensive minerals for GTIF. (*See* 7/26/2022 a.m. Zigras Test., Tr. at 24-25, 31; Exs. 122, 131.)  Nohl had Zigras and Metropolis value the same minerals and then cherry picked the higher valuations.  (*See* 7/26/2022 a.m. Zigras Test., Tr. at 28-31; Exs. 129, 131, 146, 335, 722.)  In 2016, Nohl paid the balance still owed on his gem purchase from Zigras, as Zigras was valuing other gems for GTIF. (*See* 7/26/2022 a.m. Zigras Test., Tr. at 35-37; Exs. 122, 132.)   As a result of Nohl's interference, the gem and mineral appraisals were not independent or objective.  (*See, e.g.,* 7/26/2022 p.m. Tropper Test., Tr. at 50-51.)  They were unreliable.  And to make matters worse, Nohl concealed all these facts from GTIF's auditors, and thus GTIF's investors.  (*See* 7/27/2022 a.m. Farrar Test., Tr. at 138-47; Exs. 43, 57-68, 112-13, 722.)

Nohl likewise overvalued GTIF's investment in Amiran.  He started off by basing his investment on a stale $40 million valuation of Amiran that was based on conditions which no longer existed in December 2015 and on a small number of stale purchases by friends and family.  (*See, e.g.,* 7/28/2022 a.m. McMahon Test., Tr. at 92-94, 111-15; Exs. 176, 725.)  Nohl then proceeded to ignore Amiran's lack of profitability, its consistent failure to meet projections, Amiran's increasingly "terrifying"—in Nohl's words—cash needs, the cancellation of its Kuwait contract, and the BMO default and foreclosure.  (*See, e.g.,* 7/28/2022 a.m. McMahon Test., Tr. at 71-72, 100-03, 118-20; 7/27/22 p.m. S. Amiran Test., Tr. at 122-23, 129-30, 140-42; 7/28/22

a.m. S. Amiran Test., Tr. at 9-10, 14-22; 7/27/22 p.m. de Leon Test., Tr. at 99-100, 103-04, 106-09, 112-14; Exs. 185-189, 191-92, 194, 196-98, 200, 203, 205, 207, 208-10.)  Throughout, Nohl ignored the prices he was paying for the Amiran shares that GTIF bought.  (*See* 7/28/2022 a.m. McMahon Test., Tr. at 108-09.)  Finally, when Nohl faced reality and wrote down the value of GTIF's investment in Amiran, Defendants did not inform their investors of the write-down for over a year.  (*See* July 25, 2022 p.m. Schneider Test., Tr. at 106; 8/1/2022 Hull Test., Tr. at 192-94; Exs. 68, 346.)

The unrefuted evidence at trial demonstrated that the Defendants (other than GTIF and GPRE) were investment advisers who owed fiduciary duties to GTIF and investors.  Hull conceded that he and Bluepoint were investment advisers that owed fiduciary duties to clients, including to GTIF.  (*See* 8/1/2022 Hull Test., Tr. at 164, 169; Ex. 12.)  Hull, Nohl, GAM II, and Chrysalis Financial managed the pooled funds of GTIF and invested some of those funds in Amiran stock and equity interests in various limited liability companies.  (*See, e.g.,* Exs. 1, 2, 8, 43, 54, 57.)  As such, Defendants owed GTIF and investors a duty of candor and fair dealing. (*See* 8/1/2022 Hull Test., Tr. at 163-64.)

## **ARGUMENT**

The Court possesses the authority to impose all remedies sought by the SEC in this case, including civil penalties.  Courts have broad authority to determine what equitable relief is proper in enforcement actions such as this, and their choices of remedies are committed to their sound discretion.  *See, e.g., SEC v. Capital Sols. Monthly Income Fund, LP*, 818 F.3d 346, 354 (8th Cir. 2016) (where the SEC sought equitable relief, "it was for the judge to decide . . . what equitable relief to impose") (quoting *SEC v. Lipson*, 278 F.3d 656, 662 (7th Cir. 2002)); *SEC v. Frohling*, 851 F.3d 132, 138-39 (2d Cir. 2016).  Further, the text of the securities laws at issue

expressly vests the penalty determination with the court.  *See, e.g.*, 15 U.S.C. § 77t(d)(2)(A)

("The amount of the penalty shall be determined by the court in light of the facts and

circumstances."); *SEC v. Tourre*, 4 F. Supp. 3d 579, 587 n.10 (S.D.N.Y. 2014); *SEC v. Levine*,

279 F. App'x 6, 8 (D.C. Cir. 2008).  In this case, the factors that courts typically consider in

determining whether to impose injunctive relief, disgorgement and civil penalties weigh heavily

in favor of the relief requested by the SEC.

## I.   <u>THE COURT SHOULD PERMANENTLY ENJOIN DEFENDANTS</u>

The Court should enter a permanent injunction against Defendants to prevent future

violations of the antifraud provisions of the federal securities laws.  Section 20(b) of the

Securities Act [15 U.S.C. § 77t(b)], Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)],

and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)] all provide for such relief.  The

injunctive relief should include an injunction against future violations of the securities laws that

the Defendants were found to have violated, and a conduct-based injunction against specific

activities.  Both types of injunctions are appropriate here.  The conduct-based injunction will

prevent violations in specified ways, and the obey-the-law injunction will help prevent

Defendants from evading the injunction by varying their conduct.

### A.   **The Relevant Factors Favor Entry of an Injunction Against Future Violations**

Where, as here, such violations have been proven to have occurred, courts enter a

permanent injunction if there is a reasonable likelihood the violations will reoccur in the future.

*See SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982); *SEC v. Church Extension of Church of*

*God, Inc.*, 429 F. Supp. 2d 1045, 1048 (S.D. Ind. 2005).  Courts assessing whether to order an

injunction consider factors such as "the gravity of harm caused by the offense; the extent of the

defendant's participation and his degree of scienter; the isolated or recurrent nature of the

infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions; the defendant's recognition of his own culpability; and the sincerity of his assurances against future violations." *Holschuh*, 694 F.2d at 144. No one factor is determinative. *SEC v. Koester*, 13 F. Supp. 3d 928, 934-35 (S.D. Ind. 2014) (noting that the "SEC need not prove every factor to secure an injunction"); *Church Extension*, 429 F. Supp. 2d at 1048 ("The SEC need not prove that all of these factors point to a likelihood of future violation.").

While the Seventh Circuit in *SEC v. Goulding*, 40 F.4th 558, 563 (7th Cir. 2022), did not permit an obey-the-law injunction on the facts before it because the court wanted a more specific injunction, the court noted that obey-the-law injunctions are allowed. *Id*. (citing *Power v. Summers*, 226 F.3d 815, 819 (7th Cir. 2000)). In *Power*, the Seventh Circuit endorsed the use of obey-the-law injunctions, noting their value "in order to prevent the defendant from repeating his violation in slightly different form," and stating that such injunctions are permissible "unless the prohibition is so nebulous that a violation of the injunction could not be punished as a contempt of court." *Power*, 226 F.3d at 819. Nothing in *Goulding* changes this endorsement by the Seventh Circuit of proper obey-the-law injunctions.

Here, each of the applicable factors weighs in favor of the Court granting permanent injunctive relief. First, there is no dispute that investors were harmed by Defendants' misconduct. Because of the Defendants' fraud, investors have suffered significant losses. While Defendants pitched the Fund as a success, in reality it lost over $11.4 million in cash between 2014 and 2018. Even years prior to GTIF and GPRE filing for bankruptcy, investors like Erick Hallick and Susan Ewens were unable to get their money out of the Fund. Further, instead of investing in safe, income-generating investments as promised, Defendants fraudulently used

investor funds to: (a) make Ponzi payments to earlier investors; (b) provide Hull a personal mortgage loan that was only partially paid back in cash; (c) pay Hull, Nohl, Chrysalis Financial, GAM II, and Bluepoint inflated management and investment advisory fees; (d) pay Hull, Nohl, and Chrysalis Financial exorbitant interest rates on undisclosed related party loans; (e) pay Hull, Nohl, and Nohl's entity, Ace Capital, secret finder's fees and commissions; and (f) invest in the now-worthless Amiran.

Moreover, the risk of future harm is substantial.  Defendants Hull and Nohl, acting through Chrysalis Financial and GAM II, continue to manage GTIF and thus have access to funds and assets of the very investors whom the jury found they have already defrauded.  In addition, Defendants might seek to manage the funds of other investors in the future and they have failed to recognize their own past culpability and have given no assurances against future violations.  Indeed in GAM II and Hull's Disclosure Statement in the Bankruptcy Court, they state that they intend to continue to perpetuate their fraud by raising new investor funds for GTIF: "Although $32.6 million in investor claims elected the 'leave' treatment under the GTIF Chapter 11 Plan; the Debtors anticipate other investors will be added after the effective date of the GTIF Chapter 11 Plan to replace the Leave Investors, keeping the investment amount stable at $55.6 million, exclusive of interests of GAM II and other insiders."  Bank. Case No. 21-25900 (Bankr. E.D. Wis.), ECF No. 199 at 16 n.2.  Further, Defendants Hull and Nohl have recently conducted similar activities soliciting new investors outside of GTIF for portfolio companies in which GTIF has also invested.  *See, e.g.*, ECF No. 107 at 2-3.

Second, Defendants' violations were not the result of a one-time lapse in judgment, but recurring misconduct over a period of years.  *SEC v. Lorin*, 76 F.3d 458, 461 (2d Cir. 1996) (affirming the imposition of a permanent injunction and reasoning that "when the violation has

been founded on systematic wrongdoing, rather than an isolated occurrence, a court should be more willing to enjoin future misconduct") (internal quotation marks and citation omitted); *SEC v. Am. Growth Funding II, LLC*, No. 16-cv-828, 2019 WL 4623504, at *1 (S.D.N.Y. Sept. 24, 2019) (imposing permanent injunction where "[t]he violations continued over a period of years, and were not simply an isolated occurrence of bad judgment"); *SEC v. Brown*, 579 F. Supp. 2d 1228, 1231-32, 1238 (D. Minn. 2008) (issuing a permanent injunction and finding that six violations within a 14-month period constituted continuing activity over a long period of time which justified a reasonable inference that future violations would occur); *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 329 (S.D.N.Y. 2007) (imposing permanent injunction where defendant's "behavior did not arise from a single, isolated incident, but rather represented a continuing course of wrongful conduct of more than eighteen months"); *SEC v. Global Telecom Services*, 325 F. Supp. 2d 94, 121 (D. Conn. 2004) (noting that the defendant's wrongful conduct "was systematic and not an isolated occurrence"); *SEC v. Sekhri*, No. 98-cv-2320, 2002 WL 31100823, at *15 (S.D.N.Y. July 22, 2002) (imposing a permanent injunction where defendants' violations lasted thirteen months, involved five corporate transactions, and were thus "not an isolated occurrence"). Indeed, as shown above, Defendants engaged in a multifaceted scheme to defraud that spanned a period of almost seven years.

Third, Hull and Nohl's continued operation of GTIF as well as their current occupations puts them and their entities in a position where future violations can be anticipated because the "business of trading in securities is one in which opportunities for dishonesty are of constant recurrence and ever present." *SEC v. Savino*, No. 01-cv-2438, 2006 WL 375074, at *17 (S.D.N.Y. Feb. 16, 2006) (internal citation and quotation omitted), *aff'd in relevant part*, 208 F. App'x 18 (2d Cir. 2006); *see also SEC v. U.S. Env't, Inc.*, No. 94-cv-6608, 2003 WL 21697891,

at *25 (S.D.N.Y. July 21, 2003) (finding defendants' continued employment in the securities industry gave them opportunities to commit further violations and contributed to the need for injunction), *aff'd*, 114 F. App'x 426 (2d Cir. 2004).  A defendant's "past conduct is highly suggestive of his propensity to commit securities law violations and the likelihood that he will commit such violations in the future."  *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1168 (D.C. Cir. 1978).

Fourth, Defendants have never acknowledged the wrongful nature of their conduct.  To the contrary, at trial, Defendants denied that they had done anything wrong and claimed that others were responsible for their actions and that generic, boilerplate disclosures of investment risk in offering materials absolved them of liability for years of repeated misrepresentations about GTIF.

Defendants' proffered defenses and trial testimony manifest a continued refusal to acknowledge the wrongfulness of their conduct and supports the imposition of injunctive relief. *See Lorin*, 76 F.3d at 461 ("We have also noted that the court may properly view a culpable defendant's continued protestations of innocence as an indication that injunctive relief is advisable."); *SEC v. Ginsburg*, 362 F.3d 1292, 1305 (11th Cir. 2004) ("Promising to stop doing wrong while denying any wrongdoing is the wrong way to establish that wrongdoing will not reoccur."); *SEC v. Fowler*, 440 F. Supp. 3d 284, 302 (S.D.N.Y. 2020) (holding that defendant's failure to recognize wrongfulness of actions in trial testimony in 2019 supported imposition of injunctive relief for violations in 2014), *aff'd in relevant part*, 6 F.4th 255 (2d Cir. 2021); *Savoy*, 587 F.2d at 1168 (injunction affirmed where defendant's violation "was not an isolated incident" and he had not demonstrated an understanding that his conduct was wrongful); *SEC v. Abernathy*, 11-cv-00580, 2012 WL 7679270, at *5 (W.D. Mich. Nov. 30, 2012) ("Defendants

13

have never acknowledged the wrongful nature of their conduct, nor have they provided any assurances against future violations.  The absence of such acknowledgements and assurances weighs in favor of a permanent injunction."); *SEC v. Moran*, 944 F. Supp. 286, 294 (S.D.N.Y. 1996) (enjoining firm and individual against future Section 206(2) violations where, among other things, individual had "tendency to blame others for his problems," "a business practice indicating a lack of vigilance," and a "failure to recognize the serious nature of his violation").

Finally, the entry of an injunction would enable the SEC to seek to bar Defendants from the various aspects of the securities industry in subsequent administrative proceedings.  As the evidence adduced at trial demonstrates, Defendants should be should be prohibited from serving again as investment advisers or in other capacities in the securities industry.

**B.      The Court Should Enter a Conduct-Based Injunction**

The Court should also enter a conduct-based injunction against all Defendants, permanently enjoining them from directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security and/or managing or liquidating GTIF and its subsidiaries; provided, however, that such injunction shall not prevent Defendants from purchasing or selling securities listed on a national securities exchange for their own personal accounts.  This conduct-based injunction will provide meaningful relief and substantial investor protection against future misconduct by Defendants.

The Seventh Circuit Court of Appeals has endorsed injunctions specifically tailored to the underlying violations.  *Goulding*, 40 F.4th at 563 (citing *Power*, 226 F.3d at 819).  In this case, the conduct-based injunction described above is appropriate because Hull and Nohl personally, and the entities they controlled (Chrysalis Financial, Blueprint, GAM II, GTIF, and GPRE): (i) committed multiple violations of the federal securities laws over more than a seven-year period;

14

(ii) have not provided any evidence showing that they appreciate the gravity of their wrongdoing; and (iii) have opportunities to commit future violations, and, absent an injunction, there is no legal mechanism to prohibit them from using the entities they control from managing third-party assets.  In particular, under the reorganization plan confirmed in the bankruptcy cases filed by GTIF and GPRE, Hull and Nohl remain as conditional managers of GTIF and thus continue to have access to the funds and assets of the very same investors they defrauded in the past.  (*See* Bank. Case No. 19-29613 (Bankr. E.D. Wis.), ECF Nos. 1457 and 1458.)

Further, conduct-based injunctions are particularly appropriate given the strong indications that Defendant are inclined to repeat their misconduct notwithstanding a permanent "obey-the-law" injunction.  Defendants in this case knew they were under investigation by the SEC as early as March 2017, when the SEC first issued investigative subpoenas to Hull, Nohl, Bluepoint, GPRE, and Greenpoint Asset Management LLC.  (*See* Separately filed Declaration of Keith Constance, dated 8/17/2022 at ¶ 4.)  Despite knowing this, Defendants continued to engage in much of the illegal conduct established at trial, including but not limited to (a) misrepresentations to investors regarding unrealized, "paper" gains; (b) numerous instances of undisclosed self-dealing and related party transactions; (c) the fraudulent write-up of GTIF's investment in Amiran; and (d) the making of Ponzi payments to investors.  Further, both Hull and Nohl took the stand in this case and, as the jury verdict made clear, repeatedly lied under oath in one last attempt to cast blame for their misconduct onto others.  Defendants seem unable or unwilling to understand and recognize the distinction between their violative conduct and legal conduct.  They further refuse to appreciate the fact that when testifying under oath, that

they must do so truthfully.  A conduct-based injunction is especially important here given

Defendants' continued efforts to avoid taking responsibility for their actions.[1]

## II.      DEFENDANTS SHOULD BE ORDERED TO PAY DISGORGEMENT AND PREJUDGMENT INTEREST, AND SHOULD BE HELD JOINTLY AND SEVERALLY LIABLE

### B.      Defendants Should Disgorge Their Ill-Gotten Gains Plus Prejudgment Interest, Totaling $19,835,237

Disgorgement is an appropriate remedy in any action brought to remedy violations of the

federal securities laws.  *SEC v. Faulkner*, No. 16-cv-1735, 2021 WL 75551, at *3 (N.D. Tex.

Jan. 8, 2021); 15 U.S.C. §§ 78u(d)(5) and (d)(7).  Disgorgement is a "profit-based measure of

unjust enrichment" that is measured by the defendant's "wrongful gain" and is ordered to reflect

the "foundational principle" of equity that "it would be inequitable that a wrongdoer should

make a profit out of his own wrong."  *Liu v. SEC*, 140 S. Ct. 1936, 1943 (2020) (internal

citations and quotations omitted).  The award cannot exceed the wrongdoer's net profits.  *Liu*,

140 S. Ct. at 1940; *Faulkner*, 2021 WL 75551, at *3.[2]  It has long been recognized that "[t]he

deterrent effect of an SEC enforcement action would be greatly undermined if securities law

violators were not required to disgorge illicit profits."  *SEC v. Manor Nursing Ctrs., Inc.*, 458

---

[1] Nothing in the bankruptcy cases requires or sanctifies the continued management of GTIF or its subsidiaries by Hull and Nohl.  Prior to the return of the jury verdict, the bankruptcy court confirmed a chapter 11 plan that provided that upon the effective date of the plan, the entities would be managed by Nohl and Hull *subject to an oversight board*, a reduced fee structure and meeting the promised installment payments to investors.  The new operating agreement ratified as part of the plan of reorganization expressly provides that a managing member or its representative may be removed for cause including where they have been found to have committed dishonesty or otherwise breached their duties to GTIF or its member investors.  (Bank. Case No. 19-29613 (Bankr. E.D. Wis.), ECF No. 1457 at 52.)  Since the plan was confirmed, Hull and Nohl have been found to have knowingly committed multiple violations of the antifraud provisions of the federal securities laws.

[2] In *Liu*, the Supreme Court held that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under [15 U.S.C] § 78u(d)(5) [Section 21(d)(5) of the Exchange Act]."  140 S. Ct. at 1940.  After *Liu* was decided, Congress added 15 U.S.C. § 78u(d)(7) [Section 21(d)(7) to the Exchange Act], which expressly provides for recovery of disgorgement, but which does not contain the limiting "for the benefit of investors" clause that was part of *Liu's* holding, therefore providing additional grounds for seeking disgorgement when distribution to harmed investors is not feasible.  Nevertheless, Plaintiff intends to distribute any recovered amounts back to investors to the extent it is feasible to do so.

F.2d 1082, 1104 (2d Cir. 1972); *see also Kokesh v. SEC*, 137 S. Ct. 1635, 1643 (2017) (primary purpose of disgorgement is to deter future violators of the securities laws).[3]

Disgorgement is appropriate based on a reasonable approximation of the profits causally connected to the violation. *See, e.g., SEC v. Merchant Capital LLC*, 486 F. App'x 93, 96 (11th Cir. 2012) (per curiam); *SEC v. Navellier & Assocs., Inc.*, No. 17-cv-11633, 2021 WL 5072975, at *1 (D. Mass. Sept. 21, 2021); *Faulkner*, 2021 WL 75551, at *3. Once that showing is made, the burden shifts to the defendant to establish that the amount is not a reasonable approximation. *Merchant Capital*, 486 F. App'x at 96; *Navellier*, 2021 WL 507975, at *2; *Faulkner*, 2021 WL 75551, at *3. In disputing the reasonableness of the SEC's approximation, the defendant faces a high burden. *Fowler*, 440 F. Supp. 3d at 296. Exactitude is not required of the SEC and, to the extent there is any uncertainty in calculating the amount of disgorgement, the risk of that error falls on the defendant whose illegal conduct created that uncertainty. *Merchant Capital*, 486 F. App'x at 96; *Navellier*, 2021 WL 507975, at *2; *Faulkner*, 2021 WL 75551, at *3. A defendant's ability to pay is not a consideration in determining the amount to be disgorged. *SEC v. Warren,* 534 F.3d 1368, 1370 (11th Cir. 2008).

Investment advisory fees and commissions received by a defendant are "ill-gotten gains" that are properly included as part of a disgorgement award. *See, e.g.*, *Navellier*, 2021 WL 5072975, at *4; *Fowler*, 440. F. Supp. 3d at 297; *SEC v. Wealth Strategies Partners, LLC*, No. 14-cv-2427, 2019 WL 2504600, at *4 (M.D. Fla. May 17, 2019); *SEC v. Bernath*, No. 15-cv-485, 2017 WL 527662, at *2 (W.D.N.C. Feb. 8, 2017). The same is true if the monthly payments

---

[3] The SEC may bring a claim for disgorgement not later than 10 years after the latest date of the violation giving rise to the SEC claim, if the violation involves conduct that violates Section 10(b) of the Securities Exchange Act [15 U.S.C. § 78j(b)], Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)], or Section 206(a) of the Investment Advisers Act [15 U.S.C. § 80b-6], all of which the jury found to have been violated by Defendants. *See* 15 U.S.C. § 78u(d)(8).

made to the defendant are considered salary or other compensation. *Merchant Capital*, 486 F. App'x at 96-97 ("[T]here is no reason why salaries earned cannot be used to determine disgorgement."); *SEC v. Slowinski*, No. 19-cv-03552, 2020 WL 7027639, at *2 (N.D. Ill. Nov. 29, 2020) ("Salaries and other forms of compensation may be disgorged.") (citations omitted); *Faulkner*, 2021 WL 75551, at *3 (ordering disgorgement in amount of compensation defendants received as result of fraudulent scheme).

Courts awarding disgorgement typically impose prejudgment interest, which "puts [the defendant] in the same position as if he had not received any ill-got gains [during the period of his illegal conduct]." *SEC v. Koenig*, 557 F.3d 736, 745 (7th Cir. 2009). Prejudgment interest, like disgorgement, prevents a defendant from being unjustly enriched through the time-value of the money he fraudulently obtained. *See, e.g., SEC v. Lek Sec. Corp.*, No. 17-cv-1789, 2020 WL 1316911, at *5 (S.D.N.Y. Mar. 20, 2020) ("In addition to disgorgement, Defendants should pay prejudgment interest to prevent them from obtaining what is essentially an interest-free loan from their illegal activity."); *SEC v. Levine*, 517 F. Supp. 2d 121, 141 (D.D.C. 2007) ("To preclude defendants from enjoying an interest-free loan on their illicitly-obtained gains, the court requires them to pay interest on the amounts they disgorge.") (citations omitted); *SEC v. Alanar, Inc.*, No. 05-cv-1102, 2008 WL 1994854, at *4-5 (S.D. Ind. May 6, 2008) (similar). Courts in the Seventh Circuit have calculated prejudgment interest based on the rate provided in 26 U.S.C. § 6621 for tax underpayments. *See, e.g.*, *Slowinski*, 2020 WL 7027639, at *5; *see also Koenig*, 557 F.3d at 745 (affirming prejudgment interest award based on rate provide in § 6621).

The evidence introduced at trial proves that soon after GTIF commenced operations, Defendants had transformed it into a completely fraudulent enterprise. Beginning in the very first year of GTIF in 2013, Defendants misled prospective investors about safety, diversification,

current income, cash flow, and risk management.  Defendants began their self-dealing almost as soon as they began raising money, with the Hull mortgage loan, the related origination fee, and the finder's fee for the purchase of the Splash Waterfall painting.  Also in 2013, Defendants began using new investor money to pay themselves and to pay redemptions to existing investors.

Defendants continued their fraud through the ensuing years, despite warnings from Kirchen in late 2015 to early 2016 that they should not be representing to investors that cash flow was an objective of the fund, because they had virtually none.  Kirchen also repeatedly warned Nohl about her concerns with GTIF making Ponzi payments, minimizing the risks associated with investing, and making intercompany loans.  Nohl and Hull discussed Kirchen's concerns at a meeting in Hull's house and made the deliberate decision to continue spreading their lies.  Rather than heeding Kirchen's warning, Nohl and Hull fired her.  When investors expressed concerns about the risks of investing in GTIF, Hull told them to disregard the offering documents, labelling them "boilerplate" and "legal speak."  He also repeatedly downplayed the risks associated with investing in GTIF.  Nohl and Hull engaged in undisclosed related party transactions, including loans to GTIF, and hid the transactions from investors and auditors.  Nohl interfered with the supposedly independent valuations of the gem and mineral collection and hid his actions from investors and auditors.  He also fraudulently overvalued GTIF's investment in Amiran.  Hull promised investors, when they were investing, that they could withdraw their money; but when investors requested redemptions, Hull stalled and dissembled.  In the meantime, Defendants continued to use new investor money to pay themselves.

Soon after they organized GTIF, Defendants were no longer conducting a legitimate business.  Without Defendants' fraud, GTIF could not have continued.  In particular, from the very start, GTIF was taking in only negligible cash flow or income apart from the new investor

money that Defendants were raising through their fraud.  While the Supreme Court stated in *Liu* that equity courts only award "net profits," the Court also noted that it previously had "carved out an exception when the entire profit of a business or undertaking results from the wrongful activity." 140 S. Ct. at 1945 (internal quotation marks omitted).

Following this principle, Defendants should be ordered to disgorge, and pay prejudgment interest on all the management fee payments and profit draws GTIF[4] made to Chrysalis Financial and GAM II; all payments GTIF made to Bluepoint; all payments GTIF made to Hull's companies, H Informatics and H Family Office; interest payments Defendants received on the related party loans; the commissions and kickbacks Nohl and Hull received from transactions with the Greenpoint Fine Art Fund; the portion of Hull's mortgage loan that he repaid with a non-cash offset against management fees; and the "origination" fees Nohl received for putting together the Hull mortgage loan.  These payments have been totaled by SEC accountant Keith Constance, and amount to $15,622,889, broken down as follows:

---

[4] The Defendants have previously argued that because the Bankruptcy Court set the amount of the SEC's claims in the bankruptcy proceeding in the amount of $0, that this Court is constrained from ordering monetary damages against GTIF and GPRE.  To the contrary, the Bankruptcy Court made clear in a recent opinion that it believed that the confirmation order leaves the SEC unrestrained to seek disgorgement and civil penalty relief in the District Court. (Decision and Order on Defendants' Motion to Dismiss, Bank. Case No. 21-25900 (Bankr. E.D. Wis.), ECF No. 38 at 9.)  The Bankruptcy Court recognized the superior jurisdiction of this Court to determine issues of preclusion and whether to impose monetary remedies.  (*Id*. at 10.)  Further, the Bankruptcy Court recognized that the SEC did not submit evidence or otherwise adjudicate its underlying disgorgement claims in the bankruptcy proceeding.  (*Id*. at 5.)

| Category | Amount |
|---|---|
| Chrysalis Financial Management Fees | 3,810,306 |
| GAM II Management Fees - Cash | 3,539,065 |
| GAM II Profit Draws/Redemptions | 2,740,581 |
| Chrysalis Financial Profit Draws/Redemptions | 2,248,584 |
| Bluepoint Fees | 1,205,537 |
| H Informatics Fees | 743,818 |
| H Family Office Fees | 428,634 |
| Ace Capital Art Commission | 330,000 |
| GAM II Management Fees - Loan Forgiveness | 267,168 |
| Bluepoint Art Commission | 250,000 |
| Nohl Loan Interest Payments | 50,272 |
| Ace Capital Hull Mortgage Fee | 7,424 |
| Hull Loan Interest Payments | 1,500 |
| **Total** | **15,622,889** |

(*See* Separately filed Declaration of Keith Constance, dated 8/17/2022 at ¶¶ 5-6.)  Prejudgment

interest on this amount totals $4,212,349, for a total of $19,835,237.[5]  (*Id*. at ¶¶ 7-8.)

### B.    Defendants are Subject to Joint and Several Liability

When defendants commit violations together and benefit from their concerted

misconduct, they are subject to joint and several liability.  *See Liu*, 140 S. Ct. at 1945.  *See also*

*SEC v. Janus Spectrum LLC*, Nos. 17-17042, 18-15403, 2020 WL 3578077, at *2 (9th Cir. July

1, 2020) ("[T]he imposition of joint and several liability for a disgorgement award is permissible

so long as it is 'consistent with equitable principles.'") (*quoting Liu*, 140 S. Ct. at 1949); *SEC v.*

*Bronson*, No. 12-cv-6421, 2022 WL 1287937, at *15 (S.D.N.Y. Apr. 29, 2022) (discussing cases

finding joint and several liability appropriate post *Liu* when entities are owned and controlled by

---

[5] The Court need not consider only the amount by which Defendants overstated the value of GTIF's assets. Already in 2013, almost all the money coming into GTIF consisted of new investor money.  In other words, throughout the fraud, almost all the cash paid to Defendants came from their fraudulent sale of interests in GTIF. All those payments are therefore tainted.  Regardless, over 80 percent of GTIF's investments were concentrated in the gem and mineral collection and Amiran, which relate to the bulk of Defendant's fraudulent conduct. Furthermore, the disgorgement number is conservative as it does not include funds associated with all fraudulent activity established at trial, such as (a) the $25,000 diamond engagement ring payment to Nohl's entity Chrysalis Lapidary (*see, e.g.,* Exs. 85-87); (b) Hull's and Nohl's acquisition of assets, including pianos, gems, and minerals, from GTIF (*see, e.g.,* Ex. 343); and (c) Nohl and his wife spending GTIF funds for a personal trip to Mexico.  (*See* 7/25/2022 p.m. Pietrantonio Test., Tr. at 55.)

a single individual and acting in concert to perpetrate the scheme).  Applying this principle here, Defendants should be held jointly and severally liable for any disgorgement and prejudgment interest ordered against them, because they committed the violations together and benefited from their concerted misconduct.  Hull and Nohl consulted about all important decisions.  (*See, e.g.,* Exs. 1, 2, 8; 7/26/022 p.m. Hallick Test., Tr. at 141; 7/29/2022 a.m. Nohl Test., Tr. at 46; 8/1/2022 Hull Test., Tr. at 125-26.)  Hull controlled and was at least a part owner of GAM II, Bluepoint, H Informatics, and H Family Office.  (*See, e.g.,* 8/1/2022 Hull Test., Tr. at 93-96; Exs. 1, 2, 8, 12, 104.)  Nohl controlled Chrysalis Financial.  (*See, e.g.,* Exs. 1, 2, 8.)  Through GAM II and Chrysalis Financial, Hull and Nohl controlled GTIF and GPRE.  (*See e.g.,* Exs. 1, 2, 8.)  They all acted in concert.  Accordingly, each of the Defendants should be held jointly and severally liable for the full $15,622,889 of disgorgement and $4,212,349 of prejudgment interest.[6]

### C.     Defendants Should Not Be Allowed to Deduct Expenses

Defendants should not be allowed to deduct purported expenses from the disgorgement amounts set forth above.  As noted above, in *Liu* the Supreme Court stated the general principle that disgorgement must be net of legitimate expenses but noted an exception when "the entire profit of a business or undertaking results from the wrongful activity."  140 S. Ct. at 1945 (internal quotation marks omitted).  That exception applies to this case, since already by 2013 all but negligible amounts of GTIF's cash flow was comprised of new investor money.  Defendants should not be permitted to deduct any expenses from the disgorgement of their ill-gotten gains.

---

[6] The proofs of claim that the SEC filed in the bankruptcy proceedings do not prohibit the SEC from seeking to hold GTIF and GPRE jointly and severally liable for the pecuniary gains Defendants received in the form of fees and other sums.  The proofs of claim were solely for distribution from the bankruptcy estates of GTIF and GPRE.

Moreover, despite requests made during the underlying investigation and discovery, Defendants did not produce the accounting records of Chrysalis Financial, GAM II, and Bluepoint, and produced only partial bank records for those entities. (*See* Constance Decl. at ¶¶ 9-11.) As a result, Defendants have made it impossible for the SEC to provide the Court with an approximation of Defendants' purportedly legitimate expenses. (*Id*. at ¶¶ 9-11, 14.) For this additional reason, Defendants should be foreclosed from seeking an offset based on any asserted expenses. *See SEC v. Smith*, No. 20-cv-1056, 2020 WL 6712257, at *3 (C.D. Cal. Oct. 19, 2020) (reasonable approximation satisfied where, "[b]ased on the records available to the SEC, it was not able to identify any legitimate, reasonable business expenses that should be deducted from the calculated net loss"). And as discussed above, the risk of uncertainty falls on the wrongdoer who created that uncertainty. *See also SEC v. Goulding*, 40 F.4th 558, 562 (7th Cir. July 7, 2022) ("The extent of Goulding's wrongdoing makes it hard to determine his net unjustified withdrawals, and as the wrongdoer he bears the consequence of uncertainty."); *SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021) ("If the disgorgement amount is generally reasonable, 'any risk of uncertainty' about the amount 'fall[s] on the wrongdoer whose illegal conduct created that uncertainty.'") (quoting *SEC v. Razmilovic*, 738 F.3d 14, 21 (2d Cir. 2013)).

If, however, the Court chooses to entertain claims of purportedly legitimate expenses, the SEC only needs to show a reasonable approximation of defendants' legitimate expenses. *See, e.g., Fowler*, 6 F.4th at 267 ("[Defendant] failed to identify any additional 'legitimate' business expenses that, consistent with *Liu*, should have been deducted from an otherwise reasonable disgorgement amount. Yet it was his burden to do so."); *SEC v. Griffithe*, No. 20-cv-00124, 2021 WL 6551385, at *2 (C.D. Cal. Nov. 18, 2021) (granting SEC's reasonable approximation of ill-gotten gains, to include legitimate business expenses, and rejecting defendants' unsupported and

unjustified claims of additional expenses).  Based on public filings from the bankruptcy proceedings of GTIF and GPRE and Hull and GAM II, the SEC has estimated an upper limit of the expenses of Chrysalis Financial and GAM II as set forth below.[7]

Specifically, based on bankruptcy court filings, from February 1, 2013 through September 30, 2019, the legitimate expenses of Chrysalis Financial were no more than approximately $1,508,875.  (Chrysalis Financial Amended Proof of Claim, Bank. Case No. 19-29613 (Bankr. E.D. Wis.), ECF No. 110-3; Constance Decl. at ¶ 12.)  During that same time period, again based on bankruptcy court filings, the legitimate expenses of GAM II were no more than $175,520.  (Monthly Operating Report for June 2022, Bank. Case No. 21-25900 (Bankr. E.D. Wis.), ECF No. 234; Constance Decl. at ¶ 13.)[8]

While the SEC does not believe any offsets are appropriate, assuming the Court gives credit for the expenses shown above, the adjusted disgorgement amounts are shown below:

---

[7] The SEC did obtain partial tax returns for Chrysalis Financial.  Those tax returns, however, do not provide sufficient detail to approximate the expenses of Chrysalis Financial.  The tax returns include no supporting documentation.  In addition, the tax returns reflect income from sources other than GTIF, meaning that not all the claimed expenses can be allocated to the management of GTIF.  However, it cannot be determined from the tax returns by themselves which expenses were related to the management of GTIF.  Complete bank records and general ledgers are required to answer these questions.  Moreover, certain of the expenses contained on the tax returns are inherently dubious.  For example, from 2014 to 2019, Chrysalis Financial claimed almost $2.2 million in consulting payments, most of which appear to have been paid to other companies controlled by Nohl, including Chrysalis Lapidary and Chrysalis Holding.  In any event, given that Defendants were found liable for fraud, their representations as to expenses, set forth in the tax returns, cannot be taken at face value.

[8] This approximation of expenses does not include expenses of GTIF and GPRE, because the only disgorgement the SEC seeks from those entities is the money that was passed through to Hull, Nohl, and their companies.  The SEC is not seeking disgorgement of the investor money GTIF and GPRE retained and used for their operations.  In addition, Defendants have not provided the SEC with information necessary to estimate the expenses of Bluepoint, H Informatics, or H Family Office.  (Constance Decl. at ¶¶ 9-11, 14.)

| Category | Amount |
|---|---|
| GAM II Management Fees - Cash | 3,363,545 |
| GAM II Profit Draws/Redemptions | 2,740,581 |
| Chrysalis Financial Management Fees | 2,301,430 |
| Chrysalis Financial Profit Draws/Redemptions | 2,248,584 |
| Bluepoint Fees | 1,205,537 |
| H Informatics Fees | 743,818 |
| H Family Office Fees | 428,634 |
| Ace Capital Art Commission | 330,000 |
| GAM II Management Fees - Loan Forgiveness | 267,168 |
| Bluepoint Art Commission | 250,000 |
| Nohl Loan Interest Payments | 50,272 |
| Ace Capital Hull Mortgage Fee | 7,424 |
| Hull Loan Interest Payments | 1,500 |
| **Total** | **13,938,493** |

(Constance Decl. at ¶ 15.)  Prejudgment interest on this lower disgorgement total amounts to $3,758,191.  (*Id.* at ¶ 16.)

To rebut the SEC's approximation of legitimate expenses, Defendants must provide *documented evidence* of the expenses they claim.  A defendant's unsupported assertion that legitimate expenses exist does not defeat the SEC's showing.  *Slowinski*, 2020 WL 7027639, at *3-4 (defendant failed to provide supporting evidence of expenses or offsets and therefore "offered insufficient evidence to rebut the SEC's calculation"); *SEC v. Mizrahi*, 19-cv-2284, 2020 WL 6114913, at *3-4 (C.D. Cal. Oct. 5, 2020) (rejecting defendant's unsubstantiated deductions to the SEC's disgorgement calculation); *SEC v. Owings Group, LLC,* 18-cv-2046, 2021 WL 1909606, at *5  (D. Md. May 12, 2021) (unsworn and conclusory exhibit does not overcome the SEC's showing); *SEC v. Team Resources, Inc.*, No. 15-cv-1045, 2022 WL 463390, at *2 (N.D. Tex. Feb. 15, 2022) ("criticism" of SEC's approximation, unsupported "with any documentary evidence," does not defeat the SEC's showing).

### III.     HULL, NOHL, GAM II, CHRYSALIS FINANCIAL AND BLUEPOINT SHOULD BE ORDERED TO PAY CIVIL PENALTIES[9]

In addition to the foregoing relief, Defendants Hull, Nohl, GAM II, Chrysalis Financial and Bluepoint should be ordered to pay significant civil penalties as follows:

**Hull** - $10,000,000

**Nohl** - $10,000,000

**Chrysalis Financial** - $1,000,000

**GAM II** - $1,000,000

**Bluepoint** - $1,000,000

Congress authorized such penalties under the Exchange Act, the Securities Act, and the Advisers Act to achieve the dual goals of punishing the individual violator and deterring future violations.  *See, e.g., SEC v. Cook*, No. 13-cv-01312, 2015 WL 5022152, at *28-29 (S.D. Ind. Aug. 24, 2015).  Disgorgement merely deprives the defendant of his ill-gotten gains and an injunction facilitates speedier enforcement if the defendant violates the securities laws again.  "Neither of those remedies carries the same deterrent effect as a robust civil penalty."  *SEC v. Lek Sec. Corp.*, 17-cv-1789, 2020 WL 1316911, at *8 (S.D.N.Y. Mar. 30, 2020); *see also SEC v. Berrettini*, 218 F. Supp. 3d 754, 765 (N.D. Ill. 2016) (disgorgement and prejudgment interest "merely take away [defendant's] ill-gotten gains"); *SEC v. Clay Capital Mgmt.*, No. 11–cv–05020, 2013 WL 5946989, at *7 (D.N.J. Nov. 6. 2013) (disgorgement alone "merely restores a defendant to his original position without extracting a real penalty for his illegal behavior") (internal quotations omitted).  Civil penalties encourage investor confidence, increase the efficiency of the financial markets, and promote the stability of the securities industry.  *See SEC*

---

[9] October 1, 2014 is the earliest date for which civil penalties can be awarded in this case, under the applicable statute of limitations.  *See* 28 U.S.C. § 2462.  The SEC does not seek penalties against GTIF and GPRE.

*v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998).  They do so by making "securities law violations a money-losing proposition." *Lek Sec. Corp.*, 2020 WL 1316911, at *8.

Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 20(d) of the Securities Act [15 U.S.C. 77t(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] each set out three tiers for determining the amount of penalties that may be imposed for "each violation" of the securities laws.  "The third (and highest) tier is reserved for conduct that involve (1) fraud, deceit or manipulation, and (2) resulted in substantial losses (or created a risk of such losses) to others." *SEC v. Zenergy Int'l, Inc.*, No. 13-cv-5511, 2016 WL 5080423, at *5 (N.D. Ill. Sept. 20, 2016) (citing 15 U.S.C. §§ 78u(d)(3)(B)(iii)).

The requirements of a third tier penalty have been met in this case.  The jury found Defendants liable for multiple counts of securities fraud—including counts that required scienter and involved material misrepresentations and omissions, schemes to defraud, and transactions, practices or courses of business which operated or would operate as a "fraud or deceit" upon investors.  Moreover, the evidence shows that in total Defendants' victims face potential losses of more than $50 million.

Currently, the three statutes authorize a "third-tier" penalty against an individual in an amount up to the *greater* of $207,183 per violation or the defendant's *gross* pecuniary gain as a result of the violations.  *See* 15 U.S.C. §§ 78u(d)(3)(B)(iii), 77t(d)(2)(C), 80b-9(e)(2)(C); www.sec.gov/files/civil-penalties-inflation-adjustments_1.pdf (inflationary adjustment increasing statutory penalties to $207,183 for a natural person and $1,035,909 for any other

person).[10]  A third-tier penalty against an entity may be up to the greater of $1,035,909 per violation or the gross pecuniary gain received by the entity through its fraud.  *Id.*

The appropriate penalty is left to the Court's discretion "in light of the facts and circumstances" of the case.  15 U.S.C. §§ 77t(d)(2)(a), 80b-9(e)(2); *see also SEC v. Lipson*, 278 F.3d 656, 662 (7th Cir. 2002) (explaining that the court "decide[s], consistent with the jury's finding of liability, not only what equitable relief to impose, but also the amount of civil penalty"); *Lek Sec. Corp.*, 2020 WL 1316911, at *6 ("Because monetary penalties are levied as a deterrent against securities law violations, courts have broad discretion to fashion relief in light of the facts and circumstances surrounding the violations.") (internal quotations and citations omitted).

"District courts routinely award substantial penalties in fraud and other cases" and "many courts have imposed a single penalty equal to the amount of disgorgement."  *Cook*, 2015 WL 5022152, at *28 (internal quotations omitted); *see also SEC v. Locke Capital Mgmt., Inc.*, 794 F. Supp. 2d 355, 371 (D.R.I. 2011) (court found multiple statutory violations and imposed penalty equal to pecuniary gain of nearly $1.8 million); *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y 2007) (court imposed penalty equal to $15 million of ill-gotten gains).

In exercising their discretion under the statutory penalty provisions, courts have considered various factors, including "the seriousness of the violations, the defendant's intent, whether the violations were isolated or recurring, whether the defendant has admitted wrongdoing, the losses or risks of losses caused by the conduct, and any cooperation the

---

[10] When assessing a specific amount penalty amount "per violation," courts have counted each misrepresentation or deceptive act as a separate violation and imposed a penalty for each one; courts have also considered the number of victims to whom the misrepresentations were made, or the number of statutes that were violated.  *See, e.g., SEC v. E- Smart Techs., Inc.*, 139 F. Supp. 3d 170, 192 (D.D.C. 2015) (discussing various methods of counting violations for purposes of determining civil penalty).

defendant provided to enforcement authorities." *SEC v. Durham*, No. 11-cv-00370, 2017 WL 3581640, at *9 (S.D. Ind. Aug. 18, 2017) (quoting *SEC v. Church Extension of the Church of God, Inc.*, 429 F. Supp. 2d 1045, 1050 (S.D. Ind. 2005)); *see also JCC, Inc. v. CFTC*, 63 F.3d 1557, 1571 (11th Cir. 1995) (citing overlapping factors).

Those factors largely mirror the factors supporting entry of a permanent injunction against Defendants.  Given the egregious and repetitive nature of Defendants' violations, the substantial losses faced by the victims, and Defendants' lack of acceptance of responsibility, the Court should impose penalties of $10 million apiece against Hull and Nohl and penalties of $1 million apiece against Chrysalis Financial, GAM II, and Bluepoint.  The $10 million individual penalty amount is less than the ill-gotten gains Hull and Nohl received along with the entities under their control given their concerted misconduct.  Hull and Nohl received slightly more than $13 million during the five-year period prior to the filing our complaint.  (*See* Constance Decl. at ¶ 8 n.2.)  Assessing penalties in these amounts is appropriate given that many courts have imposed a single penalty equal to the amount of disgorgement, as discussed above.  Hull and Nohl should not receive the benefit of having their civil penalties viewed in the aggregate and reduced so that the combined civil penalties are equal to or less than the total disgorgement figure.  Doing so would seemingly be a windfall for defendants who engage in misconduct with others, as opposed to just individually.  Assessing penalties in these amounts is appropriate given that many courts have imposed a single penalty equal to the amount of disgorgement, as

discussed above.[11]  For Chrysalis, GAM II and Bluepoint, the amounts are slightly below the statutory third-tier penalty for one violation by a corporate entity.

These penalties are warranted in this case as Defendants' violations were the result of repeated, fraudulent actions over nearly seven years regarding how they managed the assets and investors of GTIF.  Their conduct created actual substantial harm to investors.  Such penalties are fully warranted under the circumstances and, further, would serve to deter similarly situated investment advisers from pursuing the fraudulent path followed by Defendants in this case. Lesser penalties would be inadequate to punish and deter the multiple securities law violations committed by Defendants.

## CONCLUSION

For the reasons discussed above, the Court should impose the SEC's requested permanent injunctions, conduct-based injunctions, disgorgement, prejudgment interest, and civil penalties against the respective Defendants.

Dated: August 17, 2022

<div style="margin-left:40%">

By: /s/ Timothy J. Stockwell
Christopher H. White (WhiteCh@sec.gov)
Timothy J. Stockwell (Stockwellt@sec.gov)
John E. Birkenheier (Birkenheierj@sec.gov)
Charles J. Kerstetter (Kerstetterc@sec.gov)
175 West Jackson Boulevard, Suite 1450
Chicago, IL 60604-2615
(312) 353-7390
(312) 353-7398 (fax)

*Attorneys for Plaintiff the United States*
*Securities and Exchange Commission*

</div>

---

[11] This $10 million penalty amount is conservative.  Alternatively, the Court could impose the statutory third tier penalty of $207,183 per violation against Hull and Nohl.  Given that GTIF had at least between 60 and 80 investors (7/26/2022 a.m. Constance Test., Tr. at 65; Exs. 58-69), and Hull and Nohl made dozens, if not more, fraudulent misrepresentations to each investor, Hull and Nohl could be subject to hundreds of millions in civil penalties if counting each violation.  If the Court were to just count the minimum number of investor victims subject to Hull's and Nohl's fraud, they would each be subject to over $12 million in civil penalties (60 x $207,183 = $12,430,980).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 17, 2022, I served a true and correct copy of the foregoing filing on all counsel of record through the Court's ECF filing system:

Celiza (Lisa) Bragança, Lisa@SECDefenseAttorney.com

David O'Toole, David@SECDefenseAttorney.com

Claire Ann Richman, crichman@steinhilberswanson.com

Michael Richman, mrichman@Steinhilberswanson.com


By: /s/ Timothy J. Stockwell