## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br>             Plaintiff,<br><br>     v.<br><br>BLUEPOINT INVESTMENT COUNSEL, LLC, et al.,<br>             Defendants. | Case No. 19-cv-809<br><br>Judge William M. Conley |

## Defendants' Response
## to SEC's Brief in Support of Remedies

Celiza P. Bragança  *Lisa@SECDefenseAttorney.com*
David A. O'Toole *David@SECDefenseAttorney.com*
Bragança Law LLC
5250 Old Orchard Road, Suite 300
Skokie, Illinois  60077 | 847-906-3460

Michael Richman  *mrichman@steinhilberswanson.com*
Steinhilber Swanson LLP
122 W. Washington Avenue, Suite 850
Madison, WI  53703-2732

# Table of Contents

I.      INTRODUCTION ............................................................................................... 1

II.     There is no basis for the SEC's Contention that GTIF was a fraudulent enterprise ............ 4

   A. The jury verdict is based upon the lowest standard of proof – as emphasized by the SEC in its closing argument ........................................................................................ 4

   B. SEC misrepresented GTIF to the jury as a Ponzi Scheme .................................................. 5

III.    Disgorgement should be based upon fees earned on potentially overvalued assets and interest payment, as the Court noted ........................................................................... 7

   A. Legal Standard ........................................................................................................ 7

   B. GTIF investors have already recovered millions of dollars from the Managing Members through the Confirmation Plan ....................................................................................... 8

   C. Disgorgement based upon valuation of GTIF investment in Amiran ................................... 9

      1. Baker Tilly verified GTIF's 2015 & 2016 valuations of its investment in Amiran ........ 9

      2. No evidence that GTIF failed to comply with contractual obligations to Amiran ........ 11

      3. Calculation of management fees calculated based on Amiran appreciation during 2017 and 2018 ............................................................................................................ 12

   D. Disgorgement based upon appreciation of The Emperor emerald ................................... 15

   E. Disgorgement based upon the Zigras preappraisal/Metropolis appraisals ....................... 19

   F. Disgorgement of loan interest paid to Nohl, Graewin, and Hull ..................................... 21

   G. Disgorgement is not proper for transactions where there was no harm to investors ........ 23

   H. Disgorgement of all fees and compensation is not proper where GTIF is a legitimate enterprise that owns tens of millions of dollars of valuable assets ...................................... 27

      1. No evidence of layers of empty shell companies ..................................................... 28

      2. No evidence that Baker Tilly auditors deemed Michael Hull mortgage loan to be material item to be disclosed in audited financials ........................................................... 28

      3. No evidence that Baker Tilly auditors deemed additional detail about GP Mittelstand loans to be material item to be disclosed in audited financials ........................................... 29

      4. No evidence of the gems and minerals being simply "crystals and colorful rocks" .. 29

   I. Managing Members have already contributed over $12 million to GTIF/GPRE for which they should receive credit ................................................................................................. 32

      1. Managing Members made cash contributions of $2,778,688 ..................................... 33

      2. Managing Members gave up $4,212,202 in earned management fees ....................... 34

      3. Managing Members gave up over $5 million in earned equity compensation ........... 34

J. Disgorgement of management fees assessed against Christopher Nohl should be limited to funds related to GTIF that he personally received .................................................................. 37

IV.   GTIF and GPRE should not be subjected to any disgorgement ......................................... 39

V.    There is no basis for third-tier civil penalties requested by SEC ...................................... 41

VI.   Prejudgment Interest should be set at a reasonable amount ............................................... 40

VII.  The Court should not impose an injunction on any Defendant .......................................... 45

A. Legal Standard ................................................................................................................ 45

B. Any remedies imposed should be consistent with the Confirmation Plan and the protection of GTIF investors ............................................................................................... 46

1.    The Confirmation Plan was approved by GTIF investors ......................................... 47

2.    The Bankruptcy Court adjudicated the SEC's disgorgement and penalty claims against GTIF and GPRE to be worth $0.00 ........................................................................ 49

C. ..The SEC is precluded from seeking to relitigate its claims of disgorgement, prejudgment interest and penalties against GTIF/GPRE .......................................................................... 52

1.    Legal Standard for issue preclusion .......................................................................... 53

2.    Under the legal standard, the SEC should be barred by issue preclusion from seeking any money from GTIF/GPRE ............................................................................................. 54

D. .........Even if the SEC is not barred by issue preclusion from seeking disgorgement against GTIF/GPRE, no such amounts are merited under the SEC's theory ..................................... 58

E. Any injunction imposed upon Defendants would undermine the Confirmation Plan and harm GTIF investors ............................................................................................................ 60

VIII.  CONCLUSION ................................................................................................................ 64

# Table of Authorities

### Cases

*Bobby v. Bies*, 556 U.S. 825 (2009) ............................................................................ 57

*Carter v. Commissioner*, 746 F.3d 318 (7th Cir. 2014), as amended on denial of reh'g (Apr. 25, 2014) .......................................................................................................................... 55

*CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92 (2d Cir. 1986) ............................ 7

*Damato v. Hermanson*, 153 F.3d 464 (7th Cir. 1998) ..................................................... 5

*DeGuelle v. Camilli*, 724 F.3d 933 (7th Cir. 2013) ......................................................... 55

*Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063 (2d Cir. 1995) .................... 45

*Hann v. Educational Credit Mgmt. Corp. (In re Hann)*, 476 B.R. 344 (B.A.P. 1st Cir. 2012), *aff'd* 711 F.3d 235 (1st Cir. 2013) ......................................................................... 55, 57

*Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609 (7th Cir. 1996) ................................... 5

*In re George Worthington Co.*, 921 F.3d 626 (6th Cir. 1990) ............................................. 56

*In re GP Rare Earth Trading Account LLC*, Case No. 19-29617-gmh (Bankr. E.D. Wis.) ............ 1

*In re Greenpoint Tactical Income Fund LLC*, Case No. 19-29613-gmh (Bankr. E.D. Wis.) passim

*In re O'Malley*, 252 B.R. 451 (Bankr. N.D. Ill. 1999) .......................................................... 52

*In re Pierport Dev. & Realty, Inc.*, 491 B.R. 544 (Bankr. N.D. Ill. 2013) ................................ 52

*In re Ray*, 597 F.3d 871 (7th Cir. 2010) .......................................................................... 56

*In re Vanhook*, 426 B.R. 296 (Bankr. N.D. Ill. 2010) ........................................................ 52

*Johnson Steel Street-Rail Co. v. William Wharton, Jr. & Co.*, 152 U.S. 252 (1894) ................. 56

*Liu v. SEC*, 140 S. Ct. 1936 (2020) ................................................................. 7, 8, 58, 60

*Matrix IV, Inc. v. American Nat'l Bank & Trust Co. of Chicago*, 649 F.3d 539 (7th Cir. 2011) . 54

*Michaels v. Michaels*, 767 F.2d 1185 (7th Cir. 1985) ...................................................... 45

*Montana v. United States*, 440 U.S. 147 (1979) .............................................................. 53

*Patrick Finn & Lighthouse Mgmt. Group, Inc. v. Peoples Bank of Wis.*, No. 11-cv-322-wmc, 2012 U.S. Dist. LEXIS 130863 (W.D. Wis. Aug. 22, 2012) ......................................... 5

*People Who Care v. Rockford Bd. of Educ.*, 68 F.3d 172 (7th Cir. 1995) .............................. 54

*SEC v. Benger* No. 09 C 676, 2015 U.S. Dist. LEXIS 151412 (N.D. Ill. Nov. 9, 2015) ........ 45, 46

*SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978)) ..................................................................... 7

*SEC v. Chen*, No. C17-0405JLR, 2022 U.S. Dist. LEXIS 146547 (W.D. Wash. Aug. 16, 2022) .... 7

*SEC v. Church Extension of the Church of God, Inc.*, 429 F. Supp. 2d 1045 (S.D. Ind. 2005) ... 42

*SEC v. Contorinis*, 743 F.3d 296 (2d Cir. 2014) ............................................................... 45

*SEC v. Custable*, No. 94 C 3755, 1996 U.S. Dist. LEXIS 19321 (N.D. Ill. Dec. 26, 1996), *aff'd*, 132 F.3d 36 (7th Cir.1997) ................................................................................... 42

*SEC v. First City Fin. Corp.*, 890 F.2d 1215 (D.C. Cir. 1989) .............................................. 7

*SEC v. Gann*, 565 F.3d 932 (5th Cir. 2009) ................................................................... 46

*SEC v. Happ*, 295 F. Supp. 2d 189 (D. Mass. 2003), *aff'd*, 392 F.3d 12 (1st Cir. 2004) ............. 46

*SEC v. Holschuh*, 694 F.2d 130 (7th Cir. 1982) ............................................................. 46

*SEC v. James Spectrum LLC*, Nos. 17-17042, 18-15403, 2020 WL 3578077 (9th Cir. July 1, 2020) ................................................................................................................ 60

*SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005) ................................................................. 41, 42

*SEC v. Lemelson*, No. CV 18-11926-PBS, 2022 U.S. Dist. LEXIS 58076 (D. Mass. Mar. 30, 2022) ............................................................................................................................. 7
*SEC v. MacDonald*, 699 F.2d 47 (1st. Cir 1983) ........................................................... 7
*SEC v. Razmilovic*, 738 F.3d 14 (2d Cir. 2013) ............................................................ 7
*SEC v. Razmilovic*, 738 F.3d 1487 (2d Cir. 2013) ( ................................................... 41
*SEC v. Reserve Mgmt. Co. (In re Reserve Fund Secs. & Derivative Litig.)*, No. 09 MD. 2011 (PGG); 09 Civ. 4346 (PGG), 2013 U.S. Dist. LEXIS 141018 (S.D.N.Y. Sept. 30, 2013) ...... 46
*SEC v. Rooney*, No. 11-cv-8264, 2014 U.S. Dist. LEXIS 95101 (N.D. Ill. July 14, 2014) ......... 42
*SEC v. Steadman*, 967 F.2d 636, 296 U.S. App. D.C. 269 (D.C. Cir. 1992) ............................ 46
*SEC v. Unioil*, 952 F.2d 1304 (D.C. Cir. 1991) ............................................................. 7
*SEC v. Yang*, 795 F.3d 674 (7th Cir. 2015) ................................................................. 47
*SEC v. Youmans*, 729 F.2d 413 (6th Cir. 1984) ........................................................... 46
*SEC v. Yun*, 148 F. Supp. 2d 1287 (M.D. Fla. 2001) ................................................... 46
*Siegel v. Federal Home Loan Mortg. Corp.*, 143 F.3d 525 (9th Cir. 1998) .................... 57
*SNA Nut Co. v. Haagen-Dazs Co., Inc.*, 302 F.3d 725 (7th Cir. 2002) ......................... 55
*United States v. Coast Wineries*, 131 F.2d 643 (9th Cir. 1942) .................................... 58
*Washington Grp. Int'l, Inc. v. Bell, Boyd & Lloyd LLC*, 383 F.3d 633 (7th Cir. 2004) .............. 54

## Statutes

11 U.S.C. § 1109(a) ....................................................................................................... 56
11 U.S.C. § 1109(b) ....................................................................................................... 56
11 U.S.C. § 305(a) ......................................................................................................... 55
11 U.S.C. § 502(b) .................................................................................................. 50, 55
11 U.S.C. § 502(c)(1) ..................................................................................................... 55
15 U.S.C. § 77t(d) .......................................................................................................... 41
15 U.S.C. § 77t(d)(2) ..................................................................................................... 41
15 U.S.C. § 78t ......................................................................................................... 49, 54
15 U.S.C. § 78u ......................................................................................................... 41, 49
15 U.S.C. § 78u(d) ......................................................................................................... 41
15 U.S.C. § 80b-9 ..................................................................................................... 49, 54
15 U.S.C. § 80b-9(e) ..................................................................................................... 41
28 U.S.C. § 1334(c)(1) ................................................................................................... 55
28 U.S.C. § 157(b)(2)(B) ............................................................................................... 55
28 U.S.C. § 157(d) ......................................................................................................... 55

## Other Authorities

https://wallstreetonparade.com/2021/05/three-wall-street-mega-banks-have-admitted-to-a-combined-eight-felony-counts-but-dont-expect-the-word-felony-to-come-up-in-wednesdays-senate-banking-hearing-with-t/ ..................................................................................... 61
*https://www.investopedia.com/terms/p/ponzischeme.asp* ............................................. 6
*https://www.investor.gov/introduction-investing/investing-basics/glossary/ponzi-schemes* .......... 6
https://www.justice.gov/opa/pr/five-major-banks-agree-parent-level-guilty-pleas ..................... 61
https://www.sec.gov/news/statement/stein-waivers-granted-dissenting-statement ..................... 62

Rules

Fed. R. Bankr. P. 3001(f) .................................................................................... 52
Fed. R. Bankr. P. 3007(a)(1) .............................................................................. 55
Fed. R. Bankr. P. 9006(c)(1) .............................................................................. 55

Treatises

1 T. Hazen, The Law of Securities Regulation § 9.5 (2d ed. 1990) ........................... 46
Garner, Black's Law Dictionary (9th ed. 2009) ............................................................ 5

## I.   INTRODUCTION

The August 2 jury verdict of liability in this case was based upon evidence presented to the jury over six days of trial. While Defendants acknowledge the jury's verdict, Defendants do not accept the SEC's view of what the verdict means. In its brief, the SEC ignores the significant problems with its case including numerous allegations that it made that were demonstrably false. In its brief, the SEC ignores the Court's instructions to the jury, which the SEC emphasized in closing, that for the SEC to prevail the jury need only find one single violation of the law and that the proof supporting the SEC need only slightly tip the scales in its favor. In its brief, the SEC ignores its own rejection of Defendants' special verdict form that would have provided detail as to what facts the jury found. Having rejected Defendants' special verdict form, the SEC cannot claim that the jury found anything more than the minimum necessary for each count.

The SEC's request that all Defendants be held jointly and severally liable for almost $20 million in disgorgement and prejudgment interest to be paid to the US Treasury is manifestly unfair. GTIF and GPRE are entities that have emerged from bankruptcy and are owned by the investors.[1] Demanding relief from GTIF/GPRE would harm GTIF investors. Moreover, this issue has already been decided in the Bankruptcy Court. The SEC chose to subject itself to the jurisdiction of the Bankruptcy Court for the purposes of determining its claims against GTIF/GPRE and those claims were adjudicated to be zero. Even if the Bankruptcy Court's determination does not preclude the SEC from seeking disgorgement and prejudgment interest from GTIF/GPRE, it represents the considered judgment of Judge Halfenger, which should be accorded appropriate deference.

---

[1]    *See In re Greenpoint Tactical Income Fund LLC*, Case No. 19-29613-gmh (Bankr. E.D. Wis.) and *In re GP Rare Earth Trading Account LLC*, Case No. 19-29617-gmh (Bankr. E.D. Wis.) (collectively, the Bankruptcy Cases").

1

Since the jury returned its verdict, Defendants have undertaken significant remedial efforts, including efforts to fully inform investors and others of the results of the trial. Mr. Nohl notified all portfolio companies on which GTIF has a board seat that he was resigning the seat until the remaining issues in this case are resolved. The Managing Members changed the fund's name from Greenpoint Tactical Income Fund to the Alluvium Fund[2], thus removing the term "income" from the Fund's name. The Managing Members created a portal through which investors have access to the entire of transcript of the *SEC v Bluepoint* trial proceedings, all admitted exhibits, the jury verdict, and the jury instructions. Michael Hull and Christopher Nohl continue to confer with a board of investors established by the Confirmation Plan called the Oversight Board to ensure transparency and fairness in the operation of the Fund.

In accordance with the Court's August 2 post-verdict instruction, Defendants have calculated disgorgement figures that represent fees earned on values of Amiran and other assets that the Court and the jury may have concluded were overstated. The Court may determine that some or all of those amounts should be included in disgorgement. Defendants have calculated the amount of prejudgment interest associated with each of the potential elements of disgorgement. Defendants ask that the amount of any penalty imposed on any Defendant should be set at no more than 50% of that Defendant's disgorgement.[3]

Yet, the most punitive and destructive relief the SEC seeks is that ***all Defendants*** be subject to a general and conduct injunction that will inflict unnecessary losses on investors and undermine a bankruptcy settlement approved by nearly all of GTIF investors. GTIF's investors voted overwhelmingly to accept a Confirmation Plan and approve a revised (third) operating

---

[2]     We will refer to the Alluvium Fund under its old acronym GTIF throughout this brief to be consistent with prior filings and the evidence presented at trial.
[3]     GTIF/GPRE should not be subject to any monetary relief for the reasons set forth below.

agreement which explicitly provides for the retention of the Managing Members (GAM II and Chrysalis Financial) to manage GTIF under the plan.[4]  Injunctions imposed on Christopher Nohl, Michael Hull, or the Managing Members would undermine the 2 ½ year bankruptcy process and the fully informed decision of GTIF's investors to approve the Confirmation Plan. The SEC's inexplicable request for the imposition of injunctions on GTIF and GPRE is simply punitive.

The following investors have written to the Court in support of Michael Hull and Christopher Nohl. The letters from Paul Pongratz, Sue Ewens (mother of witness Susan Ewens), Bonnie Draxler, Laure Pientka, Vicki Fruechtl, Terri Connors all express their appreciation and support for Michael Hull and Chris Nohl. (Declaration of Celiza P. Bragança ("Bragança Decl.") at Ex. O, P, Q, R, S. Two additional letters and one message come from Wisconsin businesspeople who write are supportive of Michael Hull and Chris Nohl.  Bragança Decl. at Ex T, U, V. In these letters, the Court can see how devastating an injunction imposed on Michael Hull and Christopher Nohl would be on Yodelay Yogurt and Amtrust Biochemical. After Mr. Nohl notified the Okanjo Board that he was resigning because of the jury verdict, the Board wrote to him expressing their support and continued desire to work with him. Bragança Decl. at Ex V. We ask that the Court consider the letters from these persons who will be personally impacted by the Court's ruling.

---

[4]      Of the investors who voted, 99.14% voted to accept GTIF's plan. Deanna Schneider was the only investor who voted to reject the plan. Neither Erick Hallick nor Susan Ewens voted to reject the plan. (Declaration of Michael P. Richman ("Richman Decl.") ¶¶ 26 & 29).

## II.     THE JURY DID NOT FIND THAT GTIF WAS A FRAUDULENT ENTERPRISE

### A.     The jury verdict is based upon the lowest standard of proof – as emphasized by the SEC in its closing argument

The jury reached its verdict based upon the Court's instructions, which required them to render a verdict in favor of the SEC if they found a single instance of fraud based upon the lowest level of scienter: recklessness. The Court instructed the jury that "even one violation of the federal securities law is actionable in an SEC enforcement case." (Aug. 1, 2022 Hr'g Tr. 238:8-10; *see also* Tr. 243:13-15 ("It is only necessary for you to find one material misstatement or omission to find the defendant liable.").). Moreover, the SEC's burden of proof was merely a preponderance of the evidence, which the SEC emphasized in closing. Thus, there is no basis for the SEC to assert that it proved all of its allegations.

Characterizing the jury's verdict as anything more than the lowest level of liability is belied by the SEC's stressing to the jury in closing argument, over an image of the "Scales of Justice" barely leaning in its favor, to "[j]ust remember: This is a civil case. It's not a criminal case. The SEC must prove its case by a preponderance of the evidence. It must prove that each element is more probably true than not. In other words, that the scales tipped just ever so slightly in the SEC's favor." (Aug. 1, 2022 Hr'g Tr. t 290:13-17) That is exactly what the verdict represents, a finding that the scales tipped ***ever so slightly*** in the SEC's favor.[5]

---

[5]     A more specific jury verdict form, like the one proposed by Defendants, would have avoided any such confusion. Defendants proposed a jury verdict form that would have identified the particular conduct that the jury found to violate the federal securities laws. Had that verdict form been submitted to the jury, there would be evidence of the specific facts the jury found. But the SEC objected to Defendants' verdict form and the Court ruled in favor of the SEC's general verdict form. For example, in the SEC's Objections to Defendants' Proposed Special Verdict Form (Dkt. 234, filed 11/29/21), the SEC characterized the Defendants' proposed special verdict form which specifically asked the jury whether [fill in relevant questions] (see Dkt. 221, filed 11/15/21) as "long, complex, repetitive, (sic) confusing," emphasizing that there was no need to for the jury to make any specific or even consistent finding. See Dkt. 234 at 2 ("the SEC can establish liability against a defendant based on a single actionable misstatement, omission, or other fraudulent act. Indeed, the jurors do not even have to agree as to the specific act by any one defendant that violated the law, so long as all the jurors agree that the defendant engaged in at least one violation.").

**B.       SEC misrepresented GTIF to the jury as a Ponzi Scheme**

The SEC's "preponderance" argument was immediately followed by the SEC essentially

calling GTIF a Ponzi scheme, a comparison that is not only contrary to law, but completely

inconsistent with the SEC's own public guidance as to what constitutes a Ponzi scheme.[6] The

SEC misleadingly and disingenuously argued in closing "[n]ow, with little cash available, the

defendants also used new investor funds to repay old investors, hiding the fact that the fund had

no money to pay redemptions to investors to repay investors with the money they put into the

fund -- this is the definition of a Ponzi payment, and this was the next way that the defendants

concealed their fraud." (Aug. 1 Hr'g Tr. 288:4-9). The SEC made this argument after Defendants

clearly demonstrated that the GTIF operating agreement expressly provided for funds paid in by

investors to be used to redeem the interests of exiting investors. (Declaration of Celiza P.

Bragança ("Bragança Decl.") at Ex. A (Trial Ex. 8); Aug. 1 Hr'g Tr. 53:1-55:6).

But SEC knows, there is no such thing as a "Ponzi payment." What the SEC called a

"Ponzi payment" in closing argument is the kind of payment routinely made in many different

securities markets where a willing buyer must be identified before a willing seller can sell their

shares. The SEC knows that this is a perfectly legal process that takes place in public and

nonpublic securities markets (such as Dark Pools). That is very different from a Ponzi scheme,

which is characterized by the payment of *dividends or profits* to the earlier investors from the

payments from new investors. As this Court recognized in *Patrick Finn & Lighthouse Mgmt.

Grp, Inc. v. Peoples Bank of Wis.*, No. 11-cv-322-wmc, 2012 U.S. Dist. LEXIS 130863, at *

(W.D. Wis. Aug. 22, 2012), "[i]n the classic Ponzi scheme, the perpetrator attracts investment by

---

[6]       Aside from the SEC attorneys themselves, the only person who said GTIF was a Ponzi scheme was Erick
Hallick – the man who tried to seize $45 million in gems and fine minerals from GTIF by having Dr. Cigdem Lule
misrepresent $45 million worth of stones as worth only $15 million.

paying *artificially high returns* to early investors directly from capital supplied by other investors, usually with little or no revenue producing activity except continually raising new funds (emphasis added) (citing Garner, Black's Law Dictionary (9th ed. 2009)). *See also Damato v. Hermanson*, 153 F.3d 464, 466 (7th Cir. 1998) (describing "classic Ponzi scheme" as paying "*so-called 'profits'* to current investors with monies invested by new customers." (emphasis added)); *Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609, 619 (7th Cir. 1996) ("In classic Ponzi-scheme fashion, when an investor wanted a *return on his investment*, that particular impatient *investor would be paid 'interest'* out of the money paid in by other investors." (emphasis added)).

Under the SEC's definition of a Ponzi scheme in this case, a huge amount of trading in public markets would be a Ponzi scheme. Indeed, the SEC's own website recognizes the distinction between new investors purchasing the shares of existing investors and using new investor money to pay profits or returns to old investors: "In the 1920s, Ponzi promised investors a 50% return within a few months for what he claimed was an investment in international mail coupons. Ponzi used funds from new investors *to pay fake "returns"* to earlier investors." Investor.gov, Ponzi Schemes, *https://www.investor.gov/introduction-investing/investing-basics/glossary/ponzi-schemes* (last visited on Aug. 31, 2022). *See also* Investopedia, Ponzi Schemes, *https://www.investopedia.com/terms/p/ponzischeme.asp* (last visited on Aug. 31, 2022) ("A Ponzi scheme is a fraudulent investing scam which generates *returns* for earlier investors with money taken from later investors." (emphasis added)). The SEC misrepresented in closing argument that GTIF's raising of funds from new investors to pay exiting investors as "Ponzi Payments."

III.   **DISGORGEMENT SHOULD BE BASED UPON FEES EARNED ON POTENTIALLY OVERVALUED ASSETS AND INTEREST PAYMENTS**

After the jury verdict was delivered and the jury excused, the Court asked the parties to address damages as follows:

> I really was not certain which way this would come out, and that's a credit to the lawyering and the testimony by both sides. But when I'm thinking about a damage number, I'll be thinking about the fees that were earned on inflated values of assets. Obviously, there are other aspects, including penalties and other parts of the damage award, but that's where I would ask the parties to stay.

(Aug. 1 Hr'g. Tr. 7-P-7 through 7-P-8). Defendants have followed the Court's instruction, which reflects the law of disgorgement. In calculating disgorgement, Defendants have identified particular findings that the Court or the jury may have found and calculated the amount of fees associated with those potential findings. Those particular findings are (1) the valuation of GTIF's investment in Amiran; (2) the fair market value of The Emperor emerald; (3) the Metropolis appraisals of eight stones for which Zigras offered a preappraisal value that was lower; (4) interest on loans to GTIF made by Michael Hull, Christopher Nohl, and Dr. Shannon Graewin. We address certain other conduct that the Court or the jury may have found violative and demonstrate why such conduct does not support an award of disgorgement.

A.   **Legal Standard**

As the SEC recognized, the Supreme Court, held in *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020), that the amount of disgorgement cannot exceed a defendant's net profits. *See* Plaintiff's Brief in Support of Remedies ("SEC Br."), Dkt 390 at 22.Dkt. 390 at 22. Moreover, the Court reaffirmed that the SEC must show that the *net profits* to be disgorged *were connected to the particular wrongdoing*. *Liu*, 140 S. Ct. at 1945. "The court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing." *SEC v. MacDonald*, 699 F.2d 47, 54 (1st. Cir 1983) (en banc) (quoting *SEC v. Blatt*, 583 F.2d 1325, 1335

(5th Cir. 1978)). "[I]n order to establish a proper disgorgement amount, 'the party seeking disgorgement must distinguish between the legally and illegally derived profits.'" *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) ("*Razmilovic I*") (quoting *CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92, 93 (2d Cir. 1986)); *SEC v. Chen*, No. C17-0405JLR, 2022 U.S. Dist. LEXIS 146547 at **11-12 (W.D. Wash. Aug. 16, 2022) (denying SEC motion for disgorgement where defendants' legitimate business expenses, including legal fees, funds returned to investors, referral fees, and other expenses, exceeded the amount still owed to investors). Though the SEC may seek disgorgement "to deter others from violating the securities laws, [it] may not be used punitively." *SEC v. Unioil*, 952 F.2d 1304, 1306 (D.C. Cir. 1991) (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989)). *See also*; *SEC v. Lemelson*, No. CV 18-11926-PBS, 2022 U.S. Dist. LEXIS 58076, at *23 (D. Mass. Mar. 30, 2022) (the "Supreme Court recently made clear that disgorgement is a tool intended to benefit investors, not to further punish the defendant." (citing *Liu*, 140 S. Ct. at 1948)).

**B.      GTIF investors have already recovered millions of dollars from the Managing Members through the Confirmation Plan**

Before discussing the specific amounts of disgorgement, we note that in participation with the Equity Committee and GTIF/GPRE, the Managing Members contributed substantial sums to the Confirmation Plan. In total, the Managing Members contribution over $2.7 million in cash by not seeking reimbursement from GTIF/GPRE for those cash payments made in the years before bankruptcy and during the years of bankruptcy proceedings. In addition to cash contributions, the Managing Members agreed to forego another $10 million or so in compensation and equity that they had already earned. Those concessions are summarized here below and described in more detail in section III.I.

**C.      Disgorgement based upon valuation of GTIF investment in Amiran**

As the Court noted on August 2, disgorgement should be based upon management fees paid based upon values of assets that the Court or jury concluded were overstated. Based upon the evidence at trial, the Court may conclude that because Baker Tilly contemporaneously verified the value of Amiran as of the end of December 2016, disgorgement should be based upon the difference between the stated value of Amiran during 2017/2018 and the December 2016 value.

**1.      Baker Tilly verified GTIF's 2015 & 2016 valuations of its investment in Amiran**

Baker Tilly's valuation experts documented the work that they did to verify GTIF's valuation of its investment in Amiran as of the end of 2015 and 2016. Baker Tilly's verification was conducted by three valuation experts brought in by the Baker Tilly audit team and documented in a July 4, 2017 memorandum included in Baker Tilly's work papers and produced to the SEC during the SEC's investigation. *See* Bragança Decl., Ex. B. Baker Tilly's memorandum was prepared in 2017, before anyone knew how GTIF's investment in Amiran would work out.

Baker Tilly verified and agreed with GTIF's valuation of its investment in Amiran as of the end of 2015. In addition to considering 2015 transactions at a price of $3,333.33 per share, Baker Tilly stated:

> The estimated fair value per share for the Company's [Amiran's] common stock was based on the 2015 third-party transaction between Mohsen Amiran and Greenpoint. The Company purchased 932 shares for $2.5 million, or $2,682.40 per share (implied enterprise value of approximately $40.5 million). While there were other transactions at a price of $3,333,33 per share earlier in 2015, it is our opinion that the transaction between Mr. [Mohsen] Amiran and the Company [GTIF/GPRE] was the most representative indication of the fair value per share and should be considered a Level 1 input.

*Id.*[7]

Baker Tilly's valuation as of December 31, 2015 included verifying the $2.5 million value of the GPRE Tanzanite that Mohsen Amiran accepted in exchange for 932 shares of Amiran stock. As the SEC put it in its opening statement, "Nohl traded a rock to the founder of Amiran Technologies for some Amiran stock." (July 25, 2022 Hr'g Tr. 1-P-16). Far from proving that the tanzanite Mohsen Amiran accepted in exchange for $2.5 million of Amiran stock was simply a "rock," Baker Tilly verified that the tanzanite was worth $2.5 million. (Bragança Decl., Ex. B & Ex. C (Trial Exhibit 722 (admitted) at BTVK 824-827 (BT work paper re verification of physical asset values including purchase receipt and 12/31/2015 Mohsen Amiran/GPRE Tanzanite exchange agreement)).

As part of its work, Baker Tilly also verified GTIF's valuation of its investment in Amiran as of December 31, 2016. Baker Tilly documented that it evaluated the impact of

---

[7]     A "Level 1" input is defined in a footnote to the GTIF audited financials prepared by Baker Tilly as follows: "Level 1 – Fair value is based upon quoted prices (unadjusted) for identical assets or liabilities in active markets. Active markets are those in which transactions for the asset or liability occur in sufficient frequency and volume to provide pricing information on an ongoing basis." Bragança Decl., Ex. W (Trial Exhibit 55 admitted) at BTVK 1119 (GTIF 2013-2015 Audited Financials, footnote 2).

negative operational and financial events taking place during 2016 had on the value of GTIF's

investment in Amiran. Baker Tilly documented it considered that Amiran's

> operations suffered due to delays in processing soil in Kuwait. Sales and
> profitability declined during 2016 relative to 2015; however, there were
> significant positive developments during 2016, including the planned launch of
> two operational plants during 2017. Considering the weaker financial results
> during 2016 and significant uncertainty in forecasting cash flows for the
> Company [Amiran], we agree with the conclusion that the adjusted price per share
> from the 2015 transaction between the Company and Mr. Amiran is the most
> representative indication of fair value.

Bragança Decl., Ex. B. After weighing not just negative but also positive events taking place

during 2016, Baker Tilly concluded that GTIF's use of $2,397.92 per share as of December 31,

2016 was reasonable:

> In our opinion, we have performed the appropriate procedures necessary to review
> the estimated fair value of the common stock of Amiran Technologies LLC of
> $2,397.92 per share as of December 31, 2016, as prepared by management
> pursuant to ASC 820. In our opinion, management's estimated fair value based on
> a level one input within the fair value hierarchy appears reasonable. We believe
> that management correctly adjusted the fair value estimated as of December 31,
> 2015 (sic.), to account for events that occurred during fiscal 2016. Based on our
> detailed review, in our opinion, the estimated fair value of $2,397.92 per share as
> of December 31, 2016 appears to be a reasonable conclusion.

(*Id.*) Although the SEC spent over $750,000 to have Ms. McMahon give an opinion on the value

of Amiran, they inexplicably failed to provide her with this key document.

### 2.    No evidence that GTIF failed to comply with contractual obligations to Amiran

At trial, the SEC finally abandoned its long-standing contention that GTIF failed to fulfill

contractual obligations to Amiran. As the evidence showed, the SEC and its experts had

improperly treated options agreements as contracts and contracts as incapable of modification.

(Bragança Decl., Ex. D (Trial Ex. 180), E (Trial Ex. 182), Ex F (Trial Ex. 756)). The SEC and its

experts ignored basic contract law. They also ignored the significant structural problem of the

supermajority and nondilution provisions in the Amiran operating agreement. Those provisions essentially gave Mohsen Amiran a veto over all management decisions. Mr. Skrade and Mr. Sherwin Amiran acknowledged that these provisions made it difficult for Amiran to attract investors. Mr. Nohl testified that he needed to get Mohsen Amiran, Luis De Leon, and others at Amiran to stop making bad decisions like using $1 million paid by AECOM to pay $350,000 of salary to Luis de Leon, $250,000 of salary to Mohsen Amiran, and $200,000 of salary to Sherwin Amiran, among others. Those were funds that could and should have been used to pay down the BMO Harris Bank loan.

### 3.    Management fees based on Amiran value during 2017 and 2018

To the extent that the Managing Members were paid compensation on the increased value of Amiran during 2017 and 2018, Defendants concede that such an amount is a proper subject of disgorgement to seek from the Managing Members. Moreover, the Court may consider the fact the impact of the FBI raid and resultant publicity on GTIF's ability to obtain mezzanine financing that was in process in March 2017.[8]

Neither the SEC nor Ms. McMahon rendered an opinion as to the specific value of GTIF's investment in Amiran during 2017. Defendants have calculated disgorgement for 2017 and 2018 as the difference between the Baker Tilly verified December 31, 2016 valuation figure and the valuation figures set forth in the GTIF Amiran Quarterly Evaluation Reports. While Managing Member fees are recorded on a quarterly basis, those were estimates that were "trued

---

[8]      The SEC did not call Mark Leopold to testify but had they done so, Defendants would not have been permitted to ask him about the more than one million investment that he and some of his family members planned to make in GTIF in early 2017, before the FBI raid. Mr. Leopold not only did not make that investment, but soon after he left the company.

up" at the end of the year based on annual figures. The calculation of the incremental difference

between the different values of Amiran are summarized below:

## Recalculation of Amiran Technologies Related Mgmt Fees
### Calculation of Correction Due to Relaunch Failure

| | PERIOD END DATE | COST BASIS | UNREALIZED GAIN (1) | ACTUAL MANAGING MEMBER MGMT FEES | ADJUSTED MANAGING MEMBER MGMT FEES | NET ADJUSTMENT |
|---|---|---|---|---|---|---|
| | 12/31/2016 | 9,354,607 | 1,538,777 | | | |
| YE 2016 | | 9,354,607 | 7,271,370 | | | |
| *Contemporaneous Authentication by Baker Tilly* | | | | | | |
| | 3/31/2017 | 10,384,607 | 777,572 (a) | 92,168 | 83,130 | 9,038 |
| | 6/30/2017 | 10,769,607 | -532,912 (b)(c) | 91,428 | 83,130 | 8,298 |
| | 9/30/2017 | 10,794,607 | -25,000 | 91,428 | 83,130 | 8,298 |
| | 12/30/2017 | 10,824,607 | -30,000 | 91,428 | 83,130 | 8,298 |
| YE 2017 | | 10,824,607 | 189,660 | 366,452 | 332,520 | 33,933 |
| | 3/31/2018 | 10,994,607 | 20,060,628 | 192,581 | 83,130 | 109,451 |
| | 6/30/2018 | 11,494,607 | 6,896,080 | 227,062 | 83,130 | 143,932 |
| | 9/30/2018 | 11,614,607 | -45,532,345 | 0 | | |
| | 12/31/2018 | 11,614,607 | 0 | 0 | | |
| YE 2018 | | 11,614,607 | -18,575,637 | 419,643 | 166,260 | 253,383 |
| TOTAL OVERAGE | | | | 786,095 | 498,779 | 287,316 |

 (Declaration of Christopher J. Nohl ("Nohl Decl.") at ⸭ 8 (Ex. 2)). For the 2017 calendar year,

management fees of $332,520 would have been owed to the Managing Members if GTIF had

kept the value of Amiran at the 12/31/2016 level – a figure that was verified by Baker Tilly and

deemed reasonable considering positive and negative events occurring during 2017. The amount

of disgorgement for 2017 the $33,933 more that was paid based upon the increased valuations of

Amiran[9].

---

[9]      As numerous witnesses testified, despite Amiran's continued financial and operational difficulties, GTIF
continued to contribute funds to Amiran and work with Amiran to remove the nondilution and supermajority control
provisions from its operating agreement as well as develop with Second Wind a plan for GTIF to either obtain the
rights to Amiran's proprietary technologies by having an independent third party purchase the BMO Harris loan and

In the first half of 2018, GTIF increased its estimation of the value of Amiran in anticipation of acquiring the BMO Harris loan and the ability to institute desperately needed operational, organizational, and management reforms at Amiran. While estimated management fees were paid based upon the first two quarterly evaluations for 2018, those fees were functionally returned at the end of year "true up" process. The total amount of management fees that had already been paid to the Managing Members relating to Amiran for the first two quarters was $419,643. Because the value of Amiran was reduced to zero as of the end of year, those management fees were, in effect, credited back to GTIF and then repaid to the Managing Members based upon the value of total assets (excluding Amiran) under management at the end of the year. Based on end of year values for the Amiran investment of zero, the Managing Member fees were zero.

Nevertheless, Defendants have recalculated the estimated management fees that would have been paid to Managing Members had GTIF used the last available verified value prepared by Baker Tilly as of December 31, 2016 as the value of Amiran. Had GTIF maintained the value of its investment in Amiran in the first and second quarters of 2018 at the last Baker Tilly verified figure, estimated management fees *initially* paid would have been $166,260 – an amount that is $253,383 less than the estimated fees actually paid.

There is good reason to believe that Amiran's value should not have been further reduced until the end of September 2018. As the testimony of Messrs. Nohl, Amiran, and Crewell showed, GTIF continued during 2018 to make substantial investments in reorganizing Amiran

---

license the technologies to entities operating under the Greenpoint Green Fund or by having Amiran, Biogenesis, and Mohsen Amiran filed for bankruptcy protection, which would permit GTIF to purchase the loan – and the associated rights – through a bankruptcy approved sale process. These methods would have provided GTIF with some leverage to obtain the organization, operational, and financial reforms necessary for Amiran to grow. Simply paying off the BMO Harris loan for Amiran would mean Amiran could do the same thing again. That was not in the best interests of GTIF investors, to whom the Managing Members owed fiduciary duties.

including cash loans directly to Amiran and creating a number of new entities to take Amiran technologies to market under new management.[10]

Because the 2018 value of Amiran was reduced to zero for the "true up" process, the interim management fees were later based upon the assets under management completely excluding Amiran. Had GTIF recorded the value of Amiran during the first half of 2018 at the December 31, 2016 value, the interim management fees paid to the Managing Members would have been $253,383 less. Including those fees in disgorgement results in a total figure of $287,316. But, because all the management fees paid for Amiran during 2018 were essentially credited back to GTIF and then used to pay fees associated with other assets, the correct total amount of disgorgement relating to Amiran should be $33,933. This amount should be assessed against the Managing Members only.

### D.    Disgorgement based upon appreciation of The Emperor emerald

Defendants acknowledge that their accounting for The Emperor may not have been in accordance with GAAP until they obtained possession of the stone in early 2019. As the evidence at trial demonstrated, Pam Kirchen and the Baker Tilly auditors were aware that The Emperor was not in GTIF's possession in 2015 and 2016:

---

[10]    While SEC expert Ms. McMahon calculated a value as of March 31, 2018, her testimony and the testimony of other witnesses reveal that she completely disregarded (1) the value of Amiran's proprietary technologies and (2) the substantial investments and efforts that GTIF continued to pour into reorganizing Amiran into commercially viable businesses. Although a BMO Harris witness claimed at trial that the loan could not be purchased by GTIF directly from BMO Harris, there was no evidence whatsoever that (1) an independent party could not purchase the BMO Harris loan and license the technologies to GTIF entities (which was in process), or (2) that the BMO Harris loan could not be sold directly to GTIF through the bankruptcy process. Ms McMahon failed to account for any of this in her 2018 valuation.

 Gmail

Cj Nohl <christopherjnohl@gmail.com>

**Emperor**
4 messages

Pam Kirchen <pamelakirchen@chrysalisfinancial.com>                    Thu, Jan 7, 2016 at 10:43 AM
To: Christopher J Nohl <christopherjnohl@gmail.com>

The auditors were in today to review the GPRE inventory.  They asked for documentation on the Emperor piece in lieu of it
being physically present.  We gave them the memo forms for the items on memo.  What do you want to give them on the
Emperor?

Pam Kirchen
Chief Financial Officer
Chrysalis Financial LLC

pamelakirchen@chrysalisfinancial.com

www.chrysalisfinancial.com

Bragança Decl., Ex. G. None of these auditors ever told Chris Nohl or Michael Hull that it was

improper to record the appreciation on The Emperor when it was not in their physical possession

and/or fully paid for.

It is significant that after the FBI raid, GTIF changed the way it accounted for The

Emperor. While before GTIF had recorded The Emperor at fair market value, after the raid,

GTIF decided to record The Emperor at cost. This is something that is set forth clearly in general

ledger and inventory records of GTIF. As shown below, GTIF carried The Emperor at fair value

until the end of 2016 and then at cost until it was full paid for. During the entirety of 2017 and

2018, GTIF recorded the value of The Emperor at the value that the SEC's expert Denis

O'Connor stated was proper: the amount of the payments already made to Marcus Budil for The

Emperor, as shown here:

16



 (Nohl Decl. at ⁋ 9 (Ex. 3)). Despite the post-FBI raid crisis leading to reduced liquidity, GTIF

continued to make payments to Marcus Budil for The Emperor whenever possible:



*Id.* As a result, Defendants calculate Managing Member compensation paid based upon the non-

GAAP recording of appreciation recorded on The Emperor during 2015 and 2016 only:

17

EMPEROR ACCOUNTING & MANAGEMENT FEES CALCULATIONS

## EMPEROR ACCOUNTING & MANAGEMENT FEES
February 2015 – February 2019: Change of Accounting Method to Match Assumptions

| Year | Quarter | Date | Cost Basis | GPRE Accrued Cash Paid Budil on Piece | Budil Remaining to be Paid | Appraised Value | Value Used for Fee Calculation | Type of Value Used | Unrealized Gain Recognized | Portion of Mgmt Fee Due to Emperor Net Carrying Value | Mgmt Fee if Carried at Cost Until Receipt | Potential Overpayment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2015 | Q1 | 2/18/2015 | 2,500,000 | 0 | 2,500,000 | | | | | | | |
| 2015 | Q1 | 4/12/2015 | 2,500,000 | 0 | 2,500,000 | 3,500,000 | 1,000,000 | APRSL FMV MINUS AMOUNT DUE | | | | |
| 2015 | Q4 | 12/31/2015 | 2,500,000 | 0 | 2,500,000 | 3,500,000 | 1,000,000 | APRSL FMV MINUS AMOUNT DUE | 1,000,000 | 20,000 | 0 | 20,000 |
| 2016 | Q4 | 12/31/2016 | 2,500,000 | 815,000 | 1,685,000 | 5,000,000 | 3,315,000 | APRSL FMV MINUS AMOUNT DUE | 3,315,000 | 66,300 | 16,300 | 50,000 |
| 2017 | Q1 | 3/23/2017 | 2,500,000 | 915,000 | 1,585,000 | 5,000,000 | 915,000 | COST | 0 | 0 | 0 | 0 |
| 2017 | Q4 | 12/31/2017 | 2,500,000 | 915,000 | 1,585,000 | 5,000,000 | 915,000 | COST | 0 | 18,300 | 18,300 | 0 |
| 2018 | Q4 | 12/31/2018 | 2,500,000 | 2,115,000 | 385,000 | 5,000,000 | 2,115,000 | COST | 0 | 42,300 | 42,300 | 0 |
| 2019* | Q1 | 2/22/2019 | 2,500,000 | 2,500,000 | 0 | 5,000,000 | 5,000,000 | APRSL FMV (upon receipt) | 2,115,000 | 10,575 | 10,575 | 0 |
| | TOTALS | | | | | | | | | 157,475.00 | 87,475.00 | 70,000.00 |

*Id.* These figures are based upon the general ledger, the GPRE inventory records, and other
records provided to the SEC during the investigation and litigation.

It was only during 2015 and 2016, that GTIF calculated the value of The Emperor at the
appraised value minus the amount still due to Marcus Budil for that stone. The Managing
Members received no compensation based upon the fair market value of the stone during 2017
and 2018 because the value of The Emperor was set at its cost basis – the amount that already
been paid to Marcus Budil for that stone. As of the end of March 2017, The Emperor value was
recorded as $915,000, which was the amount of funds that had actually been paid to Marcus
Budil for the stone by that date. That value was increased to $2,115,000 after GTIF made
additional payments to Mr. Budil in late 2018.

Because The Emperor was acquired and paid off in the first quarter of 2019, according to
the SEC's expert Mr. O'Connor it was proper under GAAP to record its fair market value,
including the unrealized gain based upon the most recent appraisal. As a result, the compensation

paid to Managing Members based upon the unrealized gain on The Emperor is a total of $70,000. This amount should be assessed against the Managing Members only.

###### E.    Disgorgement based upon the Zigras preappraisal/Metropolis appraisals

Defendants acknowledge that the jury may have determined that GTIF failed in 2015 to obtain final appraisals from James Zigras in calculating the value of 14 fine minerals. Mr. Nohl testified that he had Mr. Zigras look at certain valuable fine minerals that Mr. Metropolis had recently appraised to see how reasonable Mr. Metropolis's appraisals were. While both gentlemen were eminently qualified to do appraisals, Mr. Metropolis charged significantly less than Mr. Zigras. Mr. Nohl considered the values that Mr. Zigras called "preappraisals" in assessing the validity of Mr. Metropolis's appraisals. Mr. Nohl then analyzed the difference between Zigras's and Metropolis's values and had Ms. Kirchen enter a plug of $1,056,100 as an expense that reduced gains.

As Mr. Nohl testified at trial, he discussed this process with Ms. Kirchen. In connection with that discussion, Mr. Nohl forwarded to Ms. Kirchen the substance of Exhibit 146, his request that Mr. Zigras completed appraisals on just eight of the 14 specimens and disregard the rest along with three of the appraisal reports:

| From: | Christopher J Nohl |
|---|---|
| To: | Pam Kirchen |
| Subject: | Fwd: appraisals a |
| Date: | Wednesday, December 2, 2015 1:54:29 PM |
| Attachments: | Appraisal-report-0217smale-pinkcalcite.docx |
| | Appraisal-report-0218emerald-emperor.docx |
| | Appraisal-report-0219swiss-smoky.docx |

Sent from my iPhone

Begin forwarded message:

**From:** James Zigras <jzigras@hotmail.com>
**Date:** April 16, 2015 at 5:14:42 PM CDT
**To:** Cj Nohl <christopherjnohl@gmail.com>
**Subject: RE: appraisals**

chris the last one is coming in a few hours.  the medina aqua.

From: christopherjnohl@gmail.com
Date: Sun, 12 Apr 2015 23:54:05 -0500
Subject: Re: appraisals
To: jzigras@hotmail.com

TY for the headsup:

Here's what I need finished reports on: #2, #4, #5, #6, #7, #8, #10, #14

You can disregard the rest

Greenpoint Tactical Income Fund
**Mr. Christopher J. Nohl**
Managing Director
CHRISTOPHERJNOHL@GMAIL.COM
US Federal Origination Licensee #281225 (NMLS)
Shorewood Office: (414) 744-4200
Glendale Chrysalis Offices: (414) 847-6466
Fax: (414) 918-8228
Mobile: (414) 520-2870
www.greenpointfunds.com

(Bragança Decl., Ex. H-1)

Defendants calculate compensation paid based upon the difference between the Zigras preappraisals and Metropolis appraisal reports to be $9,878 when the plug is considered and $31,000 if the plug is disregarded:

## Net Effects of Zigras - Metropolis Appraisals

| Pc No. | Piece Description | Piece SKU | Appraised Value Metropolis | Preappraisal Estimate Zigras | Appraised Value Zigras | Difference | Sold Date |
|---|---|---|---|---|---|---|---|
| | | Date: | 3/31/2015 | 4/12/2015 | 4/12/2015 | | |
| 1 | Tanzanite (Dr. Amiran) | FSNOTZTA930140001 | 1,500,000.00 | 1,300,000.00 | None | -200,000.00 | 12/31/2015 |
| 2 | Legendary Night (Budil) | FSCOMXAZ203150001 | None | 7,000,000.00 | 7,000,000.00 | | |
| 3 | Morganite/Kunzite | FSWOAFMO918140001 | 1,500,000.00 | 850,000.00 | None | -650,000.00 | |
| 4 | The Medina | FSCOBRAQ416140897 | 2,500,000.00 | 3,500,000.00 | 3,500,000.00 | 1,000,000.00 | |
| 5 | Smoky Quartz | FSCOCHQU416140251 | 75,000.00 | 150,000.00 | 150,000.00 | 75,000.00 | |
| 6 | The Emperor (Budil) | FSCCCOEM203150002 | None | 3,500,000.00 | 3,500,000.00 | | |
| 7 | Bi-Color Star (Budil) | FSCOBRTO203150003 | None | 3,000,000.00 | 3,500,000.00 | | |
| 8 | Burkhardt's Crown | FSNOBRTO226150006 | None | 750,000.00 | 750,000.00 | | |
| 9 | Pederneira Smokestacks | FSCOBRTO208150001 | 750,000.00 | 250,000.00 | None | -500,000.00 | |
| 10 | Pink Calcite (Ex. Smale) | FSCOCNCA416140896 | None | 300,000.00 | 300,000.00 | | |
| 11 | No-Pocket | FSNOBRTO226150007 | 300,000.00 | 225,000.00 | None | -75,000.00 | 9/12/2018 |
| 12 | Heliodor - Mary | FSCOUAHE416140870 | 1,500,000.00 | 1,250,000.00 | None | -250,000.00 | |
| 13 | Carrollite (Ex. Smale) | FSCOCDCO416140901 | 225,000.00 | 150,000.00 | None | -75,000.00 | |
| 14 | Candelabra - Pederneira | FSCOBRTO211150003 | None | 4,000,000.00 | 4,000,000.00 | | |

| Total Net Difference btw Zigras (incl. preappraisals) and Metropolis | 675,000.00 |
|---|---|

| | |
|---|---|
| Total Difference Btw Zigras Pre & Higher Prior Metropolis | 1,750,000.00 |
| Adjustment (Fees Calculated 12/31/15): One Piece (1) Sold Before Year-end | -200,000.00 |
| Adjusted Gross Difference | 1,550,000.00 |
| **Difference Multipled By Manager Fee Percent (2%)** | **31,000.00** |
| | |
| Plug in Accounting Records | -1,056,100.00 |
| Alleged Gross Overstatement | 693,900.00 |
| Adjustment (Fees calculated 12/31/15) - One Piece (#1) Sold Before Year-end | -200,000.00 |
| Final Net Alleged Overstatement | 493,900.00 |
| | |
| Period of Applicability | 2015 Only |
| **Total Alleged Managing Member Fee Overpayment for 2015** | **9,878.00** |

(Nohl Decl. at ¶ 10 (Ex. 4)). Any disgorgement associated with this item should be assessed against the Managing Members only.

### F.    Disgorgement of loan interest paid to Nohl, Graewin, and Hull

Defendants acknowledge that the jury may have determined that GTIF failed to disclose to investors loans that GTIF received from Mr. Nohl, Ms. Graewin and Mr. Hull – all related to the Managing Members. While the 2016 loans were disclosed to the Baker Tilly auditors and the later loans were disclosed and not objected to by Christopher Houden Sr., as Conflicts

21

Committee Chair, Defendants acknowledge the loans and interest charged were not specifically disclosed to GTIF investors. The total amount of interest paid for those loans is $43,273:

## Loans From Managing Members
### Compensation Received on Managing Member Related Loans

| Lender | Loan Date | Payoff Date | Principal | Fee By Contract | Fee Received | Reduced / Forgiven @ Payoff | Fee as % of Loan Amount |
|---|---|---|---|---|---|---|---|
| Nohl & Graewin | 11/7/16 | 11/11/16 | 100,000 | 7,500 | 7,500 | | 7.5% |
| Nohl & Graewin | 12/7/16 | 12/22/16 | 105,000 | 15,000 | 15,000 | | 14.29% |
| Nohl & Graewin | 12/1/17 | 12/7/17 | 100,000 | 3,387 | 2,867 | 520 | 2.87% |
| Nohl & Graewin | 3/23/18 | 4/18/18 | 150,000 | 10,500 | 1,000 | 9,500 | 0.67% |
| Nohl & Graewin | 7/25/18 | 10/2/18 | 18,250 | 2,500 | 2,500 | | 13.70% |
| Chrysalis Financial | 7/1/18 | 10/24/18 | 120,000 | 12,906 | 12,906 | | 12.00% |
| Michael Hull | 11/23/16 | 12/22/16 | 25,000 | 1,500 | 1,500 | | 6.00% |
| **TOTAL** | | | **618,250** | **53,293** | **43,273** | **10,020** | **6.99%** |

(Nohl Decl. at ¶ 11 (Ex. 5)). Any disgorgement associated with this item should be assessed against only the persons who received those funds:

- Christopher Nohl (for loans made by Graewin & Nohl) - $28,867

- Chrysalis Financial - $12,906

- Michael Hull - $1500

It makes no sense to hold Defendants jointly and severally liable for these amounts, particularly when GTIF investors obtained the benefit of these cash infusions at a time when they could not obtain funds from any other source (thus arguably there was no harm to investors).

### G.    Disgorgement is not proper for transactions where there was no harm to investors

While the jury may have concluded that certain other related party transactions were not fully disclosed to GTIF investors, as discussed above, disgorgement should not be awarded that does not meet the standard of being ill-gotten gains or constitute net profits to Defendants. Those transactions include the Michael Hull mortgage (2013), the Splash Waterfall painting commission (2013) and various sales of real assets to GAM II, Chrysalis Financial, and Chrysalis Lapidary. Nor did the loans that GTIF obtained from the Greenpoint Fine Art Fund or GP Mittelstand constitute ill-gotten gains or net profits to Defendants.

While Mr. Hull's mortgage was clearly disclosed to two sets of auditors and included in the first set of GTIF audited financials, the Court or the jury may have concluded that it was not properly disclosed to investors. Although the SEC considers the non-cash part of the mortgage payments to be illusory, Mr. Hull owes taxes on the full amount of GAM II management fees that were used to pay the non-cash portion of the mortgage.

In addition, there is no basis for the SEC's contention that the underwriting fee for Mr. Hull's mortgage that he paid to Ace Capital (Mr. Nohl's company at the time) was paid by GTIF on Mr. Hull's behalf. While the cash to pay that fee came from $265,000 amount loaned by GTIF, Mr. Hull borrowed that cash from GTIF and paid those funds back to GTIF plus interest of 14% as provided in the mortgage documents. In total, GTIF investors earned a profit of $137,184 on the Hull mortgage transaction:

Exhibit 330 with the missing details

### Repayment of Michael Hull $265,000 Mortgage
### October 15, 2013 – October 31, 2018

| Hull Mortgage Repayments | Cash | Management Fee Offset | TOTAL |
|---|---|---|---|
| Principal | $     3,146 | $ 261,854 | $ 265,000 |
| Interest | 131,870 | 5,314 | 137,184 |
| TOTAL | $ 135,016 | $ 267,168 | $    402,184 |

| | |
|---|---|
| Net Profit to Fund | $137,184 |
| Percent Profit to Fund | 51.77% |

(Nohl Decl. at ¶ 12 (Ex. )).     Similarly, there is no basis for finding that the various transactions detailed in SEC's summary exhibit 343 harmed GTIF investors. While Mr. Constance's Exhibit 343 set forth the following transactions, if fails to include information that was readily available to Mr. Constance showing the specific financial benefit that investors obtained from each transaction. Mr. Constance's representation of the transactions is set forth for ease of comparison:

24

**Exhibit 343 As Presented By SEC**

## Sales of Gems, Minerals and Pianos to GAM II, Chrysalis Financial and Chrysalis Lapidary
### February 1, 2013 – September 30, 2019

| Date | Purchase Price | Buyer | Seller | Category | Payment Type |
|---|---|---|---|---|---|
| 5/2/2014 | $ 11,194 | Chrysalis Lapidary Company LLC | GPRE | Gem/Mineral Purchase | Cash |
| 7/10/2014 | 93,672 | Chrysalis Lapidary Company LLC | GPRE | Gem/Mineral Purchase | Cash |
| 9/15/2014 | 58,000 | Greenpoint Asset Management II LLC | GTIF | Piano Purchase | Equity Reduction |
| 9/22/2014 | 58,000 | Greenpoint Asset Management II LLC | GPRE | Gem/Mineral Purchase | Equity Reduction |
| 5/18/2015 | 7,500 | Chrysalis Lapidary Company LLC | GPRE | Gem/Mineral Purchase | Cash |
| 10/11/2016 | 12,110 | Chrysalis Financial LLC | GPRE | Gem/Mineral Purchase | Redemptions Payable Reduction |
| 11/6/2017 | 1,250 | Chrysalis Lapidary Company LLC | GPRE | Gem/Mineral Purchase | Cash |
| 2/28/2018 | 5,100 | Chrysalis Lapidary Company LLC | GPRE | Gem/Mineral Purchase | Cash |
| 10/10/2018 | 2,500 | Chrysalis Lapidary Company LLC | GPRE | Gem/Mineral Purchase | Cash |
| **TOTAL** | **$ 249,326** | | | | |

PLAINTIFF'S EXHIBIT 343

Source: GTIF, GPRE and other GP Subsidiary Bank Records and General Ledgers

The cost basis for each of these items, obtained easily from GTIF's accounting records, shows that rather than harming investors, these transactions led to substantial profits to GTIF investors:

**Exhibit 343 With Appraisal, Cost & Net Effects**

## SEC Ex. 343 – Sales of Real Assets to GAM2, CF and CLC
### Feb 1, 2013, thru Sep 1, 2019: Insider Transactions

| Date | Purchase Price | Cost Basis | Profit to Fund | % Fund Return | Buyer | Category | Payment Type | Note |
|---|---|---|---|---|---|---|---|---|
| 5/2/14 | $11,194 | 5,800 | 5,394 | 193% | CLC | Cut Stone | Cash | Brokered Sale For GPRE – 0% Commission: 46 days |
| 7/10/14 | 93,672 | 87,544 | 6,128 | 107% | CLC | Min/Stone | Cash | Resolution of Co-purchase btw CLC & GPRE: 100 days |
| 9/15/14 | 58,000 | 47,000 | 11,000 | 123% | GAM2 | Piano | Equity | CF (CJN) Requested GAM2 buy one |
| 9/22/14 | 58,000 | 27,000 | 31,000 | 215% | GAM2 | Cut Stone | Equity | 111 days |
| 5/18/15 | 7,500 | 2,500 | 5,000 | 300% | CLC | Mineral | Cash | 424 days |
| 10/11/16 | 12,110 | 11,914 | 196 | 102% | CF | Mineral | Equity | 859 days |
| 11/6/17 | 1,250 | 220 | 1,030 | 568% | CLC | Mineral | Cash | 1230 days |
| 2/28/18 | 5,100 | 977 | 4,123 | 522% | CLC | Mineral | Cash | 1057 days |
| 10/10/18 | 2,500 | 976 | 1,524 | 256% | CLC | Mineral | Cash | Piece demanded by GPRE buyer paid for by CLC – given to buyer: 1279 days |
| **TOTAL** | **$249,326.** | **141,631.** | **65,395.** | **126%** | | | | |

(Nohl Decl. at ⁋ 13 (Ex. 7)). As a result of these transactions, GTIF investors received $65,395 in cash and noncash benefits with an aggregate return on investment of 126%. These transactions do not support an award of disgorgement.[11]

### H.     There is no basis for disgorgement from AAPS or the H Entities

Because the H Entities – H Family Office and H Informatics – did not charge begin providing services and charging fees until 2018, the fees they were paid were not based upon inflated asset values as calculated above. The H entities charged fees in arrears, so by the time those fees were charged, Amiran had already been written down to zero.

There is no basis for disgorgement of fees that GTIF paid to AAPS for the accounting services provided by Jason Noyes from 2016 to 2019. First, the evidence adduced at trial proved that the relationship between AAPS and the Managing Members was disclosed to investors. Second, the fees GTIF paid for the work that Mr. Noyes performed did not exceed the expenses AAPS incurred. The SEC bases its assertion of AAPS ill-gotten gains on an invalid calculation. The SEC only considered Mr. Noyes salary as an expense of AAPS. The SEC ignored that well-known fact that employers have expenses associated with employees other than salaries such as employer-side social security, Medicare, and other tax payments When non-direct salary expenses are included, it is clear that AAPS did not make a profit:

---

[11]     The SEC further states in its brief that the Greenpoint Fine Art Fund paid a sales commission to Chrysalis and/or Ace Capital, an entity owned by Christopher Nohl, for a painting called the Splash Waterfall. That is not true. The *sellers* of the Splash Waterfall painting, Paul & Kathy Yih, paid a commission to Chrysalis Holdings, $200,000 of which was paid to Bluepoint. The SEC alleged at trial that this transaction was a kickback for the Hull mortgage. That is not true. The reason documents for these transactions were executed at the same time was that they had to be executed in person. As a result, Mr. Nohl drove from Milwaukee to Mr. Hull's home in Oconomowoc to obtain signatures. Remote execution and notarization of legal documents was not an option in 2013 as it is today. Further the SEC's allegation that Ace Capital received a payment for the sale of the Splash Waterfall is not true. There was no payment made under the Ace Capital contract, which provided for a commission payment if and only if the Splash Waterfall painting was sold to generate profit for the Fine Art Fund. The SEC failed to disclose that as part of the settlement with Erick Hallick, this contract was assigned in full to him. The commission on profits from any sale of the Splash Waterfall painting will belong to Erick Hallick.

(Nohl Decl. at ¶ 14 (Ex. 8)).

## I.   Disgorgement of all fees and compensation is not proper where GTIF is a legitimate enterprise that owns tens of millions of dollars of valuable assets

In determining the appropriate remedy, the Court should consider the fact that the SEC *did not* prove that GTIF was a fraudulent enterprise or that the services of the Managing Members and other related entities *did not* confer a substantial benefit on GTIF investors. The SEC made a huge number of allegations that it *flat out failed to prove* at trial, such as that

- Defendants created a maze of empty shell companies in order to perpetrate a fraud,

- GTIF's gems and fine minerals were simply colorful rocks and crystals, and

- the options to invest in Amiran were contractual obligations.

The SEC misrepresented investments in two asset classes (gems/fine minerals and early-stage technology companies) as investments in two assets. GTIF invested in 18 different portfolio companies, including Fetch Rewards and Archangel Device. GTIF invested in a diverse portfolio

of over 3000 different gems and minerals, which on an individual basis, have a fair market value of $1 to millions of dollars.

Other SEC allegations were directly contradicted by Baker Tilly work papers. While the SEC spent over $1.5 million on its accounting and valuation expert witnesses, it failed to provide them with numerous Baker Tilly audit work papers that showed (1) Baker Tilly knew about the Hull mortgage, (2) Baker Tilly knew The Emperor was not in GTIF's possession, (3) Baker Tilly verified GTIF's valuation of its Amiran holdings as of December 31, 2016, and (4) Baker Tilly on its own made the decision to remove a footnote from the 2016 audited financials that disclosed details about related party loans including the GP Mittelstand loan.

### 1.    No evidence of layers of empty shell companies

In opening statement, the SEC made the unsupportable claim that Defendants created layers of shell companies with little or no employees. The SEC introduced not a shred of evidence in support of this scurrilous allegation. Defendants demonstrated conclusively through Mr. Hull's testimony that there was never any basis for making this allegation.

### 2.    No evidence that Baker Tilly auditors deemed Michael Hull mortgage loan to be material item to be disclosed in audited financials

At trial, the SEC continued its unsupportable assertion that Mr. Hull's mortgage was not disclosed to investors or auditors. Defendants showed conclusively that the mortgage was disclosed to GTIF's first auditor, William Matthews, who included it in the 2013 audited financial statements. Bragança Decl., Ex. J (Trial Exhibit 54 admitted). Defendants showed conclusively that the loan was also fully disclosed to Baker Tilly. Bragança Decl., Ex. K (Trial Exhibit 715 admitted). As Ms. Kirchen[12] testified, she expressly listed the Hull loan on a

---

[12]    While Defendants did not question the experience and qualifications of Ms. Kirchen, there is significant evidence of her not acting in good faith. Ms. Kirchen admitted at trial that she did not tell Mr. Nohl or anyone that

document provided to Baker Tilly to ensure they were aware of it. As the auditors testified

[during the SEC investigation], they do not document in their work papers their determinations

that items are not material but that is the only reasonable conclusion to be drawn from these

facts.

3.      **No evidence that Baker Tilly auditors deemed additional detail about GP Mittelstand loans to be material item to be disclosed in audited financials**

At trial, the SEC continued its unsupportable assertion that Defendants fraudulently failed

to disclose related party loans, including the GP Mittelstand loans, to investors and the Baker

Tilly auditors. It is undisputed that the GP Mittelstand loans were disclosed in the audited

financials. Bragança Decl., Ex. M (Trial Exhibit 58 admitted). The SEC simply does not believe

the disclosure was sufficient. Documents from Baker Tilly's own work papers show that during

the 2016 audit, a number of Baker Tilly auditors reviewed certain loans with odd interest rates

before deciding on their own to delete a more detailed footnote concerning those loans. Bragança

Decl., Ex. N (Trial Exhibit 717 admitted). Baker Tilly may have made an error in removing the

footnote, but that does not support a finding of intent, recklessness or even negligence by any

Defendant.

4.      **No evidence of the gems and minerals being simply "crystals and colorful rocks"**

The SEC failed to back up its claims that GTIF's world class collection of gems and fine

minerals were simply a collection of "crystals and colorful rocks." (July 25, 2022 Hr'g Tr. 1-P-

16.) The SEC did not produce a shred of evidence that any of the gems and fine minerals was an

---

she thought GTIF should not record appreciation of The Emperor until it finished paying for it and took possession. On her last day at Chrysalis Financial, Ms. Kirchen deleted a host of documents that she had no legitimate reason to delete. Bragança Decl., Ex. L. Ms. Kirchen claims that she was fired when she had informed Mr. Nohl that she resigned yet returned to the office to delete numerous Greenpoint Fund and Chrysalis Financial files.

ordinary crystal or simply a colorful rock, much less the entire collection. Clearly the SEC had planned to have Dr. Cigdem Lule and Erick Hallick testify that the gems and fine minerals that GTIF recorded as having a fair market value of approximately $45 million were only worth $15 million. (Lule Dep. 159-60, Dkt. 350; Hallick Dep. 97-99, Dkt. 351). As discovery in the *GTIF v Lule* lawsuit revealed, Dr. Lule herself acknowledged that her appraisals – done for DOJ/FBI as well as for Mr. Hallick – were not fair market value appraisals. (Lule Dep. 159-60, 233-4, Dkt. 350). While DOJ at least tacitly acknowledged its belief that GTIF gems and fine minerals were not being fraudulently misrepresented to investors by returning control of the stones to Defendants within just a few months, the SEC continues even in its brief to make this assertion.

The SEC retained expert Sandra Tropper to testify that all of the GTIF appraisals were improper because they were not prepared in accordance with USPAP standards. That was a complete waste of time and money. Neither Ms. Tropper nor any SEC expert actually appraised GTIF's gems and fine minerals. While the SEC's $945 per hour accounting expert Denis O'Connor relied upon SEC expert Renee McMahon's expert report in reaching his opinion about accounting for Amiran, Mr. O'Connor did not do the same with Ms. Tropper's expert report. Moreover, Mr. O'Connor testified that never in his extensive auditing career, which included dealings with gems, did he ever deal with USPAP. (July 27, 2022 Hr'g Tr.. 3-P-82:15 – 3-P-83:3)

There is no basis for concluding that the revised appraisal values for the tourmalines that Ambika Sharma testified she initially appraised much lower were not the proper figures. The evidence was clear that Ms. Sharma was not qualified to do the appraisals. She testified that she plugged measurements of the stones and her assessment of color into a computer program she could not identify that generated an appraisal value. That was all she could say. She had no

experience with gems and fine minerals like Mr. Metropolis and Mr. Zigras, much less any experience with the rare cuprian (copper containing) tourmalines that Mr. Nohl brought in for appraisal. Mr. Nohl was right to object to her absurd valuations.

Ms. Sharma's boss likely knew she made a big mistake. According to Ms. Sharma, he instructed her to revise the appraisals. Those revised appraisals were far more representative of what other appraisers concluded for the exact same five tourmalines. Below is a table of appraisals of those five tourmalines from 2014 to 2018. Ms. Sharma's *revised* appraisal is in line with earlier and later appraisals by Messrs. Metropolis and Zigras as well as a 2018 appraisal by Joshua Lents, a well-qualified New York appraiser who has no relationship whatsoever with any Defendant:

## Top 5 Gemstones Appraised Values 2014-2018
COMPARING THE WORK OF 4 DIFFERENT APPRAISERS OVER 4 YEARS

### Table of Appraisals

| Year: | Species: | Tourmaline | Tourmaline | Tourmaline | Tourmaline | Tourmaline |
|---|---|---|---|---|---|---|
| | Type: | Gemstone | Gemstone | Gemstone | Gemstone | Gemstone |
| | Carats: | 44.59 | 29.13 | 34.4 | 83.37 | 108.46 |
| | Item SKU: | FCCOMZTP 1007130003 | FCCOMZTP 1007130001 | FCCOMZTP 1007130002 | FCCOMZTP 1007130004 | FCCOMZTP 1007130005 |
| 2014 | Metropolis | 535,080 | 524,340 | 619,200 | 2,084,250 | 2,711,500 |
| 2015 | Sharma | 148,300 | 1,100,500 | 1,180,950 | 1,750,980 | 2,160,000 |
| 2016 | Zigras | 891,800 | 1,165,200 | 1,720,000 | 1,667,600 | 2,711,500 |
| 2018 | Lents | 535,000 | 1,050,000 | 1,200,000 | 1,300,000 | 1,950,000 |

(Nohl Decl. at ¶ 15 (Ex. 9)). As the following graphic shows, the revised appraisal by Sharma is right in the same ballpark as the three other appraisals of the same cuprian tourmalines:

31



**Note:** 2018 Joshua D. Lents appraisals for the five stones tabled contain the following comment: "Value Stated Is Based on Extensive Market Comparison Research.  However, Due <u>To</u> The Size And Quality Of the Specimen Examined, The Inherent Rarity May Dictate Even Higher Prices Within The Consumer Market."  Report stated value is used.

*Id.* Thus, Mr. Nohl's objection to Ms. Sharma's initial appraisals was fully justified. The revised appraisals were an appropriate measure of the fair value of the tourmalines used for a short time during 2015 until they were replaced by the 2016 Zigras appraisals.

**J.    Managing Members have already contributed over $12 million to GTIF/GPRE for which they should receive credit**

The Managing Members contributed over $12 million to the Confirmation Plan, which should be credited toward any disgorgement and penalties ordered against them. These contributions were made in a combination of cash paid on behalf of the fund, accrued fees given up, and equity given up. These amounts are all documented in filings with the Bankruptcy Court:

## Managing Member Total Contributions to Fund Reorganization

**Grand Summary Managing Member Contributions to Plan**

| Category | Manager Contribution |
|---|---|
| Cash Items Given Up By Managing Members | -2,778,688 |
| Compensation Given Up By Managing Members | -2,192,667 |
| Equity Given Up By Managing Members | -5,040,334 |
| **TOTALS** | **-10,011,688** |

Source: Court ordered and confirmed bankruptcy plan; Mediation Settlement Agreement; Contract: 'Effective Date Action Regarding Mediation Awards' (5-19-22); Contract: 'Effective Date Action Regarding Managing Member (Dissolving) Class B Unit Holdings' (5-19-22); 'Effective Date Action Regarding Incept Capital Account Balances of All Members' (5-19-22); 9019 Motion

Footnotes:
1)  See Footnotes for Each Line-Item Section
2)  Total is a composite of cash payments, contributed earned compensation, and equity.

(Nohl Decl. at ¶ 18 (Ex. 12)). The negative numbers indicate payments going from the

Managers to GTIF.

### 1.     Managing Members made cash contributions of $2,778,688

The first row of cash items paid by Managing Members represents $2,778,688 of outright

cash payments made by the Managing Members on behalf of GTIF during the bankruptcy and

before the bankruptcy proceedings were filed. Those cash contributions are broken out here:

**Exhibit 13: Managing Member Cash Contributions**

## Managing Member Cash Contributions to Fund Reorganization

**Cash Payments Given Up By Managing Members**

| Type of Item | Amount Due | Mediated Amount | Contributions |
|---|---|---|---|
| Cash Expenses Paid By Managers | 491,863 | 0 | -491,863 |
| Prepetition Cash Expense Reimbursements | 2,286,825 | 0 | -2,286,825 |
| **TOTALS** | **2,778,688** | **0** | **-2,778,688** |

(Nohl Decl. at ¶ 19 (Ex. 13)). The first row (cash expenses paid by managers) is cash paid by the Managing Members to the attorneys who were retained to replace Husch Blackwell in this case. The second row (unpaid accrued management fees) represents cash outlays by the Managing Members made before the filing of bankruptcy for which the Managing Members were never reimbursed.

**2.      Managing Members gave up $2,192,667 in earned management fees**

In addition to their substantial cash contributions to the Confirmation Plan, the Managing Members agreed to forego earned fee contributions. Those amounts are broken out further here:

Exhibit 14: Managing Member Compensation Contributions

## Managing Member Fee Contributions to Fund Reorganization

### Earned Compensation Given Up By Managing Members

| Type of Item | Amount Due | Mediated Amount | Contributions |
|---|---|---|---|
| Administration Fees (Mgmt 10/4/19 - 5/17/2021) | 2,334,378 | 1,921,236 | -413,142 |
| Unpaid Accrued Mgmt Fees | 1,779,525 | 0 | -1,779,525 |
| TOTALS | 4,113,903 | 1,921,236 | -2,192,667 |

(Nohl Decl. at ¶ 20 (Ex. 14)). The administration fees are management fees earned and accrued during the bankruptcy, which are treated as priority claims in bankruptcy proceedings. The Managing Members gave up a portion of those earned fees as well as $1,779,525 in prepetition earned accrued management fees, treated as a prepetition unsecured claim.

**3.      Managing Members gave up over $5 million in earned equity compensation**

In addition to cash and management fee contributions to the Confirmation Plan, the Managing Members contributed $5,040,334 of the total of $13,040,334 in equity compensation

34

that they had already earned. As shown below, in exchange for all of their earned equity, the Managing Members agreed to accept a reduced amount of equity ($8 million) [13] on par with those non-redeeming investors who seek to "stay" after all redeeming (leave) investors have been paid their net invested capital:

**Exhibit 15: Managing Member Equity Contributions**

## Managing Member Equity Contributions to Fund Reorganization

### Earned Equity Given Up By Managing Members

| Type of Item | Amount Earned | Mediated Amount | Contribution |
|---|---|---|---|
| Capital Accounts (Stay Class) | 0 | 8,000,000 | 8,000,000 |
| Capital Accounts (Class B) | 12,446,616 | 0 | -12,446,616 |
| Approved and Pended Redemptions (from 2015: CF) | 593,718 | 0 | -593,718 |
| **TOTALS** | **13,040,334** | **8,000,000** | **-5,040,334** |

(Nohl Decl. at ⁋ 21 (Ex. 15)). Thus, the Managing Members have made substantial contributions to GTIF/GPRE in the hopes that the Confirmation Plan will be wholly successful.

The Bankruptcy Court noted the substantial contributions of the Managing Members and Messrs. Nohl and Hull to GTIF/GPRE both before and after bankruptcy. After the SEC and US Trustee objected to this agreement between the Managing Members, GTIF and the Equity Committee (defined below), the Bankruptcy Court conducted an evidentiary hearing on May 3, 2022. At the hearing, Michael Hull and Christopher Nohl testified. The Bankruptcy Court then concluded:

> that GAM II and Chrysalis Financial through the persons of Hull and Nohl have provided valuable services to debtors, Greenpoint Tactical Income Fund and

---

[13] The Managing Members asserted a combined Class B equity interest of $12,446,615.55. As part of the bankruptcy mediation, the Managing Members agreed to surrender their Class B equity interest in exchange for Class A units of $6.6 million. The $8 million includes the $6.6 million, plus $1.4 million paid to the Managing Members on account of their general unsecured claims.

Greenpoint Rare Earth both before and after those entities filed for bankruptcy. Their testimony demonstrated that the amount that they will be paid for both pre and post-petition services is reasonable in the industry and is reasonable in relation to the specific services they provided the debtors.

(Richman Decl. ¶ 45, Ex. S (May 3 Hr'g Tr. 94:1–14)). The Bankruptcy Court overruled the

SEC's objection to the settlement of the pre-petition and bankruptcy compensation, reasoning:

The SEC argues that approving the compromise would approve payments of amounts that the District Court might rule that are violative of the securities law and that approval might also moot its claim objections. In addition, the SEC has objected to Claims 108 and 110 and seeks on similar grounds to have those claims entirely disallowed stating that those claims "seek payment on fees and expenses that the SEC has alleged violates the Federal Securities Law and are illegal as a matter of law." ECF #1404, Page 3; see also ECF #1405 at 3.

The SEC contends that the managing members used "misleading and an improperly determined valuation to charge Greenpoint Tactical Income Fund excessive management and other fees and payments," and that "the fees and expenses claimed by the managing members violate the Federal Securities Law are ill-gotten gains as alleged in that amended complaint and are subject to disgorgement." ECF #1404, at 2; see also ECF #1405, at -- I think also at 2.

As already discussed with respect to the managing members'[] claims, Greenpoint Tactical Income Fund filed a motion to compromise that seeks to resolve the managing members' general unsecured claim by reducing their amount and converting the general unsecured claims into an equity interest to be treated the same as the state class of investors under the proposed plan of reorganization.

As a result, given that this accommodation was reached with the agreement of the Committee after extensive negotiations, **I find no basis to determine that the amounts agreed to the conversion of general unsecured claim into an equity share that is staying in the fund can be "ill-gotten gains received as a result of the violations alleged in the SEC's complaint." ECF #1396, at 2-3. Nor do I find any basis or to conclude that the debtors approved payment of administrative expenses for services rendered to the debtors-in-possession might be found to be ill gotten in a similar vein that would lead to disgorgement.**

So I overrule the SEC's objections to the Greenpoint Asset Management and Chrysalis' claims and determine that those claims are allowed as non-priority unsecured claims in the reduced amount proposed by the settlement.

(*Id.* (May 3 Hr'g Tr. 97:2–25; 98:1–15).) The Bankruptcy Court also noted that the "compromise of the managers' claims and expenses is an integral component of the debtors' larger settlement with the Committee. A settlement as discussed previously that includes an agreement to have the Fund adopt an amended operating agreement and a proposed plan of reorganization that substantially changes the Fund's operating structure to the benefit of non-manager equity holders." (Richman Decl. ¶ 34, Ex. N (May 18, 2022 Hr'g Tr. 16:13–19)). Those terms also include:

- GTIF investors were given the choice to redeem 100% of their net invested capital ("NIC") in GTIF, to retain their equity interests, or some combination of both. (*Id.* ¶ 2) Those who elected to redeem their interests will receive set percentages of their NIC annually, beginning May 19, 2023, over a four-year period. (*Id.* ¶ 32) During this time, the Managing Members (Chrysalis and GAM II) will each be paid flat compensation in the amount of $575,000 per year, and incentive compensation based on net realized gains on sales (as approved by the Oversight Board). (*Id.* ¶ 43)

- Under the Confirmation Plan, GAM II and Chrysalis Financial are automatically terminated as managing members if they do not meet the four-year schedule for redemption payments set forth in the plan. (*Id.* ¶ 25) This is a self-executing irrevocable provision that does not require action by GTIF investors or the Oversight Board. While under the plan, a Managing Member may also be removed for cause, cause does not include a finding of liability for any SEC's claims. (*Id.*)

### K.   Disgorgement of management fees assessed against Christopher Nohl should be limited to funds related to GTIF that he personally received

Any disgorgement ordered to be paid by Christopher Nohl relating to management fees should be limited to the total amount of payments that he personally received as a result of his work for GTIF. During the entirety of 2013 to 2022, Christopher Nohl has been a salaried employee of Chrysalis Financial. In total, the compensation Mr. Nohl received from Chrysalis Financial for his work as its president is $303,946, which includes work for Chrysalis Financial that was not for GTIF:

**Total Payments to Christopher Nohl**
All Direct Wages & Payments 2013 - 2019

| YEAR | GROSS W2 WAGES FROM CHRYSALIS FIINANCIAL LLC |
|---|---|
| 2013 | 0 |
| 2014 | 0 |
| 2015 | 39,781 |
| 2016 | 61,158 |
| 2017 | 89,387 |
| 2018 | 64,779 |
| 2019 | 48,841 |
| **TOTAL** | **303,946** |

Source: Chrysalis Financial Records, Internal Revenue Service
Records, ADP Payroll & Employment Records, BK Court Documents

(Nohl Decl. at ¶ 17 (Ex. 11)). As a result, the maximum management fees that Mr. Nohl should

be ordered to pay in disgorgement should not exceed is $303,946.

**L.     Disgorgement from Managing Members should be based upon net income, not gross receipts**

The SEC argument that all Defendants should be jointly and severally liable for the

entirety of funds they collectively received relating to GTIF makes no sense based upon the

evidence at trial. There is sufficient evidence for the Court to enter an order specifying which

Defendants are liable for which specific amounts of disgorgement. In connection with that, the

Court may consider that the total net income earned by Chrysalis Financial from 2013 through

2019 was $640,460 as shown here:

38

## Net Income to Chrysalis Financial Owners
### 2013 through 2019

| YEAR | Payments to Owners: Chrysalis Holding Company LLC | Chrysalis Financial LLC Net Income [Includes AAPS] | Total Gain/Loss to Owners | Number of Employees |
|---|---|---|---|---|
| 2013 | 0 | 229,216 | 229,216 | 1 |
| 2014 | 100,000 | 162,355 | 262,355 | 1 |
| 2015 | 100,000 | 5,605 | 105,695 | 4 |
| 2016 | 337,900 | -76,608 | 261,292 | 8 |
| 2017 | 70,500 | 217,122 | 287,622 | 6 |
| 2018 | 111,825 | -277,232 | -165,407 | 6 |
| 2019 | 0 | -340,313 | -340,313 | 6 |
| TOTAL | 720,225 | -79,765 | 640,460 | |

Source: Chrysalis Financial IRS Records & Employment Records

(Nohl Decl. at ¶ 16 (Ex. 10)). Similarly GAM II incurred numerous legitimate operating expenses associated with the vast majority of the conduct of GTIF that was conducted in a perfectly legal manner. Even if the Court were to consider the SEC's overbroad request for disgorgement based on the entirety of the Managing Members activities (which both were exclusively related to GTIF during the 2013 to 2019 time period), there is no basis to use gross receipts as a basis for disgorgement. As the SEC can clearly see from numerous documents produced to it since it began its investigation in 2013, Chrysalis Financial and GAM II incurred expenses that inured to the benefit of the GTIF investors.

## IV.   GTIF AND GPRE SHOULD NOT BE SUBJECTED TO ANY DISGORGEMENT

The SEC asks the Court to make GTIF and GPRE jointly and severally liable with all Defendants for disgorgement when that would impose costs on the GTIF investors that are completely unjustified and serve no purpose. GTIF investors recognized early on that the SEC was not representing their interests. (Richman Decl. ¶ 6.) Shortly after GTIF and GPRE filed for

bankruptcy, the United States Trustee appointed a committee of GTIF investors (the "Equity Committee") to represent the interests of GTIF's investors and to provide information and solicit comments from investors. (*Id.* ¶ 4.) The Equity Committee was represented by legal counsel and retained a financial advisor to assist it in performing its duties. (*Id.* ¶ 7.)

Through the Equity Committee, investors have done a fine job of representing themselves, obtaining through mediation a reduction of over $8.6 million in Managing Member claims for compensation and an agreement that the Managing Members will continue to manage GTIF under a new operating agreement that provides for each to be paid a fixed fee of $575,000 per year plus 10% of net realized gains until all investors who wish to exit with their net invested capital ("NIC") have been paid in full. The Managing Members agreed that they would be automatically terminated from their positions if they fail to meet certain agreed performance benchmarks. The Managing Members agreed that they will operate GTIF under the oversight of an Oversight Board comprised of four investors and one independent non-investor member.

For the reasons more fully set forth below, the Court should not accede to the SEC's requests for disgorgement, prejudgment interest, and injunctions that would significantly undermine the Confirmation Plan chosen by GTIF investors and ordered by the Bankruptcy Court.

## V.  PREJUDGMENT INTEREST SHOULD BE SET AT A REASONABLE AMOUNT

Whether prejudgment interest should be awarded in a case involving violation of the securities laws is "confided to the district court's broad discretion." *SEC v. Contorinis*, 743 F.3d 296, 307-08 (2d Cir. 2014) (quoting *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1071-72 (2d Cir. 1995)); *SEC v. Benger* No. 09 C 676, 2015 U.S. Dist. LEXIS 151412, at *22 (N.D. Ill. Nov. 9, 2015) ("Prejudgment interest is a matter left to the discretion of this

Court." (citing *Michaels v. Michaels*, 767 F.2d 1185, 1204 (7th Cir. 1985)). While the SEC claims that GTIF was a fraudulent enterprise since its inception in 2013, it fails to mention that its Staff were conducting on-site examinations and investigations of GTIF as well as Bluepoint since GTIF's inception.

## VI.   THERE IS NO BASIS FOR THE PENALTIES REQUESTED BY SEC

There is no basis for third-tier penalties in this case. While the SEC was permitted to put on evidence of investor losses, the losses it presented were only cash losses as of the end of 2019. The SEC not only ignored the fair market value of the gem and fine mineral assets owned by GTIF/GPRE, it ignored the acquisition value of those stones.

Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act authorize three tiers of civil monetary penalties against violators of the Acts. 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d). While  "[t]he tier determines the maximum penalty," the actual amount of the penalty is "left up to the discretion of the district court."  *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005) (citing 15 U.S.C. § 77t(d)).  The first tier applies to any violation of the Acts.  *Id*.  The second tier applies to violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."  *Id*.  The third tier applies to any violation satisfying the second-tier criteria that also "resulted in substantial losses or created a significant risk of substantial losses to other persons."  *Id*.

The maximum penalty for a violation of the Securities Act or Advisers Act is the greater of (a) a specified monetary amount for the relevant tier times the number of violations, or (b) the defendant's gross pecuniary gain from the conduct giving rise to the violations.  *See* 15 U.S.C. §§ 77t(d)(2),  78u, 80b-9(e).  In determining a defendant's "gross pecuniary gain," a court should *not* look to compensation in the aggregate, but rather to the particular portion of overall

compensation that is earned as *a result of the violation*. *See, e.g.*, *SEC v. Razmilovic*, 738 F.3d 1487 (2d Cir. 2013) ("*Razmilovic II*")  (initial base salary excluded from disgorgement as it was not performance-based, while the increase in salary as a result of promotion from COO to CEO was based upon performance and included as part of disgorgement).  "Beyond setting maximum penalties, the statutes leave 'the actual amount of the penalty ... up to the discretion of the district court.'" *Razmilovic I*, 738 F.3d at 38 (quoting *Kern*, 425 F.3d at 153).  "In deciding what the penalties should be, the court should consider the seriousness of the violations, the defendant's intent, whether the violations were isolated or recurring, whether the defendant has admitted wrongdoing, the losses or risks of losses caused by the conduct, and any cooperation the defendant provided to enforcement authorities." *SEC v. Church Extension of the Church of God, Inc.*, 429 F. Supp. 2d 1045, 1050-51 (S.D. Ind. 2005) (citing, *inter alia*, *SEC v. Custable*, No. 94 C 3755, 1996 U.S. Dist. LEXIS 19321, at **11-12 (N.D. Ill. Dec. 26, 1996), *aff'd*, 132 F.3d 36 (7th Cir.1997)); *SEC v. Rooney*, No. 11-cv-8264, 2014 U.S. Dist. LEXIS 95101, at *9 (N.D. Ill. July 14, 2014).

In determining whether there is a risk of "substantial losses," the Court may consider the Confirmation Plan, which is what GTIF investors adopted almost unanimously and determined was most likely to avoid losses. Under the Confirmation Plan, GTIF investors were given the choice of whether to leave after being paid their net invested capital based on a predetermined schedule or whether to stay, *i.e.* keep their investment in the fund and participate in gains and losses in the longer term. (Richman Decl. ¶ 21.) A substantial number of investors voted for the plan and elected to stay, expressing their preference to wait many years to obtain the benefits of sales of gems and fine minerals as well as income or returns from investments in numerous portfolio companies. (*Id.* ¶ 27.)

The Court may also consider that GTIF investors rejected the SEC's many efforts to take control of the bankruptcy process including the SEC's demand that a trustee be appointed to take control of GTIF/GPRE in order to liquidate the fund's assets. By almost unanimous adoption of the Confirmation Plan, which provides for Messrs. Nohl and Hull to continue to manage the fund, GTIF investors have shown that this is the best way to *avoid* substantial losses.

In seeking its remedies, it appears the SEC is trying to ensure that GTIF investors *do* suffer substantial losses, perhaps to show that the SEC was right from the beginning. In its brief, the SEC states that Defendants continued their conduct knowing they were under investigation since March 2017. (SEC Br. at 15). That is not true. Since 2013, the SEC has been investigating Defendants, although it claims that GTIF/GPRE was not part of the so-called first investigation. (Def. Resp. to SEC Statement of Proposed Findings of Facts, Dkt. 166 at 15.) That is not true. In that investigation, the SEC subpoenaed and received extensive GTIF documentation if offerings, communications with investors, financials, purchases and sales of assets, account statements, and valuations. (*Id.* at 15-18.)

The SEC sent a letter to Bluepoint on June 24, 2016, the SEC misrepresenting that the SEC investigation had been closed with no action. In that letter, the SEC did not disclose several material facts:

- in April 2016, the SEC examination staff (OCIE) referred to the SEC Enforcement Division what they considered potential violations of the federal securities laws (Declaration of Charles J. Kerstetter Regarding Defendants' Request to Compel Documents ("Kerstetter Decl."), Dkt. 81 ¶¶5-7.)

- in May 2016 the SEC referred to DOJ/FBI (Western District of Wisconsin) certain conduct that the SEC considered criminal violations by Bluepoint and GTIF/GPRE (some of the same conduct raised at trial). (*Id.* ¶ 15.)

- the SEC was, in fact, continuing to investigate Bluepoint and GTIF/GPRE via a "new" investigation with the exact same name, albeit a new identification number and different staff assigned. (*Id.* ¶¶ 5-8.)

43

(Dkt. 166 at 15-18; Kerstetter Decl. ⁋⁋15, 7.) As the SEC acknowledged, on July 1, 2016 it opened its second formal investigation into Defendants – this time secretly and just one week after telling Bluepoint that all was resolved. The fact that the SEC had not ceased investigation of Defendants did become clear on the date of the FBI raid, when the SEC served subpoenas for the very same documents that the FBI was seizing.



Meanwhile, SEC examination staff were often on-site at Bluepoint's offices and were even shown some of the higher end gems and fine minerals.

The SEC still insists the entire gem and fine mineral inventory of over 3000 stones is simply a collection of colorful rocks crystals that is worthless. If the evidence at trial were not sufficient to disprove that, the Court can also consider the fact that just months after the FBI seized control all of those gems and fine minerals (during the March 2017 raids), DOJ returned each and every one of those stones to GTIF. Why would they do that? Because they confirmed through an independent source (Dr. Cigdem Lule) that the stones were not just "colorful rocks"

and "crystals." Rather, they were a wide-ranging collection that included numerous stones that were confirmed to be worth substantial millions of dollars.

As a result, Defendants ask that no penalties be imposed upon GTIF or GPRE and that any penalties that the Court believes must be imposed upon the remaining Defendants be no more than 50% of the amount of disgorgement. The Managing Members have contributed millions of dollars to the reorganized GTIF/GPRE in order to get the fund through the bankruptcy process and set it up for the best chance of success. While penalties ordered by the Court in this matter would be paid to the US Treasury and not be used for the benefit of GTIF investors, the substantial amounts that the Managing Members have contributed in the Confirmation Plan and contributed in cash during the bankruptcy provided a direct benefit to GTIF investors. The Court should not discourage parties from engaging in settlements with investors by according this settlement no weight in determining remedies.

## VII.   THE COURT SHOULD NOT IMPOSE AN INJUNCTION ON ANY DEFENDANT

### A.   Legal Standard

"'A permanent injunction is 'a drastic remedy' and should not be granted lightly, especially when the conduct has ceased.'" *SEC v. Reserve Mgmt. Co. (In re Reserve Fund Secs. & Derivative Litig.)*, No. 09 MD. 2011 (PGG); 09 Civ. 4346 (PGG), 2013 U.S. Dist. LEXIS 141018 at *71 (S.D.N.Y. Sept. 30, 2013) (quoting *SEC v. Steadman*, 967 F.2d 636, 648, 296 U.S. App. D.C. 269 (D.C. Cir. 1992)) (quoting 1 T. Hazen, The Law of Securities Regulation § 9.5, at 400 (2d ed. 1990))). It is well established that "a defendant's past violation of the securities laws . . . is insufficient to support permanent injunctive relief," *SEC v. Gann*, 565 F.3d 932, 940 (5th Cir. 2009), and injunctions are "primarily intended to protect the

45

investing public from future misconduct," *SEC v. Benger*, 2015 U.S. Dist. LEXIS 151412, at

*27 (citing *SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir. 1984)).  Indeed, Plaintiffs must show

that there is a reasonable likelihood of future violations.  *SEC v. Holschuh*, 694 F.2d 130, 144

(7th Cir. 1982).  To predict such a likelihood, the Court "must assess the totality of the

circumstances surrounding the defendant and his violation." *Id.* Factors for the Court to

consider when deciding whether to grant such an injunction include (1) "the gravity of harm

caused by the offense," (2) "the extent of the defendant's participation and his degree of

scienter," (3) "the isolated or recurrent nature of the infraction," (4) "the likelihood that the

defendant's customary business activities might again involve him in such transactions," (5)

"the defendant's recognition of his own culpability,"[14] and (6) "the sincerity of his assurances

against future violations." *Holschuh*, 694 F.2d at 144. *See SEC v. Yang*, 795 F.3d 674, 681 (7th

Cir. 2015) (quoting *Holschuh*). Taken together, these factors weigh against any injunction in

this case.

**B.     Any remedies imposed should be consistent with the Confirmation Plan and the protection of GTIF investors**

In the Bankruptcy Cases, the GTIF, GPRE and the Managing Members agreed to

implement substantial operational reforms for the benefit of investors. (Richman Decl. ¶¶ 22-23.)

As the Bankruptcy Court observed, the Confirmation Plan "provides for numerous structural

changes to the Fund that more closely align the managing members['] interest with those of the

---

[14] In assessing this factor, courts recognize that defendants should not be penalized for asserting a vigorous defense. *See SEC v. Happ,* 295 F. Supp. 2d 189, 196 (D. Mass. 2003), *aff'd,* 392 F.3d 12 (1st Cir. 2004); *SEC v. Yun*, 148 F. Supp. 2d 1287, 1294 (M.D. Fla. 2001) (court crediting defendant's statement "While I disagree with the jury's verdict in this case, I fully appreciate the importance of the securities laws that were involved in my case, and I will never again put myself in a position where the SEC or anyone else can question my actions.").

investors and allows the investors an avenue for cashing out[,] all of which resulted from the debtors' extensive negotiations with the Equity Committee." (*Id.* ¶ 33.)

The Confirmation Plan affords investors an opportunity to elect to redeem 100% of their net invested capital ("NIC") in GTIF, to retain their equity interests, or some combination of both. (*Id.* ¶ 21.) Those who elected to redeem their interests will receive set percentages of their NIC annually, beginning May 19, 2023, over a four-year period. During this time, the Managing Members (Chrysalis and GAM II) will each be paid flat compensation in the amount of $575,000 per year, and incentive compensation based on actual net realized gains on sales (as approved by an Oversight Board). (*Id.* ¶ 41.) Significantly, the Managing Members agreed to their automatic termination in the event of any default in the redemption payments over the four-year schedule (including each year a two-month grace period). (*Id.* ¶ 23.) This is a self-executing provision in the new operating agreement. It does not require any approval or other action to be taken by GTIF's equity holders or the Oversight Board, and it cannot be challenged. The Managing Members also agreed to removal for cause, which is defined in the new operating agreement. (*Id.*)

The SEC's proposed remedies not only ignore the fact that the claims it voluntarily submitted to the Bankruptcy Court were adjudicated to be worth nothing but would wholesale eviscerate the meticulous and deliberate work of the Bankruptcy Cases for no reason.

### 1.    The Confirmation Plan was approved by GTIF investors

As discussed above, the Equity Committee was represented by legal counsel and retained a financial advisor to assist it in performing its duties. (*Id.* ¶ 7.) Through lengthy negotiation mediated by a former bankruptcy court judge, consisting of over sixty hours of mediation sessions, the parties reached an agreement in principle on a confirmation plan. (*Id.* ¶¶ 14-15.)

That plan went through many months of additional negotiation and revision until it was finally confirmed on May 18, 2022. (*Id.* ¶ 15.) The Confirmation Plan provided an opportunity to each investor elect to redeem 100% of their net invested capital ("NIC") in GTIF, to retain their equity interests, or some combination of both.[15] (*Id.* ¶ 21.) Those who elected to redeem their interests will receive set percentages of their NIC annually, beginning May 19, 2023, over a four-year period. (*Id.* ¶ 30.)

Prior to making their elections to accept or reject the Confirmation Plan (and thus, whether to approve or disapprove the Third Amended Operating Agreement) and whether to redeem or retain their interests in GTIF, all equity holders were provided with full disclosure of the SEC's allegations against GTIF, GPRE, and the Managing Members. (*Id.* ¶ 17; Ex. D at 42– 43.) They were also presented with the potential risks of an adverse verdict. This was not the first time GTIF investors were made aware of the SEC's allegations against Defendants. In virtually every document it filed with the Bankruptcy Court, the SEC included a summary of its allegations against Defendants. With full knowledge of the SEC's allegations and position, the Confirmation Plan still received near-unanimous support from parties in interest as well as unsecured creditors (aside from the SEC). (*Id.* ¶ 29.)  Of the 114 investors who cast ballots, only one, Deanna Schneider, voted against confirmation. (*Id.* ¶ 35, Ex. O.)

At the May 2022 three-day confirmation hearing, only the SEC and the US Trustee challenged confirmation. Over the SEC and US Trustee's objections, the Bankruptcy Court confirmed the plans.

---

[15] 83 investors elected to redeem NIC in the amount of $37,557,349.90. 43 investors elected to retain their equity interests in GTIF, representing NIC in the amount of $9,111,065.75. 17 investors did not submit a ballot, and were therefore deemed to retain their invests, representing NIC in the amount of $5,684,997.77. (The total elections equal 143 instead of 141 because two accounts elected a combination of redemption and retention of interests.) (Richman Decl. ¶ 29.)

**2.      The Bankruptcy Court adjudicated the SEC's disgorgement and penalty claims against GTIF and GPRE to be worth $0.00**

The SEC submitted itself to the jurisdiction of the bankruptcy court by asserting that GTIF and GPRE were "liable to the Claimant, the U.S. Securities and Exchange Commission ("SEC"), for $7,359,658 in **disgorgement, plus prejudgment interest and civil penalties** equal to the disgorgement amounts pursuant to 15 U.S.C. § 78t, 15 U.S.C. § 78u, and 15 U.S.C. § 80b-9." (Richman Decl. ¶ 47, Exs. T & U, Part 2 at 1 (emphasis added).) GTIF and GPRE objected to the SEC's claims. (*Id.* ¶ 48, Exs. V & W.) In the Bankruptcy Court, the SEC argued that disgorgement imposed against the two entities should be predicated on the amount of managements fees that GTIF had *accrued* but not yet paid. That is very different from the position articulated in the SEC's August 17 brief in this case – that GTIF and GPRE should be jointly and severally liable for all amounts paid to any person or entity related to any Defendant plus prejudgment interest.

While the SEC argued a different theory of disgorgement in the Bankruptcy Court, the Bankruptcy Court's determination of the SEC's claims should preclude the SEC from obtaining the disgorgement it seeks from GTIF and GPRE. The SEC voluntarily subjected itself to the jurisdiction of the Bankruptcy Court and was given a full and fair opportunity to adjudicate its claims for disgorgement, prejudgment interest, and penalties in that court. The SEC stated the amount of its claims against GTIF/GPRE for disgorgement, prejudgment interest, and penalties in an adversary proceeding against GTIF/GPRE and stated clearly its position that those claims were not dischargeable in bankruptcy.

When GTIF and GPRE filed their objections to the SEC's claims, they triggered the claim adjudication procedure set forth in section 502(b) of the Bankruptcy Code. That section provides that if an "objection to a claim is made, the [bankruptcy] court, after notice and a

49

hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount…". 11 U.S.C. § 502(b). The SEC responded to the objection, asserting that the "amended proofs of claim reflect disgorgement compromised of charged but uncollected fees and expenses against GTIF and GPRE, both pre-petition and post-petition." (Richman Decl. ¶ 49, Exs. X & Y at 3.)

The SEC calculated its claims against GTIF/GPRE to be the Managing Members' pre-petition *unpaid* claim in the amount of $3,745,281.86 and post-petition *unpaid* administrative claim in the amount of $2,334,377.77, as well as H Informatics's *unpaid* administrative claim in an estimated amount of $1.28 million.  (*Id.*)

In advance of the hearing, the Bankruptcy Court gave the SEC an opportunity to present evidence via briefing or at an evidentiary hearing. (*Id.* ¶ 50, Ex. Z.) The SEC declined to submit a shred of evidence in any form. (*Id.* ¶ 45, Ex. 47 (May 3 Hr'g Tr. 100:9–12.) That was the SEC's choice. At the hearing itself, the Bankruptcy Court again invited the SEC to submit evidence, and the SEC declined.

On May 3, 2022, after hearing arguments from the parties (and again confirming that the SEC did not intend to present evidence), the Bankruptcy Court determined that the SEC's claims should be allowed in the amount of **$0.00.** The Bankruptcy Court explained its reasoning in a later order:

> The SEC based the amount stated in its amended proof of claim for disgorgement on the amount of allegedly improper management fees and administrative expenses that it believed debtor Greenpoint Tactical Income Fund might pay to non-debtor parties.  The SEC explained that the "amended proofs of claim reflect disgorgement comprised of charged but [as-yet] uncollected fees and expenses against GTIF and GPRE, both pre-petition and post-petition" that were asserted by Greenpoint's Managing Members against Greenpoint Tactical Income Fund in its bankruptcy case, as well as fees expected to be requested in the Fund's bankruptcy proceeding

50

by H Informatics, LLC, an insider-related administrative service provider which had a contract with Greenpoint Tactical Income Fund under which the Fund paid H Informatics an annual fee that the SEC contends offends federal securities law. *In re Greenpoint Tactical Income Fund LLC*, No. 19-29613, ECF No. 1435, at 3–4. As to the fees and expenses Tactical Income Fund promised to pay in connection with plan confirmation, the court approved those payments as permissible administrative expenses incurred by the debtor in possession of the bankruptcy estates. As to the pre-petition fees and expenses of the Managing Members, the confirmed plan (which is itself based on a mediated settlement among the Debtors, the Managing Members, and the Official Committee of Equity Security Holders of Greenpoint Tactical Income Fund LLC) reduces their $3.8 million unsecured claim to $1.4 million and converts it into "Non-Priority A Equity Interests". *In re Greenpoint Tactical Income Fund LLC*, Case No. 19-29613, ECF No. 1470, at 16. As for civil penalties, the SEC argued only that it is entitled to civil penalties equal to its claims for disgorgement because the District Court in the Western District action might award penalties equal to any disgorgement award.

**In objecting to the claims, the debtors argued, among other things, that the disgorgement remedy could not properly be based on payments the debtors made to (rather than received from) others, since even the SEC characterized the remedy as the disgorgement of unlawful gains. The court held that this objection was sufficient to overcome the presumption that the amount the SEC stated in the proof of claim is correct**, see Fed. R. Bankr. P. 3001(f), thus shifting the burden to the SEC to demonstrate that there is a factual and legal basis for the amount of its disgorgement and civil penalties claim. See *In re Pierport Dev. & Realty, Inc.*, 491 B.R. 544, 547 (Bankr. N.D. Ill. 2013) ("A party objecting to the proof of claim has the initial burden to produce some evidence or legal point to overcome this rebuttable presumption."); *In re Vanhook*, 426 B.R. 296, 299 (Bankr. N.D. Ill. 2010) ("Once the objector has produced some basis for calling into question [the] allowability of a claim, the burden then shifts back to the claimant to produce evidence to meet the objection and establish that the claim in fact is allowable." (quoting *In re O'Malley*, 252 B.R. 451, 456 (Bankr. N.D. Ill. 1999))).

**The SEC did not attempt to quantify the extent to which the debtors benefited from the alleged improper payments to other parties;  indeed, the SEC did not show that the debtors derived any benefit from the alleged promised payments.**  The SEC offered no answer to the question how could the debtors have received ill-gotten gains from alleged payments that debtor

Greenpoint Tactical Income Fund promised to pay to others but that it never paid? Given this, the court's subsequent approval of administrative expense payments the SEC sought to characterize as improper, and the fact that the non-insider investors in Greenpoint Tactical Income Fund overwhelming accepted confirmation of the debtors' plans of reorganization, which materially change Greenpoint Tactical Income Fund's operating structure to afford the non-insider investors greater oversight and control over the Fund, the court ruled that the SEC failed to establish that it would likely be awarded disgorgement relief or civil penalties against the debtors. ECF Nos. 1447 & 1453.

*Securities & Exch. Comm'n v. Greenpoint Tactical Income Fund LLC (In re Greenpoint Tactical Income Fund LLC)*, No. 20-2005-gmh, 2022 WL 2792016, at *2 n.2 (Bankr. E.D. Wis. July 15, 2022) (emphasis added).

In making this ruling, the Bankruptcy Court observed that the SEC had failed to establish it was likely to be awarded disgorgement or penalties against GTIF/GPRE in this (District Court) case. It then ruled that the SEC's claims were valued at $0.00. Those claims have been paid in full by GTIF/GPRE.

**C.     The SEC is precluded from seeking to relitigate its claims of disgorgement, prejudgment interest and penalties against GTIF/GPRE**

The SEC is precluded from seeking any amount of disgorgement, penalties, or prejudgment interest from GTIF/GPRE by the doctrine of issue preclusion (collateral estoppel). As a result of the Bankruptcy Court's claim determination, GTIF/GPRE modified their confirmation plans to provide that the SEC's claims against GTIF/GPRE would be allowed in the amount of $0.00 and paid on the plans' effective date. (Richman Decl. ¶ 52.) The Bankruptcy Court confirmed those plans on May 18, 2022, and the plans became effective on May 19, 2022. (*Id.* ¶¶ 33-3.) On May 19, 2022, the SEC's claims against GTIF and GPRE were paid and satisfied in their entirety.

52

Based on the Bankruptcy Court's determination of the value of the claim and its subsequent payment in full, GTIF/GPRE moved to dismiss the SEC non-dischargeability adversary proceeding for lack of subject-matter jurisdiction. The SEC argued that its adversary proceeding against GTIF and GPRE could not be dismissed, even though its claims of $0.00 were paid in full. The Bankruptcy Court declined to address the effect of its order, stating that "whether this court's order allowing the SEC's claim has any preclusive effect on the Western District case is a nice question. But it is a question better answered by the District Court." *Greenpoint Tactical Income Fund LLC*, 2022 WL 2792016, at *5.

### 1.    Legal Standard for Issue Preclusion

Under the doctrine of issue preclusion (collateral estoppel), "once an issue is actually and necessarily decided by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153 (1979). Federal common law requires the showing of four elements to establish issue preclusion: "1) the issue sought to be precluded must be the same as that involved in the prior action, 2) the issue must have actually been litigated, 3) the determination of the issue must have been essential to the final judgment, and 4) the party against whom estoppel is invoked must be fully represented in the prior action." *Washington Grp. Int'l, Inc. v. Bell, Boyd & Lloyd LLC*, 383 F.3d 633, 636 (7th Cir. 2004) (quoting *People Who Care v. Rockford Bd. of Educ.*, 68 F.3d 172, 178 (7th Cir. 1995)). *See also Matrix IV, Inc. v. American Nat'l Bank & Trust Co. of Chicago*, 649 F.3d 539, 547 (7th Cir. 2011). All four elements are satisfied here.

53

### 2. Under the legal standard, the SEC should be barred by issue preclusion from seeking any money from GTIF/GPRE

As Judge Halfenger stated, it is left to the Court to determine whether the decision of the Bankruptcy Court setting the amount of the SEC's claims against GTIF and GPRE at $0.00 precludes the SEC from seeking any money here against those same parties for the same conduct.

GTIF/GPRE meets the first prong of the test because the issue now presented to this Court—the value of the SEC's claims for disgorgement and pre-judgment interest—is the exact same issue that was adjudicated in the Bankruptcy Cases. *See Washington Grp.*, 383 F.3d at 637 (To resolve this element, the court must "examine what was before the bankruptcy court, and then what was before the district court."). In the Bankruptcy Court, the SEC asserted claims for "$7,359,658 in **disgorgement**, plus **prejudgment interest** and **civil penalties equal to the disgorgement amounts** pursuant to 15 U.S.C. § 78t, 15 U.S.C. § 78u, and 15 U.S.C. § 80b-9." (Richman Decl. ¶ 47.) GTIF/GPRE objected—not to their liability under federal securities laws—but rather to the amount of disgorgement, interest, and penalties due and owing to the SEC. (*Id.* ¶ 48.) As a result of the objection, the Bankruptcy Court was required to "determine the amount of [the SEC's] claim[s] in lawful currency of the United States as of the date of the filing of the petition," and then allow the claims in such amount. 11 U.S.C. § 502(b). *See also Hann v. Educational Credit Mgmt. Corp. (In re Hann)*, 476 B.R. 344, 355 (B.A.P. 1st Cir. 2012), *aff'd* 711 F.3d 235 (1st Cir. 2013). The Bankruptcy Court determined that the amount of the SEC's claims—consisting of **disgorgement** and **prejudgment interest** and **civil penalties** was

$0.00 as of the petition date, and allowed the claims in that amount. Here, the SEC asks this Court the exact same question. Thus, the first element is satisfied. [16]

The second element is whether the value of disgorgement, pre-judgment interest, and civil penalties was actually litigated between the parties. *See Carter v. Commissioner*, 746 F.3d 318, 321 (7th Cir. 2014), as amended on denial of reh'g (Apr. 25, 2014) (citing *DeGuelle v. Camilli*, 724 F.3d 933, 935 (7th Cir. 2013) (citations omitted)) (This element looks at whether ""[t]he party against whom the issue had been resolved must have had, first, a 'full and fair opportunity' to litigate the issue in the previous suit … and, second, a meaningful opportunity to appeal the resolution of the issue."). In the Bankruptcy Court, the SEC had a full and fair opportunity to litigate the question of disgorgement, prejudgment interest, and penalties. The SEC was afforded notice of a hearing on the claim objection, *see* Fed. R. Bankr. P. 3007(a)(1) and Fed. R. Bankr. P. 9006(c)(1), and afforded the opportunity to submit a written response. The Bankruptcy Court gave the SEC an opportunity to present evidence, which the SEC declined to do. The Bankruptcy Court gave the SEC another opportunity to present its evidence at an evidentiary hearing on May 3, 2022, which the SEC declined to do. At the May 3 hearing, the Bankruptcy Court heard oral arguments from the SEC and GTIF/GPRE. Only after affording the

---

[16] By filing proofs of claim in the Bankruptcy Cases, the SEC consented to the Bankruptcy Court's determination of its claims. *See* 28 U.S.C. § 157(b)(2)(B) (core proceedings include "allowance of disallowance of claims against the estate"); 11 U.S.C. § 502(b) (if a party-in-interest objects to a claim, "the [bankruptcy] court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, … ."); *SNA Nut Co. v. Haagen-Dazs Co., Inc.*, 302 F.3d 725, 730 (7th Cir. 2002) (Once a party submits a proof of claim and triggers the claim allowance process, "that party has subjected itself to the bankruptcy court's equitable jurisdiction and thus can no longer demand a right to a trial by jury."). If the SEC did not want the Bankruptcy Court to determine the value of its claims, the SEC could have, among other things, requested that the Bankruptcy Court abstain, *see* 11 U.S.C. § 305(a) and 28 U.S.C. § 1334(c)(1) , or that the Bankruptcy Court merely estimate its claim for purposes of allowance, *see* 11 U.S.C. § 502(c)(1), or that the District Court for the Eastern District of Wisconsin withdraw the reference for the claim allowance matter and then transfer venue to this Court, *see* 28 U.S.C. § 157(d).

SEC multiple opportunities to support its claims did the Bankruptcy Court determine the value of the SEC's claims were $0.00, and allow the claims in that amount.[17]

The SEC now suggests that it did not adjudicate its monetary claims against the GTIF/GPRE in the Bankruptcy Cases. (SEC Brief at 20 n. 4) ("Further, the Bankruptcy Court recognized that the SEC did not submit evidence or otherwise adjudicate its underlying disgorgement claim in the bankruptcy proceeding."). That is nonsense. The fact that the SEC chose not to submit evidence to support its claims does not mean it did not have a full and fair opportunity to do so. Nor does the SEC's choice not to submit evidence in support of its claims make a difference in the weight to be accorded the Bankruptcy Court's ruling.  The SEC had the right to present evidence and declined to do so. Thus, the second element is satisfied.

The third element is whether the determination of the amount of disgorgement, pre-judgment interest, and civil penalties was essential to the Bankruptcy Court's final determination

---

[17] Section 1109(a) of the Bankruptcy Code provides that "The Securities and Exchange Commission may raise and may appear and be heard on any issue in a case under this chapter, but the Securities and Exchange Commission may not appeal from any judgment, order, or decree entered in the case." 11 U.S.C. § 1109(a). The Bankruptcy Court observed that under Seventh Circuit precedent, unappealable final orders lack preclusive effect, and that § 1109(a) seemingly bars the SEC from appealing the claim-allowance order. *Greenpoint Tactical Income Fund LLC*, 2022 WL 2792016, at *4. But as the Bankruptcy Court also noted, the Supreme Court in *Johnson Steel Street-Rail Co. v. William Wharton, Jr. & Co.*, 152 U.S. 252 (1894), concluded that *res judicata* could apply even in the absence of a right to appeal. *Id. See also Standefer v. United States*, 447 U.S. 10, 23 n.18 (1999) (explaining that the Court is not suggesting "that the availability of appellate review is always an essential predicate of estoppel," but that helps provide "confidence that the result achieved in the initial litigation was substantially correct.") (citing *Johnson Steel Street-Rail Co.*). In any event, applying § 1109(a) is inappropriate here. The provision was enacted so that the SEC could act "as a special advisor to the courts in order to protect the interests of public investors." *In re George Worthington Co.*, 921 F.3d 626, 628 n.2 (6th Cir. 1990). That the SEC would lack appellate rights in its "advisory" capacity is sensible—it can never be a party aggrieved. *See In re Ray*, 597 F.3d 871, 874 (7th Cir. 2010) ("Only a 'person aggrieved' has standing to appeal an order of the bankruptcy court" and "[o]nly those persons affected pecuniarily by a bankruptcy order have standing to appeal that order.") (citations omitted). In the Bankruptcy Case, the SEC did not appear in an advisory capacity, but as a creditor. (Richman Decl. ¶ 45, Ex. S; May 3, 2022 Hr'g Tr. 67:21–22, SEC Counsel: "The SEC here is participating as a creditor. It's enforcing its claim.").) Thus, the claim-allowance order left the SEC as a party aggrieved pecuniarily, and § 1109(b) does not impose any limitations on a *creditor's* right to appeal. 11 U.S.C. § 1109(b) ("A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, *a creditor*, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.") (emphasis added). The SEC could have appealed the claim allowance order in its capacity as a creditor.

of the value of the SEC's claims against GTIF/GPRE. *See Bobby v. Bies*, 556 U.S. 825, 835 (2009) ("A determination ranks as necessary or essential only when the final outcome hinges on it."). The Bankruptcy Court's determination of the total amount of the claim necessarily determined that all of the constituent parts – disgorgement, prejudgment interest, and penalties – were also valued at $0.00. The Bankruptcy Court could not have determined a total claim value of $0.00 without making that determination.  Thus, the third element is satisfied.

The fourth element is whether the SEC was indisputably fully represented in the Bankruptcy Court at all stages of the claims adjudication process. The SEC was represented not just by its own counsel who specializes in bankruptcy law, but also by the very trial counsel who presented the SEC's case to the jury. It would be absurd for the SEC to contend that it was not fully represented by these very same attorneys. Thus, the fourth element is satisfied.

Accordingly, all four elements of issue preclusion are present here and the SEC should be precluded from claiming disgorgement and pre-judgment interest against GTIF or GPRE in this Court. *See Hann*, 476 B.R. at 359 (holding that because a claim allowance order was a "final, binding order for res judicata purposes, it follows that [the creditor]'s efforts to re-litigate its claim are precluded and that, therefore, the amount of [the debtor's] debt to [the creditor] must stand, conclusively, as zero."); *Siegel v. Federal Home Loan Mortg. Corp.*, 143 F.3d 525, 529 (9th Cir. 1998) (noting circuit precedent held that allowance or disallowance of "a claim in bankruptcy is binding and conclusive on all parties or their privies, and being in the nature of a final judgment, furnishes a basis for a plea of res judicata.") (*quoting United States v. Coast Wineries*, 131 F.2d 643, 648 (9th Cir. 1942)).

The SEC recognizing that its claims for disgorgement, prejudgment interest, and penalties are, in fact, barred by issue preclusion, raises remarks made by the Bankruptcy Court as

57

a basis to avoid its application. The SEC points out that the Bankruptcy Court acknowledged it understood the confirmation plans and confirmation order "to leave the SEC unrestrained to seek disgorgement and civil penalty relief in the Western District case." (Brief at 20 n.4) Even were that sufficient to overcome issue preclusion, the Court should consider that the Bankruptcy Court also questioned whether its understanding of the confirmation order "is alone sufficient to defeat the debtor-defendants' preclusion argument based on the distinct order allowing the SEC's claim is perhaps reasonably debatable." *Greenpoint Tactical Income Fund LLC*, 2022 WL 2792016, at *4. The Bankruptcy Court's distinct claim allowance order reflects the issue that was decided. Whatever remarks Judge Halfenger made, the Bankruptcy Court's determination of the amount of the SEC's claims being $0.00 satisfies all four elements of issue preclusion.

**D.      Even if the SEC is not barred by issue preclusion from seeking disgorgement against GTIF/GPRE, no such amounts are merited under the SEC's theory**

The SEC is authorized to seek disgorgement as "a 'profit-based measure of unjust enrichment' that is measured by the defendant's 'wrongful gain' and is ordered to reflect the 'foundational principle' of equity that 'it would be inequitable that a wrongdoer should make a profit out of his own wrong.'" (SEC Brief at 16 (quoting *Liu v. Securities & Exch. Comm'n*, 140 S. Ct. 1936, 1943 (2020)). Abandoning the argument raised in the Bankruptcy Cases that GTIF and GPRE should disgorge charged *but unpaid* management fees, the SEC now seeks disgorgement and pre-judgment interest from all Defendants, including GTIF and GPRE, of amounts that clearly did not unjustly enrich GTIF/GPRE or that it would inequitable to permit GTIF/GPRE to retain. In fact, the SEC seeks to recover from GTIF/GPRE amounts that they themselves paid to Defendants and other entities:

> [A]ll the management fee payments and profit draws GTIF[] made
> to Chrysalis Financial and GAM II; all payments GTIF made to
> Bluepoint; all payments GTIF made to Hull's companies, H

> Informatics and H Family Office; interest payments Defendants
> received on the related party loans; the commissions and kickbacks
> Nohl and Hull received from transactions with Greenpoint Fine Art
> Fund; the portion of Hull's mortgage loan that he repaid with a
> non-cash offset against management fees; and the "origination"
> fees Nohl received for putting together the Hull mortgage loan."

SEC Brief at 20 (internal footnote omitted). None of these disgorgement categories include

assets currently *held by* or previously paid *to* GTIF/GPRE. Thus, is no basis for awarding

disgorgement or prejudgment interest against GTIF/GPRE.

Nothing presented in the SEC's brief nor the supporting declaration of Keith Constance

indicates how GTIF or GPRE somehow possess "unjust enrichment" or "wrongful gains." Nor

could it. GTIF, and by extension GPRE, are owned by the very investors that the SEC purports to

protect in this proceeding. Any assets held by GTIF/GPRE are therefore owned by and for the

benefit of its investors. That means any disgorgement (as well as prejudgment interest or

penalties) against GTIF/GPRE would come out of the pockets of GTIF investors.

Apparently recognizing this, the SEC takes a backdoor approach of asking the Court to

impose disgorgement and prejudgment interest against GTIF/GPRE based on "joint and several"

liability. SEC Brief at 21. In other words, to the extent that GTIF investors were harmed by past

payments, the SEC wants to compound that harm by requiring those investors to again pay that

amount, but this time to SEC. The SEC asserts that such liability is appropriate here because all

Defendants "commit[ed] violations together and benefit[ted] from their concerted misconduct[.]"

*Id.* But as the SEC itself observes, "the imposition of joint and several liability for a

disgorgement award is permissible [only] so long as it is 'consistent with equitable principles.'"

*Id.* (quoting *SEC v. James Spectrum LLC*, Nos. 17-17042, 18-15403, 2020 WL 3578077, at *2

(9th Cir. July 1, 2020), quoting *Liu*, 140 S. Ct. at 1949)).

There is nothing equitable about joint and several liability here. Any disgorgement award against GTIF/GPRE in favor of the SEC would impose *double liability* because GTIF/GPRE already presumably made on behalf of its investors the payments which the SEC now seeks to recover via disgorgement. As the SEC itself acknowledges, disgorgement awards are supposed to be returned to harmed investors whenever possible. (*See* SEC Brief at 16 n.2.) Here, GTIF has already provided investors with the opportunity to redeem 100% of their net invested capital in GTIF over a four-year period. GTIF investors voted overwhelmingly to approve this redemption structure and eighty-one investors (with net invested capital exceeding $37 million) elected to redeem their interests, with the remaining investors electing to retain their interests to get the long-term benefit of GTIF's investments. Requiring disgorgement of payments from GTIF to simply be round-tripped back to those investors (minus the expenses of distribution) only makes sense as a backdoor penalty meant to punish the GTIF investors who did not let the SEC represent their interests in the bankruptcy proceedings.

### E.   Any injunction imposed upon Defendants would undermine the Confirmation Plan and harm GTIF investors

The SEC requests that this Court impose an "obey-the-law" permanent injunction against all Defendants as well as an injunction against Defendants engaging in participating in the issuance, purchase, offer, or sale of any security, managing or liquidating GTIF and its subsidiaries that would significantly undermine the Confirmation Plan, cause the failure of Yodelay, a Madison Wisconsin company, and negatively impact the ability of the GTIF portfolio companies to succeed. The SEC acknowledges its intent is punitive: it seeks to force GTIF/GPRE to, despite the Confirmation Plan, engage in a fire-sale to generate sufficient funds to pay disgorgement and prejudgment interest for which the SEC seeks to make it liable. The SEC will seek to bar Messrs. Nohl and Hull from "various aspects of the securities industry in

60

subsequent administrative proceedings." (SEC Brief at 14.) That hardly reveals the severity of

what the SEC can and will seek – a bar from Nohl and Hull serving as directors, officers, or

control persons of any company that seeks to raise money in any way. The SEC seeks to destroy

each Defendant entity and to bar Michael Hull and Christopher Nohl from any meaningful

employment.

      The SEC does not always seek such drastic, punitive relief, nor is it required to. The SEC

routinely permits Wall Street firms that plead guilty to criminal charges of fraud to continue to

operate in the securities industry. Some of the biggest firms on Wall Street have pleaded guilty to

serious criminal fraud, yet continue to conduct business unabated with the blessing of the SEC.

In May 2015, JPMorgan Chase, Barclays, Citigroup, RBS, and UBS pleaded guilty to engaging

in a criminal conspiracy to manipulate exchange rates in the foreign currency exchange spot

market that went on for years.[18] Five Major Banks Agree to Parent-Level Guilty Pleas, DOJ

Press Release, May 20, 2015, available at https://www.justice.gov/opa/pr/five-major-banks-

agree-parent-level-guilty-pleas. Rather than seeking the kind of relief the SEC is seeking against

Defendants here, the SEC made sure those firms could continue to operate as broker-dealers and

investment advisers. Dissenting Statement Regarding Certain Waivers Granted by the

Commission for Certain Entities Pleading Guilty to Criminal Charges Involving Manipulation of

Foreign Exchange Rates, Commissioner Kara M. Stein, May 21, 2015, available at

https://www.sec.gov/news/statement/stein-waivers-granted-dissenting-statement. As the DOJ

---

[18]    Since then, JPMorgan Chase pleaded guilty to another two felonies (for spoofing, a form of market
manipulation) bringing its rap sheet up to five criminal felonies. https://wallstreetonparade.com/2021/05/three-wall-
street-mega-banks-have-admitted-to-a-combined-eight-felony-counts-but-dont-expect-the-word-felony-to-come-up-
in-wednesdays-senate-banking-hearing-with-t/. Each time, JPMorgan Chase enters into a deferred prosecution
agreement but is permitted by the SEC to continue operating as a broker-dealer, investment adviser, and issuer of
hundreds of investment funds and instruments.

Press Release notes, this conduct by UBS and Barclays constituted a violation of non-prosecution agreements each had with the DOJ.

Here, the SEC unabashedly seeks a conduct-based injunction against all Defendants permanently enjoining them from directly or indirectly "managing or liquidating GTIF and its subsidiaries." Brief at 14. The SEC asserts that such an injunction is necessary to "provide meaningful relief and substantial investor protection against future misconduct by Defendants." *Id.* That is not true. The SEC recognizes that big Wall Street firms make mistakes – some are outright felonies – and routinely grants them grace. Defendants have acknowledged their misconduct and seek a chance to show that they have learned from their mistakes.

Imposing injunctions would contravene the near-unanimous determination by the very investors the SEC seeks to protect. Under the Plan, the GTIF investors made the considered decision to have the Managing Members carry out the Confirmation Plan. When GTIF's investors made these elections, they were fully informed of the SEC's allegations in this proceeding and the potential that the jury could render an adverse verdict. To enter the injunctions the SEC seeks would undermine the investors' choice to have the Managing Members continue in their positions so they can, over time, liquidate assets to pay redemption obligations *in full*, and enhance the value of the fund for the benefit of investors who have elected to remain in GTIF. Imposing an injunction that bars the Managing Members, Michael Hull, and Christopher Nohl from managing GTIF would significantly undermine the ability of GTIF to obtain fair value for its assets, making it impossible for all GTIF investors to be paid in full.

The SEC seeks such a broad injunction by claiming that GTIF/GPRE was a fraudulent enterprise since 2013 and will continue operating that way. That is simply not true. The evidence

adduced at trial and submitted with this brief shows that there is little reason to believe that violations will occur in the future. Both Michael Hull and Christopher Nohl have taken steps that demonstrate they understand the gravity of the jury's verdict. Immediately after the entry of the verdict, both Messrs. Hull and Nohl contacted investors and many others to inform them of the jury's verdict. They also provided all investors in GTIF with access to the entire transcript of the trial, every exhibit admitted into evidence, the jury verdict, and other related documents. Mr. Nohl notified all companies where he served as director of the jury's verdict and resigned his position. The name of GTIF was also changed to Alluvium to remove the word "income" from its name and to ensure that investors do not believe the fund will provide a stream of income.

The imposition of an injunction on Michael Hull, Bluepoint, and/or GAM II would not just harm GTIF investors but would also cause the failure of another Madison, Wisconsin company called Yodelay. Yodelay is an award-winning yogurt company founded in 2017 in Madison Wisconsin, one of the few urban dairies in the country, and purchases all its milk from a family farm near New Glarus, WI.  Yodelay swept the three world championships that have occurred since its founding. National retailers are ready to carry Yodelay if the company can increase production. Right now, Yodelay has just six employees. Michael Hull and his partner handle the finances of the company as well as repair machinery, pick up supplies, supervise production, and whatever else is required to keep operating.

Yodelay is in the process of raising capital to expand its operations.  It became clear after its competition wins, and the reviews from retailers that Yodelay would be able to be more than just a small Madison Wisconsin yogurt maker, and that it could be a significant participant in the marketplace.  But the expansion requires more than loans from the handful of families that have supported the company thus far. This expansion will lead to more jobs in Wisconsin. The

company is in the process of expanding its facility off Fish Hatchery Road and bringing in much needed equipment to speed up the manufacturing process and meet the demands of the national retailers who want to bring Yodelay onto their shelves.

An injunction against Michael Hull, GAM II, or Bluepoint is effectively a death sentence to Yodelay as Mr. Hull has the primary responsibility for raising capital for Yodelay. An injunction will not just cause Yodelay to fail, cause Yodelay employees to lose their jobs, but also cause the company to default on its existing loans, and negatively impact the companies with which it does business.

## VIII.   CONCLUSION

In sum, the amount of disgorgement should be set based upon interest payments and management fees paid on the basis of overstated asset values. The amounts of disgorgement are broken down in the following table:

| Category | Individual or Entity | Disgorgement Amount | Alternative Disgorgement Calculation * ^ |
|---|---|---|---|
| **Management Fees on Increased Values** | | | |
| 2017-2018 Management Fees based on increased value of Amiran * | Chrysalis Financial, GAM II | $          33,933.00 | $          287,316.00 |
| Management Fees based on increased value of The Emperor emerald (2015 only) | Chrysalis Financial, GAM II | $          70,000.00 | $          70,000.00 |
| Management Fees based on use of Metropolis appraisals when higher than Zigras preappraisal values ^ | Chrysalis Financial, GAM II | $          9,878.00 | $          31,000.00 |
| Management Fees of Bluepoint - 1% of increased values | Bluepoint | $          56,905.50 | $          194,158.00 |
| Fees for H Family/H Informatics - 0.85% of increased values | Hull | $          - | $          - |
| **Interest on Loans** | | | |
| Interest GTIF paid on loans made to GTIF by Chrysalis Financial | Chrysalis Financial | $          12,906.00 | $          12,906.00 |
| Interest GTIF paid on loans made to GTIF by Nohl/Graewin | Nohl | $          28,867.00 | $          28,867.00 |
| Interest GTIF paid on loans made to GTIF by Michael Hull | Hull | $          1,500.00 | $          1,500.00 |
| | | | $          - |
| Total Disgorgement of Chrysalis Financial | | $          69,811.50 | $          207,064.00 |
| Total Disgorgement of Bluepoint | | $          56,905.50 | $          194,158.00 |
| Total Disgorgement of H Family/H Informatics | | $          - | $          - |
| Total Disgorgement of GAM II | | $          56,905.50 | $          194,158.00 |
| Total Disgorgement of Nohl | | $          28,867.00 | $          28,867.00 |
| Total Disgorgement of Hull | | $          1,500.00 | $          1,500.00 |

* Alternative figure is calculated by including management fees initially paid to the Managing Members, even though those amounts were credited toward the value of other GTIF assets at the end of the year.

^ Alternative figure does not include the 2015 plug that Christopher Nohl had Pam Kirchen make in the accounting records to reflect his analysis of the differences between appraisals prepared by William Metropolis and preappraisal figures sent by James Zigras for some of the same stones.

The imposition of joint and several liability is inappropriate here where the amounts attributable to different entities are clear. There is no basis for assigning any liability, injunction, or penalty to GTIF/GPRE as that would simply be a punishment of GTIF investors who rebuffed the SEC's efforts to represent their interests. Penalties, if assessed at all, should not exceed 50% of the amount of disgorgement for each Defendant. Finally, no Defendant should be subject to an injunction as that would significantly impact the potential success of the Confirmation Plan. GTIF investors made the considered decision to have the Managing Members continue to manage the fund because Chris Nohl and Michael Hull have specialized knowledge about the assets of the fund and are best able to maximize the value of those assets for the benefit of GTIF investors.

Dated: August 31, 2022       Attorneys for Defendants

By:    */s/ Celiza P. Bragança*

Celiza P. Bragança *Lisa@SECDefenseAttorney.com*
David A. O'Toole *David@SECDefenseAttorney.com*
BRAGANÇA LAW LLC
5250 Old Orchard Road, Suite 300
Skokie, Illinois 60077 | 847-906-3460

Michael P. Richman
*mrichman@steinhilberswanson.com*
Claire Ann Richman
*crichman@steinhilberswanson.com*
Steinhilber Swanson LLP
122 W. Washington Avenue, Suite 850
Madison, WI 53703-2732

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 31st day of August 2022, a true and correct copy of the foregoing was served on all counsel of record via ECF to:

John Birkenheier *BirkenheierJ@sec.gov*
Christopher H. White *WhiteCH@sec.gov*
Timothy Stockwell  *StockwellT@SEC.gov*
Charles J. Kerstetter *Kerstetterc@sec.gov*
U.S. Securities & Exchange Commission
175 West Jackson Boulevard, Suite 1450
Chicago, IL 60604-2615

*/s/ Celiza P. Bragança*
Attorney for Defendants