

NOTICE

18 July 2023

Re: Fund Event Update

To: All Members

**Subject: Plan, Plan Assumptions, Progress, Tax, Tax Reporting, Expected Redemption Payments, & Managing Member Status**

### Executive Summary

While we had a delayed start to confirmation plan operations, we have worked hard to cultivate many sales pathways and potentially successful opportunities. Some have born fruit, some are still in development. Through our perseverance, we were able to pay off most of the third-party administrative debt from the past 4 years. That said, despite all of our best efforts, we are deeply sorry, but the timing of sales did not come early enough to meet the required distribution payout time frame. The Leave tranche 1 payment will be delayed. We do not yet know the date that the tranche 1 payment will be made.

We still believe in and have hope for the success of the AF. We are confident that many of our efforts will pay off in the near future. We have worked tirelessly with every person of like mind, to achieve the best outcomes for every investor.

Effective at 12pm CST, according to the terms of the Confirmation Plan, Christopher Nohl and Michael Hull are no longer managers of the fund. Your next contact from the fund will be from the Alluvium Governance Board who will appoint the fund's next managing member. The Alluvium Governance Board is expected to make this decision today or tomorrow.

### Introductory Disclosure

If there was a theme to the civil litigation it was that material disclosure is a required continuing requirement of management. The following disclosures are made in the spirit of compliance with lessons learned.

The past year has been an eventful and trying one and there are several matters to address which have a bearing on your investments and reporting. This letter is meant to update you as to current events and to help model expectations with an aim toward assisting you in making better, and perhaps even proactive, tax planning allowances.

### Conformity to Confirmation Plan Payments

As of the bankruptcy plan effective day (5/19/2022) outstanding administrative expense payments for the fund and GPRE were $4,052,473.01.[1] The fund and GPRE had no secured creditors. Unsecured creditors totaled $1,212,192.41.[2]

---

[1] Of this total $3,209,863.02 constituted court ordered payables to Managers Chrysalis Financial LLC and Greenpoint Asset Management II LLC where $2,000,000.00 was the combined prefiling claim settlement negotiated/adjudicated during the bankruptcy and other court ordered administrative fees for work during the bankruptcy of $1,209,863.02. None of these amounts have been paid as of this writing.

[2] This does not include $1,350,871.08 in accrued non-arm's length service provider fees to H Informatics LLC which is a Hull associated entity. This full amount remains unpaid and unresolved.

As of July 19th, All Unsecured Creditors are Paid in Full: Unsecured creditors have received $1,212,192.41. Zero dollars of bankruptcy unsecured claims remain. Claims were paid at a rate of $1/$1 or 100%. Managing Members have to date deferred $2 million in court ordered payments in this class.

All but $509,000[3] of Administrative Claims has been paid in full: As of today, approximately $509,000.00 (all to legal counsel) of administrative claims remain. No monies have been paid against Managing Members administrative compensation and expenses of $1,209,863.02 for work and expenses during the bankruptcy period.[4]

Governance Board Expenses: Governance Board payments have been paid timely as requested to date.

Leave-Class Redemptions: As of today, Leave-Class redemption payments payable are $3,755,732.99. The time frame for payment was one year from the confirmation date plus a 60-day grace period that ends 7/19. Under the plan failure to pay this amount by the end of the grace period triggers automatic manager termination.

## Tax Notice

This is not meant to be tax advice or direction and each of you should discuss your own particular situation with your tax professional. That aside, the Alluvium Governance Board and the Managing Members have met with fund CPA firm Clifton, Larson, Allen representative to try to anticipate tax consequences of the fund's confirmed plan.

Coming out of that meeting, our understanding is that all the fund's realized gains, such as those used to pay redemptions to Leave-Class members, will be allocated to the Stay-Class investors for tax purposes. The stated theory behind this was that as Leave-Class investors' equity is redeemed, then ownership of equity is recaptured by the Stay-Class investors. As a Stay-Class investor you may or may not have anticipated this tax treatment.

As assets are sold and as gains are realized there is then a progressive tax allocated to the Stay-Class for the four-year payment schedule where the Confirmation Plan prohibits tax offsetting payments to the Stay Class which will require the Stay-class to pay taxes on their respective portions of $37MM out of pocket.

We encourage that new management should investigate ways to mitigate tax consequences for the Stay-Class without violating terms of the plan.

## Tax Effect Mitigation & Large Opportunities

The Managers currently believe that the best tax mitigating event for all would be the total redemption of all paid in capital by year end. The first consideration going to the Leave-Class and the second to the Stay-Class equal to their paid-in-capital. In this way the remaining fund assets, if any, could be asset sold to a mezzanine corporation and paid to the former Stay-Class as royalties or interest as additional payments, if any, are achieved. In this way there would be no equity gain to the stays at year end since no members would remain and equity would be written down to zero after all payments were made.

This requires $55 - $60mm to accomplish.

There are two paths that can produce this result:

   A) Sale of the top 30 – 100 pieces in the GPRE collection
   B) Asset sale of the entire fund to a new party

Below are the sales opportunities the Manager's are working on as of July 19, 2023:

   A) Simultaneous Sale of All or Nearly All GPRE Assets: The sales efforts surrounding Monona Partners LLC interest have opened up a connection to a middle eastern sovereign wealth fund who has expressed interest in considering

---

[3] Figure does not include amounts due Managing Members in the post-confirmation period which has accrued at the contractual rate of $575,000.00 per manager per annum.
[4] This section does not include post-bankruptcy accounts payable which is material in amount.

for purchase what is described as a "$100MM collection" to them. Their representative stated that the asset class/type is not unusual for them and they purchase the same "all the time." The buyer representative has requested after this opportunity twice in the past week.

Christopher Nohl has worked to prepare a detailed and descriptive provenance, publications and photographic catalogue for presentation. Intermediate and introducing parties are expected to charge 7 – 20% combined. The sovereign wealth fund reports that they examine opportunities in 2 weeks upon which, if interested, they issue a commitment letter, and then that they close in 1 additional week. It is estimated that 10 – 20 hours of work remain to complete the catalogue. The incomplete catalogue will be forwarded to new management. It is not known if new management will have the requisite skills and knowledge necessary to complete the offering.

There is no guarantee that the sovereign wealth fund or a similar buyer will culminate a sale.

B) <u>Asset Sale to a Wealthy Individual:</u> The Managers have been pursuing this effort at the same time as we have worked on the collection sale to the sovereign wealth fund. This potential purchaser is extremely familiar with the types of assets the fund holds. He has a personal multi-generational wealth goal for which the Fund assets are particularly suited to, and a full purchase of the fund would represent only a small fraction of his overall investments. He is currently evaluating whether a purchase of the entire fund as an entity or an asset purchase is most suitable.

Michael Hull has developed a close relationship with this family over the past year and expected this transaction to complete.

The managers were pursuing both strategies simultaneously.

### Tax Reporting

Your K1 statements for 2022 are near complete. There is a remaining imbalance in the year-end balance sheets between 2022 and 2021 that we think will take 3 or 4 hours of concerted effort to solve. Our accountants believe the imbalance is arising out of the rebalancing of accounts and liabilities that took place on the Confirmation Day. Then, financials and footnotes need to be updated to accompany the K1 statements and we expect that process, already underway, to take no more than two weeks in review.

We expect the issuance and delivery of K1 statements by August 15th at the latest barring no unforeseen complications but defer to future guidance from new management.

### Hits & Misses: Assumptions of the Plan

The Confirmation Plan was predicated upon assumptions of revenue being realized primarily from the sale of fine minerals and cut stones (in wholly owned fund subsidiary GPRE) but also from the sale of interests in limited liability companies in which the fund is invested.

Three primary assumptions' timing proved incorrect in the plan:

1) <u>GPRE Return of Consigned Inventory:</u> Almost all of the value of GPRE was placed with bankruptcy court approved/ordered broker Collector's Edge Minerals Inc. out of Golden, Colorado. That contract signed March 4th, 2020, (7 days before the WHO declared a global pandemic) had a three-year maximum duration. The plan assumed the return of all stock placed with CEMI nearly contemporaneously with the confirmation date on May 19, 2022.

The civil proceeding interfered with this return plan and, instead, GPRE requested scheduling to receive its inventory back shortly after the end of the remediations phase. This was November 2022, and GPRE requested of CEMI that the return occur at yearend.

The CEO of CEMI first verbally agreed and then delayed, citing the contract duration and saying that CEMI wanted to retain the consignment through the events of Tucson's 2023 Fine Mineral and Gem Show season. Manager Michael Hull proceeded to Tucson to view the displays of CEMI during the show and noted 10 to 20 of the 1500+ consigned pieces on display for sale. CEMI sold only a few minor pieces during this time.

CEMI returned all remaining GPRE stock, comprising 85-90% of the fund's value, on April 20, 2023.

The return was nearly one full year after the return assumed in the Confirmation Plan.

2) GPRE – Settlement with Nicholas Stolowitz: The Confirmation Plan included significant contributions to revenue from the sales of consigned GPRE property to Vermont based fine mineral dealer Nicholas Stolowitz with whom there was litigation in the bankruptcy context. While the plan anticipated settlement between May and June of 2022, settlement actually occurred March 28, 2023. Settlement related consignment occurred May 9 – 10, 2023.

The Stolowitz Settlement was nearly one full year after the time assumed in the Confirmation Plan.

3) Monona Partners LLC & Fetch Rewards Inc.: The Confirmation Plan anticipated July – August 2022 revenue from the sale of Fetch Rewards Inc. stock held in Monona Partners LLC ('MP'). During the budgeting, MP manager John Philosophos was receptive to the request of redeeming fund MP interest for underlying prorate Fetch Rewards Inc. stock. The Plan assumed this redemption, assignment, and a subsequent sale by the Managers.

But, John Philosophos did not assign the underlying interest in Fetch Rewards Inc. to the fund despite the request. This was moot between July and November as all efforts turned toward the civil defense.

Afterward, John Philosophos explained to Christopher Nohl that he had wanted to delay thereby allowing time for additional appreciation / growth of Fetch Rewards Inc. value.

Between February and May 2023, Philosophos ('JP') cooperated in facilitating a sale contract but while including nearly all Monona Partners LLC interests and giving them the option to participate which nearly all did. JP then verbally offered the fund priority liquidity upon closing where the closing itself might be in tranches (parts). Christopher Nohl accepted on behalf of the fund.

JP was successful in allowing time to increase the value of the fund position which moved from the plan figure (based upon the April 2022 closed Hamilton Lane equity offering with Fetch) of $3.3 million to expected proceeds of $5.3 million+.

The sale of the fund's interest in Monona Partners LLC, assumed in the plan, will upon payment have taken approx. 1.3 years longer than assumed in the plan. The transaction is signed and in due diligence phase. The fund does not have contractual control of the sale.

The managers worked supporting this transaction and there was an effort to close by the end of the grace period, but that expectation and effort was not successful and the transaction is now set to expire or close by August 18th.

## Operations Since Confirmation of the Plan

As mentioned above, since the confirmation of the Chapter 11 Reorganization on May 19, 2022 the Fund has made some significant accomplishments. Upon confirmation the Fund paid one half of the money it owed to its creditors and paid the second half in July 2023. This means the only creditors remaining are the Managing Members, H informatics and the law firms that represent the Fund.

**Transactions Completed or in Process**

**GPRE – total sold items:**

**GPRE – total gross revenue since confirmation date:**

    Sold Fine Minerals:

        Gross Total Sold: 676,280.57[5][6]

        Pieces Sold: 75

    Sold Cut Gemstones:

        Gross total Sold: $1,696,943.15[7]

        Pieces Sold: 8

    **Total GPRE Sold since Confirmation Date: $2,363,223.73**

    **Total Pieces Sold Since Confirmation: 83**

GPRE Comparison: Total Sold by Broker CEMI during bankruptcy between 2020 and April 2023: $510,765.00 during its three years of consignment.

## Personal Note

I wanted to say that managing this fund has been the most challenging job of my career and I am happy to have had the opportunity, done the best in my power to be loyal, protective and just, and always served the interest of the fund and its investors as you laid out your instructions to the managing members in the operating agreements.

What I have learned is that reliance on the opinions of professionals is never sufficient by itself, that fear and apparent authority will drive a person to harm themselves and others despite the manifest truth, and that nothing moves at the speed of wishes, plans, and intent.

In every way we have worked to produce the best outcome in the situations we have been presented with. We sincerely pray that the full value of all of your holdings is realized by the next managing member. Thank you.

Sincerely, Christopher J. Nohl

---

[5] Two pieces sold by Nicholas Stolowitz: $225,000.00 and $300,000.00 pending payment.
[6] Includes $70,000.00 which is Dillon Stolowitz' payment regarding a red fluorite as the result of litigation against him.
[7] $720,000.00 is scheduled to be received August 15, 2023, as the second and final payment in a Paraiba-tourmaline type transaction with the same buyer.