IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

U.S. SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,                    OPINION AND ORDER

    v.                                           19-cv-809-wmc

BLUEPOINT INVESTMENT
COUNSEL, LLC, MICHAEL G. HULL,
CHRISTOPHER J. NOHL, CHRYSALIS FINANCIAL LLC,
GREENPOINT ASSET MANAGEMENT II LLC,
GREENPOINT TACTICAL INCOME FUND LLC, and
GP RARE EARTH TRADING ACCOUNT LLC,

                    Defendants.

---

      The U.S. Securities and Exchange Commission ("SEC") brought this action against Michael Hull, Christopher Nohl, and their associated entities for violating various federal securities laws and regulations by knowingly or recklessly inflating the value of their funds' investments in gems, minerals, and an environmental remediation company, then paying themselves handsome management fees based on these inflated valuations, as well as misleading investors further by reporting nonexistent income. A jury found both Hull and Nohl, and certain of their respective, associated entities, liable for violations of: Section 10(b) of the Securities Exchange Act and Rule 10b-5; Sections 17(a)(1), (2), and (3) of the Securities Act; and Sections 206(1), (2), and (4) of the Investment Advisers Act and Rule 206(4)-8. Remaining before the court are the SEC's requests for statutory damages, civil penalties, and a permanent injunction. For the reasons explained below, the court will order that defendants disgorge the SEC's requested amount and pay half of its requested

civil penalties, while permanently enjoining Hull and Nohl from working with securities on the behalf of others in the future.

FACTS[1]

## A. Background

The SEC is an independent U.S. government agency charged with enforcement of federal securities laws and regulations. Defendant Greenpoint Tactical Income Fund LLC ("GTIF") was a private investment fund nominally managed by two of its members, defendants Greenpoint Asset Management II LLC ("GAM II") and Chrysalis Financial LLC ("Chrysalis"). (Pl. PFOF (dkt #162) ¶ 2.) Defendants Michael Hull and Christopher Nohl (collectively, the "managing members") controlled GTIF through GAM II and Chrysalis, respectively. (*Id.* ¶¶ 3-4.) Defendant GP Rare Earth Trading Account LLC ("GP Rare Earth") was a wholly-owned subsidiary of defendant GTIF that held GTIF's gems and minerals. (*Id.* ¶ 5.) Defendant Bluepoint Investment Counsel LLC was a designated "investment adviser" to GTIF controlled by Hull. (*Id.* ¶ 6.) Hull also was part-owner of two, non-defendant companies that provided other services to GTIF for fees -- "H Informatics" and "H Family Office." (Tr. 6 (dkt. # 387) 93:20-96:3.)

In its amended complaint, the SEC alleged 12 counts of statutory violations: Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933 ("Securities Act") (Counts 1-3); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and

---

[1] The court draws these facts from the parties' proposed findings of fact at summary judgment and the evidence presented at trial. *See S.E.C. v. Lipson*, 278 F.3d 656, 662 (7th Cir. 2002) ("[I]t was for the judge to decide, *consistent with the jury's finding of liability* . . . what equitable relief to impose." (emphasis added)).

Rule 10b-5 (Count 4); and Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") and Rule 206(4)-8 (Counts 5-12).  (Dkt. #33.)  The SEC moved for partial summary judgment on certain of defendants' affirmative defenses, which the court granted.  (Dkts. ##161, 225.)  The SEC subsequently dismissed three of its Advisers Act claims.  (Dkt. #205.)  The case proceeded to trial, where the parties presented the following evidence.

## B.  GTIF

In 2013, Hull and Nohl, individually and through their associated entities, created and began to manage GTIF.  (Pl. Exs. 1, 2.)  Although the stated goal of that fund was to earn income (*id.*), Bruce Pietrantonio, whose company provided accounting services to GTIF shortly after its creation in 2013 and 2014, testified that he saw "very little" revenue, noting that the fund did not sell much of anything; instead, most of the fund's liquidity came from ongoing investor contributions.  (Tr. 1p (dkt. #376) 35:23-37:19, 39:7-9; 52:7-9.)  Moreover, Pam Kirchen, an accountant with Chrysalis Financial, explained that GTIF's biggest expenses were management and incentive fees, which went to GAM II and Chrysalis.  (*Id.* at 157:21-158:12, 173:3-19.)  Next, Denis O'Connor, an accountant and expert witness for the SEC, testified that GTIF had "two main investments," comprising about 85 percent of its investments overall and consisting of (1) gems and minerals, and (2) holdings in Amiran, an environmental remediation company.  (Tr. 3p (dkt. #378) 41:13-22, 53:14-24, 66:23-67:8.)  The SEC presented persuasive evidence that the managing members purposely and unreasonably inflated the value of both of these investments over time to mislead investors.

3

## C. Inflated Valuations

### 1.    Gems and Minerals

Starting with gems and minerals, appraiser Ambika Sharma testified that she originally appraised gems (apparently for GTIF), but Nohl asked that she redo those appraisals because the gems were "worth a lot more." (Tr. 2a (dkt. #383) at 111:6-14, 112:8-25.) Eventually, Sharma changed the appraisals to conform with Nohl's expectations, which resulted in a $1 million increase in the reported value of each gem, unsupported by any evidence of a change in the market value after purchase. (*Id.* at 115:2-21.)

Nohl also made it a practice to shop for higher valuations by having appraisers William Metropolis and James Zigras assign values to certain gems and minerals at the same time. (*See* Pl. Exs. 129, 146.) Specifically, Metropolis appraised several gems for Nohl on April 9, 2015. (Pl. Ex. 129.) Three days later, Zigras provided Nohl with preliminary values for a set of gems, including some that Metropolis had just appraised. (Pl. Ex. 146, at 2.) Nohl then directed Zigras not to finish appraising some of the gems that Metropolis had appraised at higher values. (*Id.* at 1.) Further, while Zigras was still appraising these minerals, Nohl and he entered into their own, separate $275,000 transaction for the purchase of other minerals. (Tr. 2p (dkt. #377) 24:16-25:3, 31:1-32:2.)

Metropolis also testified that he assessed gems and minerals for Nohl "mostly by gut feeling," without reference to purchase price and after asking Nohl in an e-mail to "please give an idea of what you might need for numbers." (Tr. 2a (dkt. #383) at 146:13-21, 147:18-21; Pl. Ex. 149.) In addition, Metropolis would annually reevaluate his

4

appraisals at the request of Nohl or Hull.  (Tr. 2a (dkt. #383) 148:20-24.)  He even went so far as to acknowledge that Nohl was trying to attract investors by asking Nohl, "Would it be beneficial to you if you gave me a list of what things last appraised for[,] so that we can show some gains in their values?"  (Pl. Ex. 153.)  Although purporting to rebuff this question by explaining, "[t]he motive I think is always irrelevant to the market price and shouldn't figure in" (Pl. Ex. 154), Nohl nevertheless proceeded to provide Metropolis with past appraised values as reflected in his 2017 appraisal forms.  (Pl. Ex. 130.)[2]

Finally, Sandra Tropper, an experienced personal property appraiser and SEC expert witness, credibly opined that none of the appraisers hired by Nohl to revalue GTIF's gems and minerals after purchase followed "current professional standards," particularly because the values were consistently inflated above the arms-length price that the same gems and minerals were sold to GTIF.  (Tr. 2p (dkt. #377) 46:4-6, 50:24-51:9.)  The dubious accuracy of the appraisals likewise called into question the accuracy of GTIF's financial statements.  To that point, Matt Farrar, an accountant with Baker Tilly who audited GTIF, testified that no one associated with the fund disclosed that: Nohl solicited multiple appraisals of the same gems and cherry picked the highest appraisals; Metropolis asked Nohl what numbers he wanted; or Metropolis knew Nohl was seeking to attract investors.  (Tr. 3a (dkt. #384) 109:6-111:2; 141:8-143:7.)  Farrar explained to the jury that each would have affected Baker Tilly's audit conclusions, as all of these facts undermined the appraisers' independence and reliability.  (Id. at 141:8-143:7.)

---

[2] At least some of Metropolis's pre-2017 appraisals also included data on past appraisals of gems. (Pl. Ex. 129, at 2.)

GTIF also improperly listed on its financial statements from 2015 to 2018 the value of the so-called "Emperor" stone -- a particularly expensive emerald -- even though it did not take possession of that gem until 2019.  Specifically, GP Rare Earth had entered into a 2015 agreement with Marcus Budil to purchase three minerals or gems for $6.8 million, with $2.5 million allocated to pay for the "Emperor."  (Defs. Ex. 722 (dkt. #398-3) 11.)  However, GTIF paid for one mineral at a time, and had not paid for *or* taken physical possession of the Emperor stone itself until February 2019.  (Tr. 5a (dkt. #386) 67:3-13; Tr. 5p (dkt. #380) 14:8-11.)  Further, in 2016, years before GTIF had paid for or received the Emperor, it not only improperly listed that emerald as owned by GTIF without explanation, but recorded a $1 million, unrealized gain in the value of the stone above the purchase price, thus grossly overstating GTIF's assets (and presumably its income) by another $1 million.  (Tr. 3p (dkt. #378) 46:7-17, 65:22-66:22.)

### 2. Amiran

As for Amiran's valuation, Renee McMahon, an economic consultant for the SEC, testified that there was "no analytical support" for GTIF's initial, $40 million valuation of Amiran in 2015.  (Tr. 4a (dkt. #385) 92:3-93:7.)  On the contrary, GTIF had based this valuation solely on Amiran's own, assigned $40 million valuation of the company as of 2010.  (*Id.*)  Worse, reliance on that valuation was plainly unjustified by 2015, having been based largely on the expectation in 2010 that Amiran would receive a lucrative U.S. government contract crucial to its success.  (*Id.* at 93:8-94:16.)  Despite knowing this contract had fallen through well before 2015, GTIF's managing members Hull and Nohl assigned an even *higher* value to GTIF's investment in Amiran at that time, principally

6

based on "writing up the value in the investment as opposed to additional investments that were being made by GTIF." (*Id.* at 94:3-94:16, 106:6-25.)

Indeed, the evidence showed that Amiran was rapidly *losing* value over this period. In particular, Sherwin Amiran, the son of Amiran's founder and a former employee of an Amiran subsidiary, testified that the future of Amiran was "very bleak" by 2016, with the company struggling to even make payroll after August of that year.  (Tr. 3p (dkt. #378) 88:16-24, 121:7-11, 141:1-42:2.)  "At one point," Sherwin also testified that while Amiran had patents -- including patents for soil remediation -- but by 2015 or 2016, all the patents had expired or lapsed because the company could not pay the patent maintenance fees. (*Id.* at 148:6-13.)    Further, by 2017, Amiran had defaulted on a large loan from BMO Harris Bank, and Sherwin spoke several times a month with Nohl about addressing Amiran's financial distress, including this loan.  (Tr. 4a (dkt. #385) 15:25-16:13.)  Later in 2017, Nohl himself described Amiran's cash flow model as "terrifying" (Pl. Ex. 188), and by October 2017, Luis De Leon, the former CEO of Amiran, testified Nohl had received notice of the cancellation of Amiran's principal soil remediation contract in Kuwait.  (Tr. 3p. (dkt. #378) 108:25-109:9.)  Finally, while Nohl also held out the promise of a solution to Amiran's funding crisis, none was ever provided.

Despite these death knells to Amiran's future viability, managing members Nohl and Hull *still* valued GTIF's investment in that company at $38 million in March 2018. (Tr. 4a (dkt. #385) 100:14-102:6.)  They also consistently reported Amiran's value at a *significantly* higher, per-share price than GTIF had paid for it in better times.  (*Id.* at 108:22-109:12.)  By way of example, GTIF purchased Amiran shares in March 2018 for $1,028

per share, while reporting their value at around $2,500 per share. (*Id.*) Moreover, while McMahon opined that GTIF had paid $10 million for its interest in Amiran and related entities, the March 2018 valuation of GTIF's interest in Amiran had dropped to $4 million in light of Amiran's "liquidity problems and . . . deteriorating financial performance." (*Id.* at 101:9-15.) Moreover, to the extent that Amiran still had any valid patents, McMahon testified that, after BMO foreclosed on Amiran, BMO would have had first rights to those patents. (Tr. 4p (dkt. #379) 14:25-15:5.) Finally, Hull had written down Amiran's value to zero in the third quarter of 2018, without informing GTIF's investors of this write-down until December of 2019. (Pl. Exs. 68, 346, at 5; Tr. 6 (dkt. #387) 191:24-193:13.)

### D. Investor Losses

In addition to overstating the value of GTIF's investments, defendants intentionally misled investors by reporting that the fund was generating income. Like other investors relying on GTIF's periodic financial statements and representations by defendants Hull and Nohl, Erick Hallick, a client of Hull's, had reasonably understood that GTIF intended to make money from selling gems and minerals. (Tr. 2p (dkt. #377) 119:15-18, 143:15-144:2.) Further, GTIF sent Hallick statements *indicating* that GTIF had already earned significant amounts of income on his initial investment, which he was led to believe by defendants reflected not just positive income earned by GTIF, but actual cash being put into his personal account. (Pl. Ex. 51; Tr. 3a (dkt. #384) 18:20-19:6.) As an example, in March 2016, GTIF sent Hallick an account statement indicating that he had personally earned more than $2 million in income during the first quarter of 2016, which was simply untrue.

8



**STATEMENT OF CHANGES IN MEMBERS' EQUITY (NET ASSET VALUE)**
**FOR THE QUARTER ENDED MARCH 31, 2016**
**(PREPARED FROM BOOKS WITHOUT AUDIT)**

| | | |
|---|---|---|
| Hallick, Erick | Member No. | 36 |
| ███████████ | | |
| Middleton, WI ████ | Class | A |

Individual Account Statement

Performance for your account (net of all fees and expenses)

| | Current Quarter | Calendar Year To Date |
|---|---|---|
| Beginning net asset value | $ 15,355,721.91 | $ 15,355,721.91 |
| Contributions | 0.00 | 0.00 |
| Redemptions | (338,334.95) | (338,334.95) |
| Net income (loss) | 2,309,751.67 | 2,309,751.67 |
| Ending net asset value | $ 17,327,138.63 | $ 17,327,138.63 |

(Pl. Ex. 51, at 1.)

Later, after talking with his CPA, Hallick learned that this income was all or mostly "unrealized" -- meaning that any "gains" were on paper only -- and many of the distributions from GTIF were actually going to its managing members as fees based on these so-called gains.  (Tr. 3a (dkt. #384) 28:18-29:14.)  After learning this, Hallick asked Hull to return his investment in GTIF, along with an outstanding distribution request of

9

$350,000. (*Id.* at 33:7-34:6, 36:8-21.) Instead, Hull told Hallick that at least some of the money to pay for his distribution would have to come from new investors, confirming for Hallick that "there wasn't a lot of selling going on" and reported profits "weren't real." (*Id.* at 36:19-25.) Ultimately, Hallick testified that he had received about $800,000 in cash distributions from GTIF over time but had lost $13 or $14 million of his reported gains at the time the SEC filed suit.[3] (*Id.* at 42:21-43:11.)

Next, Deanna Schneider testified that she had hired Hull and Bluepoint in 2014 to manage $130,000, telling Hull that she wanted to be "moderately aggressive," but the investment initially "[sat] in cash" because he did not think it was a good time to invest in the stock market. (Tr. 1p (dkt. #376) 68:4-7, 71:1-72:5.) Eventually, Schneider asked to withdraw her money, but Hull convinced her to invest $50,000 in GTIF instead, telling her that it would buy gems at low prices, then sell them for a higher amount with "constant turnover" of the gems and minerals. (*Id.* at 72:23-74:8.) In particular, the investment letter that Schneider signed stated that GTIF's goal was "to achieve a high level of current income" and explained that many of its gem and mineral holdings were "short term in nature and provide[d] strong cash flow as well." (Pl. Ex. 6, at 9-10.)

At first, Schneider's investment with GTIF reportedly did "great" (Tr. 1p (dkt. #376) 90:20-23), and like the statement sent to Hallick, Schneider's March 2016 individual account statement showed she had earned more than $8,000 in income for the first quarter of 2016 alone. (Pl. Ex. 53, at 1.) Based on the representations made to her,

---

[3] At the time of trial, Hallick had filed multiple lawsuits against defendants, although at least some of those lawsuits had settled. (Tr. 3a (dkt. #384) 46.)

Schneider testified that she assumed those earnings came from the fund's buying and selling of minerals.  (Tr. 1p (dkt. #376) 94:3-6.)  However, GTIF's statement for the third quarter of 2018, which Schneider did not receive until December 2019, showed that her investment had actually lost nearly $25,000.  (*Id.* at 106:12-16, 107:1-8; Pl. Ex. 346, at 6.)  Had she been told timely about this substantial loss in the third quarter of 2018, Schneider testified that she "would have tried to cash out before the rest of it was gone." (Tr. 1p (dkt. #376) 107:18-108:3.)

Having grown up with Hull as her family's investment adviser, another investor, Susan Ewens, testified that she hired defendants Hull and Bluepoint to manage about $1 million, investing $225,000 with GTIF in particular.  (*Id.* at 124:2-125:21; Pl. Ex. 52, at 1.)  Ewens had told Hull that she wanted to avoid risky investments, explaining that her goal was to earn "an extra supplement of money."  (Tr. 1p (dkt. #376) 126:14-24.)  In response, Hull told Ewens that GTIF itself was diversified, and her investment in the fund was low risk and high reward.  (*Id.* at 128:1-5.)  In 2016, Ewens attempted to withdraw $100,000 of her investment, and Hull eventually purported to have liquidated her investment in one of his funds for $75,000.  (*Id.* at 145:15-146:8.)  However, she never saw any of the profits that Hull represented she had made.  (*Id.*)  By August 2017, she had asked for all of her investment with Hull returned to her, but he explained that she could not liquidate her investment and, eventually, he stopped responding to her messages altogether.  (*Id.* at 151:19-152:10; Pl. Ex. 36.)  Like Hallick and Schneider, Ewens also received individual account statements showing that her investment was producing the promised income, but she later learned that the fund had actually dropped 35 percent of

11

its value by the third quarter of 2018. (Tr. 1p (dkt. #376) 141:23-142:8; Pl. Ex. 52, at 36.)

As another example, Kent Loehrke e-mailed Hull and Nohl on September 25, 2017, explaining that he needed $50,000 from his GTIF account to make charitable distributions. (Pl. Ex. 35, at 1-2.) Hull replied that GTIF should be able to send $50,000 by mid-October, but that was dependent, at least in part, on a "new investor family coming into the fund." (*Id.* at 2.)

While running GTIF, managing members Hull and Nohl also engaged in self-dealing. For example, they split an undisclosed $580,000 "finder's fee" in August 2013 in connection with GTIF's purchase of the "Splash Waterfall" painting. (Pl. Ex. 100, at 2; Tr. 5p (dkt. #380) 66:13-67:4; Tr. 2p (dkt. #377) 137:12-18.) In another instance, GTIF took a loan from an investor, owing that investor $25,000 in interest. (Pl. Ex. 85.) Chrysalis later gave that investor's son a diamond, that was purportedly worth about $25,000, without requiring him to pay for it. (Ex. 86; Tr. 5p (dkt. #380) 35:21-24.) Nohl then signed a check from GTIF paying $25,000 to "Chrysalis Lapidary Co." which was controlled by Nohl. (Ex. 87; Tr. 5p (dkt. #380) 35:3-5; 36:24-37:1.) During their management, Nohl and Chrysalis further loaned money to GTIF at exorbitant interest rates without disclosing the loans to investors. (*E.g.,* Pl. Exs. 75, 79, 95; Tr. 3a (dkt. #384) 43:12-17.) For example, Nohl and his wife made a four-day, $100,000 loan to GTIF, charging $7,000 in interest, which amounted to a 684 percent effective annual interest rate. (Pl. Ex. 75; Tr. 3p (dkt. #378) 56:21-57:5).)

### E.  The Jury Charge and Verdict

At the close of evidence, the court charged the jury with the required elements of the SEC's nine, remaining claims.  In relevant part, the court explained that Section 10(b) and Rule 10b-5 required proof that the defendant *knowingly or recklessly* committed fraud and that it was not enough to show that a defendant acted negligently.  (Tr. 6 (dkt. #387) at 245:8-246:4.)  The court likewise instructed that Section 17(a)(1) required proof of *intent* to defraud or reckless disregard for the truth, while violations of Section 17(a)(2) and (3) may be proved by a showing of defendants' negligence.  (*Id.* at 248:10-15.)

After delivering the jury charge, the court provided the jury with a special verdict form that asked for a finding of "yes" or "no" as to whether certain defendants violated the respective securities laws and regulations. (Dkt. #370.)  The jury found defendants liable on all nine counts.  (*Id.*)  In relevant part, the jury found Nohl, Hull, GAM II, Chrysalis, Bluepoint, GTIF, and GP Rare Earth liable under Section 10(b) of the Exchange Act (and Rule 10b-5) and Section 17(a)(1) of the Securities Act, all of which required the jury to find that defendants acted intentionally or recklessly.  (*Id.* at 1-2.)[4]

---

[4] Defendants later asked the court to direct that the SEC did not prove all of its allegations of fraud, having applied a "preponderance of the evidence" standard (as opposed to a "clear and convincing evidence" standard) and used a verdict form that did not identify the particular conduct that violated the securities law.  (Defs. Br. (dkt. #396) 10, 10 n.5.)  The court rejected those arguments at a post-trial hearing (dkt. #427, at 3-4), and defendants offered no legal support for either argument in post-trial briefing.  Moreover, other courts have rejected similar, verdict-related arguments.  *See S.E.C. v. Cap. Sols. Monthly Income Fund, LP*, 818 F.3d 346, 354-55 (8th Cir. 2016) (rejecting argument that district court erred by using "a general verdict form that simply asked whether or not the securities laws were violated" (quotation marks omitted)); *see also S.E.C. v. Tourre*, 4 F. Supp. 3d 579, 593-94, 594 n.16 (S.D.N.Y. 2014) (rejecting argument that general verdict limited the penalties the court could order).  Of course, the court's imposition of remedies turns on the evidence presented at trial, not just on the jury's findings of liability.

**F.  Bankruptcy Proceedings and Later Events**

On October 4, 2019, GTIF and GP Rare Earth each filed for bankruptcy protection. *In re Greenpoint Tactical Income Fund LLC*, Case No. 19-29613-gmh, dkt. #1 (Bankr. E.D. Wis.); *In re GP Rare Earth Trading Account LLC*, Case No. 19-29617-gmh, dkt. #1 (Bankr. E.D. Wis.).  In a joint action, those entities were ultimately discharged from bankruptcy on May 18, 2022, under a Chapter 11 plan of reorganization that would allow them to attempt to operate as a going concern after restructuring their debts and assets without relinquishing the SEC's rights to continue to pursue relief against either entity in this lawsuit.  *In re Greenpoint Tactical Income Fund LLC and GP Rare Earth Trading Account LLC*, Case No. 19-29613-gmh, dkt. #1470 (Bankr. E.D. Wis.).  Among other things, the plan allowed: (1) investors to keep shares (the "stay investors") or be repaid over four years in the amount of their past investments, less certain fees previously paid (the "leave investors"); and (2) the entities to continue under management by GAM II and Chrysalis, subject to an oversight board, a reduced fee structure, and their meeting the proposed installment payments to investors.[5]  (*Id.*)

---

[5] At the post-trial hearing, this court also rejected defendants' argument that these bankruptcy proceedings somehow barred the SEC's enforcement action or precluded the court from imposing appropriate remedies.  (Dkt. #427, at 3-4.)  Managing members Hull and Nohl also argue that they should receive an offset for their payment of legal fees and the management fees, as well as for so-called "earned equity compensation" that they supposedly "gave up" in the restructuring.  (Def. Br. (dkt. #396) 38-43.)  As the court pointed out at the post-trial hearing, however, the managing members received value for anything that they negotiated in bankruptcy.  (Dkt. #427, at 22-23.)  Moreover, there is no evidence that any of these contributions reached GTIF's investors, nor that any contributions represented a return of investor proceeds.  *Cf. S.E.C. v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2017) (declining to reduce disgorgement amount where defendant's contribution "was not a return of investor proceeds," and there was no evidence that defendant's contributions reached investors).

In November 2021, Hull and his management company, GAM II, also filed for bankruptcy protection. *In re Greenpoint Asset Management II*, Case No. 2:2021bk25900 (E.D. Wis. Bankr.); *In re Michael Hull*, Case No. 2:2021bk25901 (E.D. Wis. Bankr.). The bankruptcy court initially ordered their cases jointly administered but dismissed GAM II's case in June 2024. *In re Greenpoint Asset Management II*, Case No. 2:2021bk25900 (dkts. ##29, 630). In August 2024, the bankruptcy court further dismissed Hull's case for failing to file a final, amended chapter 11 plan and a final disclosure statement. *In re Michael Hull*, Case No. 2:2021bk25901 (dkt. #75).

In August 2023, the SEC filed a "notice of subsequent events," explaining that Nohl had notified the designated "leave investors" by letter that GTIF would *not* be making even its first contemplated repayment under its Chapter 11 plan, and as a result, the managing members and their entities were automatically terminated as managers of GTIF. (Nohl Letter (dkt. #433-1).) In his letter, Nohl explained that GTIF owed: (1) $3,209,863.02 in "court ordered payables" to GAM II and Chrysalis; (2) $1,350,871.08 in "unpaid and unresolved" fees due to H Informatics; and (3) $575,000 per manager, per year for the post-confirmation period. (*Id.* at 1-2.)

Later, Hull sent a message to GTIF investors via GAM II, asking them to complete a "proxy voting form" that was "critical" to re-hiring GAM II and Chrysalis as fund managers and ensuring that "the transaction[s] currently in place have the best chance of succeeding." (Dkt. #433-2.) In response to the SEC's notice, Hull further submitted a declaration acknowledging that he had asked GTIF investors to rehire GAM II and Chrysalis. (Hull Decl. (dkt. #437-1) ¶ 3.) However, Hull stated that he had "accepted

the fact that GAM II will be a member and creditor of GTIF entitled to the rights negotiated and incorporated into GTIF's confirmed plan -- not GTIF's managing member." (*Id.* ¶ 15.)[6]

## OPINION

Plaintiff SEC seeks three types of remedies from defendants: (1) disgorgement of ill-gotten gains with prejudgment interest on those gains; (2) civil monetary penalties; and (3) injunctive relief. Plaintiff again bears the burden of establishing its entitlement to these requested remedies by a preponderance of the evidence. *Steadman v. S.E.C.,* 450 U.S. 91, 103 (1981). Because different legal standards apply to each remedy, the court addresses them separately below.

## I. Disgorgement and Pre-Judgment Interest

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits." *S.E.C. v. First Jersey Sec. Inc.,* 101 F.3d 1450, 1474 (2d Cir. 1996). The remedy of disgorgement is "designed both to deprive a wrongdoer of unjust enrichment" and to "deter others from violating the securities laws." *S.E.C. v. Michel*, 521 F. Supp. 2d 795, 830 (N.D. Ill. 2007). Disgorgement should be "fashioned so

---

[6] Later in August, counsel for GTIF filed a letter in this court, asking to, among other things: (1) prohibit "Chrysalis, GAM II, Christopher Nohl, Michael Hull, or any entity which any of them control . . . from serving as a Managing Member of the Fund in the future and from communicating with investors to solicit proxies to elect a Managing Member"; and (2) "[c]ancel all debt or liabilities that the Fund owes to Chrysalis, GAM II, Christopher Nohl, Michael Hull and H Informatics LLC . . . ." (Dkt. #435.) The bankruptcy court found that GTIF's letter violated the stay imposed by section 362(a) of title 11 in Hull's and GAM II's cases but did not award damages. (Dkt. #443.)

as to deprive" the defendant of any "unjust enrichment he derived from his securities violations," *S.E.C. v. Koenig*, 532 F.Supp.2d 987, 994 (N.D. Ill. 2007), but should not be punitive. *See Michel*, 521 F.Supp.2d at 830; *Liu v. S.E.C.*, 591 U.S. 71, 75 (2020) ("a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims [constitutes] *equitable relief*" (emphasis added)). The court may also order a defendant to pay prejudgment interest on the amount to be disgorged in equity. *First Jersey*, 101 F.3d at 1476.

Courts have "broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *Id.* at 1474-75 (citations omitted). Generally, the amount of disgorgement ordered "need only be a reasonable approximation of profits causally connected to the violation." *Id.* at 1475 (quotation marks omitted). Once that showing is made, the burden shifts to the defendant to show that the amount sought is *not* a reasonable approximation. *S.E.C. v. Merchant Capital LLC*, 486 F. App'x 93, 96 (11th Cir. 2012). Finally, a defendant disputing that amount faces a high burden, *S.E.C. v. Fowler*, 440 F. Supp. 3d 284, 296 (S.D.N.Y. 2020), with the risk of any uncertainty in calculating the amount falling on the defendant whose unlawful conduct created it. *Merchant Capital*, 486 F. App'x at 96.

As an initial matter, plaintiff asserts that defendants should be found jointly and severally liable for disgorgement and prejudgment interest, while defendants assert that subjecting GTIF and GP Rare Earth to joint and several liability would harm investors who chose to stay with the fund after the Chapter 11 reorganization in bankruptcy. The "imposition of joint and several liability for a disgorgement award is permissible so long as

17

it is 'consistent with equitable principles.'" *S.E.C. v. Janus Spectrum LLC*, 811 F. App'x 432, 433-34 (9th Cir. 2020) (quoting *Liu*, 591 U.S., at 90). Further, joint and several liability is appropriate "when multiple defendants have collaborated in an illegal scheme." *F.T.C. v. Shkreli*, No. 20-CV-706, 581 F.Supp.3d 579, 642 (S.D.N.Y. Jan. 14, 2022) ("*Liu* did not categorically reject a disgorgement order imposed against multiple parties.").

In this case, joint and several liability is certainly warranted as to defendants Hull and Nohl, as well as their respective, affiliated defendant "management" entities (GAM II and Bluepoint for Hull, and Chrysalis for Nohl), since all were used to collect fraudulently inflated management fees and other, unwarranted charges. However, it is a closer question whether GTIF and GP Rare Earth should be subjected to joint and several liability, especially now that Hull, Nohl, and their affiliated entities no longer manage those funds, which plaintiff acknowledged at a post-trial hearing "lessens" a need for their joint and several liability. (Dkt. #427, at 28-29.) If anything, finding the funds jointly and severally liable could harm (or at the very least, delay payments to the equally-victimized "stay investors," which would be contrary to the purpose of disgorgement. *Liu*, 591 U.S. at 74-75 ("a disgorgement award that does not exceed a wrongdoer's net profits and *is awarded for victims* is equitable relief" (emphasis added)). On the other hand, joint and several liability might help protect "leave investors," especially when GTIF has apparently *not* made a single, promised payment to that class of investors. Nevertheless, given that Hull, Nohl, and their associated entities are no longer managing GTIF and GP Rare Earth, and any claim to further fees should be precluded by the jury's verdict in this case, the court

will decline to hold those funds jointly and severally liable for the acts of Hull, Nohl and their respective, affiliated entities.

Turning to the amounts of disgorgement, the court is first concerned that Hull and Nohl are apparently still seeking to collect more than $5.5 million in fees from GTIF. (Nohl Letter (dkt. #433-1); Hull Decl. (dkt. #437-1) ¶ 15.)  Despite these fees apparently being negotiated in the bankruptcy proceedings, any further payment to Hull and Nohl for what amounted to, at best, gross mismanagement of GTIF would be inconsistent with the jury's finding that they were actually committing securities fraud in substantial part to inflate, prolong, and justify their management fees.  To start, therefore, the court will order any outstanding management fee obligations null and void.   In addition, the parties have conferred and agreed on amounts for five categories of disgorgement: (1) managing member profit draws/redemptions totaling **$4,989,165**; (2) "Splash Waterfall" Commission of **$580,000**; (3) Nohl loan interest payments of **$50,272**; (4) Hull mortgage fee of **$7,424**; and (5) Hull loan interest payments of **$1,500**.  Thus, these amounts are awarded as well. Finally, the parties still dispute disgorgement of management fees based on inflated values of Amiran, the Emperor emerald, and other gems and minerals.  The parties also dispute the appropriate disgorgement of administrative fees charged to the fund by Bluepoint, H Informatics, and H Family Office.  The court takes up each of the SEC's disgorgement requests in turn below.

**A. Amiran**

To begin, the court finds that SEC Staff Accountant Keith Constance's detailed calculations provide a reasonable estimate of defendants' ill-gotten management fees by inflating the value of Amiran.  Specifically, following the court's instruction to use GTIF's December 2015, tanzanite-for-stock swap to determine Amiran's actual base value (dkt. #427, at 8-9), Constance calculated that Amiran's December 2015 share price was $1,395. (Constance Ex. 1 (dkt. #432-2).)  He then multiplied that per share price by 13,486 -- the number of outstanding shares -- determining that Amiran's value on December 31, 2015, was $18,801,275.  (*Id.*)  In turn, since GTIF (via its subsidiary GP Chemical) owned 10.57 percent of Amiran stock at that time, Constance calculated the value of GTIF's ownership of GP Chemical at $1,988,246.  (*Id.*)  Constance next calculated the corrected value of GTIF's total investment by adding its cash purchases of Amiran stock to this initial value. (*Id.*)  Finally, Constance arrived at defendants' fraudulent excess management fees by calculating the difference between the two percent fees paid on the inflated book value of Amiran and on the corrected, actual value of that asset, resulting in wrongly inflated management fees of $779,284.  (*Id.*)

Defendants do *not* challenge Constance's calculations, but instead assert that he improperly omitted from them: (1) earned interest on convertible notes that became GTIF capital contributions to Amiran; (2) the managing members' past payment of Amiran expenses; and (3) GTIF's sale of tax credits it obtained by investing in Amiran.  Tellingly, however, defendants do not specify any actual amounts for the claimed earned interest, expenses, or tax credits omitted, much less provide any supporting evidence.  *Fowler*, 440

20

F. Supp. 3d at 296 (defendants face a high burden disputing agency's reasonable approximation of disgorgement).

To the contrary, there is at least some evidence that it would be improper to increase Amiran's value by including any alleged capital contributions because McMahon testified that she valued GTIF's investment in Amiran at $4 million in March 2018 due to its "liquidity problems" and "deteriorating financial performance," even though GTIF had by then invested more than double that amount -- $10 million. (Tr. 4a (dkt. #385) 101:1-15.) Thus, even if defendants had provided values for these asserted capital contributions, expense payments, and tax credits, it would still be inappropriate to reduce the disgorgement amount for excessive fees when, by 2018, GTIF had already invested *more* in Amiran than its shares in the company were worth. Thus, the court will order defendants Hull, Nohl and their affiliated entities to disgorge an additional **$779,284** in excess fees.

## B. The Emperor Emerald

Constance's declaration also provides a reasonable estimate of excess management fees based on a wrongly inflated valuation for the Emperor emerald by taking two percent of the difference between the total value of the Emperor carried on GTIF's books -- even before the fund had physical, much less could claim legal possession of that emerald outright -- and the fund's cumulative cash payments at that time towards the purchase price of the Emperor -- $205,825. (Constance Ex. 2 (dkt. #432-3).) Nevertheless, defendants assert that only $70,000 in disgorgement is appropriate because Constance improperly used the appraised value of the Emperor to calculate management fees in 2017 and 2018, while the managing members actually calculated fees based on cash payments

21

towards the Emperor in those years. However, Constance's calculation acknowledged GTIF's write down of the book value of the Emperor in 2017 and 2018, resulting in only $2,600 in total, Emperor-related inflated management fees for those two years. (Constance Ex. 2 (dkt. #432-3).)

The real difference between the parties' respective disgorgement calculations for the Emperor emerald appears to be that defendants used lower book values in 2015 and 2016 (specifically, the Emperor's appraised value less the amount due on the gem). (Nohl Ex. 3 (dkt. #399-3).) However, defendants have not met their burden at this stage of the proceedings to show plaintiff's disgorgement calculation is unreasonable. In particular, defendants have not shown that Nohl's figures are consistent with GTIF's accounting records, much less citing to *specific* accounting records showing them to be consistent. (Second Constance Decl. (dkt. #411) ¶ 4 ("Nohl's figures are not consistent with the accounting records.").

Most importantly, arguing there should be *no* Emperor-related disgorgement for 2019, defendants' calculations assume that the Emperor's $5,000,000 appraisal *was* accurate, when there is ample evidence to find that the value assigned, like so many other gem valuations, was significantly inflated from a fair market price and, instead, based on Metropolis's and Zigras's unreliable appraisals. Thus, any remaining uncertainty in calculating the disgorgement amount for Emperor-related fees weighs against defendants, whose own fraud created that uncertainty. *Merchant Capital*, 486 F. App'x at 96. Finally, defendants argue that plaintiff failed to account for "interim fees" that Budil (who sold the Emperor to defendants) owed to GTIF, but that argument is unpersuasive absent evidence

of what fees Budil paid or owed.  Thus, the court will also order plaintiff's requested disgorgement of **$205,825** based on inflated management fees related to the Emperor emerald.

## C. Other Gems and Minerals

Constance also explained that GTIF had two general ledgers to account for its investment in gems and minerals through its subsidiary GP Rare Earth: (1) "Invest in GP Rare Earth-MTM"; and (2) "Invest in GP Rare Earth-PIC."[7]  (Constance Ex. 1 (dkt. #432-2) 2 n.9.)  GTIF then used "Invest in GP Rare Earth-MTM" to record unrealized, estimated gains and losses related to its inflated valuation of gems and minerals.  (*Id.*)  By calculating the inflated management fees as two percent of the "Invest in GP Rare Earth-MTM" account, less the MTM value of the Emperor of $4,512,190, Constance provided a reasonable approximation of the inflated management fees for non-Emperor gems and minerals.  (*Id.* at 1.)

In response, defendants first argue that GTIF gems and fine minerals actually sold at about 92 percent of the so-called "book" value, so the proper amount of disgorgement of fees is only $331,048.  As evidence that the appraisals were generally accurate, defendants point out that Joshua Lents, an independent appraiser, valued GTIF's five tourmalines consistently with the prior appraisals of Metropolis, Sharma, and Zigras.  (Dkt. #430, at 3.)  Defendants add that the confirmation plan ordered by the bankruptcy court was based on more recent appraised values of those gems and minerals.

---

[7] "MTM" means "mark to market," while "PIC" refers to "paid in capital."

The problem with defendants' argument is that these gems never *sold* for any price approaching 92 percent of their pie-in-the-sky book values. To the contrary, plaintiff introduced credible evidence showing that the appraisals were too high because: Nohl cherry picked the highest appraisals; Nohl demanded higher appraisals; and Metropolis and Zigras were not objective appraisers. Although defendants assert that Lents' 2018 appraisals of just *five* gems were "in line with" Metropolis's, Sharma's, and Zigras's appraisals, Lents actually consistently appraised the gems as a whole at substantially *lower* values than Zigras, who had most recently appraised the gems in 2016. (Nohl Ex. 9 (dkt. #399-9).) In particular, Lents appraised the five gems at about $2 million *less* in total value than Zigras did. (*Id.*) Finally, the bankruptcy court's reliance on more recent appraisals of the gems does *not* render them more accurate than the actual purchase prices for those gems, particularly given the jury's findings that earlier appraisals commissioned by defendants were fundamentally suspect.

Without credible evidence, defendants alternatively assert that disgorgement should be $4,282,638, as plaintiff did not account for gem cutting and faceting expenses. Because again defendants cannot meet their own burden of proving plaintiff's calculations were unreasonable without specifically identifying and providing evidence of those expenses, the court will order plaintiff's requested disgorgement of **$4,512,190**.[8]

---

[8] The court even allowed defendants an opportunity to identify potentially deductible expenses incurred in running GTIF, but defendants failed to do so. (Dkt. #427, at 20-22.)

**D. Bluepoint, H Informatics and H Family Office Fees**

Finally, plaintiff asks the court to order that defendants disgorge 69 percent of the fees paid using inflated values of Bluepoint ($831,821), H Informatics ($513,234), and H Family Office ($295,757).   (Dkt. #431, at 5.)   These amounts are supported by Constance's calculation that 69 percent of fees paid to those entities were due to be disgorged because defendants were paid $7,635,063 in total management fees, with $5,291,474 (69 percent) of those fees based on inflated values of gems, minerals, and Amiran. (Third Constance Decl. (dkt. #432) ¶¶ 8-9.) Constance then multiplied the total fees charged by Bluepoint, H Informatics, and H Family Office by 69 percent to determine the disgorgement amounts for each. (*Id.* ¶ 8 n.5.) If anything, these amounts are too low, given that Constance does not appear to have included the inflated Emperor management fees in arriving at a likely, average discount rate on management fees of 69 percent. (Constance Ex. 1 (dkt. #432-2) at 1.)[9]

Nevertheless, defendants argue that plaintiff's calculations are incorrect because Constance used a flat discount rate instead of multiplying the inflated asset value by a *one* percent contract rate on a quarterly basis.  Specifically, defendants appear to assert that Bluepoint only received fees from 2016 through the first quarter of 2018, H Informatics only received fees from 2018 to September 30, 2019, and H Family Office only received fees from 2017 through September 30, 2019.  Tellingly, defendants once again provide *no* evidence in support of their revised fee calculations.  Moreover, Constance's declaration

---

[9] Specifically, Constance appears to have omitted inflated management fees on the Emperor emerald ($205,825) in calculating the total management fees based on inflated values ($5,291,474).  (Constance Ex. 1 (dkt. #432-2) at 1.)

partly contradicts defendants' position, as he demonstrates that GTIF had paid fees to H Family Office as early as October 2016.  (Second Constance Decl. (dkt. #411) ¶ 6.)

Ultimately, since defendants have provided no evidence supporting their alternative disgorgement calculations, the court will award plaintiff's requested disgorgement of fees paid as follows:  to Bluepoint (**$831,821**); H Informatics (**$513,234**); and H Family Office (**$295,757**).  Even crediting defendants' arguments of marginal reductions, the court finds by a preponderance of the evidence that plaintiff's requested disgorgement amount of **$12,560,647** is reasonable, especially since it does not include disgorgement of inflated, Emperor-based management fees to Bluepoint, H Informatics and H Family Office.[10] (Constance Summary (dkt. #432-1); Constance Ex. 1 (dkt. #432-2) 1.)

### E.  Prejudgment Interest

"Prejudgment interest is an element of complete compensation" to account for the time value of money that defendants earned or could have earned on disgorged fees.  *S.E.C. v. Koenig*, 557 F.3d 736, 745 (7th Cir. 2009) (alteration adopted and quotation marks omitted).  Said another way, depriving plaintiff of the principal amount *and* any economic return measured by prejudgment interest would put defendants in the same position as if they had not possessed the ill-gotten gains at all.  *Id.*  In securities enforcement actions, courts in the Seventh Circuit have generally calculated prejudgment interest based on the rate provided for tax underpayments in 26 U.S.C. § 6621.  *Id.*; *see also* S.E.C. *v. Slowinksi*,

---

[10] In its brief, plaintiff mistakenly states that the total disgorgement should be $12,560,6<u>5</u>7.  (Dkt. #431, at 6.)  As explained above, the total disgorgement requested by plaintiff, and ordered by the court, does not account for Emperor-related management fees.

No. 1:19-CV-03552, 2020 WL 7027639, at *5 (N.D. Ill. Nov. 29, 2020) (ordering prejudgment interest based on IRS underpayment rate).  Plaintiff also suggests using the IRS underpayment rate to calculate prejudgment interest, which defendants do not oppose. (*See* Pl. Br. (dkt. #390) 24; Defs. Br. (dkt. #396) 46-47.)

Instead, defendants argue that it is inappropriate to begin calculating prejudgment interest payments beginning in 2013 since the SEC had been examining and investigating GTIF since that time.  However, defendants have cited no authority supporting the assertion that SEC's examinations and investigations somehow limit its ability to recover ill-gotten, prejudgment interest.  Regardless, as plaintiff points out, evidence in the record supports a finding that the managing members had engaged in fraud from GTIF's very inception in 2013, although it moved from misrepresentations as to the actual risks and income expectations at the outset of the investment scheme to essentially a Ponzi scheme by the end, mainly being held up by obtaining new investment in an attempt to cover some of the non-existent income falsely reported to early investors.  If anything, plaintiff's prejudgment interest calculation is once again *understated* because it does not appear to include interest on the disgorged amount for the Emperor.  Thus, the court will award plaintiff prejudgment interest in the amount of **$3,537,378**, which reflects the interest that accrued from incremental overpayments on a yearly basis between June 2013 and June 30, 2022, as calculated by Constance in the chart below:

BLUEPOINT INVESTMENT COUNSEL, LLC (C-08331)
Keith Constance Declaration dated September 21, 2022
*Exhibit 3: Prejudgment Interest Calculation*

| Year | Amount | PJI Start | PJI End | PJI Amt | Total |
|---|---|---|---|---|---|
| 2013 | $ 954,938 | 7/1/2013 | 6/30/2022 | $ 387,680 | $ 1,342,618 |
| 2014 | $ 2,043,689 | 7/1/2014 | 6/30/2022 | $ 745,077 | $ 2,788,766 |
| 2015 | $ 3,036,995 | 7/1/2015 | 6/30/2022 | $ 985,181 | $ 4,022,176 |
| 2016 | $ 2,179,657 | 7/1/2016 | 6/30/2022 | $ 615,052 | $ 2,794,710 |
| 2017 | $ 1,555,166 | 7/1/2017 | 6/30/2022 | $ 361,134 | $ 1,916,299 |
| 2018 | $ 1,795,969 | 7/1/2018 | 6/30/2022 | $ 325,464 | $ 2,121,433 |
| 2019 | $ 994,234 | 7/1/2019 | 6/30/2022 | $ 117,790 | $ 1,112,024 |
| Total | $ 12,560,647 | | | $ 3,537,378 | $ 16,098,026 |

Constance Ex. 3 (dkt. #432-4).)[11]

## II.    Civil Penalties

Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d)(2), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e), also authorize the court to impose civil penalties against any person who has violated those Acts.  Civil penalties punish and deter wrongdoers, because disgorgement alone "does not result in any actual economic penalty or act as financial disincentive to engage in securities fraud." *S.E.C. v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996) (quotation marks omitted).

Civil penalties are set in three tiers, with the third and highest tier applying where the violation both "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly and indirectly resulted in substantial losses or

---

[11] Given the complexity of calculating prejudgment interest using the IRS underpayment rate, the court is not able to calculate prejudgment interest through the judgment date.  However, the court will not preclude plaintiff from seeking additional interest through the judgment date, provided that they submit an updated calculation within **twenty-one days** of this opinion.  If plaintiff submits an updated calculation, defendants will have **fourteen days** to respond.

created a significant risk of substantial losses." 15 U.S.C. §§ 78u(d)(3)(B)(iii); 77t(d)(2)(C); 80b-9(e)(2)(C). For third tier penalties, the maximum penalty per violation is $100,000 for a natural person and $500,000 for "any other person" *or* "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. §§ 78u(d)(3)(B)(iii); 77t(d)(2)(C); 80b-9(e)(2)(C). Moreover, these amounts are periodically adjusted for inflation, *S.E.C. v. Swaffer*, No. 1:22-CV-1554, 2024 WL 4188299, at *4 (N.D. Ohio Sept. 13, 2024), with the current amounts being $236,451 (natural person) and $1,182,251 (any other person). *Inflation Adjustments to the Civil Monetary Penalties Administered by the [SEC] (as of January 15, 2025)*, https://www.sec.gov/files/civil-penalties-inflation-adjustments-011525.pdf (last visited July 11, 2025).

Here, plaintiff asserts that third-tier, civil penalties are appropriate and seeks penalties of: (1) $10 million each for defendants Hull and Nohl; and (2) $1 million each for defendants Chrysalis, GAM II, and Bluepoint. Specifically, plaintiff points out that the jury found defendants liable for multiple counts of securities fraud -- including counts requiring proof of scienter -- and the evidence showed that the victims of defendants' fraud face potential losses of more than $50 million. In contrast, defendants argue for no civil penalties or, at most, 50 percent of the amount of disgorgement, noting that the managing members have contributed millions of dollars to GTIF and GP Rare Earth to help the funds through bankruptcy. Defendants add that a third-tier penalty would be inappropriate because the bankruptcy confirmation plan "contemplates there will be no investor losses." (Dkt. #430, at 6.) Finally, defendants assert that "the amount of disgorgement is likely to constitute a penalty in and of itself." (*Id.* at 5.)

29

The court agrees that third-tier penalties against defendants Hull, Nohl, GAM II, Chrysalis, and Bluepoint are appropriate here.  Taking up defendants' arguments, the jury found that those defendants engaged in "fraud" or "deceit" under Sections 17(a)(1) and (3) of the Securities Act.  (Tr. 6 (dkt. #387) 247:13-248:2; Dkt. #374, at 12-13.) Moreover, investors suffered substantial losses from defendants' fraud, with outside investors paying more than $62 million for shares of GTIF, but receiving only about $9 million to date.  (Tr. 2a (dkt. #383) 64:22-65:8, 68:7-9.)  Indeed, investor Hallick testified that he alone had lost more than $10 million at the time the SEC filed suit.  (Tr. 3a (dkt. #384) 42:21-43:11.)  Finally, even if it were proper to consider the optimistic bankruptcy plan in determining appropriate penalties, defendants missed their very first payment to investors under that plan and prospects of any further recovery through that plan are remote at best.  (Nohl Letter (dkt. #433-1).)

In determining the appropriate *amount* of civil penalties, courts are to consider:  (1) the seriousness of the defendant's conduct; (2) defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; (5) whether defendant has admitted wrongdoing; (6) any cooperation; and (7) ability to pay.  *S.E.C. v. Williky*, 942 F.3d 389, 393 (7th Cir. 2019).  Under these factors, substantial civil penalties are also appropriate.

*First*, as already addressed, Hull's and Nohl's conduct was serious.  They and the entities they controlled engaged in self-dealing, and a risky investment strategy, then fraudulently increased the reported value of GTIF's investments to attract new investors

30

and increase their management fees, ultimately collecting more than $13 million in fees and other payments in the five years before GTIF's investors discovered the substantial losses that were actually occurring and plaintiff filed its complaint. (First Constance Decl. (dkt. #391) 3 n.2.)[12]  In fact, the premise that GTIF would rapidly earn sizable returns by the buying and selling of gems and minerals, and even more dubious investments in small companies with growth potential, all without significant risk of loss of principal, was fraudulent from the start, when testimony showed that it actually had "very little" revenue, falsely reported income in assets, and rapid growth was not coming from reported income. (Tr. 1p (dkt. #376) 35:23-37:19, 39:7-9; 52:7-9.)   Instead, over time, GTIF began to operate like a Ponzi scheme, using new investors' money to pay early complaining investors like Hallick.  (Tr. 3a (dkt. #384) 36:19-25.) *Second*, as also already addressed, the jury found that defendants acted intentionally, or at least with reckless disregard to the many misrepresentations being made.  (Tr. 6 (dkt. #387) 245:8-246:4, 248:10-15; Dkt. #370.) *Third*, Hull and Nohl have still not acknowledged their wrongdoing, as best evidenced by Nohl's letter to GTIF investors after the jury's verdict, stating that he had done his best "to be loyal, protective and just, and always served the interest of the fund and its investors." (Nohl Letter (dkt. #433-1) 5.)  *Fourth*, Hull and Nohl apparently intend to remain involved with securities, suggesting that there is a risk of them causing more investor losses in the future.  Indeed, after Hull and Nohl were removed as managers because the GTIF fund did not make even its first scheduled distribution to the "leave

---

[12] Five years before plaintiff filed its complaint, October 1, 2014, is the earliest date from which civil penalties can be awarded.  *See* 28 U.S.C. § 2462.

investors" post-bankruptcy, Hull solicited GTIF investors to rehire his and Nohl's management companies, GAM II and Chrysalis. (Dkt. #433-2.) Also, defendants represent in their brief that Hull is helping raise capital for "Yodelay," a Madison-based, Swiss yogurt company. (Defs. Br. (dkt. #396) 66-70.)

While these factors support substantial civil penalties, plaintiff's request is too high in light of the more than $16 million in disgorgement and prejudgment interest now ordered. *See S.E.C. v. Cap. Sols. Monthly Income Fund, LP*, 28 F. Supp. 3d 887, 902 (D. Minn. 2014) (reducing SEC's requested civil penalties, in part, because disgorgement was ordered against defendant), *aff'd*, *S.E.C. v. Cap. Sols. Monthly Income Fund, LP*, 818 F.3d 346 (8th Cir. 2016). Defendants have also not made representations about their inability to pay, and court records show that both Hull and GAM II separately sought bankruptcy protection in 2021, which the bankruptcy court ultimately dismissed. *In re Greenpoint Asset Management II*, Case No. 2:2021bk25900 (dkt. #630) (E.D. Wis. Bankr.); *In re Michael Hull*, Case No. 2:2021bk25901 (dkt. #75) (E.D. Wis. Bankr.).

In any event, considering defendants' likely, diminished financial capacities, and the substantial amounts of disgorgement and prejudgment interest ordered, the court will halve plaintiff's requested penalties and order civil penalties of: (1) $5 million each against defendants Hull and Nohl; and (2) $500,000 each against defendants GAM II, Chrysalis, and Bluepoint. These amounts, totaling slightly less than the $13 million disgorgement ordered, principally account for the jury's finding of intentional or reckless fraud, the long-running nature of the fraud, and defendants' lack of acknowledgment of wrongdoing, while also recognizing the substantial disgorgement and prejudgment interest ordered against

defendants.  Finally, to the extent that Hull's and Nohl's ongoing involvement in securities poses a continued risk to investors, the best way to reduce that risk is with a permanent injunction as ordered below.

## III. Injunctive Relief

Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d)(1), and Section 209(d) of the Advisers Act, 15 U.S.C. § 80b-9(e), all authorize the SEC to seek injunctive relief against anyone who "is engaged or is about to engage" in actions or practices violating that Act.  When imposing a permanent injunction for violations of the securities laws, the key question is whether there is a "reasonable likelihood of future violations." *S.E.C. v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982) (internal citations omitted).  To answer that question, courts must consider the totality of the circumstances, again including factors such as:

> (1) the gravity of harm caused by the offense; (2) the extent of defendant's participation; (3) defendant's degree of scienter; (4) the isolated or recurrent nature of the infraction; (5) the likelihood that defendant's customary business activities might again involve him in such transactions; (6) defendant's recognition of his own culpability; and (7) the sincerity of defendant's assurances against future violations.

*S.E.C. v. Kimmes*, 799 F. Supp. 852, 860 (N.D. Ill. 1992).

Plaintiff asks the court to enter a permanent injunction barring defendants from future violations of the antifraud provisions of federal securities laws.  Plaintiff also asks the court to impose a conduct-based injunction that permanently enjoins defendants from:

> directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security and/or managing or liquidating GTIF and its subsidiaries; provided, however, that such injunction shall not prevent Defendants from

purchasing or selling securities listed on a national securities exchange for
their own personal accounts.

(Pl. Br. (dkt. #390) 20.)

For their part, defendants assert that no injunctive relief is warranted because removing the managing members would undermine GTIF's ability to operate. Of course, having already been removed as GTIF's managing members by failing to meet the bankruptcy court's expectations, this concern is already eliminated. Defendants also assert that GTIF did not operate fraudulently from the start, and Hull and Nohl have shown that they understand the gravity of the jury's verdict by: informing investors of the verdict; providing trial transcripts and exhibits to investors; resigning from director positions with other companies; and changing the name of GTIF to "Alluvium" to ensure that investors did not believe the fund would provide income. Finally, defendants add that an injunction would be detrimental to Yodelay, the Swiss yogurt company that is relying on Hull to raise capital.

For many of the same reasons that a substantial civil penalty is appropriate, however, a permanent injunction against managing members Hull and Nohl in particular is warranted. Specifically, the gravity of their harm was substantial; the jury found that they acted recklessly at best and intentionally at worst; their fraud spanned nearly seven years; they have not recognized their culpability; and thus, there is a substantial risk that they will continue to cause investor losses. The court remains particularly concerned that Hull and Nohl will continue their securities-related work, as evidenced by Hull's brazen attempt to persuade GTIF's investors to rehire GAM II and Chrysalis. As for Hull's and Nohl's decision to rename GTIF to Alluvium -- supposedly to help ensure that the fund's

34

name no longer implies it will earn income -- it also suggests that they do *not* understand the gravity of the jury's verdict, which was based not just on their failure to follow through on generating actual income, but on their intentionally inflating the fund's assets to enrich themselves, while misleading investors into believing GTIF was actually earning income, rather than just showing dubious, sudden jumps in asset valuations as actual, realized gains. In fact, defendant Nohl himself confirmed that he did not appreciate the gravity of the jury's verdict when he wrote in his July 2023 letter to GTIF investors that the "theme" of the civil litigation was "material disclosure is a [] continuing requirement of management." (Nohl Letter (dkt. #433-1) 1.) Finally, while Hull presents his raising capital for Yodelay as a reason *not* to impose a permanent injunction, it actually supports imposing one, because his continued involvement with raising capital and finance heightens the risk that he will again commit securities fraud, just as preventing Hull or Nohl from managing GTIF going forward is a *compelling* reason to enter an injunction.

The remaining question is the appropriate scope of that permanent injunction. Plaintiff requests an "obey-the-law" injunction barring the defendants from future violations of the antifraud provisions of federal securities law, which is disfavored by the Seventh Circuit. *See S.E.C. v. Goulding*, 40 F.4th 558, 562-63 (7th Cir. 2022) (a court's injunction should not merely "repeat[] the statutory language," but instead "forbid[] with greater specificity what [defendants] must not do"), *cert. denied*, 143 S. Ct. 2582 (2023). However, plaintiff's second proposal -- that Hull and Nohl be barred from managing or liquidating GTIF and its subsidiaries, as well as be barred from issuing, purchasing, offering, or selling any security -- satisfies the Seventh Circuit's admonition.

Accordingly, Hull and Nohl will be permanently enjoined from participating, either directly or indirectly, including through any entity owned or controlled by them, in the issuance, purchase, offer, or sale of any security and/or managing or liquidating GTIF (now known as "Alluvium") and its subsidiaries. At the same time, Hull and Nohl may manage, buy, and sell investments for their own *personal* accounts, as well as those of any immediate family members (their wives or children). Although Hull, Nohl, GAM II, and Chrysalis are no longer managers of GTIF, the court will also enjoin them from seeking to collect any further fees from GTIF, including those listed in Nohl's 2023 letter: (1) $3,209,863.02 in "court ordered payables" to GAM II and Chrysalis; (2) $1,350,871.08 in "unpaid and unresolved" fees due to H Informatics; and (3) $575,000 per manager, per year for the post-confirmation period. *See S.E.C. v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984) ("once the equity jurisdiction of the district court properly has been invoked, the court has power to order all equitable relief necessary under the circumstances"); *see also S.E.C. v. Hickey*, 322 F.3d 1123, 1131 (9th Cir.), *opinion amended on denial of reh'g sub nom. S.E.C. v. Hickey*, 335 F.3d 834 (9th Cir. 2003) ("federal courts have inherent equitable authority to issue a variety of 'ancillary relief' measures in actions brought by the SEC to enforce the federal securities laws") (quotation marks omitted). A bar on Hull, Nohl, and their associated entities from receiving further payment from GTIF investors is appropriate because, as discussed above, the jury found that Hull and Nohl acted recklessly at best and intentionally at worst in defrauding GTIF's investors. Thus, *any* further payment to Hull, Nohl, and their associated entities for supposed services to GTIF before, during, or after

36

the GTIF bankruptcy proceedings is inappropriate, since their fraud is what necessitated the bankruptcy proceedings in the first place.[13]

Finally, the court will *not* enjoin Bluepoint, GAM II, or Chrysalis from securities-related activities -- provided that those entities are not owned or controlled, either directly or indirectly, by defendants Hull or Nohl.


ORDER

IT IS ORDERED that Plaintiff's motion for remedies (dkts. ##390, 431) is GRANTED IN PART and DENIED IN PART as follows:

1) Defendants Michael Hull, Christopher Nohl, Greenpoint Asset Management II LLC, Chrysalis Financial LLC, and Bluepoint Investment Counsel LLC ARE JOINTLY AND SEVERALLY LIABLE to the U.S. Securities and Exchange Commission, for **$12,560,647** in disgorgement and **$3,537,378** in prejudgment interest.

2) Defendants Hull and Nohl are also ORDERED TO PAY **$5,000,000** each in civil penalties, while defendants GAM II, Chrysalis, and Bluepoint are ORDERED TO PAY **$500,000** each in civil penalties.

3) Defendants Hull and Nohl are PERMANENTLY ENJOINED FROM participating, either directly or indirectly, in managing or liquidating GTIF (now known as "Alluvium") and its subsidiaries in particular, as well as in the issuance, purchase, offer, or sale of any other security more generally, including through any entity owned or controlled by them. Hull and Nohl may manage, buy, and sell investments for their own personal accounts, as well as on the behalf of any immediate family members.

---

[13] The bankruptcy court ordered that GAM II and Chrysalis receive $575,000 in annual fees *In re Greenpoint Tactical Income Fund LLC*, Case No. 19-29613-gmh, dkt. #1470, at 20 (Bankr. E.D. Wis.), but the bankruptcy court entered that order before the jury's fraud verdict or Nohl's letter notifying GTIF investors that defendants would not even be making its first repayment. In short, it would be unfair to revictimize GTIF investors who were defrauded by Hull and Nohl by allowing further payments from GTIF investors to them or their related entities.

4) Hull, Nohl, GAM II, and Chrysalis are PERMANENTLY ENJOINED FROM seeking to collect any fees, including via any organization controlled by them (e.g., H Informatics), from GTIF and its subsidiaries.

5) Should plaintiff wish, it may seek an updated prejudgment interest award as set forth above no later than September 26, 2025, with defendants responding no later than October 10, 2025. Otherwise, the clerk of court is directed to enter final judgment and close this case.

Entered this 5th day of September, 2025.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge